# 25-2381-cv

## United States Court of Appeals
### *for the*
## Second Circuit

SELENA STALEY, VIVIAN HOLMES, OLIVE IVEY,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

FOUR SEASONS HOTELS AND RESORTS, HOTEL 57, LLC, TY WARNER
HOTELS AND RESORTS LLC, H. TY WARNER, FSR INTERNATIONAL
HOTEL INC., d/b/a Four Seasons Hotels and Resorts, HOTEL 57
SERVICES, LLC,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
### Volume 1 of 2 (Pages SA-1 to SA-247)

JAMES J. BOLAND
SMITH, GAMBRELL & RUSSELL, LLP
155 North Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000

KATHRYN T. LUNDY
MARC B. ZIMMERMAN
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas,
 15th Floor
New York, New York 10019
(212) 907-9700

*Attorneys for Defendants-Appellees Hotel 57, LLC, Ty Warner Hotels
and Resorts LLC, H. Ty Warner and Hotel 57 Services, LLC*

CP COUNSEL PRESS   (800) 4-APPEAL • (389758)

i

# TABLE OF CONTENTS

**Page**

Answer and Defenses to First Amended Complaint, by Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts LLC and H. Ty Warner (the "Warner Defendants"), dated May 3, 2024 ........................................................... SA-1

Declaration of Marc B. Zimmerman, for Warner Defendants, in Support of Motion for an Order to Take Judicial Notice of Certain Facts, dated May 31, 2024 ........................................................ SA-54

Exhibit A to Zimmerman Declaration - Cover Page of *The New York Times*, dated December 19, 2020 ................................................ SA-57

Exhibit B to Zimmerman Declaration - Cover Page of *The New York Times*, dated January 19, 2020 ..................................................... SA-59

Exhibit C to Zimmerman Declaration - NPR.com Article titled, "Worried About Catching The New Coronavirus? In the U.S., Flu Is Bigger Threat," dated January 29, 2020 ............................ SA-61

Exhibit D to Zimmerman Declaration - *Los Angeles Times* Article titled, "Should you panic about the coronavirus from China? Here's what the experts say," dated January 24, 2020 ...... SA-67

Exhibit E to Zimmerman Declaration - World Health Organization Director-General's Opening Remarks at the Media Briefing on COVID-19, dated March 11, 2020 ........................ SA-79

**ii**

Page

Exhibit F to Zimmerman Declaration - Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, dated February 10, 2023 ................................................... SA-84

Exhibit G to Zimmerman Declaration - Various New York State Executive Orders Concerning COVID-19 .......................................... SA-86

Exhibit H to Zimmerman Declaration - Four Seasons Hotel Press Release, dated August 3, 2023 ....................................................... SA-135

Local Rule 56.1 Statement of Undisputed Facts, by Warner Defendants, dated May 31, 2024 .......... SA-137

Memorandum of Law, by Warner Defendants, in Support of Motion for Summary Judgment, dated May 31, 2024 ................................................ SA-159

Joint Opposition, by Defendants, to Plaintiffs' Motion to Certify Class, dated May 31, 2024 ....... SA-191

Declaration of Elizabeth Ortiz, for Warner Defendants, in Opposition to Plaintiffs' Motion to Certify Class, dated May 30, 2024 ......................... SA-237

Declaration of Cathy Hwang, for Warner Defendants, in Opposition to Plaintiffs' Motion to Certify Class, dated May 30, 2024 ......................... SA-245

Memorandum of Law, by Plaintiffs, in Opposition to Warner Defendants' Motion for Summary Judgment, dated August 8, 2024 ............................ SA-248

Declaration of Elizabeth Ortiz, for Warner Defendants, in Opposition to Plaintiffs' Motion to Approve Class Notice, dated August 12, 2024 ...... SA-279

iii

**Page**

Exhibit A to Ortiz Declaration -
Letter from Elizabeth Ortiz, dated
July 19, 2024.......................................................... SA-282

Supplemental Memorandum of Law, by Plaintiffs,
in Opposition to Warner Defendants' Motions for
Summary Judgment, dated September 16, 2024 ... SA-284

Exhibit A to Supplemental Memorandum -
Transcript of Oral Argument before the
Honorable Jed S. Rakoff, dated
September 6, 2024 ................................................. SA-300

Exhibit B to Supplemental Memorandum -
12 NYCRR 921 — New York State Worker
Adjustment and Retraining Notification (WARN)
Requirements ......................................................... SA-360

Joint Supplemental Memorandum of Law, by
Defendants, in Further Support of Motions for
Summary Judgment, dated September 16, 2024 ... SA-405

Declaration of Kathryn T. Lundy, for Warner
Defendants, in Support of Motions for Summary
Judgment, dated September 16, 2024 .................... SA-418

Exhibit A to Lundy Declaration -
Transcript of Oral Argument before the
Honorable Jed S. Rakoff, dated
September 6, 2024
(Reproduced herein at pp. SA-300-SA-359)

Exhibit B to Lundy Declaration -
Complaint, dated August 9, 2022 .......................... SA-420

**iv**

**Page**

Joint Memorandum of Law, by Defendants,
in Response to Plaintiffs' Supplemental
Memorandum of Law, dated
September 18, 2024 ............................................... SA-457

Response, by Plaintiffs, to Defendants' Joint
Memorandum of Law Concerning Their
Obligation to Provide Multiple WARN Notices,
dated September 16, 2024...................................... SA-465

Proposed Joint Pretrial Consent Order, dated
August 4, 2025....................................................... SA-482

Exhibit 1 to Proposed Pretrial Order -
Plaintiffs' Trial Exhibit List .................................. SA-490

Exhibit 2 to Proposed Pretrial Order -
Hotel 57 Services, LLC's Trial Exhibit List ......... SA-499

SA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

SELENA STALEY, VIVIAN HOLMES, and
OLIVE IVEY, on behalf of themselves and
all others similarly situated,

                      Plaintiffs,

            V.

FSR INTERNATIONAL HOTEL INC. d/b/a FOUR
SEASONS HOTELS AND RESORTS, HOTEL 57
SERVICES, LLC, HOTEL 57, LLC, TY WARNER
HOTELS & RESORTS LLC, and H. TY WARNER,

                    Defendants.

------------------------------------------------------------------X

Case No. 22-cv-6781 (JSR)

**ANSWER AND DEFENSES TO
FIRST AMENDED COMPLAINT**

Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts LLC and

H. Ty Warner[1] (the "Warner Defendants"), for their Answer and Defenses to Plaintiffs' First

Amended Complaint (the "Amended Complaint") state as follows:

### NATURE OF THE ACTION

1.     Admit that Plaintiffs' Amended Complaint, which contains 109 allegations made

"upon information and belief" and does not allege a single fact upon which any alleged "belief"

(many contradictory) is supposedly based, purports to assert six causes of action against the

Warner Defendants and/or others.  Deny that any of Plaintiffs' allegations and claims in the

Amended Complaint – all but three of which have been dismissed pursuant to the Court's April

19, 2024 Order and Decision – have any merit and deny the remaining allegations in Paragraph 1

of the Amended Complaint.

---

[1] All claims in the Amended Complaint against H. Ty Warner have been dismissed pursuant to the Court's April 19, 2024 Order and Decision.  Accordingly, no Answer to the Amended Complaint by Mr. Warner is required.  However, to avoid any confusion and to the extent an Answer is required, the Warner Defendants' Answer and Defenses include answers and defenses to Plaintiffs' claims on behalf of Mr. Warner.

SGR/70773940.2

SA-2

2.      Admit that Plaintiffs' Sixth Cause of Action in the Amended Complaint purports to assert a claim for promissory estoppel, which was dismissed pursuant to the Court's April 19, 2024 Order and Decision.  Deny that Plaintiffs' Sixth Cause of Action in the Amended Complaint stated a valid claim for promissory estoppel and deny the remaining allegations in Paragraph 2 of the Amended Complaint.

3.      Admit that the Four Seasons Hotel New York is located at 57 East 57th Street, New York, New York and that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration.  Deny the remaining allegations in Paragraph 3 of the Amended Complaint.

4.      Deny the allegations in Paragraph 4 of the Amended Complaint.

5.      Deny the allegations in Paragraph 5 of the Amended Complaint.

6.      Deny the allegations in Paragraph 6 of the Amended Complaint.

7.      Deny the allegations in Paragraph 7 of the Amended Complaint.

8.      Admit that Plaintiffs and Hotel 57 Services, LLC are parties to a contract known as the EmPact Agreement.  Deny the remaining allegations in Paragraph 8 of the Amended Complaint.

9.      Deny the allegations in Paragraph 9 of the Amended Complaint.

10.     Admit that on June 25, 2021, Elizabeth Ortiz sent correspondence to Hotel 57 Services, LLC employees.  Deny that the Hotel sent any correspondence because the Hotel, as defined by Plaintiffs in the Amended Complaint, is a building.  Deny the remaining allegations in Paragraph 10 of the Amended Complaint.

11.     Deny the allegations in Paragraph 11 of the Amended Complaint.

2

SGR/70773940.2

SA-3

12.    Deny the allegations in Paragraph 12 of the Amended Complaint.

13.    Deny the allegations in Paragraph 13 of the Amended Complaint.

14.    Deny the allegations in Paragraph 14 of the Amended Complaint.

15.    Deny the allegations in Paragraph 15 of the Amended Complaint.

16.    Deny the allegations in Paragraph 16 of the Amended Complaint.

17.    Deny the allegations in Paragraph 17 of the Amended Complaint.

18.    Deny the allegations in Paragraph 18 of the Amended Complaint.

19.    Deny the allegations in Paragraph 19 of the Amended Complaint.

20.    Deny the allegations in Paragraph 20 of the Amended Complaint.

21.    Deny the allegations in Paragraph 21 of the Amended Complaint.

22.    Deny the allegations in Paragraph 22 of the Amended Complaint.

23.    Deny the allegations in Paragraph 23 of the Amended Complaint.

24.    Admit that Plaintiffs have not been paid No-Fault Separation Pay.  Deny the remaining allegations in Paragraph 24 of the Amended Complaint.

25.    Deny the allegations in Paragraph 25 of the Amended Complaint.

26.    Admit that on November 1, 2021, Alexandra Erbiti sent an email to Hotel 57 Services, LLC employees, including Plaintiffs, attaching a November Monthly Communication to Hotel 57 Services, LLC employees.  Deny the allegations in Paragraph 26 in the Amended Complaint to the extent inconsistent with the November 1, 2021 email and attachments.  Deny the remaining allegations in Paragraph 26 of the Amended Complaint.

27.    Deny the allegations in Paragraph 27 of the Amended Complaint.

28.    Deny the allegations in Paragraph 28 of the Amended Complaint.

29.    Deny the allegations in Paragraph 29 of the Amended Complaint.

3

## JURISDICTION AND VENUE

30.    The Warner Defendants do not contest this Court's jurisdiction over Plaintiffs' claims in this lawsuit.  Deny the remaining allegations in Paragraph 30 of the Amended Complaint.

31.    The Warner Defendants do not contest this Court's jurisdiction over Plaintiffs' claims in this lawsuit.  Deny the remaining allegations in Paragraph 31 of the Amended Complaint.

32.    The Warner Defendants do not contest this Court's jurisdiction over Plaintiffs' claims in this lawsuit.  Deny the remaining allegations in Paragraph 32 of the Amended Complaint.

33.    The Warner Defendants do not contest venue in this district.  Deny the remaining allegations in Paragraph 33 of the Amended Complaint.

34.    The Warner Defendants do not contest venue in this district.  Deny the remaining allegations in Paragraph 34 of the Amended Complaint.

## JURY TRIAL DEMAND

35.    The Warner Defendants state that a jury trial demand is not an allegation of fact, and deny the allegations in Paragraph 35 of the Amended Complaint.

## PARTIES

36.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 36 of the Amended Complaint.  Admit that Selena Staley is a Hotel 57 Services, LLC employee and Reservation Agent.  Deny the remaining allegations in Paragraph 36 of the Amended Complaint.

37.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 37 of the Amended Complaint.  Admit that Vivian Holmes is a Hotel 57 Services, LLC employee and Rooms Division Administrative Assistant. Deny the remaining allegations in Paragraph 37 of the Amended Complaint.

SGR/70773940.2

SA-5

38.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 38 of the Amended Complaint. Admit that Olive Ivey is a Hotel 57 Services, LLC employee and Senior Housekeeping Manager. Deny the remaining allegations in Paragraph 38 of the Amended Complaint.

39.    Deny the allegations in Paragraph 39 of the Amended Complaint.

40.    Admit that Plaintiffs are employed by Hotel 57 Services, LLC and that Hotel 57 Services, LLC pays Plaintiffs' salaries. Deny the remaining allegations in Paragraph 40 of the Amended Complaint.

41.    Deny the allegations in Paragraph 41 of the Amended Complaint.

42.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Amended Complaint.

43.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the Amended Complaint.

44.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 of the Amended Complaint.

45.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 of the Amended Complaint.

46.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Amended Complaint.

47.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Amended Complaint.

48.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 of the Amended Complaint.

SGR/70773940.2

SA-6

49. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Amended Complaint.

50. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the Amended Complaint.

51. Deny the allegations in Paragraph 51 of the Amended Complaint.

52. Deny the allegations in Paragraph 52 of the Amended Complaint.

53. Admit that FSR International Hotels, Inc. manages the Four Seasons Hotel New York. Deny the remaining allegations in Paragraph 53 of the Amended Complaint.

54. Admit that FSR International Hotels, Inc. operates the Four Seasons Hotel New York. Deny the remaining allegations in Paragraph 54 of the Amended Complaint.

55. Admit that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration. Deny the remaining allegations in Paragraph 55 of the Amended Complaint.

56. Admit that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration. Deny the remaining allegations in Paragraph 56 of the Amended Complaint.

57. Deny the allegations in Paragraph 57 of the Amended Complaint.

58. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 of the Amended Complaint.

59. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 of the Amended Complaint.

6

SA-7

60.    Admit that Hotel 57, LLC and Hotel 57 Services, LLC are parties to a contract with FSR International Hotels, Inc.  Deny the remaining allegations in Paragraph 60 of the Amended Complaint.

61.    Admit that Hotel 57, LLC and Hotel 57 Services, LLC are parties to a contract with FSR International Hotels, Inc.  Deny the remaining allegations in Paragraph 61 of the Amended Complaint.

62.    Deny the allegations in Paragraph 62 of the Amended Complaint.

63.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 of the Amended Complaint.

64.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 of the Amended Complaint.

65.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 of the Amended Complaint.

66.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 of the Amended Complaint.

67.    Deny the allegations in Paragraph 67 of the Amended Complaint.

68.    Deny the allegations in Paragraph 68 of the Amended Complaint.

69.    Deny the allegations in Paragraph 69 of the Amended Complaint.

70.    Deny the allegations in Paragraph 70 of the Amended Complaint.

71.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 71 of the Amended Complaint.

72.    Deny the allegations in Paragraph 72 of the Amended Complaint.

7

SA-8

73.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 73 of the Amended Complaint.

74.    Admit the allegations in Paragraph 74 of the Amended Complaint.

75.    Admit that Hotel 57 Services, LLC is authorized to conduct business in New York and employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 75 of the Amended Complaint.

76.    Admit that Hotel 57 Services, LLC is authorized to conduct business in New York and employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 76 of the Amended Complaint.

77.    Admit that Hotel 57 Services, LLC is authorized to conduct business in New York and employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 77 of the Amended Complaint.

78.    Admit that Hotel 57 Services, LLC is authorized to conduct business in New York and employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 78 of the Amended Complaint.

79.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 79 of the Amended Complaint.

80.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 80 of the Amended Complaint.

8

81.    Admit that Hotel 57 Services, LLC is a party to a contract with FSR International Hotels, Inc.  Deny the remaining allegations in Paragraph 81 of the Amended Complaint.

82.    Admit that Hotel 57 Services, LLC is a party to a contract with FSR International Hotels, Inc.  Deny the remaining allegations in Paragraph 82 of the Amended Complaint.

83.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at that Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 83 of the Amended Complaint.

84.    Admit the allegations in Paragraph 84 of the Amended Complaint.

85.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at that Four Seasons Hotel New York.  Deny the remaining allegations in Paragraph 85 of the Amended Complaint.

86.    Deny the allegations in Paragraph 86 of the Amended Complaint.

87.    Deny the allegations in Paragraph 87 of the Amended Complaint.

88.    Admit that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration.  Deny the remaining allegations in Paragraph 88 of the Amended Complaint.

89.    Admit that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration.  Deny the remaining allegations in Paragraph 89 of the Amended Complaint.

90.    Deny the allegations in Paragraph 90 of the Amended Complaint.

91.    Deny the allegations in Paragraph 91 of the Amended Complaint.

9

SGR/70773940.2

92.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 of the Amended Complaint.

93.    Deny the allegations in Paragraph 93 of the Amended Complaint.

94.    Deny the allegations in Paragraph 94 of the Amended Complaint.

95.    Deny the allegations in Paragraph 95 of the Amended Complaint.

96.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 96 of the Amended Complaint.

97.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 97 of the Amended Complaint.

98.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 98 of the Amended Complaint.

99.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 99 of the Amended Complaint.

100.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 100 of the Amended Complaint.

101.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 101 of the Amended Complaint.

102.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 102 of the Amended Complaint.

103.    Admit that Hotel 57, LLC is authorized to conduct business in New York.  Deny the remaining allegations in Paragraph 103 of the Amended Complaint.

104.    Deny the allegations in Paragraph 104 of the Amended Complaint.

105.    Deny the allegations in Paragraph 105 of the Amended Complaint.

SGR/70773940.2

SA-11

106.    Deny the allegations in Paragraph 106 of the Amended Complaint.

107.    Deny the allegations in Paragraph 107 of the Amended Complaint.

108.    Admit that Ty Warner Hotels & Resorts, LLC's principal place of business is 280 Chestnut Avenue, Westmont, IL 60559.  Deny the remaining allegations in Paragraph 108 of the Amended Complaint.

109.    Admit that Ty Warner Hotels & Resorts, LLC's principal place of business is 280 Chestnut Avenue, Westmont, IL 60559.  Deny the remaining allegations in Paragraph 109 of the Amended Complaint.

110.    Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York.  Deny the remaining allegations in Paragraph 110 of the Amended Complaint.

111.    Deny the allegations in Paragraph 111 of the Amended Complaint.

112.    Deny the allegations in Paragraph 112 of the Amended Complaint.

113.    Deny the allegations in Paragraph 113 of the Amended Complaint.

114.    Deny the allegations in Paragraph 114 of the Amended Complaint.

115.    Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York.  Deny the remaining allegations in Paragraph 115 of the Amended Complaint.

116.    Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York.  Deny the remaining allegations in Paragraph 116 of the Amended Complaint.

SGR/70773940.2

SA-12

117. Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York. Deny the remaining allegations in Paragraph 117 of the Amended Complaint.

118. Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York. Deny the remaining allegations in Paragraph 118 of the Amended Complaint.

119. Admit that Ty Warner Hotels & Resorts, LLC is authorized to conduct business in the State of New York. Deny the remaining allegations in Paragraph 119 of the Amended Complaint.

120. Admit the allegations in Paragraph 120 of the Amended Complaint.

121. Deny the allegations in Paragraph 121 of the Amended Complaint.

122. Deny the allegations in Paragraph 122 of the Amended Complaint.

123. Deny the allegations in Paragraph 123 of the Amended Complaint.

124. Deny the allegations in Paragraph 124 of the Amended Complaint.

125. Deny the allegations in Paragraph 125 of the Amended Complaint.

126. Deny the allegations in Paragraph 126 of the Amended Complaint.

127. Deny the allegations in Paragraph 127 of the Amended Complaint.

128. Deny the allegations in Paragraph 128 of the Amended Complaint.

129. Deny the allegations in Paragraph 129 of the Amended Complaint.

130. Deny the allegations in Paragraph 130 of the Amended Complaint.

131. Deny the allegations in Paragraph 131 of the Amended Complaint.

132. Deny the allegations in Paragraph 132 of the Amended Complaint.

133. Deny the allegations in Paragraph 133 of the Amended Complaint.

SGR/70773940.2

134.    Deny the allegations in Paragraph 134 of the Amended Complaint.

135.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York. Deny the remaining allegations in Paragraph 135 of the Amended Complaint.

136.    Deny the allegations in Paragraph 136 of the Amended Complaint.

137.    Deny the allegations in Paragraph 137 of the Amended Complaint.

138.    Deny the allegations in Paragraph 138 of the Amended Complaint.

139.    Deny the allegations in Paragraph 139 of the Amended Complaint.

140.    Deny the allegations in Paragraph 140 of the Amended Complaint.

141.    Deny the allegations in Paragraph 141 of the Amended Complaint.

142.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 of the Amended Complaint.

143.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York. Deny the remaining allegations in Paragraph 143 of the Amended Complaint.

144.    Deny the allegations in Paragraph 144 of the Amended Complaint.

145.    Deny the allegations in Paragraph 145 of the Amended Complaint.

146.    Deny the allegations in Paragraph 146 of the Amended Complaint.

147.    Deny the allegations in Paragraph 147 of the Amended Complaint.

148.    Admit that Hotel 57 Services, LLC employs Plaintiffs and others who work at the Four Seasons Hotel New York. Deny the remaining allegations in Paragraph 148 of the Amended Complaint.

149.    Deny the allegations in Paragraph 149 of the Amended Complaint.

150.     Deny the allegations in Paragraph 150 of the Amended Complaint.

151.     Deny the allegations in Paragraph 151 of the Amended Complaint.

152.     Admit that the Four Seasons Hotel New York has a Ty Warner Penthouse and Ty Bar.  Deny the remaining allegations in Paragraph 152 of the Amended Complaint.

153.     Admit the allegations in Paragraph 153 of the Amended Complaint.

154.     Deny the allegations in Paragraph 154 of the Amended Complaint.

155.     Deny the allegations in Paragraph 155 of the Amended Complaint.

156.     Deny the allegations in Paragraph 156 of the Amended Complaint.

157.     Deny the allegations in Paragraph 157 of the Amended Complaint.

158.     Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 158 of the Amended Complaint.

159.     Deny the allegations in Paragraph 159 of the Amended Complaint.

160.     Deny that Plaintiffs or any other Hotel 57 Services, LLC employee was told that they would forfeit No-Fault Separation Pay if they worked elsewhere during their furlough, as other employment is, and always was, expressly permitted under the terms of the EmPact Agreement, which Plaintiffs and other Hotel 57 Services, LLC employees were parties to, and provided a copy of.  Deny the remaining allegations in Paragraph 160 of the Amended Complaint.

161.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161 of the Amended Complaint to the extent they relate to Four Seasons Hotels.  Deny the remaining allegations in Paragraph 161.

162.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162 of the Amended Complaint.

14

SGR/70773940.2

163.     Admit that Plaintiffs and other Hotel 57 Services, LLC employees signed versions of the EmPact Agreement covering the terms of their employment by Hotel 57 Services, LLC. Plaintiffs have not attached a copy of any EmPact Agreement to the Amended Complaint and Paragraph 163 of the Amended Complaint does not identify which EmPact Agreement is being quoted from. The Warner Defendants therefore deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 163 of the Amended Complaint.

164.     Admit that Plaintiffs and other Hotel 57 Services, LLC employees signed versions of the EmPact Agreement covering the terms of their employment by Hotel 57 Services, LLC. Plaintiffs have not attached a copy of any EmPact Agreement to the Amended Complaint and Paragraph 164 of the Amended Complaint does not identify which EmPact Agreement is being quoted from. The Warner Defendants therefore deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164 of the Amended Complaint.

165.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165 of the Amended Complaint.

166.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166 of the Amended Complaint.

### STATEMENT OF FACTS

167.     Admit that some Hotel 57 Services, LLC employees were placed on temporary furlough beginning on March 20, 2020 as a result of the Disaster Emergency declared in the State of New York relating to the COVID-19 pandemic and series of executive orders following that declaration. Deny the remaining allegations in Paragraph 167 of the Amended Complaint.

168.     Admit the allegations in Paragraph 168 of the Amended Complaint.

169.     Deny the allegations in Paragraph 169 of the Amended Complaint.

15

SGR/70773940.2

SA-16

170.    Deny the allegations in Paragraph 170 of the Amended Complaint.

171.    Deny the allegations in Paragraph 171of the Amended Complaint.

172.    Deny the allegations in Paragraph 172 of the Amended Complaint.

173.    Deny the allegations in Paragraph 173 of the Amended Complaint.

174.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 174 of the Amended Complaint.

175.    Deny the allegations in Paragraph 175 of the Amended Complaint.

176.    Deny the allegations in Paragraph 176 of the Amended Complaint.

177.    Deny the allegations in Paragraph 177 of the Amended Complaint.

178.    Deny the allegations in Paragraph 178 of the Amended Complaint.

179.    Deny the allegations in Paragraph 179 of the Amended Complaint.

180.    Admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be recalled when the Hotel reopens. Deny the remaining allegations in Paragraph 180 of the Amended Complaint.

181.    Admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be recalled when the Hotel reopens. Deny the remaining allegations in Paragraph 181 of the Amended Complaint.

182.    The Warner Defendants admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be

16

recalled when the Hotel reopens.  Deny the remaining allegations in Paragraph 182 of the Amended Complaint.

183.    Deny the allegations in Paragraph 183 of the Amended Complaint.

184.    Admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be recalled when the Hotel reopens. Deny the remaining allegations in Paragraph 184 of the Amended Complaint.

185.    Deny the allegations in Paragraph 185 of the Amended Complaint.

186.    Deny the allegations in Paragraph 186 of the Amended Complaint.

187.    Deny the allegations in Paragraph 187 of the Amended Complaint.

188.    Deny the allegations in Paragraph 188 of the Amended Complaint.

189.    Deny the allegations in Paragraph 189 of the Amended Complaint.

190.    Deny the allegations in Paragraph 190 of the Amended Complaint.

191.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 191 of the Amended Complaint.

192.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 192 of the Amended Complaint.

193.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 193 of the Amended Complaint.

SGR/70773940.2

194.   Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 194 of the Amended Complaint.

195.   Admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be recalled when the Hotel reopens. Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 195 of the Amended Complaint.

196.   Deny that Plaintiffs or any other Hotel 57 Services, LLC employees were terminated and deny Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 196 of the Amended Complaint.

197.   Deny the allegations in Paragraph 197 of the Amended Complaint.

198.   Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on May 22, 2020, which is partially quoted in Paragraph 198 of the Amended Complaint.  Deny the allegations in Paragraph 198 of the Amended Complaint to the extent inconsistent with the May 22, 2020 correspondence.  Deny the remaining allegations in Paragraph 198 of the Amended Complaint.

199.   Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on June 22, 2020, which is partially quoted in Paragraph 199 of the Amended Complaint.  Deny the allegations in Paragraph 199 of the Amended Complaint to the extent

18

SGR/70773940.2

inconsistent with the June 22, 2020 correspondence. Deny the remaining allegations in Paragraph 199 of the Amended Complaint.

200. Admit that Elizabeth Ortiz sent an email to Hotel 57 Services, LLC employees on July 29, 2020, which is partially quoted in Paragraph 200 of the Amended Complaint. Deny the allegations in Paragraph 200 of the Amended Complaint to the extent inconsistent with the July 29, 2020 correspondence. Deny the remaining allegations in Paragraph 200 of the Amended Complaint.

201. Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on September 17, 2020, which is partially quoted in Paragraph 201 of the Amended Complaint. Deny the allegations in Paragraph 201 of the Amended Complaint to the extent inconsistent with the September 17, 2020 correspondence. Deny the remaining allegations in Paragraph 201 of the Amended Complaint.

202. Admit that Antoine Chahwan sent correspondence to Hotel 57 Services, LLC employees on December 24, 2020. Deny the allegations in Paragraph 202 of the Amended Complaint to the extent inconsistent with the December 24, 2020 correspondence. Deny the remaining allegations in Paragraph 202 of the Amended Complaint.

203. Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on December 24, 2020, which is partially quoted in Paragraph 203 of the Amended Complaint. Deny the allegations in Paragraph 203 of the Amended Complaint to the extent inconsistent with the December 24, 2020 correspondence. Deny the remaining allegations in Paragraph 203 of the Amended Complaint.

204. Deny the allegations in Paragraph 204 of the Amended Complaint.

19

205.    Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on December 24, 2020, which is partially quoted in Paragraph 205 of the Amended Complaint.  Deny the allegations in Paragraph 205 of the Amended Complaint to the extent inconsistent with the December 24, 2020 correspondence.  Deny the remaining allegations in Paragraph 205 of the Amended Complaint.

206.    Admit that Rudy Tauscher sent correspondence to Hotel 57 Services, LLC employees on December 24, 2020, which is partially quoted in Paragraph 206 of the Amended Complaint.  Deny the allegations in Paragraph 206 of the Amended Complaint to the extent inconsistent with the December 24, 2020 correspondence.  Deny the remaining allegations in Paragraph 206 of the Amended Complaint.

207.    Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team".  Deny the allegations in Paragraph 207 of the Amended Complaint to the extent inconsistent with the February 8, 2021 correspondence.  Deny the remaining allegations in Paragraph 207 of the Amended Complaint.

208.    Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team," which is partially quoted in Paragraph 208 of the Amended Complaint.  Deny the allegations in Paragraph 208 of the Amended Complaint to the extent inconsistent with the correspondence.  Deny the remaining allegations in Paragraph 208 of the Amended Complaint.

209.    Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team," which is partially quoted in Paragraph 209 of the Amended Complaint.  Deny

SGR/70773940.2

the allegations in Paragraph 209 of the Amended Complaint to the extent inconsistent with the February 8, 2021 correspondence. Deny the remaining allegations in Paragraph 209 of the Amended Complaint.

210. Deny the allegations in Paragraph 210 of the Amended Complaint.

211. Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team." Deny the allegations in Paragraph 211 of the Amended Complaint to the extent inconsistent with the February 8, 2021 correspondence. Deny the remaining allegations in Paragraph 211 of the Amended Complaint.

212. Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team." Deny the allegations in Paragraph 212 of the Amended Complaint to the extent inconsistent with the February 8, 2021 correspondence. Deny the remaining allegations in Paragraph 212 of the Amended Complaint.

213. Admit that on February 8, 2021, a correspondence incorrectly dated February 8, 2020 was sent to Hotel 57 Services, LLC employees on behalf of "The Four Seasons New York Leadership Team." Deny the allegations in Paragraph 213 of the Amended Complaint to the extent inconsistent with the February 8, 2021 correspondence. Deny the remaining allegations in Paragraph 213 of the Amended Complaint.

214. Deny knowledge information sufficient to form a belief as to the truth of the allegations in Paragraph 214 of the Amended Complaint.

215. Admit that Elizabeth Ortiz sent correspondence to Hotel 57 Services, LLC employees on March 25, 2021, which is partially quoted in Paragraph 215 of the Amended

21

SGR/70773940.2

SA-22

Complaint. Deny the allegations in Paragraph 215 of the Amended Complaint to the extent inconsistent with the March 25, 2021 correspondence. Deny the remaining allegations in Paragraph 215 of the Amended Complaint.

216. Deny the allegations in Paragraph 216 of the Amended Complaint.

217. Admit that Elizabeth Ortiz sent correspondence to Hotel 57 Services, LLC employees on June 25, 2021, which is partially quoted in Paragraph 217 of the Amended Complaint. Deny the allegations in Paragraph 217 of the Amended Complaint to the extent inconsistent with the June 25, 2021 correspondence. Deny the remaining allegations in Paragraph 217 of the Amended Complaint.

218. Deny knowledge or information sufficient to form a belief as to the meaning of "the Hotel's competitive set" as used in Paragraph 218 of the Amended Complaint and deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218 of the Amended Complaint.

219. Admit that Elizabeth Ortiz sent correspondence to Hotel 57 Services, LLC employees on June 25, 2021. Deny the allegations in Paragraph 219 of the Amended Complaint to the extent inconsistent with the June 25, 2021 correspondence. Deny the remaining allegations in Paragraph 219 of the Amended Complaint.

220. Admit that Elizabeth Ortiz sent correspondence to Hotel 57 Services, LLC employees on June 25, 2021. Deny the allegations in Paragraph 220 of the Amended Complaint to the extent inconsistent with the June 25, 2021 correspondence. Deny the remaining allegations in Paragraph 220 of the Amended Complaint.

22

SGR/70773940.2

221.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 221 of the Amended Complaint.

222.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny that there was a Zoom meeting on June 25, 2021 and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 222 of the Amended Complaint.

223.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 223 of the Amended Complaint.

224.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 224 of the Amended Complaint.

225.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 225 of the Amended Complaint.

226.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz and that Hotel 57 Services, LLC employees were permitted to submit questions. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 226 of the Amended Complaint.

227.    The Warner Defendants admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 227 of the Amended Complaint.

23

228.    The Warner Defendants admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 228 of the Amended Complaint.

229.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz in which Frank Galasso participated.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 229 of the Amended Complaint.

230.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz in which Frank Galasso participated.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 230 of the Amended Complaint.

231.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz in which Frank Galasso participated.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 231 of the Amended Complaint.

232.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny that Elizabeth Ortiz "represented" that Hotel 57 Services, LLC employees "could remain on furlough indefinitely."  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 232 of the Amended Complaint.

233.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 233 of the Amended Complaint.

24

234.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 234 of the Amended Complaint.

235.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny the remaining allegations contained in Paragraph 235 of the Amended Complaint.

236.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 236 in the Amended Complaint.

237.    Deny that Plaintiffs or any other Hotel 57 Services, LLC employee was ever told by Elizabeth Ortiz or anyone else that they would forfeit No-Fault Separation Pay if they worked elsewhere during furlough, as other employment is and always was expressly permitted under the terms of the EmPact Agreements, which Plaintiffs and other Hotel 57 Services, LLC employees were parties to, and provided a copy.  Deny the remaining allegations in Paragraph 237 in the Amended Complaint.

238.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 238 of the Amended Complaint.

239.    Admit that there was a Microsoft Teams meeting on June 25, 2021 attended by Elizabeth Ortiz.  Deny the remaining allegations in Paragraph 239 of the Amended Complaint.

240.    Deny the allegations in Paragraph 240 of the Amended Complaint.

SGR/70773940.2

241.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 241 of the Amended Complaint.

242.    Admit that Plaintiffs and other Hotel 57 Services, LLC employees who have not resigned from their employment remain Hotel 57 Services, LLC employees, and that those who are not working at the Hotel remain on furlough with a right to be recalled when the Hotel reopens. Deny the remaining allegations in Paragraph 242 of the Amended Complaint.

243.    Deny the allegations in Paragraph 243 of the Amended Complaint.

244.    Deny the allegations in Paragraph 244 of the Amended Complaint.

245.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law.  Deny the remaining allegations in Paragraph 245 of the Amended Complaint.

246.    Deny the allegations in Paragraph 246 of the Amended Complaint.

247.    Deny the allegations in Paragraph 247 of the Amended Complaint.

248.    Deny the allegations in Paragraph 248 of the Amended Complaint.

249.    Admit that Plaintiffs and other Hotel 57 Services, LLC employees signed versions of the EmPact Agreement covering the terms of their employment with Hotel 57 Services, LLC. Plaintiffs have not attached a copy of any EmPact Agreement to the Amended Complaint and Paragraph 249 of the Amended Complaint does not identify which EmPact Agreement is being quoted from.  The Warner Defendants therefore deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 249 of the Amended Complaint.

250.    Deny the allegations in Paragraph 250 of the Amended Complaint.

251.    Deny the allegations in Paragraph 251 of the Amended Complaint.

SGR/70773940.2

252.    Deny the allegations in Paragraph 252 of the Amended Complaint.

253.    Deny the allegations in Paragraph 253 of the Amended Complaint.

254.    Deny the allegations in Paragraph 254 of the Amended Complaint.

255.    Deny the allegations in Paragraph 255 of the Amended Complaint.

256.    Deny the allegations in Paragraph 256 of the Amended Complaint.

257.    Deny the allegations in Paragraph 257 of the Amended Complaint.

258.    Deny the allegations in Paragraph 258 of the Amended Complaint.

259.    Deny the allegations in Paragraph 259 of the Amended Complaint.

260.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law and deny that Plaintiffs and other Hotel 57 Services, LLC employees were terminated from their employment.  Deny the remaining allegations in Paragraph 260 of the Amended Complaint.

261.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law and deny that Plaintiffs and other Hotel 57 Services, LLC employees were terminated from their employment.  Deny the remaining allegations in Paragraph 261 of the Amended Complaint.

262.    Deny that Plaintiffs were not provided WARN Act Notices, which were sent to Plaintiffs and all other Hotel 57 Services, LLC employees as required by applicable law and deny that Plaintiffs and other Hotel 57 Services, LLC employees were terminated from their employment.  Deny the remaining allegations in Paragraph 262 of the Amended Complaint.

263.    Deny the allegations in Paragraph 263 of the Amended Complaint.

264.    Deny the allegations in Paragraph 264 of the Amended Complaint.

27

265.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265 of the Amended Complaint.

266.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266 of the Amended Complaint, which are hearsay.

267.    Admit that the Hotel has undergone certain renovations in the past during which it was not closed to outside guests.  Deny the remaining allegations in Paragraph 267 of the Amended Complaint.

268.    Admit that the Hotel has undergone certain renovations in the past during which it was not closed to outside guests.  Deny the remaining allegations in Paragraph 268 of the Amended Complaint.

269.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 269 of the Amended Complaint.

270.    Deny the allegations in Paragraph 270 of the Amended Complaint.

271.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 271 of the Amended Complaint.

272.    Deny the allegations in Paragraph 272 of the Amended Complaint.

273.    Deny the allegations in Paragraph 273 of the Amended Complaint.

274.    Deny the allegations in Paragraph 274 of the Amended Complaint.

275.    Deny the allegations in Paragraph 275 of the Amended Complaint.

276.    Deny the allegations in Paragraph 276 of the Amended Complaint.

277.    Deny the allegations in Paragraph 277 of the Amended Complaint.

278.    Deny the allegations in Paragraph 278 of the Amended Complaint.

279.    Deny the allegations in Paragraph 279 of the Amended Complaint.

SGR/70773940.2

280.    Deny the allegations in Paragraph 280 of the Amended Complaint.

281.    Deny the allegations in Paragraph 281 of the Amended Complaint.

282.    Deny the allegations in Paragraph 282 of the Amended Complaint.

283.    Deny the allegations in Paragraph 283 of the Amended Complaint.

284.    Deny the allegations in Paragraph 284 of the Amended Complaint.

**CLASS ALLEGATIONS**

285.    Admit that Plaintiffs claim to bring their first and second causes of action on behalf of a purported class, and claimed to bring their fifth cause of action on behalf of a purported class until that cause of action was dismissed pursuant to the Court's April 19, 2024 Order and Decision.  Deny that Plaintiffs' claims in the first and second causes of action are valid, that they are appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 285 of the Amended Complaint.

286.    Admit that Paragraph 286 of the Amended Complaint purports to define a "Class" for purposes of Plaintiffs' first and second causes of action.  Deny that Plaintiffs' claims in the first and second causes of action are valid, that they are or appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 285 of the Amended Complaint.

287.    Deny the allegations in Paragraph 287 of the Amended Complaint.

288.    The Warner Defendants state that Plaintiffs' statement purportedly "reserving the right" to modify a class definition is not an allegation of fact, and deny the allegations in Paragraph 288 of the Amended Complaint.

289.    Deny the allegations in Paragraph 289 of the Amended Complaint.

290.    Deny the allegations in Paragraph 290 of the Amended Complaint.

SGR/70773940.2

291.    Deny the allegations in Paragraph 291 of the Amended Complaint.

292.    Deny the allegations in Paragraph 292 of the Amended Complaint.

293.    Deny the allegations in Paragraph 293 of the Amended Complaint.

294.    Deny the allegations in Paragraph 294 of the Amended Complaint.

295.    Deny the allegations in Paragraph 295 of the Amended Complaint.

296.    Deny the allegations in Paragraph 296 of the Amended Complaint.

297.    Admit that Plaintiffs claim to bring their third cause of action on behalf of a purported subclass, and claimed to bring their fourth and fifth causes of action on behalf of a purported subclass until those causes of action were dismissed pursuant to the Court's April 19, 2024 Order and Decision.  Deny that Plaintiffs' claim in the third cause of action is valid, that the claim is appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 297 of the Amended Complaint.

298.    Admit that Paragraph 298 of the Amended Complaint purports to define a "Sub-Class" for purposes of Plaintiffs' third cause of action.  Deny that Plaintiffs' claim in the third cause of action is valid, that the claim is appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 298 of the Amended Complaint.

299.    Deny the allegations in Paragraph 299 of the Amended Complaint.

300.    The Warner Defendants state that Plaintiffs' statement purportedly "reserving the right" to modify a sub-class definition is not an allegation of fact, and deny the allegations in Paragraph 300 of the Amended Complaint.

301.    Deny the allegations in Paragraph 301 of the Amended Complaint.

302.    Deny the allegations in Paragraph 302 of the Amended Complaint.

303.    Deny the allegations in Paragraph 303 of the Amended Complaint.

30

304.    Deny the allegations in Paragraph 304 of the Amended Complaint.

305.    Deny the allegations in Paragraph 305 of the Amended Complaint.

306.    Deny the allegations in Paragraph 306 of the Amended Complaint.

307.    Deny the allegations in Paragraph 307 of the Amended Complaint

308.    Deny the allegations in Paragraph 308 of the Amended Complaint.

## FIRST CAUSE OF ACTION

309.    The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-308) of the Amended Complaint as if fully set forth herein.

310.    Admit that Plaintiffs claim to bring their first cause of action on behalf of a purported class, but deny that Plaintiffs' claim in the first cause of action is valid, deny that the claim is appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 310 of the Amended Complaint.

311.    Admit that Hotel 57 Services, LLC has employed more than 100 persons from time to time.  Deny the remaining allegations in Paragraph 311 of the Amended Complaint.

312.    Deny the allegations in Paragraph 312 of the Amended Complaint.

313.    Deny the allegations in Paragraph 313 of the Amended Complaint.

314.    Deny the allegations in Paragraph 314 of the Amended Complaint.

315.    Deny the allegations in Paragraph 315 of the Amended Complaint.

316.    Deny the allegations in Paragraph 316 of the Amended Complaint.

317.    Deny the allegations in Paragraph 317 of the Amended Complaint.

318.    Deny the allegations in Paragraph 318 of the Amended Complaint.

319.    Deny the allegations in Paragraph 319 of the Amended Complaint.

320.    Deny the allegations in Paragraph 320 of the Amended Complaint.

SGR/70773940.2

321.    Deny the allegations in Paragraph 321 of the Amended Complaint.

322.    Deny the allegations in Paragraph 322 of the Amended Complaint.

323.    Deny the allegations in Paragraph 323 of the Amended Complaint.

324.    Deny the allegations in Paragraph 324 of the Amended Complaint.

325.    Deny the allegations in Paragraph 325 of the Amended Complaint.

326.    Deny the allegations in Paragraph 326 of the Amended Complaint.

**SECOND CAUSE OF ACTION**

327.    The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-326) of the Amended Complaint as if fully set forth herein.

328.    Admit that Plaintiffs claim to bring their second cause of action on behalf of a purported class, but deny that Plaintiffs' claim in the second cause of action is valid, deny that the claim is appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 328 of the Amended Complaint.

329.    Deny the allegations in Paragraph 329 of the Amended Complaint.

330.    Deny the allegations in Paragraph 330 of the Amended Complaint.

331.    Deny the allegations in Paragraph 331 of the Amended Complaint.

332.    Deny the allegations in Paragraph 332 of the Amended Complaint.

333.    Deny the allegations in Paragraph 333 of the Amended Complaint.

334.    Deny the allegations in Paragraph 334 of the Amended Complaint.

335.    Deny the allegations in Paragraph 335 of the Amended Complaint.

336.    Deny the allegations in Paragraph 336 of the Amended Complaint.

337.    Deny the allegations in Paragraph 337 of the Amended Complaint.

338.    Deny the allegations in Paragraph 338 of the Amended Complaint.

SGR/70773940.2

339.    Deny the allegations in Paragraph 339 of the Amended Complaint.

340.    Deny the allegations in Paragraph 340 of the Amended Complaint.

341.    Deny the allegations in Paragraph 341 of the Amended Complaint.

342.    Deny the allegations in Paragraph 342 of the Amended Complaint.

**THIRD CAUSE OF ACTION**

343.    The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-342) of the Amended Complaint as if fully set forth herein.

344.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Admit that Plaintiffs claim to bring their third cause of action on behalf of a purported class, but deny that Plaintiffs' claim in the third cause of action is valid, deny that the claim is appropriate for class certification or that any class can be certified, and deny the remaining allegations in Paragraph 344 of the Amended Complaint.

345.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. The Warner Defendants admit that Plaintiffs and Hotel 57 Services, LLC entered into the EmPact Agreement, which is a valid contract. Deny the remining allegations in Paragraph 345 of the Amended Complaint.

346.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. The Warner Defendants admit that the EmPact Agreement is a valid contract. Deny the remaining allegations in Paragraph 346 of the Amended Complaint.

SGR/70773940.2

347.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 347 of the Amended Complaint.

348.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 348 of the Amended Complaint.

349.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 349 of the Amended Complaint.

350.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Admit that Plaintiffs were not paid No-Fault Separation Pay because neither Plaintiffs nor any other Hotel 57 Services, LLC employee was terminated for no fault, permanently laid off with no right of recall, or otherwise entitled to No-Fault Separation Pay.  Deny the remaining allegations in Paragraph 350 of the Amended Complaint.

351.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 351 of the Amended Complaint.

352.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 352 of the Amended Complaint.

34

SGR/70773940.2

353.    Plaintiffs' third cause of action has been dismissed against all Warner Defendants other than Hotel 57 Services, LLC pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 353 of the Amended Complaint.

## FOURTH CAUSE OF ACTION

354.    The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-353) of the Amended Complaint as if fully set forth herein.

355.    Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 355 of the Amended Complaint.

356.    Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 356 of the Amended Complaint.

357.    Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 357 of the Amended Complaint.

358.    Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 358 of the Amended Complaint.

359.    Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 359 of the Amended Complaint.

SGR/70773940.2

360.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 360 of the Amended Complaint.

361.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 361 of the Amended Complaint.

362.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 362 of the Amended Complaint.

363.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 363 of the Amended Complaint.

364.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 364 of the Amended Complaint.

365.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 365 of the Amended Complaint.

366.     Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 366 of the Amended Complaint.

SGR/70773940.2

367.   Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 367 of the Amended Complaint.

368.   Plaintiffs' fourth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 368 of the Amended Complaint.

**FIFTH CAUSE OF ACTION**

369.   The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-368) of the Amended Complaint as if fully set forth herein.

370.   Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 370 of the Amended Complaint.

371.   Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 371 of the Amended Complaint.

372.   Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 372 of the Amended Complaint.

373.   Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 373 of the Amended Complaint.

SGR/70773940.2

SA-38

374.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 374 of the Amended Complaint.

375.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 375 of the Amended Complaint.

376.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 376 of the Amended Complaint.

377.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 377 of the Amended Complaint.

378.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 378 of the Amended Complaint.

379.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 379 of the Amended Complaint.

380.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 380 of the Amended Complaint.

381.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 381 of the Amended Complaint.

382.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 382 of the Amended Complaint.

383.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 383 of the Amended Complaint.

384.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 384 of the Amended Complaint.

385.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 385 of the Amended Complaint.

386.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 386 of the Amended Complaint.

387.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 387 of the Amended Complaint.

SGR/70773940.2

388.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 388 of the Amended Complaint.

389.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 389 of the Amended Complaint.

390.    Plaintiffs' fifth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 390 of the Amended Complaint.

## SIXTH CAUSE OF ACTION

391.    The Warner Defendants incorporate their answers to the foregoing paragraphs (Paragraphs 1-390) of the Amended Complaint as if fully set forth herein.

392.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 392 of the Amended Complaint.

393.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 393 of the Amended Complaint.

394.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 394 of the Amended Complaint.

SGR/70773940.2

395.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 395 of the Amended Complaint.

396.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 396 of the Amended Complaint.

397.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 397 of the Amended Complaint.

398.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 398 of the Amended Complaint.

399.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 399 of the Amended Complaint.

400.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  The Warner Defendants deny the allegations in Paragraph 400 of the Amended Complaint.

401.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision.  Deny the allegations in Paragraph 401 of the Amended Complaint.

SGR/70773940.2

402.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 402 of the Amended Complaint.

403.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 403 of the Amended Complaint.

404.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 404 of the Amended Complaint.

405.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 405 of the Amended Complaint.

406.    Plaintiffs' sixth cause of action has been dismissed in its entirety pursuant to the Court's April 19, 2024 Order and Decision. Deny the allegations in Paragraph 406 of the Amended Complaint.

### "ALLEGATIONS REGARDING RELIEF"

407.    Deny the allegations in Paragraph 407 of the Amended Complaint.

408.    Deny the allegations in Paragraph 408 of the Amended Complaint.

### PRAYER FOR RELIEF

The Warner Defendants deny that Plaintiffs have asserted any valid claims against the Warner Defendants, deny that Plaintiffs have suffered any harm or damages, and deny that Plaintiffs are entitled to any relief in this lawsuit, including, but not limited to, the relief requested in Paragraphs a-k of Plaintiffs' Prayer for Relief.

SGR/70773940.2

SA-43

## AFFIRMATIVE AND OTHER DEFENSES

The Warner Defendants assert the following affirmative and other defenses to Plaintiffs' claims in the Amended Complaint, without assuming the burden of proof on any defense or any element of a defense where that burden would not otherwise be on the Warner Defendants:

### FACTS

1.    The Warner Defendants incorporate their answers to Paragraphs 1-408 of the Amended Complaint as if fully set forth herein.

2.    On March 3, 2020, the Centers for Disease Control and Prevention reported  60 cases of COVID-19 across Arizona, California, Florida, Georgia, Illinois, Massachusetts, New Hampshire, New York, Oregon, Rhode Island, Washington, and Wisconsin.

3.    On March 7, 2020, Governor Cuomo issued Executive Order 202, "Declaring a Disaster Emergency in the State of New York[.]"

4.    On March 11, 2020, the World Health Organization designated COVID-19 a pandemic.

5.    On March 12, 2020, Governor Cuomo issued Executive Order 202.2.  Executive Order 202.2 ordered the cancellation of any large events or gatherings anticipated to be in excess of 500 people and restricted places of public accommodation and events or gatherings with less than 500 people to 50% of their occupancy or seating capacity.

6.    On March 13, 2020, the Trump administration declared a nationwide emergency due to COVID-19.

7.    On March 16, 2020, Governor Cuomo issued Executive Order 202.3.  Executive Order 202.3 modified Executive Order 202.2 to require cancellation of any gathering of more than

43

SGR/70773940.2

50 people. Restaurants and bars were ordered closed immediately for on-site service, and gyms and fitness centers were also closed.

8.      On March 16, 2020, Governor Cuomo issued Executive Order 202.4.  Executive Order 202.4 ordered schools to close.

9.      On March 18, 2020, Governor Cuomo issued Executive Order 202.5.  Executive Order 202.5 order shopping malls and all indoor and outdoor places of public amusement (excluding parks) to close.

10.     On March 18, 2020, Governor Cuomo issued Executive Order 202.6.  Executive Order 202.6 ordered that, with the exception of entities providing "essential" services, "[e]ffective March 20 at 8:00 p.m.: All business and not-for-profit entities shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize." Employers were ordered to reduce their in-person workforce at any location by 50% by the same day and time.

11.     On March 19, 2020, Governor Cuomo issued Executive Order 202.7.  Executive Order 202.7 increased the in-person workforce reduction to 75%.

12.     Given the collective impact of the orders relating to COVID-19, the health and safety issues presented, and the lack of travel or demand for accommodations, on March 20, 2020, the Hotel was closed to outside guests, but continued to operate as a business with reduced staffing.

13.     Starting in March 2020 and continuing over the course of the next few months, most but not all Hotel 57 Services, LLC employees, were either placed on temporary furlough pending recall or had their working hours reduced.

14.     Plaintiffs Selena Staley and Olive Ivey were placed on temporary furlough in March 2020.

44

SGR/70773940.2

15.     Plaintiff Vivian Holmes continued to work when the Hotel was no longer taking outside guests.

16.     At the time the Hotel stopped taking guests, there was uncertainty about the impact COVID-19 would have, the length of time that it would impact hotel operations, and the date when the Hotel might reopen to guests.

17.     As Plaintiffs allege in Paragraphs 198, 199, and 200 of the Amended Complaint, communications were sent to Plaintiffs and other Hotel 57 Services, LLC employees after March 20, 2020 addressing, among other things, a resumption of regular operations on or about July 15, 2020.

18.     On July 10, 2020, correspondence was sent to Plaintiffs and other Hotel 57 Services, LLC employees reporting that given the continuing pandemic, there would be a "transitioning to a temporary shutdown of the hotel."

19.     Recognizing, consistent with the parade of executive orders issued to date, that the effect and duration of COVID-19 would prevent the Hotel from reopening for an extended period of time, WARN Act Notices were sent to Plaintiffs on August 5, 2020.

20.     Plaintiff Selena Staley received the WARN Act Notice sent to her on August 5, 2020 and had a copy in her possession, and knew that the notice had been sent before she commenced this lawsuit.

21.     Plaintiff Olive Ivey received the WARN Act Notice sent to her on August 5, 2020 had had a copy in her possession, and knew that the notice had been sent before she commenced this lawsuit.

45

22.     Plaintiff Vivian Holmes does not recall receiving the notice on August 5, 2020, but was aware that it had been sent and had a copy in her possession before she commenced this lawsuit.

23.     Hotel 57 Services, LLC has never terminated the employment of Selena Staley, Olive Ivey or Vivian Holmes.

24.     Hotel 57 Services, LLC has never permanently laid off Selena Staley, Olive Ivey or Vivian Holmes with no right of recall.

25.     Plaintiffs Selena Staley, Olive Ivey and Vivian Holmes all remain current Hotel 57 Services, LLC employees on furlough with rights to be recalled when the Hotel reopens.

26.     As current employees who remain on furlough, Plaintiffs Selena Staley, Olive Ivey and Vivian Holmes each continued to be paid by Hotel 57 Services, LLC in 2021 and 2022 for various items, such as vacation pay.

27.     As current non-exempt employees who remained on furlough, all of some of the Plaintiffs have been paid $500 per week by Hotel 57 Services, LLC for various lengths of time beginning in October 2021 and continuing into at least 2022 per New York City Local Law No. 405 Int. No. 2397-A (2021).

28.     No Plaintiff has ever refused to accept any of the $500 weekly payments made to employees who remain on furlough, nor has any Plaintiff returned or offered to return any of those payments.

29.     On May 5, 2023, the World Health Organization declared the end of the COVID-19 global pandemic.

30.     The United States Department of Health and Human Services declared the end of the COVID-19 pandemic in the United States effective May 11, 2023.

46

SGR/70773940.2

SA-47

31.     In a press release dated August 3, 2023, it was announced that the Four Seasons Hotel New York would reopen in Fall 2024.

32.     Plaintiffs Selena Staley, Olive Ivey and Vivian Holmes are all valued Hotel 57 Services, LLC employees, whom Hotel 57 Services, LLC plans to recall when the Hotel reopens.

### FIRST DEFENSE

33.     The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

34.     Plaintiffs who each remain a current Hotel 57 Services, LLC employee on furlough have each been paid various amounts as current by Hotel 57 Services, LLC though at least 2022.

35.     Had Plaintiffs been terminated or permanently laid off with no right of recall, Plaintiffs would not have been paid the amounts of money they have been paid.

36.     Plaintiffs accepted all amounts paid to them by Hotel 57 Services, LLC in 2021, 2022 and beyond, and have never returned or offered to return any amounts to Hotel 57 Services, LLC.

37.     Plaintiffs' claims are barred, in whole or part, under the doctrine of estoppel.

### SECOND DEFENSE

38.     The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

39.     Plaintiffs commenced this lawsuit on August 9, 2022.

40.     At no time prior to August 9, 2022, did either Plaintiff Selena Staley, Olive Ivey or Vivian Holmes tell the Warner Defendants that she contends that she was terminated for no fault or permanently laid off with no right of recall in June 2021 or at any other time and thus entitled to payment of No-Fault Separation Pay under the governing EmPact Agreement.

47

SGR/70773940.2

41.    Rather than tell the Warner Defendants that she was terminated or permanently laid off, Plaintiffs Selena Staley, Olive Ivey and Vivian Holmes each continued to request and accept payment from Hotel 57 Services, LLC for things such as vacation time.

42.    Rather than tell the Warner Defendants that she was terminated or permanently laid off, Plaintiffs Selena Staley and Vivian Holmes each continued to accept payment from Hotel 57 Services, LLC of $500 per week to furloughed employees under New York City Local Law No. 405 Int. No. 2397-A (2021).

43.    Prior to accepting the payments described in Paragraphs 41 and 42, each Plaintiff was under a duty to disclose the material fact that she contended that she was terminated for no fault or permanently laid off with no right of recall in June 2021 or another time and thus entitled to payment of No-Fault Separation Pay under the governing EmPact Agreement.

44.    Plaintiffs' claims are barred in whole or part by fraud.

**THIRD DEFENSE**

45.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

46.    Plaintiffs, who each remain a current Hotel 57 Services, LLC employee on furlough, have each been paid various amounts as current by Hotel 57 Services, LLC through at least 2022.

47.    Plaintiffs' claims are barred in whole or part as a result of these payments; alternatively, Plaintiffs' claims for damages are barred in who or part under the doctrine of set-off.

**FOURTH DEFENSE**

48.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

48

SGR/70773940.2

49.    Plaintiffs, who each remain a current Hotel 57 Services, LLC employee on furlough, have each been paid various amounts as current by Hotel 57 Services, LLC through at least 2022.

50.    At no time prior to August 9, 2022, did either Plaintiff Selena Staley, Olive Ivey or Vivian Holmes tell the Warner Defendants that she contends that she was terminated for no fault or permanently laid off with no right of recall in June 2021 or at any other time and thus was entitled to payment of No-Fault Separation Pay under the governing EmPact Agreement in or around June 2021.

51.    Plaintiffs could have immediately demanded payment of No-Fault Separation pay in June 2021 or promptly thereafter based on their claimed termination or permanent layoff, but did not do so.

52.    Rather than demand No-Fault Separation pay in or around June 2021 based on a claimed termination or permanent layoff, Plaintiff Selena Staley, Olive Ivey and Vivian Holmes instead chose to request and accept payment from Hotel 57 Services, LLC throughout 2021 and into 2022 for things such as vacation time.

53.    Rather than demand No-Fault Separation pay in or around June 2021 based on a claimed termination or permanent layoff, Plaintiffs Selena Staley and Vivian Holmes chose to accept payment from Hotel 57 Services, LLC of $500 per week to furloughed employees under New York City Local Law No. 405 Int. No. 2397-A (2021).

54.    Plaintiffs' claims are barred in whole or part under the doctrine of waiver.

**FIFTH DEFENSE**

55.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

49

SGR/70773940.2

56.    Under the terms of the governing EmPact Agreements, Plaintiffs are and were always expressly permitted to obtain additional employment other than by Hotel 57 Services, LLC without losing their employment by Hotel 57 Services, LLC.

57.    Plaintiffs' right and ability to obtain additional employment other than by Hotel 57 Services, LLC without losing their employment by Hotel 57 Services, LLC existed before Plaintiffs were placed on furlough.

58.    Plaintiffs' right and ability to obtain additional employment other than by Hotel 57 Services, LLC without losing their employment by Hotel 57 Services, LLC existed after Plaintiffs were placed on furlough and exists to this day.

59.    To the extent Plaintiffs contend that they have been economically damaged as a result of being placed on furlough, Plaintiffs each had and have the ability to mitigate those damages by securing additional employment.

60.    Plaintiffs' claims are barred in whole or part by their failure to mitigate their damages, if any.

**SIXTH DEFENSE**

61.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

62.    At no point prior to commencing this lawsuit on August 9, 2020 did Plaintiff Selena Staley invoke or follow the steps required by the Complaint, Arbitration & Review For Employees ("C.A.R.E.") provisions of the governing EmPact Agreement.

63.    At no point prior to commencing this lawsuit on August 9, 2020 did Plaintiff Olive Ivey invoke or follow the steps required by the C.A.R.E. provisions of the governing EmPact Agreement.

50

SGR/70773940.2

64.    At no point prior to commencing this lawsuit on August 9, 2020 did Plaintiff Vivian Holmes invoke or follow the steps required by the C.A.R.E. provisions of the governing EmPact Agreement.

65.    Hotel 57 Services, LLC has not waived any steps of the C.A.R.E. with respect to Plaintiffs.

66.    Plaintiffs' breach of contract claim is barred by their breach of the EmPact Agreement and failure of the condition precedent.

**SEVENTH DEFENSE**

67.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

68.    Under the governing EmPact Agreements, Plaintiffs are not entitled to No-Fault Separation Pay if a permanent layoff results from "strikes, walkouts, or lockouts, war, national emergencies, fires acts of God, acts of terrorism, disaster, riots, boycotts, or any other cause beyond the control of Four Seasons."

69.    The furlough Plaintiffs were placed on was the result of the national emergency caused by the spread of the COVID-19 pandemic, resulting in the multiple executive orders and restrictions put in place and the effect of these factors on the Hotel and its business.

70.    To the extent Plaintiffs claim that they were terminated for no fault or permanently laid off with no right of recall as a result of the Hotel's response to the factors set forth in these Affirmative and Other Defenses and summarized in Paragraph 69, Plaintiffs are barred from recovering No-Fault Separation Pay.

51

SGR/70773940.2

SA-52

**EIGHTH DEFENSE**

71.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

72.    The furlough Plaintiffs were placed on was the result of the sudden spread of the COVID-19 pandemic, designated as a national emergency and an emergency in the State of New York, resulting in the multiple executive orders and restrictions put in place and the effect of these factors on the Hotel and its business.

73.    Plaintiffs' claims for violations of the federal and New York State WARN Acts are barred in whole or part because any furlough or lay-off resulted from a national emergency that was not reasonably foreseeable.

**NINTH DEFENSE**

74.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

75.    The furlough Plaintiffs were placed on was the result of the sudden spread of the COVID-19 pandemic, the multiple executive orders and restrictions put in place and the effect of these factors on the Hotel and its business.

76.    Plaintiffs' claims for violations of the Federal and New York State WARN Acts are barred in whole or part because any furlough or lay-off resulted from unforeseeable business circumstance.

**TENTH DEFENSE**

77.    The Warner Defendants incorporate the allegations of Paragraphs 1-32 of their Affirmative and Other Defenses as if fully set forth herein.

52

SGR/70773940.2

78.    Plaintiffs' claims are barred in whole or part by the applicable statutes of limitations.

Dated: New York, NY
      May 3, 2024

Respectfully submitted,

*/s/ Marc B. Zimmerman*

Marc B. Zimmerman
James J. Boland
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, NY 10019
(212) 907-9700

Kathryn T. Lundy
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner*

53

SA-54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

SELENA STALEY, VIVIAN HOLMES, and
OLIVE IVEY, on behalf of themselves and
all others similarly situated,

                            Plaintiffs,

                    V.

FSR INTERNATIONAL HOTEL INC. d/b/a FOUR
SEASONS HOTELS AND RESORTS, HOTEL 57
SERVICES, LLC, HOTEL 57, LLC, TY WARNER
HOTELS & RESORTS LLC, and H. TY WARNER,

                         Defendants.

----------------------------------------------------------------X

    :  Case No. 22-cv-6781- (JSR)

**DECLARATION OF
MARC B. ZIMMERMAN**

I, Marc B. Zimmerman, pursuant to 28 U.S.C. § 1746, state and declare as follows:

1.      I am a Partner at Smith, Gambrell & Russell, LLP, attorneys for Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner (collectively the "Warner Defendants") and am fully familiar with the facts and circumstances surrounding this action and the matters stated in this Declaration.

2.      I respectfully submit this declaration in support of the Warner Defendants' motion for an Order (1) to take judicial notice of certain facts the Warner Defendants rely upon in their Motion for Summary Judgment dated May 31, 2024 and their Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Counsel dated May 31, 2024 (contemporaneously filed herewith); and (2) for such other and further relief as this Court deems just and proper.

3.      A true and correct copy of the New York Times' Newspaper published on December 19, 2019 and available on the New York Time's official website can be found at https://www.nytimes.com/issue/todayspaper/2019/12/19/todays-new-york-times.

SA-55

4.      A true and correct copy of the New York Times' December 19, 2020 cover page available on the New York Time's website is annexed hereto as **Exhibit A**.

5.      A true and correct copy of the New York Times' Newspaper published on January 19, 2020 and available on the New York Time's official website can be found at https://www.nytimes.com/issue/todayspaper/2020/01/19/todays-new-york-times.

6.      A true and correct copy of the New York Times' January 19, 220 cover page available on the New York Time's website is annexed hereto as **Exhibit B**.

7.      A true and correct copy of the article titled "*Worried About Catching The New Coronavirus? In the U.S., Flu Is Bigger Threat*" published by National Public Radio on January 29, 2020 and accessible on NPR's website at https://www.npr.org/sections/health-shots/2020/01/29/800813299/worried-about-catching-the-new-coronavirus-in-the-u-s-flu-is-a-bigger-threat is annexed hereto as **Exhibit C**.

8.      A true and correct copy of the article titled "*Should you panic about the coronavirus from China? Here's what the expert say*" published by the Los Angeles Times on January 24, 2020 and accessible on the website as https://www.latimes.com/science/story/2020-01-24/china-coronavirus-panic is annexed hereto as **Exhibit D**.

9.      A true and correct copy of the World Health Organization (the "WHO") Director-General's opening remarks at the media briefing on COVID-19 on March 11, 2020 is accessible on the WHO's website at https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 and annexed hereto as **Exhibit E**.

10.     A true and correct copy of the Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic is available on the

2

White House website at https://www.whitehouse.gov/briefing-room/presidential-actions/2023/02/10/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic-3/#:~:text=February%2010%2C%202023-,Notice%20on%20the%20Continuation%20of%20the%20National%20Emergency%20Concerning%20the,(COVID%2D%E2%81%A019)%20Pandemic&text=On%20March%2013%2C%202020%2C%20by,(COVID%2D19)%20pandemic and annexed hereto as **Exhibit F**.

11.    A true and correct copy of the various New York State Executive Orders issued by New York State then-Governor Andrew Cuomo concerning COVID-19 that were issued beginning March 7, 2020 is available at www.op.nysed.gov/about/covid-19/expired-executive-orders and applicable Executive Orders are collectively annexed hereto as **Exhibit G.**

12.    A true and correct copy of the Four Seasons Hotel New York's announcement of its re-opening on its website can be found on its website at https://www.fourseasons.com/newyork/.

13.    A true and correct copy of the Four Season Hotel New York's August 3, 2023 press release regarding the Hotel's re-opening is annexed hereto as **Exhibit H**.

14.    For the reasons set forth in the accompanying Memorandum of Law, the Warner Defendants' Motion for Judicial Notice should be granted, in its entirety.

15.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        May 31, 2024

By: */s/ Marc B. Zimmerman*
     Marc B. Zimmerman

SA-57

# EXHIBIT A

# The New York Times

"All the News That's Fit to Print"

**Late Edition**
Today, plenty of sunshine, brisk, colder, high 27. Tonight, clear skies, cold, low 21. Tomorrow, sunny skies, not as cold of an afternoon, high 34. Weather map appears on Page B10.

VOL. CLXIX ... No. 58,546  © 2019 The New York Times Company  NEW YORK, THURSDAY, DECEMBER 19, 2019  $3.00

# TRUMP IMPEACHED

## *BECOMES THIRD PRESIDENT TO FACE TRIAL IN SENATE*



PETE MAROVICH FOR THE NEW YORK TIMES

President Trump denounced his Democratic accusers during a rally on Wednesday in Battle Creek, Mich. "There's no crime," he said.

### *After Bitter Fight, House Adopts Charges of Abuse of Power and Obstruction*

**By NICHOLAS FANDOS and MICHAEL D. SHEAR**

WASHINGTON — The House of Representatives on Wednesday impeached President Trump for abuse of power and obstruction of Congress, making him the third president in history to be charged with committing high crimes and misdemeanors and face removal by the Senate.

On a day of constitutional consequence and raging partisan tension, the votes on the two articles of impeachment fell largely along party lines, after a bitter debate that stretched into the evening and reflected the deep polarization gripping American politics in the Trump era.

Only two Democrats opposed the article on abuse of power, which accused Mr. Trump of corruptly using the levers of government to solicit election assistance from Ukraine in the form of investigations to discredit his Democratic political rivals. Republicans were united in opposition. It passed 230 to 197, with Speaker Nancy Pelosi gaveling the vote to a close from the House rostrum.

On the second charge, obstruction of Congress, a third Democrat joined Republicans in opposition. The vote was 229 to 198.

The impeachment votes set the stage for a historic trial beginning early next year in the Senate, which will have final say — 10 months before Mr. Trump faces re-election — on whether to acquit the 45th president or convict and remove him from office. The timing was uncertain, after Ms. Pelosi suggested late Wednesday that she might wait to send the articles to the Senate, holding them out as leverage in a negotiation on the terms of a trial.

Acquittal in the Republican-controlled chamber may be likely, but the proceeding is certain to further aggravate the political and cultural fault lines in the country that Mr. Trump's presidency has brought into dramatic relief. Regardless of the outcome, the impeachment votes in the House put an indelible stain on Mr. Trump's presidency that cannot be wiped from the public consciousness with a barrage of tweets or an angry tirade in front of thousands of his cheering supporters at a campaign rally.

On Wednesday, Democrats characterized his impeachment as an urgent action to stop a corrupt president whose misdeeds had unfolded in plain view from damaging the United States any further.

"Over the course of the last three months, we have found incontrovertible evidence that President Trump abused his power by pressuring the newly elected president of Ukraine to announce an investigation into President

*Continued on Page A13*



ERIN SCHAFF/THE NEW YORK TIMES

Voting on the second article.

---

### 'Lev and Igor': Putting Ukraine On the Agenda

*This article is by Michael Rothfeld, Ben Protess, William K. Rashbaum, Kenneth P. Vogel and Andrew E. Kramer.*

On a warm summer evening last year, Lev Parnas stepped aboard a private cruise around New York Harbor for a gathering of some of Rudolph W. Giuliani's closest friends.

The passengers sipped wine and cocktails while they sailed past the Statue of Liberty, singing along as another guest, the entertainer Joe Piscopo, belted out "Theme from New York, New York." Mr. Giuliani, a personal lawyer to President Trump, relaxed on the open deck in a bright blue polo shirt as the sun set over Lower Manhattan, a video of the event shows.

The August 2018 cruise, won in a charity auction, came at a pivotal moment in Mr. Giuliani's relationship with Mr. Parnas and his associate Igor Fruman, both Soviet-born businessmen from Florida who were among the newest entrants to his circle.

Mr. Parnas had recently struck up a friendship with Mr. Giuliani while recruiting him for a business deal, but now they were on the verge of something bigger: teaming to unearth damaging information on Mr. Trump's political rivals.

In the coming months, Mr. Parnas and Mr. Fruman helped Mr. Giuliani carry out a shadow diplomacy campaign, sweeping them

*Continued on Page A18*

---

### NEWS ANALYSIS

## A Crossroads for a Nation in Tumult

**By PETER BAKER**

WASHINGTON — For the most unpredictable of presidents, it was the most predictable of outcomes. Is anyone really surprised that President Trump was impeached? His defiant disregard for red lines arguably made him an impeachment waiting to happen.

From the day he took office, Mr. Trump made clear that he would not abide by the conventions of the system he inherited. So perhaps it was inevitable that at some point he would go too far for the opposition party, leading to a historic day of debate on the House floor where he was alternately depicted as a constitutional villain or victim.

Over nearly three years in office, he has become the most polarizing figure in a country stewing in toxic politics. He has punished enemies and, many

The proximate charge as Democrats impeached him for high crimes and misdemeanors on party-line votes Wednesday night was the president's campaign to pressure Ukraine to help him against his domestic political rivals while withholding security aid. But long before Ukraine consumed the capital, Mr. Trump had sought to bend the instruments of government to his own purposes even if it meant pushing boundaries that had been sacrosanct for a generation.

argue, undermined democratic institutions. Disregarding advice that restrained other presidents, Mr. Trump kept his real estate business despite the Constitution's emoluments clause, paid hush money to an alleged paramour and sought to impede investigations that threatened him.

His constant stream of falsehoods, including about his dealings with Ukraine, undermined his credibility at home and abroad, even as his supporters saw him as a challenger to a corrupt status quo subjected to partisan persecution.

Impeachments come at times of tumult, when pent-up pres-

*Continued on Page A16*



ERIN SCHAFF/THE NEW YORK TIMES

Speaker Nancy Pelosi during the voting. She called it "tragic" that impeachment was necessary.

---

### Rally Becomes 'A Good Time' To Vent Anger

*This article is by Michael Crowley, Annie Karni and Maggie Haberman.*

BATTLE CREEK, Mich. — President Trump angrily responded to the impeachment he had long been dreading on Wednesday, lashing out at his Democratic accusers in a rambling two-hour speech and calling for their defeat in November.

Moments after the House passed two articles of impeachment against him, he told a campaign rally in a state he won in 2016 that is crucial to his re-election that the vote was an attempt to "nullify the ballots of tens of millions of patriotic Americans."

But in his mostly unscripted remarks, Mr. Trump claimed he was enjoying himself.

"They said there's no crime," he said. "There's no crime. I'm the first person to ever get impeached and there's no crime. I feel guilty. It's impeachment lite."

He paused before adding, "I don't know about you, but I'm having a good time."

His rejoinder presented the remarkable image of a combative president standing unbowed before his core supporters even as he became the third in American history to be impeached.

But more often he seemed embittered, mocking the physical appearance of his rivals, attacking the news media, calling a female protester a "slob" and a "disgusting person," and suggesting that

*Continued on Page A21*

---

### In Washington, The Abnormal Feels Routine

**By MARK LEIBOVICH and KATIE ROGERS**

WASHINGTON — It's not as if anyone was expecting a normal Wednesday to materialize on Capitol Hill. Presidents don't get impeached every day, just like they generally don't write six-page harangues charging Democrats with "declaring open war on American Democracy" (that was Tuesday) or tweet that Speaker Nancy Pelosi's "teeth were falling out of her mouth" (that was Sunday).

This is what Washington is dealing with now: the daily acceptance that whatever notions of normal and not normal that used to exist have been scrambled beyond recognition. It has been like this for nearly three years.

Still, Wednesday — a clear and cold December morning — hit with a special punch. It was one of those "step back" days when history stands out from the pile of routine chaos. The 45th president of the United States would be impeached on Wednesday. Even in a nonstop news cycle, that's a full-stop sentence. "Impeachment" can't be brushed off like a subpoena.

It's happened only twice before. President Trump seemed especially haunted by the "very ugly word, impeachment," as he put it in his letter to the Democrats. He likened his coming impeachment to an "attempted coup," an "election-nullification scheme" and a "lynching," among other things.

*Continued on Page A15*

---

BUSINESS B1-8

**Breeding Hollywood's Future**
Rideback Ranch, a communal workspace for creative talent, aims to develop new film and TV ideas. PAGE B1

**Fallout for Boeing Suppliers**
Boeing's move to halt production of the Max jet could force cutbacks or layoffs for some of its 600 suppliers. PAGE B1

INTERNATIONAL A4-10

**Abandoned by U.N. Troops**
Fathered by peacekeepers in Haiti, hundreds of children were left behind with their mothers to face poverty and social stigma, a study says. PAGE A6

**Seoul Returns 2 Men to North**
The North Koreans face likely execution. Before trying to defect, they killed 16 people on their fishing boat. PAGE A9

ARTS C1-7

**What Comes After Rikers**
Michael Kimmelman asks if new architecture can help heal what ails the city's troubled prison system. PAGE C1

NATIONAL A11-23

**Health Mandate Struck Down**
A federal appeals court sent the case back to a federal district judge in Texas to determine if other parts of the Affordable Care Act can stand. PAGE A21

**Gloves Off, Now Taking Heat**
Pete Buttigieg's stock in the presidential race didn't rise until he attacked his top rivals. He may face payback. PAGE A22

THURSDAY STYLES D1-8

**Silent Night, Sustainable Night**
You want festive décor, but also want to save the planet. Here's how to make the holiday season eco-friendly. PAGE D1

SPORTSTHURSDAY B9-14

**In Rarefied N.B.A. Air**
LeBron James and James Harden are flirting with statistical achievements of the Wilt Chamberlain variety. PAGE B9

**Bird of Prey, With Health Care**
A top-flight hospital in Doha, Qatar, has a special clientele: falcons only. And the lines can get long. PAGE B9

SPECIAL SECTION

**Curtain Falls on Iron Triangle**
Willets Point, a Queens neighborhood of squalid streets lined with auto repair shops near Citi Field, La Guardia Airport and the National Tennis Center, finally seems about to be tamed.

EDITORIAL, OP-ED A30-31

**George T. Conway III, Steve Schmidt, John Weaver and Rick Wilson** PAGE A31





0 354613

SA-59

# EXHIBIT B

# The New York Times

*"All the News That's Fit to Print"*

**Late Edition**
Today, partial sunshine, windy, high 41. Tonight, partly cloudy, breezy, turning colder, low 22. Tomorrow, mostly sunny, breezy, a colder day, high 32. Weather map, Page 20.

VOL. CLXIX .. No. 58,577 — © 2020 The New York Times Company — NEW YORK, SUNDAY, JANUARY 19, 2020 — $6.00

---

## Face Scan App Inches Toward End of Privacy

### Using 3 Billion Photos to Identify Anyone

**By KASHMIR HILL**

Until recently, Hoan Ton-That's greatest hits included an obscure iPhone game and an app that let people put Donald Trump's distinctive yellow hair on their own photos.

Then Mr. Ton-That — an Australian techie and onetime model — did something momentous: He invented a tool that could end your ability to walk down the street anonymously, and provided it to hundreds of law enforcement agencies, ranging from local cops in Florida to the F.B.I. and the Department of Homeland Security.

His tiny company, Clearview AI, devised a groundbreaking facial recognition app. You take a picture of a person, upload it and get to see public photos of that person, along with links to where those photos appeared. The system — whose backbone is a database of more than three billion images that Clearview claims to have scraped from Facebook, YouTube, Venmo and millions of other websites — goes far beyond anything ever constructed by the United States government or Silicon Valley giants.

Federal and state law enforcement officers said that while they had only limited knowledge of how Clearview works and who is behind it, they had used its app to help solve shoplifting, identity theft, credit card fraud, murder and child sexual exploitation cases.

Until now, technology that readily identifies everyone based on his or her face has been taboo because of its radical erosion of privacy. Tech companies capable of

*Continued on Page 16*

---



WILLIAM WIDMER FOR THE NEW YORK TIMES

A picture of Ariel McCullough is one of the banners in "Seeing Newnan," an art installation that upended the Georgia community.

## Art Forces a Small Southern City to Rethink Its Image

**By AUDRA D. S. BURCH**

NEWNAN, Ga. — It was the Saturday afternoon that this small Southern city had been dreading. A group of neo-Nazis promised to hold a rally in downtown Newnan to celebrate Adolf Hitler's birthday and rail against illegal immigration and the removal of Confederate monuments.

Newnan had prided itself on its quiet charm. It offered small-town living just 40 miles southwest of Atlanta and had earned the nickname "City of Homes" for its antebellum architecture. Now, on a spring day in April 2018, a neo-Nazi group had assembled in a park near the courthouse, the leader having said the group preferred to hold rallies in

**IMPERFECT UNION**

*Rattled by Portraits of 19 Residents*

predominantly white towns.

But it turned out that only a few dozen white nationalists attended the rally, and the Newnan they had imagined no longer existed. Its population had more than doubled in less than 20 years, drawing an increasingly diverse collection of newcomers. Newnan was changing and many in the community wanted to embrace that change more openly. A year after the white nationalist rally, the town made an effort to do so by putting up 17 large-scale banner portraits, images of the or-

dinary people who make up Newnan.

They hang from the perches of brick buildings around downtown. There's Helen Berry, an African-American woman who for years worked at a sewing factory. Wiley Driver, a white worker who folded and packed blankets at a local mill before his death in 2017. Jineet Blanco, a waitress who arrived in Newnan carrying her Mexican traditions and dreams. And then there were the Shah sisters.

A portrait of Aatika and Zahraw Shah wearing hijabs was displayed on the side of an empty building in downtown Newnan. The sisters were born in Georgia and had lived in Newnan since 2012, after they moved from

*Continued on Page 18*

---

## TRUMP'S LAWYERS DISMISS CHARGES AS 'BRAZEN' PLOT

### A DEFIANT 6-PAGE FILING

#### Democratic Memo Calls Actions the 'Framers' Worst Nightmare'

**By MICHAEL D. SHEAR and NICHOLAS FANDOS**

WASHINGTON — President Trump's legal defense team strenuously denied on Saturday that he had committed impeachable acts, denouncing the charges against him as a "brazen and unlawful" attempt to cost him re-election as House Democrats laid out in meticulous detail their case that he should be removed from office.

In the first legal filings for the Senate impeachment trial that opens in earnest on Tuesday, the dueling arguments from the White House and the House impeachment managers previewed a politically charged fight over Mr. Trump's fate, unfolding against the backdrop of the presidential election campaign.

They presented the legal strategies both sides are likely to employ during the third presidential impeachment trial in American history. They also vividly illustrated how the proceeding is almost certain to rekindle feuding over the 2016 election that has barely subsided over Mr. Trump's tenure, and reverberate — whether he is convicted or acquitted — in an even more brutal electoral fight in November.

In a 46-page trial memorandum, and additional 60-page statement of facts, the House impeachment managers asserted that beginning in the spring, Mr.

*Continued on Page 14*

---

## Royal Couple To Cede Titles In Family Rift

**By MARK LANDLER**

WINDSOR, England — Prince Harry and his wife, Meghan, will stop using their loftiest royal titles, give up state funding and repay at least $3 million in taxpayer money used to refurbish their official residence at Windsor Castle under an agreement announced by Buckingham Palace on Saturday.

The unusual deal, negotiated by aides to Queen Elizabeth II, Prince Harry and other senior family members, is intended to end a crisis that erupted 10 days ago when the couple abruptly announced plans to step back from their royal duties and spend part of each year in North America.

However civil, the agreement codifies one of the most dramatic ruptures within the British royal family since King Edward VIII abdicated the throne in 1936 to marry an American woman, Wallis Simpson. It is a spectacle that has enthralled and divided Britain, overshadowing even the country's impending departure from the European Union, and has provoked conversations around the world about race, privilege and tradition.

The couple plan to spend a majority of their time outside Britain, initially in Canada but later likely in the United States as well, according to officials at the palace. They will continue to carry out limited duties on behalf of the

*Continued on Page 4*

---



MEREDITH KOHUT FOR THE NEW YORK TIMES

A small clothing factory that was flooded by calls from widows seeking work in Aleppo, Syria.

## Finding Freedom in a Syria of Ever Fewer Men

**By VIVIAN YEE and HWAIDA SAAD**

ALEPPO, Syria — The women of eastern Aleppo were rarely visible before the war, but now they shape the bitter peace. In the poor, conservative districts of Syria's ancient commercial capital, many women seldom used to leave the house, and only with their husbands if they did; the men not only won the bread, but also went out to buy it.

Then came the civil war.

Eight years and counting of

bloodshed have condemned a generation of Syrian men to their deaths, to prison or to precarious lives as refugees. Now, with most of the country once again under government control, yet ruptured beyond recognition, moving forward is up to the women left behind: part survivors, part mourners, part mop-up crew.

Grandmothers are raising orphaned grandchildren. Single women worry they will never find husbands. Widows are supporting families gutted by losses that once seemed unendurable, and that the

world now treats as routine.

In many cases, women are leaving the house on their own and working for the first time, old customs succumbing to the extremities of war and an economy in collapse — nothing new in large cities like Damascus, the capital, but a swift transformation for some of the more traditional corners of this socially and religiously conservative country.

"Before, women were afraid of everything," said Fatima Rawass, 32, who opened a beauty salon for

*Continued on Page 10*

---

## Up for 5th Senate Term, Collins Walks Impeachment Tightrope

**By JENNIFER STEINHAUER**

WASHINGTON — A few days after Senator Susan Collins cast her vote to acquit President Bill Clinton, as she was greeted with icy stares at a Lincoln Day dinner in rural Maine, a fellow Republican approached her, irate.

"I can't believe you let him off the hook," he told Ms. Collins. "I am never, ever voting for you again."

Twenty-one years later, she faces another presidential impeachment vote with heavy consequences for the nation and her own political survival. Ms. Collins, one of a handful of moderate Republicans whose votes could alter the trajectory of the trial, said she does not regret her votes to acquit then.

She said she would use the same logic behind that decision when she weighs the impeachment charges against President Trump in a Senate trial that begins in earnest this week.

"I, too, was furious at President Clinton and felt that he had lied under oath, but it didn't reach the constitutional test of high crimes and misdemeanors, and was not sufficient to overturn an election and throw him out of office," she said in an interview on Thursday in her Capitol Hill office.

In the case of Mr. Trump, she said, she would be "applying that same standard."

Ms. Collins's position as a centrist gives her outsize influence over the shape of Mr. Trump's trial, including whether new wit-

DAVID HUME KENNERLY/GETTY IMAGES

Senator Susan Collins said she would use the "same standard" she followed in the 1999 trial.

nesses and evidence will be heard, just as it has in some of the most important and impassioned debates during her four terms in the Senate. But that middle ground is shrinking in the Trump era, leaving her open to bitter attack from both political parties.

She was among three Republicans who sank Mr. Trump's attempts to repeal the Affordable Care Act, and she helped lead an unsuccessful effort to prevent him from taking unallocated money for his border wall. But she also voted for a tax bill that was the centerpiece of the Republican agenda. And the move that overshadowed all that was her deciding vote to confirm Justice Brett

*Continued on Page 15*

---

**NATIONAL 12-23**

**A Guantánamo Bay Mystery**
The trial of a former commander of the naval base put a spotlight on life at the secretive outpost best known for its terrorist court and prison. **PAGE 21**

**Message at the Women's March**
In the movement's fourth year, participants say that President Trump's policies cannot be separated from the matters they are protesting. **PAGE 23**

**INTERNATIONAL 4-11**

**Enduring China's Crackdown**
A rare visit finds the people of the ancient town of Yarkand, a cultural cradle for Uighur Muslims, resilient in the face of mass detentions. **PAGE 6**

**SUNDAY BUSINESS**

**Unliking All Those 'Likes'**
Instagram's chief executive wants to keep the platform a safe, special space. That means learning from the mistakes of its parent company, Facebook. **PAGE 1**

**SUNDAY REVIEW**

**Michelle Alexander** **PAGE 1**

0 354713 8

---

"'Once Upon A Time...in Hollywood' is not going anywhere. It will stand as a source of delight for as long as we care about movies. And it wants us to care."

A.O. SCOTT *The New York Times*

**10 ACADEMY AWARD NOMINATIONS** INCLUDING **BEST PICTURE**

ONCE UPON A TIME IN... **HOLLYWOOD**

WRITTEN AND DIRECTED BY QUENTIN TARANTINO

R SonyPictures-Awards.com COLUMBIA PICTURES

SA-61

# EXHIBIT C

SA-62

 Despite Coronavirus Alert, Flu's Risk To U.S. Is Much More Immediate : Shots - Health News : NPR






PLAYLIST

    WAMU 88.5

DONATE

---

**Shots**

---

THE CORONAVIRUS CRISIS

# Worried About Catching The New Coronavirus? In The U.S., Flu Is A Bigger Threat

JANUARY 29, 2020 · 4:37 PM ET

Allison Aubrey

3-Minute Listen                                    PLAYLIST



Making sure to frequently give your hands a thorough scrub — with soap and for about as long as it takes to sing the "Happy Birthday" song a couple of times — can significantly cut your chances of catching the flu or other

SA-63

respiratory virus.

*Mandel Ngan/AFP via Getty Images*

If you live in the U.S., your risk of contracting the new strain of coronavirus identified in China is exceedingly low.



**GOATS AND SODA**

**Wuhan Coronavirus 101: What We Do — And Don't — Know About A Newly Identified Disease**

So far, the only people infected in the U.S. have been those who have traveled to the region in China where the virus first turned up in humans. And though that could change, one thing is for certain: Another severe respiratory virus that threatens lives — the influenza or flu virus — is very active in the U.S. right now.

Already this flu season (which generally begins in the U.S. in October and peaks during winter months), the Centers for Disease Control and Prevention estimates that more than 15 million people in the U.S. have gotten sick with flu. More than 150,000 Americans have been hospitalized, and more than 8,000 people have died from their infection. And, this isn't even a particularly bad flu year.

**Sponsor Message**

"Last year, we had 34,000 deaths from flu," says epidemiologist Brandon Brown of the University of California, Riverside. On average, the flu is responsible for

somewhere between 12,000 and 61,000 deaths each year. "And this is just in the United States," Brown says.



**GOATS AND SODA**

**Public Health Efforts Step Up Around The World As Coronavirus Cases Rise**



**GOATS AND SODA**

**Must-Know Vocab For Wuhan Coronavirus: From Droplets To Zoonotic**

A flu shot is your best way to protect yourself against getting the flu, and it's still not too late to be vaccinated this season.

There's another very effective strategy for fending off the flu virus — one that could also help protect against the novel coronavirus if it were to spread within the U.S, Brown says.

His top tip is remarkably simple, effective — and familiar. Ready for this? Wash your hands. You need to lather up and wash for at least 20 seconds to make this work, according to the CDC's tips for proper hand-washing. The time it takes to hum the song "Happy Birthday' twice is about right duration.

"Our hands are one of the main ways we can transmit a virus," Brown says. As a reality check, begin to notice everything you touch in a day. "We shake other people's hands, we touch surfaces, open doors," he says.

In addition to inhaling airborne particles from a neighbor's cough or sneeze, touching your hand to a contaminated surface and then to your eyes, nose or mouth is how the virus most often gets inside you.



**GOATS AND SODA**

**Coronavirus: Americans Evacuated From Wuhan Will Remain At U.S. Air Base For 3 Days**

There's still a lot to learn about the new coronavirus, but respiratory illnesses in general — whether the flu, a cold or a virus that humans haven't encountered

before — can spread via little respiratory droplets when an infected person sneezes or coughs.

That's why we teach our kids to cover their coughs and to sneeze into an elbow. Each of us can help prevent the spread of viruses, and good hygiene habits are key.

Another important reminder: The CDC recommends a pneumococcal vaccine for children under 2, for adults who are 65 or older, for people who smoke and for those who have certain medical conditions.

**Sponsor Message**

It's not that this vaccine will directly fight the pneumonia caused by influenza or the new coronavirus; the pneumococcal vaccine actually revs the body's defenses against a different microbe — the common bacterium *Streptococcus pneumonia* – that also causes pneumonia.

However, one of the main reasons some people get very sick from flu is that, once infected and weakened by the influenza virus, they are extra vulnerable to getting a secondary infection from bacteria — and often, it's the pneumococcal bacteria.



**GOATS AND SODA**

**Coronavirus FAQs: Do Masks Help? Is The Disease Really So Mysterious?**

For an historical perspective: It was actually bacterial pneumonia that caused the most deaths during the 1918 influenza pandemic, according to the National Institutes of Health.

By fending off those bacteria, the pneumococcal vaccine can be an important part of a flu defense — and might also help in fending off the new coronavirus strain.

"We don't know whether this new coronavirus tends to predispose people toward pneumococcal infection, but many respiratory viruses do," explains Marc Lipsitch, an infectious disease epidemiologist at the Harvard T.H. Chan School of Public Health.

"It [would be] better to be infected with only coronavirus, rather than the coronavirus and a bacterium at the same time," Lipsitch says.

The science of why that's true is complicated, Lipsitch says, but in general, when we get a virus, "the immune system is distracted." It focuses on fighting the virus, and that makes it harder to fend off a bacterial infection. "It's hard [for the immune system] to do both at once."

pandemic     coronavirus     sars     influenza     flu shot



# Sign up for the NPR Health newsletter

The latest on the science of healthy living.

| Email address | | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

SA-67

# EXHIBIT D

# Los Angeles Times

SCIENCE & MEDICINE

# Should you panic about the coronavirus from China? Here's what the experts say



A monitor displays information on the coronavirus at SRT train terminal on Thursday in Seoul. So far, two cases of the virus have been confirmed in South Korea.  (Getty Images)

**By Emily Baumgaertner**
|  🐦 Follow

Jan. 24, 2020 9:44 PM PT

It's a virus scientists have never seen before. Health officials don't know exactly where it came from, but it has traveled more than 7,000 miles since it was discovered late last

5/30/24, 9:56 AM       Case 1:22-cv-06678-JSR   Document 93-4   from China? Experts say no - Los Angeles Times   Filed 05/31/24 - Page 3 of 12

month in central China. New infections are confirmed every day despite an unprecedented quarantine. The death toll is rising, too.

If this were a Hollywood movie, now would be time to panic. In real life, however, all that most Americans need to do is wash their hands and proceed with their usual weekend plans.

"Don't panic unless you're paid to panic," said Brandon Brown, an epidemiologist at UC Riverside who has studied many deadly outbreaks.

"Public health workers should be on the lookout. The government should be ready to provide resources. Transmitting timely facts to the public is key," Brown said. "But for everyone else: Breathe."

More than three weeks into the outbreak that has spread to at least 1,354 people in 11 countries and territories, scientists have learned some important things about the virus.

It is a coronavirus, which makes it a relative of the pathogens that cause severe acute respiratory syndrome, or SARS, and Middle East respiratory syndrome, or MERS. Those diseases have sickened thousands of people around the world and caused hundreds of deaths.

Other coronaviruses result in nothing worse than a common cold.

In addition to humans, coronaviruses can sicken cows, pigs, cats, chickens, camels, bats and other animals. Most of the outbreak's early victims said they had visited a large seafood and live animal market in the Chinese megacity of Wuhan, suggesting that the virus originated in another species before jumping to humans.

When experts examined the organism's genetic code, they found a sequence that was entirely new to science. That means many people have not had a chance to develop

SA-70

Should you panic about the coronavirus from China? Experts say no - Los Angeles Times

sufficient natural immunity to the coronavirus that has been dubbed 2019-nCoV — an

important consideration since vaccines take years to develop.

SA-71

# Coronavirus cases

As of 8:30 p.m. Wednesday, 95,414 cases of the new coronavirus and 3,285 deaths worldwide have been confirmed.



SA-72

5/30/24, 9:56 AM   Case 1:22-cv-06781-JSR   Document 93-4   Filed 05/31/24   Page 6 of 12



Johns Hopkins University

Fortunately, the virus seems to cause only minor symptoms — such as fever and difficulty with breathing — in people who are young and healthy. Most of the 41 deaths tied to the coronavirus to date have been in people who were at least 50 years old with underlying medical problems or weakened immune systems, Chinese officials said.

"We don't have evidence yet to suggest this is any more virulent than the flu you see in the U.S. each year," said said Dr. Michael Mina, an epidemiology researcher at Harvard's T.H. Chan School of Public Health. "Most people, with proper medical attention, will do just fine."

In fact, it's possible that hundreds or even thousands of people in China and elsewhere have been infected but have had such mild reactions that no one even noticed, said Dr. Tom Inglesby, director of the Center for Health Security at the Johns Hopkins Bloomberg School of Public Health. Some might have fought off the bug without showing any outward symptoms at all.

ADVERTISING



Get away to 60 miles where you belong: Th…          Visit Site
Visit Myrtle Beach - Sponsored

"It's too soon to know," Inglesby said. "Often in new outbreaks, the most serious or severe cases are recognized first," and that may result in a skewed picture of just how dangerous the virus truly is.

Epidemiologists are also trying to nail down when the new coronavirus gained the ability to jump directly from human to human. More than 85% of patients identified in the past week said they had not visited the Wuhan market that is believed to be ground zero for the outbreak. (The market is now closed.)

"It is clear the growing outbreak is no longer due to ongoing exposures at the Huanan seafood market," according to the latest situation report from the World Health Organization.

Patients in Guangdong province have spread the virus to family members who had not traveled to Wuhan, which is about 600 miles away. The WHO also reports a few cases of hospital employees and other healthcare workers becoming sick after treating infected patients.

SA-74

# Coronavirus cases

As of 12:30 p.m. Friday, there have been 84,119 confirmed cases of the new coronavirus.

**Mainland China**

Deaths **2,788**

Cases **78,824**

**Other regions**

Deaths **83** (France, Hong Kong, Iran, Italy, Japan, Philippines, South Korea, Taiwan, Diamond Princess cruise ship)

Cases **5,295** (705 on Diamond Princess cruise ship)



## Confirmed cases in the U.S.: 62



SA-75



This map reflects official information from earlier Friday. The number of confirmed cases continues to grow.

Public health officials said they expect to see human-to-human transmissions continue in the short term. That means new cases are sure to emerge throughout Asia, and even in the United States.

Information is spreading faster than the pathogen — and that's just as novel.

The 2003 SARS outbreak that began in China's Guangdong province in 2002 sickened 8,098 people and killed 774 in 29 countries by the time it ended in 2003. But in the outbreak's early days, the Chinese government obfuscated the number of cases, hindering foreign leaders' efforts to help citizens' ability to protect themselves. The resulting public backlash prompted the dismissals of the country's health minister and mayor of Beijing.

This time around, Chinese officials have moved swiftly to alert other countries to the outbreak's developments. They've also shared the virus' genetic sequence, which can help epidemiologists track its spread and make predictions about what it might do next.

"This is definitely not 2003," said Rebecca Katz, the director of the Center for Global Health Science and Security at Georgetown University. "The speed with which this virus

was identified is testament to that."

Within 24 hours of receiving the coronavirus's genome, the CDC programmed a real-time diagnostic test called an RT-PCR assay, said Dr. Nancy Messonnier, director of the agency's National Center for Immunization and Respiratory Diseases. The tool quickly confirmed that a man in Washington state and a woman in Chicago were infected with 2019-nCoV and not some other pneumonia-causing virus. Other institutions around the world have used the genetic code to design similar tests.

That leads to another reason to avoid alarm: The rapidly rising case counts may be deceiving you. Before these new tools were developed, doctors had no surefire way to confirm a case of 2019-nCoV. That means that, as testing becomes available, infections appear to skyrocket.

"You'll see a spike of 300 cases, but maybe those 300 were there all along," Mina said. "This might not reflect a growing epidemic as much as it reflects better detection."

Until they have a better count of the number of people infected, experts can't calculate the coronavirus's death rate. And since viruses are capable of mutating quickly, much of the information scientists have gathered may only be temporarily accurate.

"In any evolving outbreak, you need to make response decisions with imperfect information," Katz said.

Mina said he has "absolute faith" in the CDC's ability to stay on top of the situation. The health agency alerted doctors in early January to be on the lookout for patients who might have the virus, and last week it began screening passengers at U.S. airports that receive flights from Wuhan.

But the CDC isn't running the show, and questions still abound about global preparedness. On Thursday, WHO officials said the outbreak did not rise to the level of

5/30/24, 9:56 AM    Case 1:22-cv-06781-JSR    Should you panic about the coronavirus? No - Los Angeles Times ... 24    no - Page 11 of 12

"a global health emergency," but that "it may yet become one."

Dr. Guan Yi is almost certain that it will. Yi, an infectious disease expert at the University of Hong Kong, told reporters that even the drastic quarantine measures affecting 36 million people in and around Wuhan won't be enough to keep the coronavirus from spreading because the Chinese government acted too late.

Yi also said he visited markets in Wuhan after the outbreak began and was dismayed by the lack of hygiene he observed there. Though he has put his expertise to use to fight SARS and several influenza outbreaks involving novel strains from birds and pigs, this is the first time he has felt hopeless, he said.

Indeed, Mina said some pathogens prove to outsmart even the world's best public health agencies — and when they've never been seen before, they have a competitive advantage.

"Something as horrific as Ebola can seem better than this, because we've had years to understand it. At least we would really know the beast we're up against," he said. "As humans, we are always fearful of the unknown."

*Times staff writer Richard Read contributed to this report from Seattle.*

## More to Read

**COVID-19 is 'heating up all around' this summer. Should we be wearing masks again?**

Aug. 9, 2023



**The coronavirus has made itself at home in animals. Why that ramps up the risk for people**

June 9, 2023



SA-78

### What you need to know to stay safe from COVID now that the public health emergency has ended

May 11, 2023





**Emily Baumgaertner**

Emily Baumgaertner was a national correspondent for the Los Angeles Times focused on medical investigations and features. She joined the newsroom in 2019 from the New York Times Washington bureau and left in 2022. Her work has appeared in the Atlantic, the Washington Post, Foreign Policy, Scientific American and elsewhere. A New Haven, Conn., native, Baumgaertner earned her master of public health degree from the George Washington University.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

SA-79

# EXHIBIT E

SA-80

 Case 1:22-cv-06781-JSR Document 93-5 Filed 05/31/24 Page 2 of 5 WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020



# WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020

11 March 2020



Good afternoon.

In the past two weeks, the number of cases of COVID-19 outside China has increased 13-fold, and the number of affected countries has tripled.

There are now more than 118,000 cases in 114 countries, and 4,291 people have lost their lives.

Thousands more are fighting for their lives in hospitals.

In the days and weeks ahead, we expect to see the number of cases, the number of deaths, and the number of affected countries climb even higher.

WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.

We have therefore made the assessment that COVID-19 can be characterized as a pandemic.

SA-81

Pandemic is not a word to use lightly or carelessly. It is a word that, if misused, can cause unreasonable fear, or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.

Describing the situation as a pandemic does not change WHO's assessment of the threat posed by this virus. It doesn't change what WHO is doing, and it doesn't change what countries should do.

We have never before seen a pandemic sparked by a coronavirus. This is the first pandemic caused by a coronavirus.

And we have never before seen a pandemic that can be controlled, at the same time.

WHO has been in full response mode since we were notified of the first cases.

And we have called every day for countries to take urgent and aggressive action.

We have rung the alarm bell loud and clear.

===

As I said on Monday, just looking at the number of cases and the number of countries affected does not tell the full story.

Of the 118,000 cases reported globally in 114 countries, more than 90 percent of cases are in just four countries, and two of those – China and the Republic of Korea - have significantly declining epidemics.

81 countries have not reported any cases, and 57 countries have reported 10 cases or less.

We cannot say this loudly enough, or clearly enough, or often enough: all countries can still change the course of this pandemic.

If countries detect, test, treat, isolate, trace, and mobilize their people in the response, those with a handful of cases can prevent those cases becoming clusters, and those clusters becoming community transmission.

Even those countries with community transmission or large clusters can turn the tide on this virus.

Several countries have demonstrated that this virus can be suppressed and controlled.

SA-82

WHO Director-General's opening remarks at the media briefing on COVID-19 -- 11 March 2020

The challenge for many countries who are now dealing with large clusters or community transmission is not whether they **can** do the same – it's whether they **will**.

Some countries are struggling with a lack of capacity.

Some countries are struggling with a lack of resources.

Some countries are struggling with a lack of resolve.

We are grateful for the measures being taken in Iran, Italy and the Republic of Korea to slow the virus and control their epidemics.

We know that these measures are taking a heavy toll on societies and economies, just as they did in China.

All countries must strike a fine balance between protecting health, minimizing economic and social disruption, and respecting human rights.

WHO's mandate is public health. But we're working with many partners across all sectors to mitigate the social and economic consequences of this pandemic.

This is not just a public health crisis, it is a crisis that will touch every sector – so every sector and every individual must be involved in the fight.

I have said from the beginning that countries must take a whole-of-government, whole-of-society approach, built around a comprehensive strategy to prevent infections, save lives and minimize impact.

Let me summarize it in four key areas.

First, prepare and be ready.

Second, detect, protect and treat.

Third, reduce transmission.

Fourth, innovate and learn.

I remind all countries that we are calling on you to activate and scale up your emergency response mechanisms;

Communicate with your people about the risks and how they can protect themselves – this is everybody's business;

SA-83

 Case 1:22-cv-06781-JSR Document 93-5 Filed 05/31/24 Page 5 of 5 WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020

Find, isolate, test and treat every case and trace every contact;

Ready your hospitals;

Protect and train your health workers.

And let's all look out for each other, because we need each other.

===

There's been so much attention on one word.

Let me give you some other words that matter much more, and that are much more actionable.

Prevention.

Preparedness.

Public health.

Political leadership.

And most of all, people.

We're in this together, to do the right things with calm and protect the citizens of the world. It's doable.

I thank you.

SA-84

# EXHIBIT F

SA-85

FEBRUARY 10, 2023

# Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic

On March 13, 2020, by Proclamation 9994, the President declared a national emergency concerning the coronavirus disease 2019 (COVID-19) pandemic. Today, we are in a different phase of the response to that pandemic than we were in March of 2020, and my Administration is planning for an end to the national emergency, but an orderly transition is critical to the health and safety of the Nation. For this reason, the national emergency declared on March 13, 2020, and beginning March 1, 2020, must continue in effect beyond March 1, 2023. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing the national emergency declared in Proclamation 9994 concerning the COVID-19 pandemic. I anticipate terminating the national emergency concerning the COVID-19 pandemic on May 11, 2023.

This notice shall be published in the *Federal Register* and transmitted to the Congress.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
   February 10, 2023.

SA-86

# EXHIBIT G

SA-87

THOMSON REUTERS
WESTLAW
**Unofficial New York Codes, Rules and Regulations**

---

9 CRR-NY 8.202
NY-CRR

| STATE COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK |
| --- |
| TITLE 9. EXECUTIVE DEPARTMENT |
| SUBTITLE A. GOVERNOR'S OFFICE |
| CHAPTER I. EXECUTIVE ORDERS |
| PART 8. EXECUTIVE ORDERS (ANDREW M. CUOMO) |

9 CRR-NY 8.202
9 CRR-NY 8.202

### 8.202 Executive Order No. 202: Declaring a Disaster Emergency in the State of New York.

WHEREAS, on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern;

WHEREAS, on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue; and

WHEREAS, New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors.

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, hereby find, pursuant to Section 28 of Article 2-B of the Executive Law, that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately, and I do hereby declare a State disaster emergency for the entire State of New York. This Executive Order shall be in effect until September 7, 2020; and

IN ADDITION, this declaration satisfies the requirements of 49 C.F.R. 390.23(a)(1)(A), which provides relief from Parts 390 through 399 of the Federal Motor Carrier Safety Regulations (FM CSR). Such relief from the FM CSR is necessary to ensure that crews are available as needed.

FURTHER, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 6, 2020 the following:

Section 112 of the State Finance Law, to the extent consistent with Article V, Section 1 of the State Constitution, and to the extent necessary to add additional work, sites, and time to State contracts or to award emergency contracts, including but not limited to emergency contracts or leases for relocation and support of State operations under Section 3 of the Public Buildings Law; or emergency contracts under Section 9 of the Public Buildings Law; or emergency contracts for professional services under Section 136- a of the State Finance Law; or emergency contracts for commodities, services, and technology under Section 163 of the State Finance Law; or design-build or best value contracts under and Part F of Chapter 60 of the Laws of 2015 and Part RRR of Chapter 59 of the Laws of 2017; or emergency contracts for purchases of commodities, services, and technology through any federal GSA schedules, federal 1122 programs, or other state, regional, local, multi-jurisdictional, or cooperative contract vehicles;

Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, to the extent necessary to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes;

Section 97-G of the State Finance Law, to the extent necessary to purchase food, supplies, services, and equipment or furnish or provide various centralized services, including but not limited to, building design and construction services to assist affected local

governments, individuals, and other non-State entities in responding to and recovering from the disaster emergency;

Section 359-a, Section 2879, and 2879-a of the Public Authorities Law to the extent necessary to purchase necessary goods and services without following the standard procurement processes;

Sections 375, 385 and 401 of the Vehicle and Traffic Law to the extent that exemption for vehicles validly registered in other jurisdictions from vehicle registration, equipment and dimension requirements is necessary to assist in preparedness and response to the COVID-19 outbreak;

Sections 6521 and 6902 of the Education Law, to the extent necessary to permit unlicensed individuals, upon completion of training deemed adequate by the Commissioner of Health, to collect throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and to the extent necessary to permit non-nursing staff, upon completion of training deemed adequate by the Commissioner of Health, to perform tasks, under the supervision of a nurse, otherwise limited to the scope of practice of a licensed or registered nurse;

Subdivision 6 of section 2510 and section 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

Section 224-b and subdivision 4 of section 225 of the Public Health Law, to the extent necessary to permit the Commissioner of Health to promulgate emergency regulations and to amend the State Sanitary Code;

Subdivision 2 of section 2803 of the Public Health Law, to the extent necessary to permit the Commissioner to promulgate emergency regulations concerning the facilities licensed pursuant to Article 28 of the Public Health Law, including but not limited to the operation of general hospitals;

Subdivision 3 of section 273 of the Public Health Law and subdivisions 25 and 25-a of section 364-j of the Social Services Law, to the extent necessary to allow patients to receive prescribed drugs, without delay;

Section 400.9 and paragraph 7 of subdivision f of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

Section 400.11 of Title 10 of the NYCRR, to the extent necessary to permit Article 28 facilities receiving patients as a result of the disaster emergency to complete patient review instruments as soon as practicable;

Section 405 of Title 10 of the NYCRR, to the extent necessary to maintain the public health with respect to treatment or containment of individuals with or suspected to have COVID-19;

Subdivision d and u of section 800.3 of Title 10 of the NYCRR, to the extent necessary to permit emergency medical service personnel to provide community paramedicine, transportation to destinations other than hospitals or health care facilities, telemedicine to facilitate treatment of patients in place, and such other services as may be approved by the Commissioner of Health;

Paragraph 3 of subdivision f of section 505.14 of Title 18 of the NYCRR, to the extent necessary to permit nursing supervision visits for personal care services provided to individuals affected by the disaster emergency be made as soon as practicable;

Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals who meet the federal requirements for high complexity testing to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

Subdivision 4 of section 6909 of the Public Health Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

Section 596 of Title 14 of the NYCRR to the extent necessary to allow for rapid approval of the use of the telemental health services, including the requirements for in-person initial assessment prior to the delivery of telemental health services, limitations on who can deliver telemental health services, requirements for who must be present while telemental health services are delivered, and a recipient's right to refuse telemental health services;

Section 409-i of the Education Law, section 163-b of the State Finance Law with associated OGS guidance, and Executive Order No. 2 are suspended to the extent necessary to allow elementary and secondary schools to procure and use cleaning and maintenance products in schools; and sections 103 and 104-b of the General Municipal Law are suspended to the extent necessary to allow schools to do so without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

Article 7 of the Public Officers Law, section 41 of the General Construction Law, and section 3002 of the Public Health Law, to the extent necessary to permit the Public Health and Health Planning Council and the State Emergency Medical Services Council to meet and take such actions as authorized by law, as may be necessary to respond to the COVID-19 outbreak, without meeting quorum requirements or permitting the public in-person access to meetings, provided that any such meetings must be webcast and means for effective public comment must be made available; and

FURTHER, I hereby temporarily modify, for the period from the date of this Executive Order through April 6, 2020, the following laws:

Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law, Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations, to the extent necessary to provide the Governor with the authority to regulate traffic and the movement of vehicles on roads, highways, and streets.

Signed: Andrew M. Cuomo
Dated: March 7, 2020

Executive Order No. 202.1

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the laws of the State of New York, do hereby continue Executive Order 202, dated March 7, 2020, and I hereby continue any suspension or modification of law made by Executive Order 202 for thirty days until April 11, 2020, except that such Executive Order is amended to read as follows:

FURTHER, pursuant to the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 11, 2020 the following:

Suspension of laws and regulations to allow for expansion of services and temporary facilities for health and human service providers:

• Subdivisions (a) and (e) of section 401.3 and section 710.1 of Title 10 of the NYCRR, to the extent necessary to allow hospitals to make temporary changes to physical plant, bed capacities, and services provided, upon approval of the Commissioner of Health, in response to a surge in patient census;

• Parts 709 and 710 of Title 10 of the NYCRR, to the extent necessary to allow construction applications for temporary hospital locations and extensions to be approved by the Commissioner of Health without considering the recommendation of the health systems agency or the Public Health and Health Planning Council, and to take such further measures as may be necessary to expedite departmental reviews for such approval;

• Sections 34-2.6 and 58-1.7 of Title 10 of the NYCRR, to the extent necessary to permit clinical laboratories to operate temporary collecting stations to collect specimen from individuals suspected of suffering from a COVID-19 infection;

• Section 41.34 of the Mental Hygiene law and Part 620 and section 686.3 of Title 14 of the NYCRR, to the extent necessary to allow facilities certified pursuant to Article 16 of the Mental Hygiene law to increase and/or exceed certified capacity limits without following site selection procedures and/or without providing notification to the appropriate local governmental unit upon approval of the commissioner of OPWDD;

• Section 33.17 of the Mental Hygiene Law and associated regulations to the extent necessary to permit providers to utilize staff members in the most effective means possible to transport individuals receiving services from the Office of Mental Health or a program or provider under the jurisdiction of the Office of Mental Health during the emergency, provided such facilities take all reasonable measures to protect the health and safety of such individuals;

• Sections 29.11 and 29.15 Mental Hygiene Law and section 517 of Title 14 of the NYCRR to the extent necessary to permit mental health facilities licensed pursuant to Article 31 of the Mental Hygiene Law that are treating patients during the emergency to rapidly discharge, including conditionally discharge, transfer, or receive such patients, as authorized by the Commissioner of the Office of Mental Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices;

• Section 29.13 of the Mental Hygiene Law and associated regulations to the extent individuals in areas affected by the emergency are temporarily receiving services from different providers, whose immediate priority is to stabilize the individual, address acute symptoms, and provide supports including medication and stress relief, such that it is impossible to comply with development, assessment, scope and frequency, and documentation requirements for treatment plans;

• Sections 131, 132 and 349-a of the Social Services Law to the extent necessary to allow screenings to be conducted by telephone;

• Sections 2510 and 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

• Subdivision 4 of section 6909 of the Education Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen

to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

• Section 400.9 and paragraph 7 of subdivision h of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

• Subdivision 3 of section 2801-a of the Public Health Law and section 600.1 of Title 10 of the NYCRR, to the extent necessary to permit the Commissioner of Health to approve the establishment of temporary hospital locations and extensions without following the standard approval processes and to take such further measures as may be necessary to expedite departmental reviews for such approval;

• Section 2999-cc of the Public Health Law and any regulatory provisions promulgated thereunder by the Department of Health, the Office of Mental Health, the Office of Addiction Services and Supports, and the Office for People with Developmental Disabilities, to the extent necessary to allow additional telehealth provider categories and modalities, to permit other types of practitioners to deliver services within their scopes of practice and to authorize the use of certain technologies for the delivery of health care services to established patients, pursuant to such limitations as the commissioners of such agencies may determine appropriate;

Suspension of laws and regulations relating to child care to allow flexibility for providers while continuing to protect the health and safety of children:

• Sections 414.7, 416.7, 417.7, 418-1.7, 418-2.7, 414.8, 416.8, 417.8, 418-1.8, and 418-2.8 of Title 18 of the NYCRR insofar as that regulation sets the ages of children who can be served and the standards for care; Sections 414.13, 416.13, 417.13, 418-1.13, 418-2.13 of Title 18 of the NYCRR suspending requirements for staff qualifications; Section 390 of the Social Services law suspending provisions setting capacity limits for family and group family day care programs and standards for staff/child ratios in all child care modalities; Sections 390(3) and 390-a of the Social Services Law and regulations at 18 NYCRR Sections 413(g), 414.14, 415.13, 416.14, 417.14, 418-1.14, 418-2.14, allowing for the waiver of certain provisions establishing training and inspection requirements for child day care; and Section 424-a of the Social Services Law insofar as allowing for the waiver of fees paid for statewide central register of child abuse and maltreatment database check;

• Section 410-w of the Social Services Law and sections 404.1, 404.7, 415.2, 415.3, 415.6 of Title 18 of the NYCRR insofar as that statute and those regulations establish financial eligibility standards, the reimbursement requirements, and set timeliness requirements for the provision of services including payment for absences due to COVID-19 abatement processes;

Suspension of regulations to prevent delays in providing home delivered meals and in providing services under the Expanded In-Home Services for the Elderly Program (EISEP) to older adults:

• Clause (d) of subparagraph (ii) of paragraph (3) of subdivision (a) of section 6654.10 of Title 9 of the NYCRR, insofar as it requires an assessment be conducted prior to or within 10 days of the initiation of home delivered meals;

• Subdivision (h) of section 6654.16 of Title 9 of the NYCRR, insofar as it requires an assessment be conducted within 10 working days after the completion of the screening intake and prior to the initiation of services under the Expanded In-Home Services for the Elderly Program (EISEP);

• Subdivision (n) of section 6654.16 of Title 9 of the NYCRR, to allow for a care plan to remain in effect for a period exceeding 12 months under the Expanded In-Home Services for the Elderly Program (EISEP) when such care plan would otherwise expire during the period in which a disaster emergency is declared;

• Subdivision (x) of section 6654.16 of Title 9 of the NYCRR, modifying requirements for reassessments to be conducted every 12 months or within 5 days of becoming aware of a change in circumstance under the Expanded In-Home Services for the Elderly Program (EISEP);

Suspension of law to allow waiver of requirements necessary for apportionment of school aid:

• Section 3604(7) of the Education Law, to the extent consistent and necessary to allow the commissioner to disregard such reduction in the apportionment of public money due to a failure by a school to meet the instructional requirements proscribed within this section due to the properly executed declaration of a local state of emergency as defined within sub-section (i), a school is directed to close by a state or local health official or following a properly executed declaration of a state of emergency as defined within sub-section (i), limited to the extent that those specified schools are unable to make up missed instructional days;

Suspension of laws and regulations relating to emergency procurement:

• Sections 553(22), 559, 1209, and 1265-a of the Public Authorities Law, and 21 NYCRR Part 1002, to the extent necessary to purchase necessary equipment, materials, supplies, or services, without following the standard procurement processes, including the standard prompt payment policy;

Suspensions of law relating to appearances by defendants:

• Notwithstanding any other provision of law and except as provided in section 182.30 of Article 182 of the Criminal Procedure Law, the court, in its discretion, may dispense with the personal appearance of the defendant, except an appearance at a hearing or trial, and conduct an electronic appearance in connection with a criminal action pending in any county in New York State, provided that the chief administrator of the courts has authorized the use of electronic appearance due to the outbreak of COVID-19, and the defendant, after consultation with counsel, consents on the record. Such consent shall be required at the commencement of each electronic appearance to such electronic appearance.

Suspension of law relating to waiting periods for unemployment insurance claimants whose claims arise directly out of COVID-19 outbreak:

• Subdivision 7 of Section 590 of the Labor Law, so far as it relates to the waiting period for unemployment insurance claimants whose claims for unemployment insurance arise directly out of closings of schools or other workplaces in which claimants were employed, or out of claimants' isolation or quarantine in connection with COVID-19; and

Suspension of law allowing the attendance of meetings telephonically or other similar service:

• Article 7 of the Public Officers Law, to the extent necessary to permit any public body to meet and take such actions authorized by the law without permitting in public in-person access to meetings and authorizing such meetings to be held remotely by conference call or similar service, provided that the public has the ability to view or listen to such proceeding and that such meetings are recorded and later transcribed;

Suspension of law allowing residents of nursing homes to vote with modified visitor policies in place:

• Subdivision 8 of section 8-407 of the Election Law to allow individuals not employed by the Board of Elections to assist residents of nursing homes or adult care facilities in the completion of absentee ballot applications and voting;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 11, 2020:

• Any guidance issued by the New York State Department of Health related to prevention and infection control of COVID-19 at nursing homes and adult care facilities, including but not limited to guidance on visitation, shall be effective immediately and shall supersede any prior conflicting guidance issued by the New York State Department of Health and any guidance issued by any local board of health, any local department of health, or any other political subdivision of the State related to the same subject.

• Any large gathering or event for which attendance is anticipated to be in excess of five hundred people shall be cancelled or postponed for a minimum of thirty days.

• Any place of business or public accommodation, and any gathering or event for which attendance is anticipated to be fewer than five hundred people, shall operate at no greater than fifty percent occupancy, and no greater than fifty percent of seating capacity, for thirty days effective on Friday, March 13, 2020, except that any theater seating five hundred or more attendees for a live performance located in a city of one million or more shall not hold any further performances after 5pm on March 12, 2020.

• The two preceding directives shall not apply to a school, hospital, nursing home, other medical office or facility as determined by the Commissioner of Health, mass transit or mass transit facility, governmental facility, law enforcement facility, or retail establishments including grocery stores. The Commissioner of Health may allow for businesses that are not public gathering spaces to exceed five hundred persons if the occupancy is less than fifty percent capacity subject to public health review.

Signed: Andrew M. Cuomo<br>
Dated: March 12, 2020

Executive Order No. 202.2

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 13, 2020 the following:

Suspension of laws and regulations:

• Section 8-400 of the Election Law is temporarily suspended and otherwise altered to provide that due to the prevalence and community spread of COVID-19, temporary illness for the purpose of this section shall include the potential for contraction of the COVID-19 virus for any election held on or before April 1, 2020;

• Solely for any election held on or before April 1, 2020, Section 8-400 of the Election Law is hereby further modified to allow for electronic application, with no requirement for in-person signature or appearance to be able to access an absentee ballot; and deadlines to apply for such ballot are hereby modified to no later than March 23, 2020 and such ballots once voted shall be postmarked no later than March 24, 2020 or may be delivered in person to any board of elections; and

• Article 6 of the Election Law is modified to the extent necessary to reduce required number of signatures on petitions pursuant to Section 6-136 of such law to 1.5% of the enrolled voters required, or 30% of the stated threshold, whichever is less. Further such provisions are modified to require that gathering of signatures shall be suspended effective Tuesday, March 17, 2020 at 5 p.m.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 13, 2020:

Any school district which is closing pursuant to a local state of emergency declared as a result of the COVID-19 virus shall be required to first consult with local department of health and also exhaust any available time including snow days and vacation days. Additionally, the State Education Department shall promulgate guidance for districts to ensure access to meals for students in need, critical educational supports for students and distance learning options.

Signed: Andrew M. Cuomo<br>
Dated: March 16, 2020

Executive Order No. 202.3

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, one state acting alone cannot control the continued spread of this disease and it requires coordination and cooperation amongst the states; and

NOW, THEREFORE, I, Governor Andrew M. Cuomo, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, or to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives and suspensions and modifications for the period from the date of this Executive Order 202.3 through April 15, 2020:

• The directive requiring large gatherings and events to be cancelled or postponed if they had anticipated attendance in excess of 500 people by virtue of Executive Order 202.1 dated March 12, 2020, is hereby amended and modified to require that any large gathering or event (concert, conference, worship service, performance before a large audience, etc.) shall be cancelled or postponed if more than fifty persons are expected in attendance, at any location in New York State until further notice.

• Any restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption. Notwithstanding any provision of the alcohol and beverage control law, a retail on-premises licensee shall be authorized for the duration of this Executive Order to sell alcohol for off-premises consumption, which shall include either take-out or delivery, subject to reasonable limitations set by the State Liquor Authority.

• Any facility authorized to conduct video lottery gaming, or casino gaming shall cease operation effective at 8 pm on March 16, 2020, and until further notice. For a Class III Tribal Gaming enterprise or Class II Tribal Gaming enterprise, any facility should also close to the public until further notice.

• Any gym, fitness centers or classes, and movie theaters shall also cease operation effective at 8 pm on March 16, 2020 until further notice.

• No local government or political subdivision shall issue any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with or superseding the foregoing directives, or any other executive order issued under Section 24 of the Executive Law and any local emergency order or any local administrative codes, charters, laws, rules or regulations, are hereby suspended with respect to any such order issued under such authority different or in conflict with Executive directives.

Signed: Andrew M. Cuomo
Dated: March 16, 2020

Executive Order No. 202.4

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue; and

NOW, THEREFORE, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 15, 2020:

• Any local government or political subdivision shall, effective March 17, 2020, allow non-essential personnel as determined by the local government, to be able to work from home or take leave without charging accruals, except for those personnel essential to the locality's response to the COVID-19 emergency. Such non-essential personnel shall total no less than fifty-percent (50%) of the total number of employees across the entire workforce of such local government or political subdivision.

• Restrictions on reporting to work for any state worker whose service is non-essential, or not required to support the COVID-19 response, are expanded to all counties in the State of New York.

• Notwithstanding any prior directives, every school in the state of New York is hereby directed to close no later than Wednesday, March 18, 2020, for a period of two weeks, ending April 1, 2020. The state shall reassess at that time whether to extend such closure beyond this date and may continue to suspend the 180 day instructional requirement. The 180 day suspension will be adjusted to the state's allowed closure directive. Schools that exceed the period will not be exempted from the 180-day rule. School districts shall develop a plan for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of parents in the health care profession or first responders who are critical to the response effort. Such plans shall be submitted to the State Education Department and may be amended or modified by the State Education Department, in consultation with the Department of Health and Office of Children and Family Services at any time. School districts in Nassau County, Suffolk County and Westchester County and the City of New York must submit such plans for approval no later than midnight, March 17, 2020 to the State.

• Any village election to be held March 17, 2020 shall be postponed and any elected official holding such position shall remain in office until such time as a new election is held.

Signed: Andrew M. Cuomo
Dated: March 16, 2020

Executive Order No. 202.5

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, in order to facilitate the most timely and effective response to the COVID 19 emergency disaster,it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 17, 2020 the following:

• Sections 6512 through 6516, and 6524 of the Education Law and Part 60 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in any state in the United States to practice medicine in New York State without civil or criminal penalty related to lack of licensure;

• Section 6502 of the Education Law and Part 59.8 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

• Sections 6512 through 6516, and 6905, 6906 and 6910 of the Education Law and Part 64 of Title 8 of the NYCRR, to the extent necessary to allow registered nurses, licensed practical nurses, and nurse practitioners licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 6512 through 6516, and 6541 of the Education Law and Part 60.8 of Title 8 of the NYCRR 8 NYCRR, to the extent necessary to allow physician assistants licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

• Section 400.12 of Title 10 of the NYCRR, to the extent necessary to allow patients affected by the disaster emergency to be transferred to receiving Article 28 facilities as authorized by the Commissioner of Health;

• Section 415.11 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to perform comprehensive assessments of those residents temporarily evacuated to such nursing homes as soon as practicable following admission or to forego such assessments for individuals returned to facilities from which they were evacuated;

• Subdivision b of section 415.15 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to obtain physician approvals for admission as soon as practicable following admission or to forego such approval for individuals returned to facilities from which they were evacuated;

• Subdivision i of section 415.26 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to comply with admission procedures as soon as practicable following admission or to forego such procedures for individuals returned to facilities from which they were evacuated;

• Paragraph 2 of subdivision g of section 763.4; paragraphs 7 and 8 of subdivision h of section 763.4; paragraph 2 of subdivision a of section 766.5; and paragraph 1 of subdivision d of section 766.5 of Title 10 of the NYCRR, to the extent necessary to permit certified home health agencies, long term home health care programs, AIDS home care programs, and licensed home care services agencies serving individuals affected by the disaster emergency to conduct in-home supervision of home health aides and personal care aides as soon as practicable after the initial service visit, or to permit in-person and in-home supervision to be conducted through indirect means, including by telephone or video communication;

• Subdivision a of section 763.5 of Title 10 of the NYCRR, to the extent necessary to permit initial patient visits for certified home health agencies, long term home health care programs and AIDS home care programs serving individuals affected by the disaster emergency to be made within 48 hours of receipt and acceptance of a community referral or return home from institutional placement;

• Sections 403.3 and 403.5 if Title 10 of the NYCRR, to extend the time in which home care services entities must submit information to the Home Care Worker Registry;

• Sections 358-4.3, 358-5.12 and 358-5.13 of Title 18 of the NYCRR, to the extent necessary to allow or require appearance by any parties to a fair hearing by written, telephonic, video or other electronic means;

• Sections 2999-h and 2999-j of the Public Health Law, to the extent necessary to provide reimbursement to Medical Indemnity Fund enrollees, in primary residences where a resident has had COVID-19 or was exposed to COVID-19, for costs related to cleaning and disinfection of such primary residences, at the discretion of the Commissioner of Health;

• Section 2805-k of the Public Health Law and sections 405.4, 405.5, 405.9, 405.14, 405.19, and 405.22 of Title 10 of the NYCRR, to the extent necessary to allow staff with the necessary professional competency and who are privileged and credentialed to work in a facility in compliance with such section of the Public Health Law and such sections of the NYCRR, or who are privileged and credentialed to work in a facility in another state in compliance with the applicable laws and regulations of that other state, to practice in a facility in New York State;

• Part 405 of Title 10 of the NYCRR, to the extent necessary to adopt existing policies and procedures in a general hospital at a new, temporary facility created for the purpose of treating patients during the COVID-19 outbreak;

• Any code related to construction, energy conservation, or other building code, and all state and local laws, ordinances, and regulations relating to administration and enforcement of the foregoing, to the extent necessary to allow, upon approval by the Commissioner of Health or the Commissioner of OPWDD, as applicable, the temporary changes to physical plant, bed capacities, and services provided; the construction of temporary hospital locations and extensions; the increase in and/or exceeding of certified capacity limits; and the establishment of temporary hospital locations and extensions;

• Part 425 of Title 10 of the NYCRR and section 461-k of the Social Services Law, to the extent necessary to prevent transportation to and attendance at adult day care programs, until authorized by the Commissioner of Health;

• Section 16.17 of the Mental Hygiene Law to the extent necessary to permit the Office of People with Developmental Disabilities to take emergency action to suspend or limit a provider's operating certificate;

• Sections 633.12 and 636-1 of Title 14 of the NYCRR, to the extent necessary to temporarily deviate from an individual's service plan, which would otherwise outline participation in day programming and other community based served, and to the extent necessary to temporarily relocate individuals, in order to maintain the health and safety of that individual during this emergency period and to the extent necessary;

• Sections 33.02 and 33.05 of the Mental Hygiene law and sections 633.4, 636-1.4 and 633.16 of Title 14 of the NYCRR, to the extent necessary to restrict visitors to facilities certified pursuant Article 16 of the Mental Hygiene law and to permit restrictions on community outings for residents of such facilities to reduce the spread of COVID-19;

• Sections 633.8 and 633.14 of Title 14 of the NYCRR to the extent necessary to permit abbreviated training of direct support professionals employed in programs and facilities certified pursuant to Article 16 of the Mental Hygiene Law that are experiencing staff shortages;

• Section 633.17 of Title 14 of the NYCRR, to the extent necessary to permit abbreviated medication administration training of direct support professionals employed in programs or facilities certified pursuant to Article 16 of the Mental Hygiene Law;

• Section 390-b of the Social Services Law and regulations at sections 413.4 and 415.15 of Title 18 of the NYCRR insofar as that statute and those regulations establish background check requirements for child day care;

• Section 390 of the Social Services Law insofar as that section of law exempts school age child care programs operated by a school or entity with experience providing child care and located in a school providing elementary or secondary education from having to comply with the regulations of the office of children and family services;

• Subdivision 7 of section 590 and subdivision 2 of section 607 of the Labor Law, so far as they relate to waiting periods for unemployment insurance claimants whose claims for unemployment insurance arise due to closure of an employer for a reason related to COVID-19 or due to a mandatory order of a government entity duly authorized to issue such order to close such employer, as of March 12, 2020;

• Subdivision b of section 708 of the Business Corporation Law to the extent necessary to permit business corporations to take any action otherwise permitted under that section with the electronic consent of the members of the board or committee, when such consent is submitted via electronic mail along with information from which it can reasonably be determined that the transmission was authorized by such member;

• Sections 65(13)(b) and 66(12)(f) of the Public Service Law to the extent of having in-person public hearings, provided that such hearings are held by conference call or similar electronic means, which are recorded and later transcribed;

• Section 165(1) of the Public Service Law ("PSL") to the extent of holding public statement hearings, provided that the public may file written comments in any case subject to PSL Article 10 until issuance of a final order; and

• Section 123(1) of the Public Service Law ("PSL") to the extent of holding a public hearing, provided that the public may file written comments in any case subject to PSL Article VII until issuance of a final order.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 17, 2020:

• Any village election set to be held March 18, 2020 shall be postponed and any elected official holding such position shall remain in office until such time as a new election is held.

• Effective at 8 p.m. March 19, 2020, all indoor common portions of retail shopping malls with in excess of 100,000 square feet of retail space available for lease shall close and cease access to the public. Any stores located within shopping malls, which have their own external entrances open to the public, separate from the general mall entrance, may remain open, subject to the requirements of Executive Order 202.3 that any restaurant shall limit itself to take out or delivery food services, and that any interior entrances to common areas of the mall remain closed and locked.

• Additionally, all places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions shall likewise be closed to the public at 8 p.m. on March 19. This directive shall not apply to public parks and open recreation areas.

• Notwithstanding section 24 of the Executive Law, no locality or political subdivision shall issue any local emergency order or executive order with respect to response of COVID-19 without the approval of the State Department of Health.

Signed: Andrew M. Cuomo
Dated: March 18, 2020

Executive Order No. 202.6

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, in order to facilitate the most timely and effective response to the COVID 19 emergency disaster,it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 17, 2020 the following:

• Section three of the Public Officer's Law shall not apply to an individual who is deemed necessary to hire or to engage in a volunteer capacity to provide for an effective and efficient emergency response, for the duration of such emergency;

• Subparagraph (i) of subdivision 1 of section 73 of the Public Officers Law Section shall not apply to any person who is hired, retained, appointed, or who volunteers in any way to assist New York State in its response to the declared emergency;

• Subparagraph 5 of section 73 of the Public Officers Law Section shall not apply to a state officer or employee, or a volunteer who is facilitating contributions or donations to assist New York State in its response to the declared emergency;

• Subparagraph 8 of section 73 of the Public Officers Law Section 73(8) and section 74 of the Public Officer's Law shall not apply to volunteers or contractors who assist New York State in its response, provided that any recusals shall be adhered to if determined necessary by the appointing entity;

• Legislative Law Section 1-M is suspended to the extent that any agency may receive a donation in kind or otherwise, in any amount from any source, provided such donation is made to the State and is administered by a state agency in furtherance of the response effort;

• State Finance Law Section 11, to the extent necessary to facilitate an efficient and effective New York State emergency disaster response, shall not apply to any state agency efforts to further the response to the declared emergency;

NOW, THEREFORE, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 17, 2020:

• Effective on March 20 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. This includes essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media; banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses; vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public;

• Any other business may be deemed essential after requesting an opinion from the Empire State Development Corporation, which shall review and grant such request, should it determine that it is in the best interest of the state to have the workforce continue at full capacity in order to properly respond to this disaster. No later than 5 p.m. on March 19, 2020, Empire State Development Corporation shall issue guidance as to which businesses are determined to be essential.

Signed: Andrew M. Cuomo
Dated: March 18, 2020

Executive Order No. 202.7

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, in order to facilitate the most timely and effective response to the COVID 19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-8 of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 18, 2020 the following:

• The suspensions made to the Public Officer's Law, including provisions of Section 73 and Section 74, by Executive Order 202.6 are hereby modified to require that such suspensions and modifications shall only be valid with respect to a person hired for a nominal or no salary or in a volunteer capacity.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 18, 2020:

• Any notarial act that is required under New York State law is authorized to be performed utilizing audio-video technology provided that the following conditions are met:

○ The person seeking the Notary's services, if not personally known to the Notary, must present valid photo ID to the Notary during the video conference, not merely transmit it prior to or after;

○ The video conference must allow for direct interaction between the person and the Notary (e.g. no pre-recorded videos of the person signing);

○ The person must affirmatively represent that he or she is physically situated in the State of New York;

○ The person must transmit by fax or electronic means a legible copy of the signed document directly to the Notary on the same date it was signed;

○ The Notary may notarize the transmitted copy of the document and transmit the same back to the person; and

○ The Notary may repeat the notarization of the original signed document as of the date of execution provided the Notary receives such original signed document together with the electronically notarized copy within thirty days after the date of execution.
• Effective March 21, 2020 at 8 p.m. and until further notice, all barbershops, hair salons, tattoo or piercing parlors and related personal care services will be closed to members of the public. This shall also include nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services; as these services cannot be provided while maintaining social distance.
• The provisions of Executive Order 202.6 requiring in-person work environment restrictions are modified as follows: Effective March 21, 2020 at 8 p.m. and until further notice all businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 75% no later than March 21 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions.

Signed: Andrew M. Cuomo
Dated: March 19, 2020

Executive Order No. 202.8

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;
WHEREAS, in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:
• In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020;
• Subdivision 1 of Section 503 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a driver's license, in order to extend for the duration of this executive order the validity of driver's licenses that expire on or after March 1, 2020;
• Subdivision 1 of Section 491 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, in order to extend for the duration of this executive order the validity of non-driver identification cards that expire on or after March 1, 2020;
• Sections 401, 410, 2222, 2251, 2261, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all terrain vehicle, respectively, in order to extend for the duration of this executive order the validity of such registration certificate or number plate that expires on or after March 1, 2020;
• Section 420-a of the vehicle and traffic law to the extent that it provides an expiration for temporary registration documents issued by auto dealers to extend the validity of such during the duration of this executive order.
• Subsection (a) of Section 602 and subsections (a) and (b) of Section 605 of the Business Corporation Law, to the extent they require meetings of shareholders to be noticed and held at a physical location.
NOW, THEREFORE, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 19, 2020:
• The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.
• There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days.
• Effective at 8 p.m. March 20, any appointment that is in-person at any state or county department of motor vehicles is cancelled, and until further notice, only on-line transactions will be permitted.
• The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to also authorize abatement of interest, for a period of 60 days for a taxpayers who are required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.

SA-97

Signed: Andrew M. Cuomo
Dated: March 20, 2020

Executive Order No. 202.9

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 20, 2020 the following:

• Subdivision two of Section 39 of the Banking Law is hereby modified to provide that it shall be deemed an unsafe and unsound business practice if, in response to the COVID-19 pandemic, any bank which is subject to the jurisdiction of the Department shall not grant a forbearance to any person or business who has a financial hardship as a result of the COVID-19 pandemic for a period of ninety days.

NOW, THEREFORE, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 20, 2020:

• The Superintendent of the Department of Financial Services shall ensure under reasonable and prudent circumstances that any licensed or regulated entities provide to any consumer in the State of New York an opportunity for a forbearance of payments for a mortgage for any person or entity facing a financial hardship due to the COVID-19 pandemic. The Superintendent shall promulgate emergency regulations to require that the application for such forbearance be made widely available for consumers, and such application shall be granted in all reasonable and prudent circumstances solely for the period of such emergency.

• Further, the Superintendent shall be empowered to promulgate emergency regulations to direct that, solely for the period of this emergency, fees for the use of automated teller machines (ATMs), overdraft fees and credit card late fees, may be restricted or modified in accordance with the Superintendent's regulation of licensed or regulated entities taking into account the financial impact on the New York consumer, the safety and soundness of the licensed or regulated entity, and any applicable federal requirements.

Signed: Andrew M. Cuomo
Dated: March 21, 2020

Executive Order No. 202.10

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, ensuring the State of New York has adequate bed capacity, supplies, and providers to treat patients affected with COVID-19, as well as patients afflicted with other maladies, is of critical importance; and

WHEREAS, eliminating any obstacle to the provision of supplies and medical treatment is necessary to ensure the New York healthcare system has adequate capacity to provide care to all who need it;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 22, 2020 the following:

• Section 2803 of the Public Health Law, and Parts 400, 401, 405, 409, 710, 711 and 712 of Title 10 of the NYCRR, to the extent necessary to permit and require general hospitals to take all measures necessary to increase the number of beds available to patients, in accordance with the directives set forth in this Executive Order;

• Section 3001, 3005-a, 3008, and 3010 of the Public Health Law to the extent necessary to modify the definition of "emergency medical services" to include emergency, non-emergency and low acuity medical assistance; to eliminate any restrictions on an approved ambulance services or providers operating outside of the primary territory listed on such ambulance services operating certificate with prior approval by the Department of Health; to permit the Commissioner of Health to issue provisional emergency medical services provider certifications to qualified individuals with modified certification periods as approved; and to allow emergency medical services to transport patients to locations other than healthcare facilities with prior approval by Department of Health;

• Section 3002, 3002-a, 3003, and 3004-a of Public Health Law to the extent necessary to allow any emergency medical treatment protocol development or modification to occur solely with the approval of the Commissioner of Health;

• Sections 405.13 and 755.4 of Title 10 of the NYCRR to the extent necessary to permit an advanced practice registered nurse with a doctorate or master's degree specializing in the administration of anesthesia administering anesthesia in a general hospital or free-standing ambulatory surgery center without the supervision of a qualified physician in these health care settings;

• Paragraph 1 of Section 6542 of the Education Law and Subdivisions (a) and (b) of Section 94.2 of Title 10 of the NYCRR to the extent necessary to permit a physician assistant to provide medical services appropriate to their education, training and experience without oversight from a supervising physician without civil or criminal penalty related to a lack of oversight by a supervising physician;

• Paragraph 1 of Section 6549 of the Education Law and Subdivisions (a) and (b) of Section 94.2 of Title 10 of the NYCRR to the extent necessary to permit a specialist assistant to provide medical services appropriate to their education, training and experience without oversight from a supervising physician without civil or criminal penalty related to a lack of oversight by a supervising physician;

• Subdivision (3) of Section 6902 of Education Law, and any associated regulations, including, but not limited to, Section 64.5 of Title 10 of the NYCRR, to the extent necessary to permit a nurse practitioner to provide medical services appropriate to their education, training and experience, without a written practice agreement, or collaborative relationship with a physician, without civil or criminal penalty related to a lack of written practice agreement, or collaborative relationship, with a physician;

• Subdivision (15) of section 3001, and Sections 800.3, 800.15 and 800.16 of Title 10 of the NYCRR with approval of the department, to the extent necessary to define "medical control" to include emergency and non-emergency direction to all emergency medical services personnel by a regional or state medical control center and to permit emergency medical services personnel to operate under the advice and direction of a nurse practitioner, physician assistant, or paramedic, provided that such medical professional is providing care under the supervision of a physician and pursuant to a plan approved by the Department of Health;

• Subdivision (2) of section 6527, Section 6545, and Subdivision (1) of Section 6909 of the Education Law, to the extent necessary to provide that all physicians, physician assistants, specialist assistants. nurse practitioners, licensed registered professional nurses mid licensed practical nurses shall be immune from civil liability for any injury or death alleged to have been sustained directly as a result of an act or omission by such medical professional in the course of providing medical services in support of the State's response to the COVID-19 outbreak, unless it is established that such injury or death was caused by the gross negligence of such medical professional;

• Any healthcare facility is authorized to allow students. in programs to become licensed in New York State to practice as a healthcare professional, to volunteer at the healthcare facility for educational credit as if the student had secured a placement under a clinical affiliation agreement, without entering into any such clinical affiliation agreement;

• Notwithstanding any law or regulation to the contrary, health care providers are relieved of recordkeeping requirements to the extent necessary for health care providers to perform tasks as may be necessary to respond to the COVID-19 outbreak, including, but not limited to, requirements to maintain medical records that accurately reflect the evaluation and treatment of patients, or requirements to assign diagnostic codes or to create or maintain other records for billing purposes. Any person acting reasonably and in good faith under this provision shall be afforded absolute immunity from liability for any failure to comply with any recordkeeping requirement. In order to protect from liability any person acting reasonably and in good faith under this provision, requirements to maintain medical records under Subdivision 32 of Section 6530 of the Education Law, Paragraph (3) of Subdivision (a) of Section 29.2 of Title 8 of the NYCRR, and Sections 58-1.11, 405.10, and 415.22 of Title 10 of the NYCRR, or any other such laws or regulations are suspended or modified to the extent necessary for health care providers to perform tasks as may be necessary to respond to the COVID-19 outbreak;

• Section 405.45 of Title 10 of the NYCRR to the extent necessary to permit the Commissioner of Health to designate a health care facility as a trauma center, or extend or modify the period for which a health care facility may be designated as a trauma center, or modify the review team for assessment of trauma center;

• Sections 800.3, 800.8, 800.9, 800.10, 800.12, 800.17, 800.18, 800.23, 800.24, and 800.26 of Title 10 of the NYCRR to the extent necessary to extend all existing emergency medical services provider certifications for one year; to permit the Commissioner of Health to modify the examination or recertification requirements for emergency medical services provider certifications; to suspend or modify, at the discretion of the Commissioner of Health, any requirements for the recertification of previously certified emergency medical services providers; and, at the discretion of the Commissioner of Health, develop a process determined by the Department of Health, to permit any emergency medical services provider certified or licensed by another State to provide emergency medical services within New York state; at the discretion of the Commissioner of Health, to suspend or modify equipment or vehicle requirements in order to ensure sustainability of EMS operations;

• Paragraph (6) of subdivision (b) of part 405.4 of Title 10 of the NYCRR to the extent necessary to remove limits on working hours for physicians and postgraduate trainees;

• Subparagraph (ii) of paragraph (2) of subdivision (g) of 10 N.Y.C.R.R. section 405.4, to the extent necessary to allow graduates of foreign medical schools having at least one year of graduate medical education to provide patient care in hospitals, is modified so as to allow such graduates without licenses to provide patient care in hospitals if they have completed at least one year of graduate medical education;

• Subdivision (c) of section 405.2 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals affected by the disaster emergency to maintain adequate staffing;

• Subdivision (b) of section 405.3 of Title 10 of the NYCRR, to the extent necessary to allow general hospitals to use qualified volunteers or personnel affiliated with different general hospitals, subject to the terms and conditions established by the Commissioner of Health;

• Section 3507 of the Public Health Law and Part 89 of Title 10 of the NYCRR to the extent necessary to permit radiologic technologists licensed and in current good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

• Sections 3502 and 3505 of the Public Health Law and Part 89 of Title 10 of the NYCRR to the extent necessary to permit radiologic technologists licensed and in current good standing in any state in the United State to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 8502, 8504, 8504-a, 8505, and 8507 of the Education Law and Subpart 79-4 of Title 8 of the NYCRR, to the extent necessary to allow respiratory therapists licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

• Section 6502 of the Education Law and 8 NYCRR 59.8, to the extent necessary to allow physician's assistants licensed and in current good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

• Section 6502 of the Education Law and 8 NYCRR 59.8, to the extent necessary to allow registered professional nurses, licensed practical nurses and nurse practitioners licensed and in current good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

• Subdivision (2-b) of Section 4002 of the Public Health Law to the extent necessary to allow a hospice residence to designate any number of beds within such facility as dually certified inpatient beds;

• Title V of Article 5 of the Public Health Law and subparts 19 and 58 of Title 10 of the NYCRR, to the extent necessary to allow laboratories holding a Clinical Laboratory Improvement Acts (CUA) certificate and meeting the CLIA quality standards described in 42 CFR Subparts 11, J, K and M, to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

• Article 139 of the Education Law, Section 576-b of the Public Health Law and Section 58-1.7 of Title 10 of the NYCRR, to the extent necessary to permit registered nurses to order the collection of throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and

• Subdivision (I) of Section 6801 of the Education Law, Section 6832 of the Education Law and Section 29.7(a)(2I)(ii)(b)(4) of Title 8 of the NYCRR, to the extent necessary to permit a certified or registered pharmacy technician, under the direct personal supervision of a licensed pharmacist, to assist such licensed pharmacist, as directed, in compounding, preparing, labeling, or dispensing of drugs used to fill valid prescriptions or medication orders for a home infusion provider licensed as a pharmacy in New York, compliant with the United States Pharmacopeia General Chapter 797 standards for Pharmaceutical Compounding - sterile preparations, and providing home infusion services through a home care agency licensed under Article 36 of the Public Health Law.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through April 22, 2020:

• Any healthcare facility is authorized to allow students, in programs to become licensed in New York State to practice a healthcare professional, to volunteer at the healthcare facility for educational credit as if the student had secured a placement under a clinical affiliation agreement, without entering into any such clinical affiliation agreement;

• The Commissioner of Health is authorized to direct, and shall so direct, all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by canceling all elective surgeries and procedures, as the Commissioner of Health shall define. General hospitals shall comply with such order by submitting COVID-19 Plans to the New York State Department of Health (NYSDOH), on a schedule to be determined by NYSDOH, to accomplish this purpose;

• The Commissioner of Health is authorized to suspend or revoke the operating certificate of any general hospital should they be unable to meet the requirements of the necessary capacity directives; and notwithstanding any law to the contrary the Commissioner may appoint a receiver to continue the operations on 24 hours' notice to the current operator, in order to preserve the life, health and safety of the people of the State of New York.

• No pharmacist shall dispense hydroxychloroquine or chloroquine except when written as prescribed for an FDA-approved indication; or as part of a state approved clinical trial related to COVID-19 for a patient who has tested positive for COVID-19, with such test result documented as part of the prescription. No other experimental or prophylactic use shall be permitted, and any. permitted prescription is limited to one fourteen day prescription with no refills.

• Any licensed health insurance company shall deliver to the Superintendent, no later than March 24, 2020 a list of all persons who have a professional licensure or degree, whether physician's assistant, medical doctor, licensed registered nurse, licensed nurse practitioner or licensed practical nurse, and whether or not the person has a currently valid, or recently (within past five years) expired license in the state of New York. The Department of Financial Services shall poll such individuals to determine whether or not such professionals would serve in the COVID-19 response effort.

• Non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other social events) are canceled or postponed at this time.

Signed: Andrew M. Cuomo
Dated: March 23, 2020

Executive Order No. 202.11

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 26, 2020 the following:

• Sections 16.03 and 16.05 of the Mental Hygiene Law and Part 619 of Title 14 of the NYCRR to the extent that they limit the provision of certain services to certified settings provided, however, that use of such settings shall require the approval of the commissioner of OPWDD;

• Section 633.16 of Title 14 of the NYCRR to the extent necessary to permit abbreviated training and/or extension of recertification deadlines for direct support professionals employed in programs and facilities certified pursuant to Article 16 of the Mental Hygiene Law that are experiencing staff shortages;

• Sections 131-u and 459(b) of the Social Services Law and Sections 408.6, 408.7 and 408.8 Of Title 18 of the NYCRR insofar as the statute and regulations limit the duration and amount of reimbursement for residential programs for victims of domestic violence to the per diem rate established by the Office of Children and Family Services;

• Section 6808(1) of the Education Law and any associated regulations, to the extent necessary to temporarily permit registered resident pharmacies and registered resident outsourcing facilities to compound certain alcohol-based hand sanitizer products, consistent with the Food and Drug Administration's Policy for Temporary Compounding of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (March 2020);

• Sections 6802, 6808, and 6841 of the Education Law and Parts 29.7 (10) and 63.6 of Title 8 of the NYCRR, to the extent necessary to permit pharmacy technicians and pharmacists to practice at an alternative location, including their home, as long as there is adequate security to prevent any Personal Health Information from being compromised;

• Subdivision 5 of Section 6907 of the Education Law and associated regulation, to the extent necessary to permit graduates of registered professional nurse and licensed practical nurse licensure qualifying education programs registered by the State Education Department to be employed to practice nursing under the supervision of a registered professional nurse and with the endorsement of the employing hospital or nursing home for 180 days immediately following graduation;

• Subdivision 11 of section 17 of the Public Officers Law, and any associated regulations, to the extent necessary to ensure that physicians assisting in the State's response to COVID-19 in a facility owned or leased by SUNY and operated by SUNY are not excluded from the provisions of section 17 of the Public Officers Law for the medical services provided as part of the State's response to COVID-19;

• Paragraph a of subdivision 1 of section 17 of the Public Officers Law, and any associated regulations, to the extent that SUNY has designated a state volunteer program under this paragraph for SUNY Upstate Hospital, SUNY Stony Brook University Hospital, and University Hospital SUNY Downstate, that is comprised of both compensated and uncompensated volunteers;

• Subdivision (3) of section 6305 of the Education Law and subdivision (c) of section 602.12 of Title 8 of the NYCRR, and any other applicable state or local law, rule, or regulation, to the extent necessary to suspend the thirty-day requirement for submission of certificates of residence to community colleges in New York State, and to allow for electronic mail and mail by post applications for certificates of residence in every county for the duration of the COVID-19 emergency;

• Sections 2800(1)(a) and (2)(a); 2801(1) and (2); 2802(1) and (2); 2824(2) of the Public Authorities Law, to the extent consistent and necessary to allow the director of the Authorities Budget Office to disregard such deadlines due to a failure by a state or local authority to meet the requirements proscribed within these sections during the period when a properly executed declaration of a state of emergency has been issued;

• Section 103(2) of the General Municipal Law, Section 144(1) of the State Finance Law, Section 376(8)(a) of the Education Law, and Section 359(1) of the Public Authorities Law to the extent necessary to allow the non-public opening of bids; provided, however, that, where practical, public entities shall record or live stream bid openings so that the public has the opportunity to view such bid openings;

• To allow individuals and businesses licensed by the Department of State to extend the expiration date of their license:

• Articles 6-D, 7, 7-A, 8-B, 8-C, 27, 28, 35-B, 35-C, 37-A, 39-E, 39-G, 41, and Section 399-pp of the General Business Law are amended, as necessary, to extend the time to renew a license to the 30th day following the expiration of this Executive Order;

• Articles 6-F, 6-H, and Sections 130-131 of the New York Executive Law are amended, as necessary, to extend the time to renew a license to the 30th day following the expiration of this Executive Order;

• Articles 12-A, 12-B, and 12-C of the Real Property Law are amended, as necessary, to extend the time to renew a license to the 30th day following the expiration of this Executive Order; and

• Article 25 of the New York Arts and Cultural Affairs Law is amended, as necessary, to extend the time to renew a license to the 30th day following the expiration of this Executive Order;

• Section 1210.13 of Title 19 of the NYCRR, to the extent that continuing education requirements cannot be met due to the cancellation or postponement of courses during this COVID-19 emergency, to allow manufacturers, retailers, installers, and mechanics currently certified by the Department of State to continue to renew their existing certifications;

• Title 16, the Urban Development Corporation Act, to the extent a public hearing is required to effectuate a proposed project, provided that the Urban Development Corporation provides an alternative opportunity for the public to comment on proposed project and publishes notice of that opportunity consistent with notice requirements in the Act;

• Section 94 of the Executive Law, to the extent that certain trainings are required by Section 94(10)(a-c), failure to meet such deadlines will not be held to be a violation of the Executive Law provided such trainings are complete in 30 days;

• Section 352-e(2) of the General Business Law to the extent that it requires response to co-op/condominium offering plans in 30 days, provided, however, the timeframe for such response may be extended up to 30 days;

• Sections 806, 808, 809, and 814 of the Executive Law, Section 24-0801 of the Environmental Conservation Law, and associated regulations to the extent necessary to suspend the statutory and regulatory time periods required for the Adirondack Park Agency to respond to requests for variances, permit modifications and otherwise process permit requests;

• Sections 6951, 6952, 6953 and 6955 of the Education Law, to the extent necessary to the extent necessary to allow midwives licensed and in current good standing in any state in the United States, or in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

• Section 140(3) of the Transportation Law to the extent necessary to toll for a 30-day period corresponding to the duration of this Executive Order the requirement of a vehicle inspection within a period of six months last preceding, only for those vehicles voluntarily placed out of service due to the COVID-19 outbreak;

• Section 212 of the Retirement and Social Security Law, for the purpose of disregarding any income earned during the period of the emergency from the earnings limitation calculated under such section;

• Subdivision (a) of Section 301 of the Vehicle and Traffic Law, to the extent that it require annual safety inspections and at least biennial emissions inspections, so that vehicles may continue to be lawfully operated after the expiration of inspection certificates that were valid as of the date of this order but that expire hereafter; and

• Section 307(1) of the State Technology Law to the extent necessary to allow an electronic signature to be used by a person in lieu of a signature affixed by hand in executing documents and forms authorizing or accepting funeral services.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through April 26, 2020:

• The directive contained in Executive Order 202.4 related to the closure of schools statewide shall hereafter be modified to provide that all schools shall remain closed until April 15, 2020, at which time the continued closure shall be re-evaluated. No school shall be subject to a diminution in school aid due to failure to meet the 180 day in session requirement as a result of the COVID-19 outbreak, provided their closure does not extend beyond the term set forth herein. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers, and continue to first use any vacation or snow days remaining.

• The directive contained in Executive Order 202.10 related to restrictions on dispensing hydroxychloroquine or chloroquine for prophylactic purposes is amended as follows: No pharmacist shall dispense hydroxychloroquine or chloroquine except when written: as prescribed for an FDA-approved indication; for an indication supported by one or more citations included or approved for inclusion in the compendia specified in 42 U.S.C. 1396r–8(g)(1)(B)(i); for patients in inpatient settings and acute settings; for residents in a subacute part of a skilled nursing facility; or as part of an study approved by an Institutional Review Board. Any person authorized to prescribe such medications shall denote on the prescription the condition for which the prescription has been issued.

• During the period when an Executive Order limiting operation of a type of facility or limiting the number of persons who may occupy any space is in effect, any operation of such a facility or occupancy of any such space by more than the number of persons allowed by said Executive Order shall be deemed to be a violation of law and in particular, but not by way of limitation, shall be deemed to be a violation of the Uniform Code or other local building code in effect in the jurisdiction in which the facility or space is located. In the event of any such violation, any state, county, or local police officer authorized to enforce laws within the jurisdiction in which the space or facility is located is authorized to remove persons from such space or facility. In addition, in the event of such violation, any state, county, or local code enforcement official or fire marshal authorized to enforce the Uniform Code or other local building code within the jurisdiction in which the facility or space is located is authorized to issue an appearance ticket, a Notice of Violation, an Order to Remedy such violation, which shall require immediate compliance, and/or a Do Not Occupy Order to any owner, operator, or occupant of any such facility or space. Nothing in this provision shall limit the authority of any governmental unit or agency to take such other and/or additional enforcement actions to the extent necessary to ensure compliance with such occupancy-related directives or facility operation-related directives.

• Any guidance issued by the New York State Department of Health related to prevention and infection control of COVID-19 shall be effective immediately and shall supersede any prior conflicting guidance issued by the New York State Department of Health and any guidance issued by any local board of health, any local department of health, or any other political subdivision of the State related to the same subject.

Signed: Andrew M. Cuomo
Dated: March 27, 2020

Executive Order No. 202.12

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 27, 2020 the following:

• Subdivision (1) of Section 4-117 of the Election law to the extent necessary so that the time to mail the annual check of registrants and notice by mail shall be as directed by the New York State Board of Elections.

• Paragraph 28 of section 171 of the Tax Law, to the extent it limits the allowable period that the Tax Commissioner can disregard when a disaster emergency has been declared, in order to authorize the Tax Commissioner to disregard a period or more than 90 days, but not more than 100 days.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through April 27, 2020:

• Any presidential primary to be held on April 28, 2020, shall be postponed and rescheduled for June 23, 2020.

• Any special election to be held on April 28, 2020, including for the Twenty-Seventh Congressional District, the Twelfth Assembly District, the Thirty-First Assembly District, the One Hundred and Thirty-Sixth Assembly District, and the Fiftieth Senate District shall be postponed and rescheduled for June 23, 2020, and the ballots shall remain the same.

• Any article twenty-eight facility licensed by the state, shall, as a condition of licensure permit the attendance of one support person who does not have a fever at the time of labor/delivery to be present as a support person for a patient who is giving birth.

Signed: Andrew M. Cuomo
Dated: March 28, 2020

Executive Order No. 202.13

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 28, 2020 the following:

• Sections 16.03 and 16.05 of the Mental Hygiene Law and Part 619 of Title 14 of the NYCRR to the extent that they limit the provision of certain services to certified settings provided, however, that use of such settings shall require the approval of the commissioner of OPWDD;

• Sections 16.33, 16.34, 31.35 and 19.20 of the Mental Hygiene law; sections 378-a, 424-a and 495 of the Social Services law; sections 550, 633.5, 633.24 and 805 of Title 14 of the NYCRR; Article 3, sections 442.18, 447.2, 448.3, 449.4, 450.9, 451.6 of Title 18 of the NYCRR; and sections 166-1.2, 180-1.5, 180-3.4, 182-1.5, 182-1.9, 182-1.11, 182-2.5, 182-2.9 and 6051.1 of Title 9 of the NYCRR, to the extent necessary to allow current employees of OPWDD or OPWDD approved providers, OCFS licensed or certified programs, OASAS certified, funded or authorized programs, OMH or OMH licensed, funded or approved programs who have previously undergone such background checks to be employed by a different OPWDD approved provider and/or OCFS licensed or certified program and/or OASAS certified, funded or authorized program and/or OMH licensed, funded or approved program without undergoing new background checks. These provisions are also waived to the extent necessary to allow providers the discretion to permit already qualified individuals and who are not listed on the Staff Exclusion List to work unsupervised while an updated background check is completed;

• Sections 3203 and 4510 of the Insurance Law are modified to extend the grace period for the payment of premiums and fees to 90 days for any life insurance policyholder or fraternal benefit society certificate holder, as those terms are used in such sections, facing a financial hardship as a result of the COVID-19 pandemic;

• Sections 3203, 3219, and 3220 of the Insurance Law are modified to provide a life insurance policyholder or annuity contract holder or a certificate holder, as those terms are used in such sections, under a group policy or contract with 90 days to exercise rights or benefits under the applicable life insurance policy or annuity contract for any policyholder or contract holder or certificate holder under the group policy or contract who is unable timely to exercise rights or benefits as a result of the COVID-19 pandemic;

• Section 1116 and Articles 34, 53, 54, and 55 of the Insurance Law and Sections 54 and 226 of the Workers' Compensation Law are modified to impose a moratorium on an insurer cancelling, non-renewing, or conditionally renewing any insurance policy issued to an individual or small business, or, in the case of a group insurance policy, insuring certificate holders that are individuals or small businesses, for a period of 60 days, for any policyholder, or in the case of a group insurance policy, group policyholder or certificate holder, facing financial hardship as a result of the COVID-19 pandemic. The foregoing relief shall also apply to the kinds of insurance set forth in paragraphs (16), (17), (20), (21), (24), (26), and (30) of Section 1113(a) of the Insurance Law. For purposes of this Executive Order, a small business shall mean any business that is resident in this State, is independently owned and operated, and employs one hundred or fewer individuals;

• Section 576 of the Banking Law is modified to grant the Superintendent of Financial Services the authority to promulgate an emergency regulation to apply the provisions of the Executive Order relevant to policy cancellations, to premium finance agencies (as defined in Article XII-B of the Banking Law), subject to the safety and soundness considerations of the premium finance agencies;

• Subdivisions three and four of section 42 of the Public Officer's Law to the extent that it requires that a proclamation be separately issued by the Governor for an election to fill a vacancy; and

• Subdivision (i) of section 414 of the Education Law to the extent necessary to allow the school districts to pay for the cost of such child care services.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through April 28, 2020:

• All instruments that are signed and delivered to the superintendent under the New York Banking Law (the "Banking Law"), and are required to be verified or acknowledged under the Banking Law, may be verified or acknowledged by including standard verification or acknowledgement language in the instrument and transmitting a legible copy of the signed instrument by fax or electronic means.

• The special election in the City of New York to fill the vacancy in the Office of Borough President of Queens is rescheduled for June 23, 2020. Only candidates who were eligible to appear on the ballot for the March 24, 2020 special election shall appear on the ballot for the June 23, 2020 special election.

• Any special election which was previously scheduled to occur on April 28, 2020 and rescheduled for June 23, 2020 by virtue of Executive Order 202.12 shall only contain the names of those individuals who had previously been qualified to appear on the ballot on April 28, 2020.

• Circulation, filing, and collection of any designating petitions, or independent nominating petitions for any office that would otherwise be circulated or filed pursuant to the Election Law, Education Law or any other consolidated law for any office commencing March 31, 2020 are hereby postponed.

• Any school board, library board, or village election scheduled to take place in April or May of 2020 is hereby postponed until at least June 1, 2020, and subject to further directive as to the timing, location or manner of voting for such elections.

• Any worker who is employed by the state of New York, shall, if deemed non-essential by their agency shall work from home or shall be able to stay home without charging their accruals until April 16, 2020.

• Executive Order 202.6 is hereby modified to clarify that construction which was an essential service not subject to the in-person work restrictions is modified to provide only certain construction is considered exempt from the in-person restrictions as of March 28, 2020. Further, on and after March 27, 2020, Empire State Development Corporation is hereby authorized to determine which construction projects shall be essential and thereby exempt from the in-person workforce prohibition, contained in EO 202.6 and subsequent Executive Orders which further reduced the workforce requirements. All continuing construction projects shall utilize best practices to avoid transmission of COVID-19.

• By virtue of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11 which closed or otherwise restricted public or private businesses or places of public accommodation, all such Executive Orders shall be continued, provided that the expiration dates of such Executive Orders shall be aligned, such that all in-person business restrictions will be effective until 11:59 p.m. on April 15, 2020, unless later extended by future Executive Orders.

• The directive of Executive Order 202.12 requiring a support person for a patient giving birth is modified insofar as to cover labor, delivery as well as the immediate postpartum period.

Signed: Andrew M. Cuomo
Dated: March 29, 2020

Executive Order No. 202.14

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order to 202, for thirty days until May 7, 2020, except as limited below.

IN ADDITION, I hereby temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, for the period from the date of this Executive Order through May 7, 2020, the following:

• Section 6524 of the Education Law, section 60.7 of title 8 of NYRR and section paragraph (1) of subdivision (g) 405.4 of title 10 of the NYCRR to the extent necessary to allow any physician who will graduate in 2020 from an academic medical program accredited by a medical education accrediting agency for medical education by the Liaison Committee on Medical Education or the American Osteopathic Association, and has been accepted by an Accreditation Council for Graduate Medical Education accredited residency program within or outside of New York State to practice at any institution under the supervision of a licensed physician;

• Subdivisions one, two, four, five, eight and nine of Section 1726 of the Surrogate's Court Procedure Act are hereby modified to provide that any parent, a legal guardian, a legal custodian, or primary caretaker who works or volunteers in a health care facility or who reasonably believes that they may otherwise be exposed to COVID-19, may designate a standby guardian by means of a written designation, in accordance with the process set forth in such subdivisions; and such designation shall become effective also in accordance with the process set forth in such subdivisions; and

• Sections 3216(d)(1)(C) and 4306(g) of the Insurance Law, subject to consideration by the Superintendent of Financial Services of the liquidity and solvency of the applicable insurer, corporation subject to Article 43 of the Insurance Law, or health maintenance organization certified pursuant to Article 44 of the Public Health Law, to:

o Extend the period for the payment of premiums to the later of the expiration of the applicable contractual grace period and 11:59 p.m. on June 1, 2020, for any comprehensive health insurance policyholder or contract holder under an individual policy or contract, as those terms are used in such sections, who is facing a financial hardship as a result of the COVID-19 pandemic; and

o Require that the applicable insurer, corporation subject to Article 43 of the Insurance Law, or health maintenance organization certified pursuant to Article 44 of the Public Health Law shall be responsible for the payment of claims during such period and shall not retroactively terminate the insurance policy or contract for non-payment of premium during such period.

FURTHER, I hereby issue the following directives for the period from the date of this Executive Order through May 7, 2020:

• Any medical equipment (personal protective equipment (PPE), ventilators, respirators, bi-pap, anesthesia, or other necessary equipment or supplies as determined by the Commissioner of Health) that is held in inventory by any entity in the state, or otherwise located in the state shall be reported to DOH. DOH may shift any such items not currently needed, or needed in the short term future by a health care facility, to be transferred to a facility in urgent need of such inventory, for purposes of ensuring New York hospitals, facilities and health care workers have the resources necessary to respond to the COVID-19 pandemic, and distribute them where there is an immediate need. The DOH shall either return the inventory as soon as no longer urgently needed and/or, in consultation with the Division of the Budget, ensure compensation is paid for any goods or materials acquired at the rates prevailing in the market at the time of acquisition, and shall promulgate guidance for businesses and individuals seeking payment.

• By virtue of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all

non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), all such Executive Orders shall be continued, provided that the expiration dates of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on April 29, 2020, unless later extended by a future Executive Order.

• The enforcement of any violation of the foregoing directives on and after April 7, 2020, in addition to any other enforcement mechanism stated in any prior executive orders, shall be a violation punishable as a violation of public health law section 12-b(2) and the Commissioner of Health is directed and authorized to issue emergency regulations. The fine for such violation by an individual who is participating in any gathering which violates the terms of the orders or is failing to abide by social distancing restrictions in effect in any place which is not their home shall not exceed $1,000.

• The directive contained in Executive Order 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide shall hereafter be modified to provide that all schools shall remain closed through April 29, 2020, at which time the continued closure shall be re-evaluated. No school shall be subject to a diminution in school aid due to failure to meet the 180 day in session requirement as a result of the COVID-19 outbreak, provided their closure does not extend beyond the term set forth herein. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers, and continue to first use any vacation or snow days remaining.

• Superintendent of Financial Services shall have the authority to promulgate an emergency regulation, subject to consideration by the Superintendent of Financial Services of the liquidity and solvency of the applicable insurer, corporation subject to Article 43 of the Insurance Law, health maintenance organization certified pursuant to Article 44 of the Public Health Law, or student health plan certified pursuant to Insurance Law § 1124, to:

o extend the period for the payment of premiums to the later of the expiration of the applicable contractual grace period and 11:59 p.m. on June 1, 2020 for any small group or student blanket comprehensive health insurance policy or contract, or any child health insurance plan policy or contract where the policyholder or contract holder pays the entire premium, as those terms are used in the Insurance Law, for any policyholder or contract holder who is facing financial hardship as a result of the COVID-19 pandemic; and

o require that the applicable insurer, corporation subject to Article 43 of the Insurance Law, health maintenance organization certified pursuant to Article 44 of the Public Health Law, or student health plan certified pursuant to Insurance Law § 1124, shall be responsible for the payment of claims during such period and shall not retroactively terminate the insurance policy or contract for non-payment of premium during such period.

• Superintendent of Financial Services shall have the authority to promulgate emergency regulations necessary to implement this Executive Order, including regulations regarding: (1) the waiver of late fees; and (2) the prohibition on reporting negative data to credit bureaus.

• For the purposes of Estates Powers and Trusts Law (EPTL) 3-2.1(a)(2), EPTL 3-2.1(a)(4), Public Health Law 2981(2)(a), Public Health Law 4201(3), Article 9 of the Real Property Law, General Obligations Law 5-1514(9)(b), and EPTL 7-1.17, the act of witnessing that is required under the aforementioned New York State laws is authorized to be performed utilizing audio-video technology provided that the following conditions are met:

o The person requesting that their signature be witnessed, if not personally known to the witness(es), must present valid photo ID to the witness(es) during the video conference, not merely transmit it prior to or after;

o The video conference must allow for direct interaction between the person and the witness(es), and the supervising attorney, if applicable (e.g. no pre-recorded videos of the person signing);

o The witnesses must receive a legible copy of the signature page(s), which may be transmitted via fax or electronic means, on the same date that the pages are signed by the person;

o The witness(es) may sign the transmitted copy of the signature page(s) and transmit the same back to the person; and

o The witness(es) may repeat the witnessing of the original signature page(s) as of the date of execution provided the witness(es) receive such original signature pages together with the electronically witnessed copies within thirty days after the date of execution.

Signed: Andrew M. Cuomo
Dated: April 7, 2020

Executive Order No. 202.15

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 9, 2020 the following:

• Paragraph (4) of subdivision (a) of Section 5-6.12 of Title 10 of the NYCRR, governing bottled or bulk water products sold or distributed in New York, to allow bottled and bulk water product facilities currently certified in in New York to temporarily, if their stock of regularly used labels has been depleted, distribute bottled or bulk water products without an assigned New York State Department of Health certificate number shown on the product label and use labels authorized in any other state. Once labels showing the assigned certificate number have been obtained, their use must be resumed;

• Section 6808 of the Education Law and any regulations promulgated thereunder, to the extent necessary to permit a manufacturer, repacker, or wholesaler of prescription drugs or devices, physically located outside of New York and not registered in New York, but licensed and/or registered in any other state, may deliver into New York, prescription drugs or devices;

SA-105

• Section 6808 of the Education Law and Part 63.8 of Title 8 of the NYCRR to the extent necessary to allow that a New York-licensed pharmacy may receive drugs and medical supplies or devices from an unlicensed pharmacy, wholesaler, or third-party logistics provider located in another state to alleviate a temporary shortage of a drug or device that could result in the denial of health care under the following conditions:

o The unlicensed location is appropriately licensed in its home state, and documentation of the license verification can be maintained by the New York pharmacy.

o The pharmacy maintains documentation of the temporary shortage of any drug or device received from any pharmacy, wholesaler, or third-party logistics provider not licensed in New York.

o The pharmacy complies with all record-keeping requirements for each drug and device received from any pharmacy, wholesaler, or third-party logistics provider not licensed in New York.

o All documentation and records required above shall be maintained and readily retrievable for three years following the end of the declared emergency.

o The drug or device was produced by an authorized FDA registered drug manufacturer;

• Sections 6512 through 6516, and 6524 of the Education Law and Part 60 of Title 8 of the NYCRR, to the extent necessary to allow individuals, who graduated from registered or accredited medical programs located in New York State in 2020, to practice medicine in New York State, without the need to obtain a license and without civil or criminal penalty related to lack of licensure, provided that the practice of medicine by such graduates shall in all cases be supervised by a physician licensed and registered to practice medicine in the State of New York;

• Subparagraphs (ii) and (iii) of paragraph (b) and paragraph (c) of subdivision (4) of section 2801-a of the Public Health Law, and subparagraph (ii) of paragraph (c) of subdivision (1) and paragraph (c) of subdivision (2) of section 3611-a of the Public Health Law, to the extent necessary to limit the Department of Health's review functions to essential matters during the pendency of the COVID-19 health crisis, and to toll any statutory time limits for transfer notices pertaining to operators of Article 28 and Article 36 licensed entities for the duration of this declaration of disaster emergency, and any subsequent continuation thereof;

• Sections 43 and 45 of the Religious Corporations Law to the extent necessary to allow Protestant Episcopal parishes to postpone any annual election and notice to the parish of such election during the state disaster emergency absent formal resolution and ratification by meeting;

• Environmental Conservation Law Articles 3, 8, 9, 13, 15, 17, 19, 23, 24, 25, 27, 33, 34, 35, 37, and 75, and 6 NYCRR Parts 552, 550, 601, and 609 to the extent necessary to suspend the requirement that public hearings are required, provided that public comments shall still be accepted either electronically or by mail, to satisfy public participation requirements;

• State Administrative Procedures Act Section 202(2)(a) to the extent necessary to extend the expiration date of notices of proposed rulemakings until 90 calendar days after this Executive Order, as it may be continued, terminates;

• Environmental Conservation Law Article 70, as implemented by 6 NYCRR Parts 621 and 624, and Environmental Conservation Law Article 17, as implemented by 6 NYCRR Parts 704 and 750 for processing permit applications, to the extent necessary to suspend public hearings provided that public comments may be accepted as written submissions, either electronically or by mail, or that any required appearances may be done so by teleconferencing or other electronic means;

• 6 NYCRR Part 375 and Environmental Conservation Law Article 27 to the extent necessary to suspend for the duration of this Executive Order public meetings prior to a selection of a final remedy at inactive hazardous waste disposal sites and public meetings at certain brownfield cleanup program sites, provided that written comments on proposed remedies may be continue to be submitted and will be evaluated in remedial decision;

• Section 3635 of the Education law, to the extent necessary to delay the April 1 requirement that parents must file transportation requests with their school district in order to obtain transportation for their children for the following school year;

• Sections 6512 through 6516 and 8510 of the Education Law and 8 NYCRR Subpart 79-4 to the extent necessary to allow respiratory therapy technicians licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 6512 through 6516, 8402, 8403, 8404, 8405 of the Education Law and 8 NYCRR Sub Parts 79-9, 79-10, 79-11 and 79-12 to the extent necessary to allow mental health counselors, marriage and family therapists, creative arts therapists and psychanalysts licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 3400, 3420 through 3423, and 3450 through 3457 of the Public Health Law, to the extent necessary to permit funeral directors licensed and in good standing in any state or territory of the United States to practice as a funeral director in New York State upon the approval of, and pursuant to such conditions as may be imposed by, the Commissioner of Health, without civil or criminal penalty related to lack of licensure in New York State, provided that such funeral director shall practice under the supervision of a funeral director licensed and registered in New York State;

• Section 3428 of the Public Health Law to the extent necessary to permit a funeral director licensed in New York State, but not registered in New York State, to practice in New York State upon the approval of, and pursuant to such conditions as may be imposed by, the Commissioner of Health, without civil or criminal penalty related to lack of registration in New York State, provided that such funeral director shall practice under the supervision of a funeral director licensed and registered in New York State;

• Section 1517 of the Not for Profit Corporation Law, Sections 203.3, 203.6 and 203.13 of Title 19 of the NYCRR and Section 77.7(a)(1) of Title 10 of the NYCRR, to the extent necessary to allow persons deputized by the Commissioner of Health to be agents authorized by a funeral director or undertaker to be present and personally supervise and arrange for removal or transfer of each dead human body;

• Section 1517 of the Not for Profit Corporation Law, Sections 203.3, 203.6 and 203.13 of Title 19 of the NYCRR and Section 77.7(a)(4) of Title 10 of the NYCRR, to the extent necessary to allow persons deputized by the Commissioner of Health to be agents authorized by a funeral director or undertaker, or a county coroner, coroner physician and/or medical director for those deceased human bodies within their supervision, to personally supervise and arrange the delivery of a deceased person to the cemetery; crematory or a common carrier, with a copy of the filed death certificate;

• Sections 4140 and 4144 of the Public Health Law, Sections 1502, 1517 of the Not for Profit Corporation Law and Sections 203.1, 203.4, 203.8 and 203.13 of Title 19 of the NYCRR and Section 13.1 of Title 10 of the NYCRR, to the extent necessary to permit the

SA-106

State Registrar to register death certificates and issue burial and removal permits, upon the request of a local registrar and upon approval of the Commissioner of Health;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 9, 2020:

• Any local official, state official or local government or school, which, by virtue of any law has a public hearing scheduled or otherwise required to take place in April or May of 2020 shall be postponed, until June 1, 2020, without prejudice, however such hearing may continue if the convening public body or official is able to hold the public hearing remotely, through use of telephone conference, video conference, and/or other similar service.

• For the period from the date of this Executive Order through May 9, 2020, the Department of Taxation and Finance is authorized to accept digital signatures in lieu of handwritten signatures on documents related to the determination or collection of tax liability. The Commissioner of Taxation and Finance shall determine which documents this directive shall apply to and shall further define the requirements for accepted digital signatures.

• Section 8-400 of the Election Law is temporarily suspended and hereby modified to provide that due to the prevalence and community spread of COVID-19, an absentee ballot can be granted based on temporary illness and shall include the potential for contraction of the COVID-19 virus for any election held on or before June 23, 2020.

• Solely for any election held on or before June 23, 2020, Section 8-400 of the Election Law is hereby modified to allow for electronic application, with no requirement for in-person signature or appearance to be able to access an absentee ballot.

Signed: Andrew M. Cuomo
Dated: April 9, 2020

Executive Order No. 202.16

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 12, 2020 the following:

• Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals to perform testing for the detection of SARS-CoV-2, or its antibodies, in specimens collected from individuals suspected of suffering from a COVID-19 infection; individuals performing testing must meet the federal requirements for testing personnel appropriate to the assay or device authorized by the FDA or the New York State Department of Health;

• Section 711 of the Real Property and Proceedings Law, Section 232-a of the Real Property Law, and subdivisions 8 and 9 of section 4 of the Multiple Dwelling Law, and any other law or regulation are suspended and modified to the extent that such laws would otherwise create a landlord tenant relationship between any individual assisting with the response to COVID-19 or any individual that has been displaced due to COVID-19, and any individual or entity, including but not limited to any hotel owner, hospital, not-for-profit housing provider, hospital, or any other temporary housing provider who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVD-19;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 12, 2020:

• The New York City Department of Law shall issue no-action or no-filing letters received during the duration of this executive order within 45 days from submission of such no-action or no-filing application made to the department of law for essential projects involving affordable housing and homeless shelters. For each application granted by the department of law which permits the applicant to solicit public interest or public funds preliminary to the filing of an offering statement or for the issuance of a "no-filing required" letter. The New York City Department of Finance shall process and record condominium declarations for essential projects involving hospitals or health care facilities, affordable housing, and homeless shelters within 30 days of receipt of such filing.

• Any political party, political party authority or political party official, which, by virtue of any law has a caucus scheduled or otherwise required to take place in April or May of 2020, shall be postponed until June 1, 2020, without prejudice, however such caucus may continue if the caucus is able to be held remotely, through use of telephone conference, video conference, and/or other similar service, and provided that notice for any party caucus to be held remotely shall be deemed satisfied if such notice includes specific information on remote participation and has been filed with the clerk and board of elections at least five days preceding the day of the caucus and published either by newspaper publication thereof once within the village, or on the party's website, or through electronic mail to any previous caucus participant for which the party has an electronic mail address.

• For all essential businesses or entities, any employees who are present in the workplace shall be provided and shall wear face coverings when in direct contact with customers or members of the public. Businesses must provide, at their expense, such face coverings for their employees. This provision may be enforced by local governments or local law enforcement as if it were an order pursuant to section 12 or 12-b of the Public Health Law. This requirement shall be effective Wednesday, April 15 at 8 p.m.

Signed: Andrew M. Cuomo
Dated: April 12, 2020

Executive Order No. 202.17

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 15, 2020:

• The directive contained in Executive Order 202.16 related to issuance of no-action or no-filing letters is modified to require such letters be issued by the Attorney General.

• Effective at 8 p.m. on Friday, April 17, 2020 any individual who is over age two and able to medically tolerate a face-covering shall be required to cover their nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance.

Signed: Andrew M. Cuomo
Dated: April 15, 2020

Executive Order No. 202.18

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 16, 2020 the following:

• Sections 6512 through 6516, and 6905, 6906 and 6910 of the Education Law and Part 64 of Title 8 of the NYCRR, to the extent necessary to allow registered nurses, licensed practical nurses, and nurse practitioners or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 6512 through 6516, and 6524 of the Education Law and Part 60 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in any province or territory of Canada, to practice medicine in New York State without civil or criminal penalty related to lack of licensure;

• Sections 6512 through 6516, and 6541 of the Education Law and Part 60.8 of Title 8 of the NYCRR 8 NYCRR, to the extent necessary to allow physician assistants or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 3502 and 3505 of the Public Health Law and Part 89 of Title 10 of the NYCRR to the extent necessary to permit radiologic technologists or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

• Sections 6512 through 6516, 6548 and 6911 of the Education Law and sections 60.11 and 64.8 Title 8 of the NYCRR, to the extent necessary to allow clinical nurse specialists, specialist assistants, and substantially similar titles certified and in current good standing in any state in the United States, or any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of certification;

• Sections 6512 through 6516, and 7704 of the Education Law and Part 74 of Title 8 of the NYCRR, to the extent necessary to allow licensed master social workers, licensed clinical social workers, and substantially similar titles licensed and in current good standing in any state in the United States, or in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

• Section 6502 of the Education Law and 8 NYCRR 59.8, to the extent necessary to allow specialist assistants, respiratory therapists, respiratory therapist technicians, pharmacists, clinical nurse specialists, dentists, dental hygienists, registered dental assistants, midwives, perfusionists, clinical laboratory technologists, cytotechnologists, certified clinical laboratory technicians, certified histological technicians, licensed clinical social workers, licensed master social workers, podiatrists, physical therapists, physical therapist assistants, mental health counselors, marriage and family therapists, creative arts therapists, psychoanalysts and psychologists who have an unencumbered license and are currently in good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

• Section 6908 of the Education Law and associated regulations, to the extent necessary to permit graduates of State Education Department registered, licensure qualifying nurse practitioner education programs to be employed to practice nursing in a hospital or nursing home for 180 days immediately following successful completion of a New York State Registered licensure qualifying education program, provided that the graduate files with the State Education Department an application for certification as a nurse practitioner;

• Section 8609 of the Education Law and associated regulations, to the extent necessary to permit graduates of State Education Department registered, licensure qualifying clinical laboratory technology and clinical laboratory technician education programs to be

employed to practice for 180 days immediately following successful completion of a New York State Registered licensure qualifying education program, in a clinical laboratory with a valid New York State permit, provided that the graduate files an application for a New York State clinical laboratory practitioner license and limited permit;

• Section 6808 of the Education Law and 8 NYCRR 63.6 and 63.8, to the extent necessary to extend the triennial registrations of pharmacy establishments who are currently registered and whose registration is set to expire on or after March 31, 2020. An application for re-registration of such registrations shall be submitted no later than 30 days after expiration of Executive Order 202;

• Sections 1514 and 1531 of the Business Corporation Law and Section 121-1500(g) of the Partnership Law, to the extent necessary to extend the statements of domestic or foreign professional service corporations, design professional service corporations, registered professional limited liability partnerships, New York registered foreign professional limited liability partnerships whose statements are set to expire on or after March 31, 2020. Such statements shall be filed no later than 30 days after the expiration of Executive Order 202;

• Section 7210 of the Education Law, to the extent necessary to extend the triennial renewal of certificates of authorizations of domestic or foreign professional service corporations, design professional service corporations, professional service limited liability companies, foreign professional service limited liability companies, registered professional limited liability partnerships, New York registered professional foreign limited liability partnerships, partnerships and joint enterprises specified in Education Law § 7209(4) authorized to provide professional engineering, land surveying or professional geology services whose certificates of authorizations are set to expire on or after March 31, 2020. The application for the renewal of such certificates of authorization shall be submitted no later than 30 days after the expiration of Executive Order 202;

• Section 6503-b of the Education Law and 8 NYCRR 59.15, to the extent necessary to extend the waivers for certain special education schools and early intervention programs providing certain professional services whose waivers are set to expire on or after March 31, 2020. An application for renewal of such waivers shall be submitted no later than 30 days after expiration of Executive Order 202;

• Sections 6802, 6808, and 6841 of the Education Law and Parts 29.7 (10) and 63.6 of Title 8 of the NYCRR, to the extent necessary to permit pharmacy technicians and pharmacists to practice at an alternative location, including their home, as long as there is adequate security to prevent any Personal Health Information from being compromised;

• Section 603(b) of the Not-for-Profit Corporations Law to the extent necessary to permit annual meetings of members to be held remotely or by electronic means;

• Sub-clauses (1), (2), and (3) of clause (a) of subparagraph (ii) of paragraph (3) of subdivision (a) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, to the extent necessary to make home-delivered meals available to persons age 60 or older who do not meet these listed eligibility requirements;

• Paragraph (4) of subdivision (a) and subparagraph (ii) of paragraph (14) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires meals served to provide minimum percentages of the dietary reference intake;

• Paragraph (6) of subdivision (a) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires menus to be reviewed and approved by a registered dietitian;

• Paragraph (5) of subdivision (a) and paragraph (6) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires menus to follow a minimum of a four-week cycle;

• Clause (a) of subparagraph (i) of paragraph (3) of subdivision (a) and subparagraph (ii) of paragraph (2) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires that home-delivered meals be provided 5 or more days per week;

• Paragraph (2) of subdivision (s) of section 6654.17 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires an in-home supervisory visit within 5 days of the first time services are provided to a client;

• Section 6654.6 of Title 9 of the New York Code of Rules and Regulations to the extent necessary to allow for all new clients to be provided services under the Expanded In-Home Services for the Elderly Program without the requirement that any such clients pay cost-sharing until such time as an assessment is conducted and a cost share amount can be determined;

• Subdivision (r) of section 6654.16 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires client contacts be conducted in-home or in-person and to allow for all required client contacts to be conducted by telephone or otherwise remotely;

• Section 352-eeee(2)(a) of the General Business Law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires that an offering statement or prospectus become effective within fifteen months from filing or from the date of issue of the letter of the attorney general stating that the offering statement or prospectus has been accepted for filing, and any such fifteen month period, shall be tolled during the duration of this executive order;

• Section 352-e(7)(a) of the General Business law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires certain filing fees be made at the time of submission and filing of each offering statement or prospectus, shall be exempted during the duration of this executive order, it being understood that such filing fees shall be remitted in full to the department of law within 90 days from the expiration of this executive order;

• 13 NYCRR §§ 18.3(g)(1), 20.3(h)(1), 23.3(h)(1), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to set forth a budget for the first year of condominium operation, the requirements with respect to any such projected first year of condominium operation are hereby tolled for the duration of this executive order. Sponsor must update the first year of operation, as necessary, within 30 days from the expiration of this executive order and shall not be required to offer rescission, to the extent such budget for the first year of operation does not increase by 25 percent or more during the pendency of the state of disaster emergency;

• 13 NYCRR § 20.3(o)(12), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to offer rescission if the first closing of a unit does not occur within the first year of operation projected in schedule B, is hereby tolled for the duration of the executive order. Sponsor must update the first year of operation, as necessary, within 30 days from the expiration of this executive order;

• Article 165 of the Education Law and section 58-1.3 of Title 10 of the NYCRR, to the extent necessary to allow clinical laboratory practitioners to perform testing in a clinical laboratory under remote supervision, provided a supervisor is on-site at least eight hours

per week;

• Subdivision (a) of section 70 and subdivision (a) of section 370 of the retirement and social security law, to the extent necessary to waive the 15 day waiting period in which a service retirement application must be on file before it becomes effective, which suspension shall be deemed to have been in effect on and after the issuance of executive order 202, and shall enable any member who has died due to COVID-19 after March 7, 2020 while an application was on file, but not yet effective, shall be entitled to retirement benefits due to them pursuant to this suspension;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 16, 2020:

• Any skilled nursing facility, nursing home, or adult care facility licensed and regulated by the Commissioner of Health shall notify family members or next of kin if any resident tests positive for COVID-19, or if any resident suffers a COVID-19 related death, within 24 hours of such positive test result or death.

• Any person utilizing public or private transportation carriers or other for-hire vehicles, who is over age two and able to medically tolerate a face covering, shall wear a mask or face covering over the nose and mouth during any such trip; any person who is operating such public or private transport, shall likewise wear a face covering or mask which covers the nose and mouth while there are any passengers in such vehicle. This directive shall take effect in the same manner as Executive Order 202.17, at 8 p.m. on Friday, April 17, 2020.

• Executive Order 202.14, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which each closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), is hereby continued, provided that the expiration date of such provisions of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on May 15, 2020, unless later extended by a future Executive Order. All enforcement mechanisms by state or local governments shall continue to be in full force an effect until May 15, 2020 unless later extended by a future Executive Order.

• Executive Order 202.14, which extended the directive contained in Executive Order 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide is hereby continued to provide that all schools shall remain closed through May 15, 2020, at which time the continued closure shall be re-evaluated. No school shall be subject to a diminution in school aid due to failure to meet the 180 day in session requirement as a result of the COVID-19 outbreak, provided their closure does not extend beyond the term set forth herein. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers, and continue to first use any vacation or snow days remaining.

Signed: Andrew M. Cuomo
Dated: April 16, 2020

Executive Order No. 202.19

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 17, 2020 the following:

• Subdivision one of Section 860-b of the Labor Law, to the extent necessary to allow a business that receives federal Paycheck Protection Program funding and subsequently rehires employees, to provide the notice required under this section as soon as practicable but not necessarily within ninety days, provided that a business that receives federal Paycheck Protection Program funding provided the notice required under this section when it initially laid off employees.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 17, 2020:

• The Department of Health shall hereby establish a single, statewide coordinated testing prioritization process that shall require all laboratories in the state, both public and private, that conduct COVID-19 diagnostic testing, to complete such COVID-19 diagnostic testing only in accordance with such process. Any such laboratories shall prioritize testing of entities or individuals as directed by this coordinated statewide process. Any such laboratories may not, without an exemption from the Department of Health, enter into an agreement that would reserve testing capabilities for any private or public entity and therefore impede the Departments' ability to prioritize and coordinate COVID-19 testing in New York State. Any violation of this directive may result in a civil penalty not to exceed $10,000 or three times the value of such testing provided in violation of this section, and provided further that the Commissioner is hereby empowered and may revoke any operating certificate or license of such laboratory.

• The directive contained in Executive Order 202.18 requiring any skilled nursing facility, nursing home, or adult care facility licensed and regulated by the Commissioner of Health to notify a family member or next of kin if any resident tests positive for COVID-19, or suffers a COVID-19 related death, within 24 hours is hereby modified solely to provide a penalty for non-compliance of $2,000 per violation per day, as if it were a violation of section 12 of the public health law, and any subsequent violation shall be punishable as if it is a violation of section 12-b of the public health law.

• No local government or local department of health shall take any actions that could affect public health without consulting with the state department of health. No local government official shall take any action that could impede or conflict with any other local government actions, or state actions, with respect to managing the COVID-19 public health emergency.

Signed: Andrew M. Cuomo
Dated: April 17, 2020

Executive Order No. 202.20

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 18, 2020 the following:
• Section 13 of the Domestic Relations Law, to the extent necessary to permit those persons to whom marriage licenses were issued but shall expire within the period of time that New York State residents are to maintain distance between each other, to waive the 60 days required to obtain a marriage license during the period of time that there exists a declared emergency in New York State; and
• Section 15 of the Domestic Relations Law, to the extent necessary to permit those persons who were unable to marry within the time frame issued on the marriage license, waive the fees necessary to obtain a second marriage license, if necessary, mirroring the original marriage license that was obtained during the period of time a declared emergency existed in New York State.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 18, 2020:
• Any issuance of a marriage license application, marriage license, or witnessing or solemnizing of the marriage ceremony, that is required under New York State law is authorized to be performed utilizing audio-video technology provided that the following conditions are met: The couple seeking the marriage services, must present valid photo ID to verify identity whenever required by law the during the video conference, not merely transmit it prior to or after; the video conference must allow for direct interaction between the couple and the town or city clerk, the witness or the person to solemnize the marriage (e.g. no pre-recorded videos of the person signing or engaged in the marriage ceremony); the couple must affirmatively represent that he or she is physically situated in the jurisdiction where the marriage is legally allowed to occur, within the State of New York; the couple must transmit by fax or electronic means a legible copy of the signed document directly to the town or city clerk, the witnesses, the person to solemnize the marriage on the same date it was signed; the town or city clerk, witness or person who solemnizes the marriage may sign the transmitted copy of the document and transmit the same back to the person responsible for the document by law; to the extent practicable, all parties will use their best efforts to ensure the document is transmitted in the most confidential manner and information will not be released to any third party not associated with the marriage license and marriage ceremony; and the electronic signed copy of the marriage license application or marriage license will become the official document for purposes of Domestic Relations Law. Local town and city clerks may provide guidance related to how marriage licensure applications and issuance will be implemented in their jurisdictions.

Signed: Andrew M. Cuomo
Dated: April 18, 2020

Executive Order No. 202.21

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;
NOW THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 19, 2020:
• The directive regarding solemnization of a marriage ceremony contained in Executive Order 202.20 shall be modified to expressly include any officiant, public or private, as able to perform or solemnize such marriage ceremony utilizing audio-video technology, as delineated in such directive.

Signed: Andrew M. Cuomo
Dated: April 19, 2020

Executive Order No. 202.22

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 20, 2020 the following:

• Article 5 of the Real Property Tax Law, and analogous provisions of any other general or special laws that require a tentative assessment roll to be filed on or before June 1, 2020, to allow the tentative and final assessment rolls to be filed, at local option, up to 30 days later than otherwise allowable, to allow an assessing unit to set a date for hearing assessment complaints that is at least 21 days after the filing of the tentative roll, to allow notice of the filing of the tentative roll to be published solely online so long as the date for hearing complaints is prominently displayed, to suspend in-person inspection of the tentative roll, and to allow local Boards of Assessment Review to hear complaints remotely by conference call or similar service, provided that complainants can present their complaints through such service and the public has the ability to view or listen to such proceeding;

• Section 1212 of the Real Property Tax Law, to the extent necessary to allow the commissioner of taxation and finance to certify final state equalization rate, class ratios, and class equalization rates, if required, no later than ten days prior to the last date set by law for levy of taxes of any municipal corporation to which such equalization rate, class ratios, and class equalization rates are applicable;

• Section 1512(1) of the Real Property Tax Law and Sections 283.291 and 283.221 of the Laws of Westchester County, are suspended to allow the County Executive to negotiate with any town supervisor or mayor of any city, to accept a lesser percentage of taxes, special ad valorem levies or special assessments which are otherwise due on May 25, provided that in no event shall any town or city be required to pay more than sixty percent. The County Executive is empowered to determine whether or not penalties for late payment or interest are able to be waived dependent on whether or not such town or city applies the County Executive's criteria for determining hardship due to COVID-19;

• Section 283.221 of the Laws of Westchester County is further suspended to the extent necessary to require the supervisor of a town, to waive payment of penalties for late payment of county and county district taxes under section 283.221 up to July 15, 2020, and waive payment of penalties for late payment of town and town district taxes and assessments in the same manner, provided such town applies the County Executive's criteria for the determination of hardship due to COVID-19;

• Section 1512(1) of the Real Property Tax Law and any penalty provision of the tax code of a city within Westchester County is further suspended to the extent necessary to allow the mayor of that City to waive the payment of penalties for late payment of county and county district taxes and to further waive payment of penalties for late payment of city and city district taxes and assessments in the same manner, provided such city applies the County Executive's criteria for the determination of hardship due to COVID-19;

• Section 5-18.0(2) of the Nassau County Administrative Code, to the extent necessary to allow the Nassau County Executive to extend until June 1, 2020, the deadline to pay without interest or penalty the final one-half of school taxes upon real estate in such county.

Signed: Andrew M. Cuomo
Dated: April 20, 2020

Executive Order No. 202.23

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 24, 2020 the following:

• Section 8-400 and any provision of Article 9 of the Election Law in order to provide that every voter that is in active and inactive status and is eligible to vote in a primary or special election to be held on June 23, 2020 shall be sent an absentee ballot application form with a postage paid return option for such application. This shall be in addition to any other means of requesting an absentee ballot available, and any voter shall continue to be able to request such a ballot via phone or internet or electronically. Any ballot which was requested or received for any previously re-scheduled election, or for the primary election to be held on June 23, 2020 shall continue to be valid and shall be counted by the Board of Elections if it shall be returned to them.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 24, 2020:

• The Commissioner of Health is authorized to suspend or revoke the operating certificate of any skilled nursing facility or adult care facility if it is determined that such facility has not adhered to any regulations or directives issued by the Commissioner of Health, and if determined to not be in compliance notwithstanding any law to the contrary the Commissioner may appoint a receiver to continue

the operations on 24 hours' notice to the current operator, in order to preserve the life, health and safety of the people of the State of New York.

• The state assembly and state senate special elections, which are otherwise scheduled to be held on June 23, 2020 are hereby cancelled and such offices shall be filled at the general election. The special election to be held for the office of Queens Borough President is hereby cancelled, and such office shall be filled at the general election.

Signed: Andrew M. Cuomo
Dated: April 24, 2020

Executive Order No. 202.24

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 25, 2020 the following:

• Section 6801 of the Education Law, to the extent necessary to authorize licensed pharmacists to order COVID-19 tests, approved by the Food and Drug Administration (FDA), to detect SARS-CoV-2 or its antibodies, and to administer COVID-19 tests subject to certificate of waiver requirements pursuant to the federal clinical laboratory improvement act of nineteen hundred eighty-eight, in patients suspected of a COVID-19 infection, or suspected of having recovered from COVID-19 infection, subject to completion of appropriate training developed by the Department of Health;

• Subdivision (6) of section 571 of the Public Health Law, to the extent necessary to permit licensed pharmacists to be designated as a qualified healthcare professional for the purpose of directing a limited service laboratory, pursuant to subdivision 579(3) of the Public Health Law, to test patients suspected of a COVID-19 infection or its antibodies provided that such test is FDA-approved and waived for use in a limited service laboratory; and

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 25, 2020:

• The special election to be held for the office of City Council in the 37th district is hereby cancelled, and such office shall be filled at the general election.

Signed: Andrew M. Cuomo
Dated: April 25, 2020

Executive Order No. 202.25

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 29, 2020 the following:

• Subdivisions (a) and (e) of section 401.3 and section 710.1 of Title 10 of the NYCRR, and Part 709 and 710 of Title of the NYCRR, and any other applicable regulation, to the extent necessary to allow for the approval and certification by the Commissioner of Health of temporary dedicated birthing sites operated by currently-licensed birthing hospitals and currently-licensed birthing centers;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 29, 2020:

• The directive related to support persons for birthing patients contained in Executive Order 202.13 and 202.12 is hereby modified to require any article twenty-eight facility, shall, as a condition of licensure, allow any patient giving birth to have present with them: a support person, who does not have symptoms of COVID-19, for the labor, delivery and also the remaining duration of the patient's stay; and/or a doula, who does not have symptoms of COVID-19 for the labor, delivery, and the remaining duration of the patient's stay. The presence of a support person and/or doula will be subject to exceptions for medical necessity determined by the Commissioner.

• The directive contained in Executive Order 202.10 authorizing the Commissioner of Health to direct all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by canceling all elective surgeries and procedures, is hereby modified only to the extent necessary to

SA-113

authorize general hospitals to perform elective surgeries and procedures so long as the following criteria are met: within a county, the total available hospital inpatient capacity is over thirty percent and the total available hospital ICU capacity is over thirty percent and the total change, from April 17, 2020 to April 27, 2020, in the number of hospitalized patients who are positive for COVID-19 is fewer than ten; for each hospital within county that has met the eligibility criteria, the available hospital inpatient capacity is over thirty percent and the available hospital ICU capacity is over thirty percent and the change, from April 17, 2020 to April 27, 2020, in the number of hospitalized patients who are positive for COVID-19 is fewer than ten. The Commissioner of Health is authorized to issue guidance with respect to the implementation of these criteria. General hospitals that are authorized to perform elective surgeries and procedures must report, at a minimum, the number and types of surgeries and procedures performed to the Department of Health, in a manner prescribed by the Commissioner. General hospitals that do not meet the criteria to perform elective surgeries and procedures contained in this directive may seek a waiver from the prohibition, by submitting a plan that includes, at a minimum, their facility capacity, physical configuration, infectious disease protocols, and staffing capacity, including any applicable employment hardship information that includes any reductions in workforce, including furloughs, that have occurred due to the inability of such facility to perform elective surgeries or procedures, or any reductions in workforce, including furloughs, that may imminently occur due to the inability of such facility to perform elective surgeries or procedures, to the Department of Health, in a manner prescribed by the Commissioner. General hospitals shall not perform any elective surgery or procedure for patients until each such patient has tested negative for COVID-19 through an approved diagnostic test, and the hospital and patient have complied with the pre-operative and pre-procedure guidelines in a manner prescribed by the Commissioner.

Signed: Andrew M. Cuomo
Dated: April 29, 2020

Executive Order No. 202.26

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 31, 2020 the following:

• Sections 103 and 104-b of the General Municipal Law, to the extent necessary to allow a board of elections to procure and provide absentee ballot applications, absentee ballots, envelopes, or any other means of transmitting an absentee ballot application or absentee ballot, including postage, to voters without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

• Sections 1804, 1906, 2002, 2022, 2601-a of the Education Law, to the extent necessary, to provide that the annual district meeting and election of every common, union free, central and central high school district and the annual meeting of every city school district in a city having a population of less than one hundred twenty-five thousand inhabitants was scheduled to be held on the third Tuesday of May, two thousand twenty is hereby adjourned and rescheduled until June 9, 2020, which shall be deemed the statewide uniform voting day;

• Sections 2003, 2004, 2022 2601-a of the Education Law, to the extent necessary to provide that trustees or boards of education of each such school district shall provide notice of such adjourned meeting to the qualified voters in the manner prescribed for notice of the annual meeting except that the number of required publications shall be two and the first publication must be no later than 28 days before the election, and such notice shall provide for an adjourned budget hearing. Such adjourned meeting shall take place remotely, and qualified voters shall vote in such adjourned election only by absentee ballot, to be provided to all qualified voters by each school district. Each district shall send out postcard notice which details the date of the election, date of budget hearing, definition of qualified voter, and an absentee ballot, The adjourned district meeting or district meeting and election shall be deemed the annual meeting or annual meeting and election of the district for all purposes;

• Sections 1608 and 1716 of the Education Law to the extent necessary to allow report cards to be submitted to the State Education Department no later than 18 days prior to the date of the adjourned meeting, and the department shall make its compilation available electronically at the latest on June 2, 2020, seven days prior to the adjourned meeting date;

• Sections 2018-a and 2018-b of the Education Law are temporarily suspended and hereby modified to provide that due to the prevalence and community spread of COVID-19, that the potential for contraction of the COVID-19 virus shall be deemed temporary illness;

• Sections 2018-a and 2018-b of the Education Law are hereby modified, only for the purpose of any election held on or before June 30, 2020, to require every eligible voter be sent an absentee ballot with a postage paid return envelope;

• Sections 2018, 2032, and 2608 of the Education Law to the extent necessary to allow candidates be listed on ballots alphabetically, and that ballots for small city school districts shall be set 30 days before the election;

• Sections 2018 and 2608 of the Education Law to the extent necessary to eliminate any minimum threshold of signatures required, provided, however, an individual must meet any other requirements necessary to be placed on the ballot, including any applicable residency and age requirements;

• Section 260 of the Education Law to the extent necessary to authorize public libraries established and supported by a school district to re-notice an election noticed pursuant to this section. Such election and/or budget vote shall be conducted via absentee ballot in conjunction with the school district's rescheduled absentee ballot process or independently using the guidelines created for the school district's absentee ballot process. Such a vote may be managed by the school district or the library, at the library's

request. Furthermore, the same provisions that are made for a school board trustee's petition shall apply to a library board trustee's petition;

• Section 259(1) of the Education Law to the extent necessary to give applicable school ballot funding propositions for public or association libraries to take place on the absentee ballot used to administer the school district's budget vote;

• Sections 259 and 260 of the Education Law are hereby modified for any library election held on or before July 1, 2020, to eliminate any requirement for an application to access an absentee ballot, and each such eligible voter shall be mailed an absentee ballot with a postage paid return envelope;

• Article 6 and 15 of the Election Law in relation to conducting any village election to be held September 15, 2020 pursuant to this Executive Order, are temporarily suspended and otherwise modified as follows:

o Any village election previously scheduled to be held in March, April, May, or June will be held on September 15, 2020.

o For any village election scheduled to be held on September 15, 2020 as directed by this Executive Order, all party nominations shall be made by party caucus, which may be conducted remotely as set forth by the chair of such party, and which shall be held not later than August 20, 2020, and provided that a certificate of nomination from such caucus and any certificates of declination or acceptance shall be filed not later than August 22, 2020, and provided that once a certificate of declination is submitted, no substitutions shall be permitted.

o All independent nominations for a village election previously scheduled prior to September 2020, now to be held on September 15, 2020, shall be postponed until such time as NY on Pause is suspended, subject to a process determined by a future Executive Order.

o Any village election postponed by Executive Order originally scheduled for a date in March, April, May or June of 2020 for which the ballot was fully determined at the time of this Executive Order shall proceed with the same ballot as would have been used at such prior election, and if such ballots were already printed, such ballots may be used at the September 15, 2020 election despite containing thereon the original date of the election.

o Any provision of the election law or village law otherwise applicable to the manner of conducting such an election in March, April, May or June, shall apply to the date of the September 15, 2020 election.

o Village officials elected at a rescheduled election held on September 15, 2020, shall assume office as soon as the statement of canvass is filed with the village clerk pursuant to section 15-126 of the Election Law or certified by the board of election, and the term of office of such officers shall end as if they had been elected at the time of the originally scheduled election.

o Any village election previously postponed by Executive Order for which ballot access was not completed at the time of such suspension shall be conducted solely in accordance with the ballot access provisions applicable to the September 15, 2020, election.

• Section 8-406 that is modified to the extent that any absentee ballot sent to a voter for a primary or special election to be held on June 23, 2020 shall be provided with a postage paid return envelope;

• Section 9-209 of the Election Law in relation to canvassing absentee ballots is modified to permit any absentee ballot submitted by a voter who requested such ballot for the prior date of an election canceled and then rescheduled due to the COVID-19 public health emergency, shall be cast and canvassed unless otherwise invalid, unless such voter shall appear to vote on the date of the rescheduled election or such voter requests and returns a subsequent absentee ballot;

• Section 8-410 of the Election Law in relation to marking absentee ballots is modified to the extent that for any election held before July 1, 2020, upon transmitting or mailing absentee ballots to voters, the board of elections shall provide and maintain, in its office, a voting system that is accessible for voters wishing to mark their ballot privately and independently, and provided that availability of this service shall be posted on the website of each board of elections;

• Section 16-108 of the Election Law is modified to permit any Justice of the Supreme Court appointed to hear election matters on election day may hear and determine such matters telephonically or by video conference and shall not be required to be physically at a board of elections;

• Section 8-407 of the Election Law, in relation to providing absentee ballots to voters residing in certain facilities, is modified to the extent that inspectors of the board shall not attend and/or visit facilities described in section 8-407 of the Election Law, and shall not physically deliver ballots to residents of facilities in person for primaries or elections held on or prior to July 1, 2020, and boards of elections, in the same manner as absentee ballots are delivered to other absentee voters pursuant to Title 4 of Article 8 of the Election Law, shall instead mail or deliver absentee ballots to voters residing in such facilities; and

• Section 5-204 of the Election Law in relation to local in person registration is modified to the extent that meetings for local in person registration at poll sites shall not be held in 2020.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 31, 2020:

• Any district or special district, including, but not limited to fire, library, sewer, or water, that conducts an election and/or budget vote shall be rescheduled to September 15, 2020 and collection of signatures for nominating petitions is hereby suspended until further notice, subject to a process determined by a future Executive Order; provided however, a library district may conduct an election on June 9, 2020 pursuant to this Executive Order if such election is managed by a school district.

• Circulation, filing, and collection of any independent nominating petition pursuant to section 6-138 of the Election Law for any office that would otherwise be circulated or filed pursuant to the Election Law or for any special district election, as provided for in Executive Order 202.13, continue to be postponed until further notice and shall be subject to a future Executive Order.

• Any village election that was postponed in March of 2020, or scheduled to be held on June 16, 2020, or any time prior to September 15, 2020, is hereby rescheduled for September 15, 2020.

• Executive Order 202.23 is modified to clarify that any voter that is in active and/or inactive status and is eligible to vote in a primary or special election to be held on June 23, 2020 who requests an absentee ballot via telephone for the June 23 special election or primary election, shall be sent an absentee ballot with a postage paid return envelope; provided however each voter shall not be sent more than one ballot, and shall not be required to complete an application either prior to or simultaneously to receiving the ballot. Further, the board of elections receiving the telephone request shall maintain a record of such telephone request for an absentee ballot, and may complete the absentee ballot application as such record on behalf of the voter requesting the absentee ballot, provided that no ballot shall be deemed invalid for lack of a complete absentee ballot application for any reason.

Signed: Andrew M. Cuomo
Dated: May 1, 2020

Executive Order No. 202.27

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue; and

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through June 4, 2020:

• Any suspension or modification of any law heretofore suspended in Executive Order 202, or any amended or modified Executive Order issued thereafter, which allowed for the practice of a profession in the state of New York without a current New York State licensure, or registration, including but not limited to those individuals who are validly licensed in another state or Canada, is hereby extended for a period of thirty days to allow those professionals the ability to continue to provide services necessary for the State's COVID-19 response.

Signed: Andrew M. Cuomo
Dated: May 5, 2020

Executive Order No. 202.28

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, for thirty days until June 6, 2020, except as modified below:

• The suspension or modification of the following statutes and regulations are not continued, and such statutes, codes and regulations are in full force and effect as of May 8, 2020:

o 10 NYCRR 405.9, except to the limited extent that it would allow a practitioner to practice in a facility where they are not credentialed or have privileges, which shall continue to be suspended; 10 NYCRR 400.9; 10 NYCRR 400.11, 10 NYCRR 405; 10 NYCRR 403.3; 10 NYCRR 403.5; 10 NYCRR 800.3, except to the extent that subparagraphs (d) and (u) could otherwise limit the scope of care by paramedics to prohibit the provision of medical service or extended service to COVID-19 or suspected COVID-19 patients; 10 NYCRR 400:12; 10 NYCRR 415.11; 10 NYCRR 415.15; 10 NYCRR 415.26; 14 NYCRR 620; 14 NYCRR 633.12; 14 NYCRR 636-1; 14 NYCRR 686.3; and 14 NYCRR 517;

o Mental Hygiene Law Sections 41.34; 29.11; and 29.15;

o Public Health Law Sections 3002, 3002-a, 3003, and 3004-a to the extent it would have allowed the Commissioner to make determination without approval by a regional or state EMS board;

o Subdivision (2) of section 6527, Section 6545, and Subdivision (1) of Section 6909 of the Education Law; as well as subdivision 32 of Section 6530 of the Education Law, paragraph (3) of Subdivision (a) of Section 29.2 of Title 8 of the NYCRR, and sections 58-1.11, 405.10, and 415.22 of Title 10 of the NYCRR;

o All codes related to construction, energy conservation, or other building code, and all state and local laws, ordinances, and regulations which would have otherwise been superseded, upon approval by the Commissioner of OPWDD, as applicable only for temporary changes to physical plant, bed capacities, and services provided; for facilities under the Commissioners jurisdiction.

IN ADDITION, I hereby temporarily suspend or modify the following if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, for the period from the date of this Executive Order through June 6, 2020:

• Sections 7-103, 7-107 and 7-108 of the General Obligations Law to the extent necessary to provide that:

o Landlords and tenants or licensees of residential properties may, upon the consent of the tenant or licensee, enter into a written agreement by which the security deposit and any interest accrued thereof, shall be used to pay rent that is in arrears or will become due. If the amount of the deposit represents less than a full month rent payment, this consent does not constitute a waiver of the remaining rent due and owing for that month. Execution in counterpart by email will constitute sufficient execution for consent;

o Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardship due to the COVID-19 pandemic;

o It shall be at the tenant or licensee's option to enter into such an agreement and landlords shall not harass, threaten or engage in any harmful act to compel such agreement;

o Any security deposit used as a payment of rent shall be replenished by the tenant or licensee, to be paid at the rate of 1/12 the amount used as rent per month. The payments to replenish the security deposit shall become due and owing no less than 90 days from the date of the usage of the security deposit as rent. The tenant or licensee may, at their sole option, retain insurance that provides relief for the landlord in lieu of the monthly security deposit replenishment, which the landlord, must accept such insurance as replenishment.

• Subdivision 2 of section 238-a of the Real Property Law to provide that no landlord, lessor, sub-lessor or grantor shall demand or be entitled to any payment, fee or charge for late payment of rent occurring during the time period from March 20, 2020, through August 20, 2020; and

• Section 8-400 of the Election Law is modified to the extent necessary to require that to the any absentee application mailed by a board of elections due to a temporary illness based on the COVID-19 public health emergency may be drafted and printed in such a way to limit the selection of elections to which the absentee ballot application is only applicable to any primary or special election occurring on June 23, 2020, provided further that for all absentee ballot applications already mailed or completed that purported to select a ballot for the general election or to request a permanent absentee ballot shall in all cases only be valid to provide an absentee ballot for any primary or special election occurring on June 23, 2020. All Boards of Elections must provide instructions to voters and post prominently on the website, instructions for completing the application in conformity with this directive.

• The suspension of the provisions of any time limitations contained in the Criminal Procedure Law contained in Executive Order 202.8 is modified as follows:

o Section 182.30 of the Criminal Procedure Law, to the extent that it would prohibit the use of electronic appearances for certain pleas;

o Section 180.60 of the Criminal Procedure Law to provide that (i) all parties' appearances at the hearing, including that of the defendant, may be by means of an electronic appearance; (ii) the Court may, for good cause shown, withhold the identity, obscure or withhold the image of, and/or disguise the voice of any witness testifying at the hearing pursuant to a motion under Section 245.70 of the Criminal Procedure law—provided that the Court is afforded a means to judge the demeanor of a witness;

o Section 180.80 of the Criminal Procedure Law, to the extent that a court must satisfy itself that good cause has been shown within one hundred and forty-four hours from May 8, 2020 that a defendant should continue to be held on a felony complaint due to the inability to empanel a grand jury due to COVID-19, which may constitute such good cause pursuant to subdivision three of such section; and

o Section 190.80 of the Criminal Procedure Law, to the extent that to the extent that a court must satisfy itself that good cause has been shown that a defendant should continue to be held on a felony complaint beyond forty-five days due to the inability to empanel a grand jury due to COVID-19, which may constitute such good cause pursuant to subdivision b of such section provided that such defendant has been provided a preliminary hearing as provided in section 180.80.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through June 6, 2020:

• There shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020.

• Executive Order 202.18, which extended the directive contained in Executive Orders 202.14 and 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide, is hereby continued to provide that all schools shall remain closed through the remainder of the school year. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers.

Signed: Andrew M. Cuomo
Dated: May 7, 2020

Executive Order No. 202.29

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15, 202.16, 202.17, 202.18, 202.19, 202.20, and 202.21, for thirty days until June 7, 2020; and

IN ADDITION, I hereby temporarily modify, beginning on the date of this Executive Order, the following:

• Section 214-g of the Civil Practice Law and Rules, to the extent it allows an action to be commenced not later than one year and six months after the effective date of such section, is hereby modified to allow an action commenced pursuant to such section to be commenced not later than one year and eleven months after the effective date of such section.

Signed: Andrew M. Cuomo
Dated: May 8, 2020

Executive Order No. 202.30

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through June 9, 2020 the following:

• Clause (b) of subparagraph (v) of paragraph (1) of subdivision (c) of section 415.26 , paragraph (8) of subdivision (a) of section 487.9 and paragraph (5) of subdivision (a) of section 488.9 of Title 18 of the NYCRR; and subdivision (7) of section 4656 of the Public Health Law are modified to the extent necessary to require that the operator and administrator of all nursing homes and all adult care facilities, including all adult homes, enriched housing programs and assisted living residences to test or make arrangements for the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, twice per week, pursuant to a plan developed by the facility administrator and filed with the Department of Health no later than 5:00 p.m. on Wednesday, May 13, 2020. Any positive test result shall be reported to the Department of Health by 5:00 p.m. of the day following receipt of such test result, in a manner determined by the Commissioner of Health. Nothing herein shall prohibit staff of the Department of Health, or the local health department in the jurisdiction of the nursing home or adult care facility, from having unrestricted access to the facility where such access is determined necessary in the discretion of the Commissioner of Health for purposes of testing all personnel for COVID-19, and provided further that in such circumstances the operator and administrator shall cooperate fully with Department of Health and local health department staff to facilitate such testing.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through June 9, 2020:

• No later than May 15, 2020, both the operator and the administrator of all nursing homes and adult care facilities must provide to the Department of Health a certification of compliance with this Executive Order and directives of the Commissioner of Health, and all other applicable Executive Orders and directives of the Commissioner of Health.

o The Commissioner of Health is authorized to suspend or revoke the operating certificate of any nursing home or adult care facility if it is determined that such facility has not complied with this Executive Order, or any regulations or directives issued by the Commissioner of Health, and if determined to not be in compliance, notwithstanding any law to the contrary the Commissioner may appoint a receiver to continue the operations on 24 hours' notice to the current operator, in order to preserve the life, health and safety of the people of the State of New York. Any false statement in the attestation shall be punishable under the provisions of Penal Code 210.45.

o Any nursing home or adult care facility which does not comply with this Executive Order shall be subject to a penalty for non-compliance of $2,000 per violation per day, as if it were a violation of section 12 of the public health law, and any subsequent violation shall be punishable as if it is a violation of section 12-b of the public health law, with a penalty of $10,000 per violation per day.

o Any personnel of a nursing home or adult care facility who refuse to be tested for COVID-19 pursuant to a plan submitted to the Department of Health shall be considered to have outdated or incomplete health assessments and shall therefore be prohibited from providing services to such nursing home or adult care facility until such testing is performed.

• Any article 28 general hospital shall not discharge a patient to a nursing home, unless the nursing home operator or administrator has first certified that it is able to properly care for such patient. Provided further, that any article 28 general hospital shall not discharge a patient to a nursing home, without first performing a diagnostic test for COVID-19 and obtaining a negative result.

Signed: Andrew M. Cuomo
Dated: May 10, 2020

Executive Order No. 202.31

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through June 13, 2020 the following:

• Subdivisions (1), (2), and (3) of Section 594 of the Labor Law are suspended to the extent necessary to prevent forfeiture of effective benefit days to provide claimants with temporary relief from serving forfeit day penalties during the COVID-19 disaster emergency; and

• Section 240.35 of the penal law, to the extent it is inconsistent with any directive requiring an individual wear a face covering in public or otherwise.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through the date so designated below:

• Executive Order 202.28, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, and 202.14 which each closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any

reason (e.g. parties, celebrations, games, meetings or other social events), which together constitute New York On PAUSE, is hereby continued until 11:59 p.m. on May 28, 2020, unless later amended or extended by a future Executive Order;

o Provided, however, that effective at 12:01 a.m. on May 15, 2020 that the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase One industries

• Construction, Agriculture, Forestry, Fishing and Hunting, Retail - (Limited to curbside or in-store pickup or drop off); Manufacturing and Wholesale Trade;

o Such businesses or entities must be operated subject to the guidance promulgated by the Department of Health;

o Only those businesses or entities in a region that meets the prescribed public health and safety metrics, as determined by the Department of Health, will be eligible for reopening;

o As of May 14, 2020 the regions are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier and the North Country regions comprising the counties of: Genesee, Livingston, Monroe, Ontario, Orleans, Seneca, Wayne, Wyoming, Yates Cayuga, Cortland, Madison, Onondaga, Oswego, Fulton, Herkimer, Montgomery, Oneida, Otsego, Schoharie, Broome, Chemung, Chenango, Delaware, Schuyler, Steuben, Tioga, Tompkins Clinton, Essex, Franklin, Hamilton, Jefferson, Lewis, and St. Lawrence. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open phase one industries, subject to the same terms and conditions.

o All enforcement mechanisms by state or local governments shall continue to be in full force an effect until June 13, 2020 unless later extended or amended by a future Executive Order.

• The directive contained in Executive Order 202.15 authorizing the Department of Taxation and Finance to accept digital signatures in lieu of handwritten signatures on documents related to the determination or collection of tax liability, is hereby modified to authorize such acceptance for the duration of the disaster emergency.

• The directive contained in Executive Order 202.3 which closed movie theaters until further notice and was later extended by Executive Order 202.14 and EO 202.28, is hereby modified to provide that a drive-in movie theater, shall not be required to close, but shall be treated as any other business per Executive Order 202.6, which designated certain businesses as essential or non-essential and subjected such businesses to in-person presence restrictions in the workplace.

Signed: Andrew M. Cuomo
Dated: May 14, 2020

Executive Order No. 202.32

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.23 and each successor Executive Order up to and including Executive Order 202.27, for thirty days until June 20, 2020.

IN ADDITION, I hereby temporarily suspend or modify the following for the period from the date of this Executive Order through June 20, 2020, the following:

• Subdivision (1) of section 576-b of the Public Health Law and section 58-1.7 and 58-1.8 of Title 10 of the NYCRR, to the extent necessary to, in furtherance of Executive Order 202.30 and any extensions thereof, allow clinical laboratories to accept and examine specimens for COVID-19 testing, from personnel of nursing homes and adult care facilities, as such personnel are defined in Executive Order 202.30, without a prescription or order from an authorized ordering source, and to report the results of such tests to the appropriate operators and administrators of the nursing home or adult care facility for which the person for whom the test was performed provides services; provided that, to ensure appropriate follow-up with patients who test positive for COVID-19, the facility administrator shall contact the local health department to ensure all facility personnel who test positive are provided appropriate clinical guidance as well as appropriate isolation orders; and

• Section 6530 of the Education Law, to the extent necessary to allow physicians to order COVID-19 tests, authorized by the U.S. Food and Drug Administration (FDA) for self-collection, without otherwise having an initial physician-patient relationship with the patient.

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Antwerp, Jefferson County; Village of Asharoken, Suffolk County; Village of Bainbridge, Chenango County; Village of Bayville, Nassau County; Village of Bronxville, Westchester County; Village of Canastota, Madison County; Village of Cedarhurst, Nassau County; Village of Chester, Orange County; Village of Chittenango, Madison County; City of Corning, Steuben County; Village of Coxsackie, Greene County; Village of Croton-on-Hudson, Westchester County; Village of Delhi, Delaware County; Village of Deposit, Broom-Delaware County; Village of Dexter, Jefferson County; Village of Dryden, Tompkins County; Town/Village of East Rochester, Monroe County; Village of East Rockaway, Nassau County; Village of Flower Hill, Nassau County; Grand-View-on-Hudson, Rockland County; Village of Granville, Washington County; Village of Great Neck, Nassau County; Village of Great Neck Estates, Nassau County; Village of Haverstraw, Rockland County; Village of Herkimer, Herkimer County; Village of Holland Patent, Oneida County; Village of Holley, Orleans County; Village of Huntington Bay, Suffolk County; Village of Kings Point, Nassau County; Village of Irvington, Westchester County; Village of Lynbrook, Nassau County; Village of Massapequa Park, Nassau County; Village of Massena, St. Lawrence County; Village of Menands, Albany County; Village of Mexico, Oswego County; Village of Mill Neck, Nassau County; Village of Millport, Chemung County; Village of Naples, Ontario County; Village of Nassau, Rensselaer County; Village of New Hartford,

Oneida County; Village of New York Mills, Oneida County; Village of Old Westbury, Nassau County; Village of Orchard Park, Erie County; Village of Oyster Bay Cove, Nassau County; Village of Pawling, Dutchess County; Village of Poland, Herkimer County; Village of Pulaski, Oswego County; Village of Quogue, Suffolk County; Village of Roslyn, Nassau County; Village of Roslyn Harbor, Nassau County; Village of Saranac Lake, Franklin-Essex Counties; Village of Saugerties, Ulster County; Village of Scottsville, Monroe County; Village of Sea Cliff, Nassau County; Village of Sidney, Delaware County; Village of Spencerport, Monroe County; Village of Sodus, Wayne County; Village of South Glens Falls, Saratoga County; Village of Trumansburg, Tompkins County; Village of Tuckahoe, Westchester County; Village of Upper Nyack, Rockland County; Village of Warwick, Orange County; Village of Wesley Hills, Rockland County; Village of West Haverstraw, Rockland County; Village of Westbury, Nassau County; Village of Whitehall, Washington County; Village of Whitesboro, Oneida County; Village of Williston Park, Nassau County; Village of Valley Stream, Nassau County; Village of Floral Park, Nassau County; Village of Schoharie, Schoharie County; and the County of Suffolk.

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law, I do hereby retroactively extend by twenty-one days the period for paying without interest or penalty the property taxes that were due by April 1, 2020, in the Village of Head of the Harbor, Suffolk County, and the Village of Russell Gardens, Nassau County.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through June 20, 2020:

• Any licensee or franchisee of a racetrack in the State is hereby permitted to operate such racetrack as of June 1, 2020, provided such racetrack does not permit any visitor or fan into the facility, and allows on site only essential personnel; and provided further that such licensee or franchisee of a racetrack, and all essential personnel adhere to any directive or guidance issued by the Department of Health and/or by the Gaming Commission.

• Executive Order 202.10 (as later extended by Executive Order 202.18 and Executive Order 202.29) which prohibited all non-essential gatherings of any size for any reason, is hereby modified to permit a gathering of ten or fewer individuals for any religious service or ceremony, or for the purposes of any Memorial Day service or commemoration, provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to, and provided further, that any drive-in or remote religious service may continue in excess of the ten person limit so long as there is no in-person contact between participants. Vehicle caravans are permitted.

• The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to authorize abatement of interest and penalties for a period of up to 100 days for taxpayers who were required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, I hereby suspend or modify the following provisions included in Executive Order 202.22, for the period from the date of this Executive Order through June 20, 2020, unless an earlier date is specified below:

• Article 5 of the Real Property Tax Law, and analogous provisions of any other general or special laws that require a tentative assessment roll to be filed on or before June 1, 2020, to allow the tentative and final assessment rolls to be filed, at local option, up to 30 days later than otherwise allowable, to allow an assessing unit to set a date for hearing assessment complaints that is at least 21 days after the filing of the tentative roll, to allow notice of the filing of the tentative roll to be published solely online so long as the date for hearing complaints is prominently displayed, to suspend in-person inspection of the tentative roll, and to allow local Boards of Assessment Review to hear complaints remotely by conference call or similar service, provided that complainants can present their complaints through such service and the public has the ability to view or listen to such proceeding;

• Section 1212 of the Real Property Tax Law, to the extent necessary to allow the commissioner of taxation and finance to certify final state equalization rate, class ratios, and class equalization rates, if required, no later than ten days prior to the last date set by law for levy of taxes of any municipal corporation to which such equalization rate, class ratios, and class equalization rates are applicable;

• Section 1512(1) of the Real Property Tax Law and Sections 283.291 and 283.221 of the Laws of Westchester County, are suspended to allow the County Executive to negotiate with any town supervisor or mayor of any city, to accept a lesser percentage of taxes, special ad valorem levies or special assessments which are otherwise due on May 25, provided that in no event shall any town or city be required to pay more than sixty percent. The County Executive is empowered to determine whether or not penalties for late payment or interest are able to be waived dependent on whether or not such town or city applies the County Executive's criteria for determining hardship due to COVID-19;

• Section 283.221 of the Laws of Westchester County is further suspended to the extent necessary to require the supervisor of a town, to waive payment of penalties for late payment of county and county district taxes under section 283.221 up to July 15, 2020, and waive payment of penalties for late payment of town and town district taxes and assessments in the same manner, provided such town applies the County Executive's criteria for the determination of hardship due to COVID-19;

• Section 1512(1) of the Real Property Tax Law and any penalty provision of the tax code of a city within Westchester County is further suspended to the extent necessary to allow the mayor of that City to waive the payment of penalties for late payment of county and county district taxes and to further waive payment of penalties for late payment of city and city district taxes and assessments in the same manner, provided such city applies the County Executive's criteria for the determination of hardship due to COVID-19;

• Section 5-18.0(2) of the Nassau County Administrative Code, to the extent necessary to allow the Nassau County Executive to extend until June 1, 2020, the deadline to pay without interest or penalty the final one-half of school taxes upon real estate in such county.

Signed: Andrew M. Cuomo
Dated: May 21, 2020

Executive Order No. 202.33

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through June 21, 2020:

• Executive Order 202.10, as later extended by Executive Order 202.18, Executive Order 202.29 and as extended and amended by Executive Order 202.32, which prohibited all non-essential gatherings of any size for any reason, except for any religious service or ceremony, or for the purposes of any Memorial Day service or commemoration, which allowed ten or fewer individuals to gather, provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to is hereby modified to permit any non-essential gathering of ten or fewer individuals, for any lawful purpose or reason, provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to.

Signed: Andrew M. Cuomo
Dated: May 22, 2020

Executive Order No. 202.34

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through June 27, 2020:

• Business operators and building owners, and those authorized on their behalf shall have the discretion to ensure compliance with the directive in Executive Order 202.17 (requiring any individual over age two, and able to medically tolerate a face-covering, be required to cover their nose and mouth with a mask or cloth face-covering when in a public place), including the discretion to deny admittance to individuals who fail to comply with the directive in Executive Order 202.17 or to require or compel their removal if they fail to adhere to such directive, and such owner or operator shall not be subject to a claim of violation of the covenant of quiet enjoyment, or frustration of purpose, solely due to their enforcement of such directive. Nothing in this directive shall prohibit or limit the right of State and local enforcement authorities from imposing fines or other penalties for any violation of the directive in Executive Order 202.17. This directive shall be applied in a manner consistent with the American with Disabilities Act or any provision of either New York State or New York City Human Rights Law, or any other provision of law.

• Executive Order 202.31, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.32 as modified by Executive Order 202.33 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

o As soon as a region meets the prescribed public health and safety metrics, as determined by the Department of Health, they will be eligible for Phase One reopening.

o Businesses or entities open pursuant to Department of Health guidance must be operated subject to the guidance promulgated by the Department of Health.

o As of May 28, 2020 the regions meeting the prescribed public health and safety metrics required for Phase One reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, North Country, Western New York, Capital Region, Mid-Hudson, and Long Island. Such regions include the counties of Genesee, Livingston, Monroe, Ontario, Orleans, Seneca, Wayne, Wyoming, Yates, Cayuga, Cortland, Madison, Onondaga, Oswego, Fulton, Herkimer, Montgomery, Oneida, Otsego, Schoharie, Broome, Chemung, Chenango, Delaware, Schuyler, Steuben, Tioga, Tompkins, Clinton, Essex, Franklin, Hamilton, Jefferson, Lewis, St. Lawrence, Allegany, Cattaraugus, Chautauqua, Erie, Niagara, Albany, Columbia, Greene, Saratoga, Schenectady, Rensselaer, Warren, Washington, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, Westchester, Nassau, and Suffolk. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase One industries, subject to the same terms and conditions.

Signed: Andrew M. Cuomo
Dated: May 28, 2020

Executive Order No. 202.35

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through June 28, 2020:

• Executive Order 202.34, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, and 202.31 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.32 as modified by Executive Order 202.33 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:
o That effective at 1:00 p.m. on May 29, 2020 that the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Two industries:
Professional Services, Administrative Support, Information Technology,
Real estate services, Building and Property Management, Leasing, Rental, and Sales Services,
Retail In-store Shopping, Rental, Repair, and Cleaning,
Barbershops and Hair Salon (limited services), and
Motor Vehicle Leasing, Rental, and Sales.
o Businesses or entities in industries open in Phase Two must be operated subject to the guidance promulgated by the Department of Health.
o As of May 29, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Two reopening are:
Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase two industries, subject to the same terms and conditions.

Signed: Andrew M. Cuomo
Dated: May 29, 2020

Executive Order No. 202.36

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Angola, Erie County; Village of Babylon, Suffolk County; Village of Bellport, Suffolk County; Village of Brockport, Monroe County; Village of Brookville, Nassau County; Village of Buchanan, Westchester County; Village of Clayton, Jefferson County; Village of Depew, Erie County; Village of East Hills, Nassau County; Village of Endicott, Broome County; Village of Farmingdale, Nassau County; Village of Fayetteville, Onondaga County; Village of Greenport, Suffolk County; Village of Groton, Tompkins County; Village of Hempstead, Nassau County; Village of Homer, Cortland County; Village of Hudson Falls, Washington County; Village of Island Park, Nassau County; Village of Kensington, Nassau County; Village of Laurel Hollow, Nassau County; Village of Monroe, Orange County; Village of Munsey Park, Nassau County; Village of Nyack, Rockland County; Village of Ocean Beach, Suffolk County; Village of Otisville, Orange County; Village of Patchogue; Suffolk County; City of Peekskill, Westchester County; Village of Red Hook, Dutchess County; Village of Rhinebeck, Dutchess County; City of Saratoga Springs, Saratoga County; Village of Scarsdale, Westchester County; Village of South Floral Park, Nassau County; Village of Stamford, Delaware County; Village of Stewart Manor, Nassau County; Village of Sylvan Beach, Oneida County; Village of Watkins Glen, Schuyler County; Village of Wellsville, Allegany County; and
IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law, I do hereby retroactively extend by twenty-one days the period for paying without interest or penalty the property taxes that were due by April 1, 2020, in the Village of Thomaston, Nassau County.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 2, 2020 the following:
• Section 6530 of the Education Law, or any section of the Public Health Law, to the extent necessary to allow a questionnaire administered through an asynchronous electronic interface or electronic mail that is approved by a physician licensed in the State of New York to be sufficient to establish a practitioner-patient relationship for purposes of ordering a clinical laboratory test.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 2, 2020:
• The directive contained in Executive Order 202.7, as extended, requiring all barbershops, hair salons, tattoo or piercing parlors and related personal care services to be closed to members of the public is hereby modified to allow for the opening of barbershops and hair salons, only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Two industries reopening.
• The directive contained in Executive Order 202.32 allowing any licensee or franchisee of a racetrack to operate such racetrack is hereby modified and extended until July 2, 2020, to allow any operator of an auto racetrack to operate beginning June 3, 2020, pursuant to Department of Health guidance for such operation, and provided such auto racetrack allows only essential personnel or participants to be on site, and does not permit any visitor or spectator into the facility or on premise.
• Executive Order 202.35, which amended prior Executive Orders with respect to New York on Pause, is here by modified as follows:

• Any region that meets the prescribed public health and safety metrics as determined by the Department of Health for Phase One reopening may allow outdoor, low-risk recreational activities and businesses providing such activities, as determined by Empire State Development Corporation, to be permitted to operate, in accordance with Department of Health guidance.

Signed: Andrew M. Cuomo
Dated: June 2, 2020

Executive Order No. 202.37

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby direct, for the period from the date of this Executive Order through July 5, 2020 the following:

Notwithstanding any prior Executive Order to the contrary, special education services and instruction required under Federal, state or local laws, rules, or regulations, may be provided in person for the summer term in school districts. Any district providing such services in person must follow State and Federal guidance.

Signed: Andrew M. Cuomo
Dated: June 5, 2020

Executive Order No. 202.38

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, as continued as contained in Executive Order 202.27 and 202.28 until July 6, 2020; and

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 6, 2020:

• Consistent with Center for Disease Controls and Prevention and New York State Department of Health Guidance, commercial building owners, retail store owners and those authorized on their behalf to manage public places within their buildings and businesses (collectively "Operators") shall have the discretion to require individuals to undergo temperature checks prior to being allowed admittance. Further, Operators shall have the discretion to deny admittance to (i) any individual who refuses to undergo such a temperature check and (ii) any individual whose temperature is above that proscribed by New York State Department of Health Guidelines. No Operator shall be subject to a claim of violation of the covenant of quiet enjoyment, or frustration of purpose, solely due to their enforcement of this directive. This directive shall be applied in a manner consistent with the American with Disabilities Act and any provision of either New York State or New York City Human Rights Law.

• The directive contained in Executive Order 202.3, as extended, that required any restaurant or bar to cease serving patrons food or beverage on-premises, is hereby modified to the extent necessary to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity.

• Executive Order 202.35 which continued the directive of Executive Order 202.33 is hereby modified to permit any non-essential gatherings for houses of worship at no greater than 25% of the indoor capacity of such location, provided it is in a geographic area in Phase 2 of re-opening, and further provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to.

• Upon the resumption of on-premises outdoor service of food and beverages at the licensed premises of restaurants and bars, to facilitate compliance with social distancing requirements in connection with such service, notwithstanding any provision of the Alcoholic Beverage Control law, restaurants or bars in the state of New York shall be permitted to expand the premises licensed by the State Liquor Authority to use (a) contiguous public space (for example, sidewalks or closed streets) and/or (b) otherwise unlicensed contiguous private space under the control of such restaurant or bar, subject to reasonable limitations and procedures set by the Chairman of the State Liquor Authority and, with respect to (a) the use of public space, subject to the reasonable approval of the local municipality, and all subject to the guidance promulgated by the Department of Health.

Signed: Andrew M. Cuomo
Dated: June 6, 2020

Executive Order No. 202.39

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15, through 202.21, and including 202.29, as contained in Executive Order 202.29 until July 7, 2020, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 7, 2020 the following:

• Sections 2018-a and 2018-b of the Education Law, to the extent necessary to allow any absentee ballot for an election held on June 9, 2020 and received by mail in the office of the clerk of the school district or designee of the trustees or school board not later than June 16, 2020 to be canvassed for such election. No ballots for such election shall be accepted by the clerk of the school district or designee of the trustees or school board after 5 p.m. on June 9, 2020 except those received by mail in accordance with this provision. Any receptacle used for hand delivery of absentee ballots in such election shall be closed and removed at 5 p.m. on June 9, 2020; The ballots therein shall remain unopened pending delivery of mailed ballots, and shall be removed and canvassed after 5 p.m. on June 16, 2020;

• Section 3012(d) of the Education Law and Subpart 30-3 of Title 8 of the NYCRR, to the extent necessary to exempt school districts from completing annual professional performance reviews of classroom teachers and building principals during the 2019-20 school year without withholding any apportionment of funds for the general support of public schools for which a school district is otherwise entitled; and

• Sections 2509, 2573, 3012 and 3014 of the Education Law, to the extent necessary to allow a board of education or the trustees of a common school district, only upon specific agreement, to appoint on tenure those classroom teachers and building principals recommended by the superintendent of schools who are in the final year of the probationary period, have received the previous requisite annual professional performance review ratings pursuant to § 3012-d of the education law and would have been in their discretion qualified for appointment on tenure based upon past performance, notwithstanding that their annual professional performance review had not been completed and they had not received the necessary effectiveness rating for the 2019-20 school year, or to allow such board of education or trustees of a common school district to extend such determination for an additional year.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 7, 2020:

• The directive contained in Executive Order 202.38, that allowed a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity, is modified to explicitly limit such activity to those regions that are in Phase 2 of the re-opening.

• The directive contained in Executive Order 202.4, as extended, that required local governments to allow non-essential personnel to be able to work from home or take leave without charging accruals, and required such number of non-essential personnel to total no less than 50% of the total number of employees across the entire workforce of such local government or political subdivision, is hereby modified to apply only to local governments that have not met the prescribed public health and safety metrics to be eligible for Phase Two reopening, provided such local governments in Phase Two regions may bring non-essential employees back to work beginning two weeks after such region meets the metrics to reopen Phase Two.

Signed: Andrew M. Cuomo
Dated: June 7, 2020

Executive Order No. 202.40

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.30 until July 9, 2020, subject to the modification below:

• The modifications of clause (b) of subparagraph (v) of paragraph (1) of subdivision (c) of section 415.26, paragraph (8) of subdivision (a) of section 487.9, paragraph (5) of subdivision (a) of section 488.9 of Title 18 of the NYCRR, and subdivision (7) of section 4656 of the Public Health Law contained in Executive Order 202.30 are continued, provided that such modification is amended only to the extent that the operator and administrator of all nursing homes and all adult care facilities, which are located in regions that have reached Phase Two of reopening, must test or make arrangements for the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, once per week.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby suspend or modify the following:
• Subdivision 4 of section 2022 of the education law and subdivision 3 of section 2007 of the education law to the extent necessary to provide that, in the event that the original budget proposed by a school district is not approved by the voters at an election held on June 9, 2020, pursuant to Executive Order 202.26, any resubmission to the voters of the original or revised budget shall be conducted at a date and by a process determined by and subject to a future Executive Order, provided, however, such revote shall not occur prior to July 9, 2020.

Signed: Andrew M. Cuomo
Dated: June 9, 2020

Executive Order No. 202.41

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby continue the directives contained in Executive Order 202.31, unless superseded by a subsequent directive; and
IN ADDITION, I hereby temporarily suspend or modify the following and issue the following directives for the period from the date of this Executive Order through July 13, 2020:
• The directive contained in Executive Order 202.7, as extended and as amended by Executive Order 202.36, requiring all salons, tattoo parlors, piercing parlors, and related personal care services to be closed to members of the public is hereby again modified to the extent necessary to allow for the opening of such personal care services, and only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Three reopening.
• Executive Order 202.35, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, and 202.31, and 202.34 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.38 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:
• That effective on June 12, 2020, the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Three industries, as determined by the Department of Health, in eligible regions, including:
o Restaurants / Food Services; and
o Personal Care.
o Businesses or entities in industries open in Phase Three must be operated subject to the guidance promulgated by the Department of Health.
o As of June 12, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Three reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase Three industries, subject to the same terms and conditions.

Signed: Andrew M. Cuomo
Dated: June 13, 2020

Executive Order No. 202.42

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through July 15, 2020:
• The directive contained in Executive Order 202.35, as extended and as amended by Executive Order 202.38, which amended the directive in Executive Order 202.10 that limited all non-essential gatherings to ten or fewer individuals, is hereby further modified to allow twenty-five (25) or fewer individuals, for any lawful purpose or reason, provided that the location of the gathering is in a region that has reached Phase 3 of the State's reopening, and social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to.

SA-125

Signed: Andrew M. Cuomo
Dated: June 15, 2020

Executive Order No. 202.43

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 18, 2020 the following:

• Section 5-18.0(2) of the Nassau County Administrative Code, to the extent necessary to allow the Nassau County Executive to extend until July 1, 2020, the deadline to pay without interest or penalty the final one-half of school taxes upon real estate in such county and to require payments made after such date to be subject to interest and penalties beginning on July 1, 2020.

• Subdivision 23 of section 621 of the Executive Law to the extent necessary to provide that an award for relocation expenses also shall include reasonable, temporary lodging expenses, such as motel or hotel, for victims of a crime or crimes related to domestic violence, subject to the fiscal limitation in subdivision 2 of section 631 of the Executive Law;

• Subdivision 1 of section 631 of the Executive Law to the extent necessary to provide that any certified residential program for victims of domestic violence as defined in section 459-a of the Social Services Law that had provided services to a victim of a crime or crimes related to domestic violence shall be considered a "criminal justice agency" for the purposes of the subdivision;

• Section 627 of the Executive Law and any other associated regulations to the extent necessary to provide that for the purposes of implementing this Executive Order, the Office of Victim Services shall determine claims submitted by a victim of a crime or crimes related to domestic violence, subject to the following conditions:

o If there is a physical injury, the claimant submits medical records of the injury and a statement from any certified residential program for victims of domestic violence as defined in section 459-a of the Social Services Law that such injuries were the result of a crime.

o In the event that there is no physical injury, the certified residential program for victims of domestic violence as defined in section 459-a of the Social Services Law after consultation with police or district attorney's office, determines such actions include one or more of the enumerated charges under subdivisions 11 or 12 of section 631 of the Executive Law and specifies such crime or crimes in the application or information submitted to the office.

• IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through July 18, 2020:

• In service of the policy goal of preventing the unnecessary congregation of people to slow the spread of the novel coronavirus, for businesses engaging in the sale/service of alcoholic beverages (i.e, restaurants, bars, convenience stores, liquor stores, and other entities licensed to sell alcoholic beverages at retail), whether such sale/service is for (i) off-premises consumption pursuant to regular licensed privileges; (ii) off-premises consumption through take-out or delivery service authorized under Executive Order 202.3, as extended, or (iii) on-premises consumption, including under the expansion procedures for outdoor service under Executive Order 202.38, in addition to such businesses' supervisory obligations under existing laws, ordinances, rules, and regulations, all such businesses shall be further required to inspect, monitor, and otherwise supervise the area within 100 feet of the licensed premises to ensure that any consumption of food or beverage comports with the applicable open container ordinances, and the social distancing and face covering requirements set forth for such business or service in any applicable Executive Order, regulation, ordinance, law, Department of Health guidance, and/or State Liquor Authority guidance; if unable to comply, the serving business must discontinue such sale/service of alcoholic beverages unless and until such Executive Orders, regulations, law, ordinances, Department of Health guidance, and State Liquor Authority guidance can be fully observed.

• The directive contained in Executive Order 202.8 that required only on-line transactions for the Department of Motor Vehicles is hereby modified to allow for in-person transactions at county-operated Department of Motor Vehicles offices if such transactions are conducted by appointment only, and only in regions that have met the prescribed public health and safety metrics required for Phase Three reopening.

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Alfred, Allegany County; Village of Cambridge, Washington County; Village of Greenwood Lake, Orange County; Village of Honeoye Falls, Monroe County; Village of Lake George, Warren County; Village of Manorhaven, Nassau County; Village of New Square, Rockland County; Village of Old, Field Suffolk County; Village of Palmyra, Wayne County; Village of Piermont, Rockland County; Village of Schaghticoke, Rensselaer County; Village of South Nyack, Rockland County; and the Village of Tupper Lake, Franklin County.

Signed: Andrew M. Cuomo
Dated: June 18, 2020

Executive Order No. 202.44

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby suspend or temporarily modify the following provisions of law of law until July 21, 2020:

• Real Property Tax Law Article 5, to allow tentative and final real property tax assessment rolls to be filed up to 30 days late; allows hearing assessment complaints for tax assessing units to be at a date 21 days after the filing of the tentative roll; allows notice of the tentative roll filing to be published online and to suspend in-person inspection of tentative rolls; and to allow Boards of Assessment Review to hear complaints remotely.

• Real Property Tax Law § 1212, to allow the commissioner of Dept. of Tax and Finance to certify final state equalization rates, class ratios, and class equalization rates no later than 10 days before the last date sent by law.

• Education Law § 680, to allow licensed pharmacists to order and administer COVID tests or tests for its antibodies.

• Public Health Law § 571(6), to allow licensed pharmacists to be designated as qualified healthcare professionals so they can direct a limited service laboratory to test patients for COVID or its antibodies.

• 10 NYCRR 401.3(a),(e), 709, 710, 710.1 or any other applicable regulation, to allow for DOH to approve and certify dedicated birthing sites operated by licensed birthing hospitals and centers.

• Article 6 and 15 of the Election Law in relation to conducting any village election to be held September 15, 2020 pursuant to this Executive Order, and article 6 of the Town Law are temporarily suspended and otherwise modified as follows:

o Any village or town election previously scheduled to be held in March, April, May, or June will be held on September 15, 2020. For any village or town election scheduled to be held on September 15, 2020 as directed by this Executive Order, all party nominations shall be made by party caucus, which may be conducted remotely as set forth by the chair of such party, and which shall be held not later than August 20, 2020, and provided that a certificate of nomination from such caucus and any certificates of declination or acceptance shall be filed not later than August 22, 2020, and provided that once a certificate of declination is submitted, no substitutions shall be permitted.

o All independent nominations for a village or town election previously scheduled prior to September 2020, now to be held on September 15, 2020, shall be postponed until such time as NY on Pause is suspended, subject to a process determined by a future Executive Order.

o Any village or town election postponed by Executive Order originally scheduled for a date in March, April, May or June of 2020 for which the ballot was fully determined at the time of this Executive Order shall proceed with the same ballot as would have been used at such prior election, and if such ballots were already printed, such ballots may be used at the September 15, 2020 election despite containing thereon the original date of the election.

o Any provision of the election law or village law otherwise applicable to the manner of conducting such an election in March, April, May or June, shall apply to the date of the September 15, 2020 election.

o Village or town officials elected at a rescheduled election held on September 15, 2020, shall assume office as soon as the statement of canvass is filed with the village clerk pursuant to section 15-126 of the Election Law or certified by the board of election, and the term of office of such officers shall end as if they had been elected at the time of the originally scheduled election.

o Any town or village election previously postponed by Executive Order for which ballot access was not completed at the time of such suspension shall be conducted solely in accordance with the ballot access provisions applicable to the September 15, 2020, election.

• Election Law § 9-209, to permit absentee ballots submitted by a voter who requested them for a canceled and rescheduled election to be cast and canvassed unless the voter appears to vote at the rescheduled election or requests another ballot.

• Election Law § 8-410, to require boards of election of any election held before July 1, 2020 to maintain a voting system that is accessible for voters who want to mark their ballots privately and independently; this must be on their website so people know of the service,

• Election Law § 16-108, to permit any Justice of the Supreme Court to hear election matters on election day and determine them by telephone or video conference.

• Election Law § 8-407, to allow that inspectors of boards of elections shall not attend or visit facilities to provide absentee ballots physically, and will send them by mail or by personal delivery.

• Election Law § 5-204, to eliminate the need for local or in person registration at poll sites in 2020.

• Public Health Law § 576-b(1) and 10 NYCRR 58-1.7, 58-1.9 to allow clinical labs to accept and examine specimens for COVID-19 testing from nursing home and adult care facilities personnel without a prescription or order and to report tests to the appropriate staff at the facilities; and to require the facilities to report positives to the local department of health for treatment and isolation orders.

• Education Law § 6530, to the extent necessary to allow physicians to order COVID-19 tests for self-collection without having a physician-patient relationship.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 21, 2020:

• The Commissioner of Health is authorized to suspend or revoke the operating certificate of any skilled nursing facility or adult care facility if it is determined that such facility has not adhered to any regulations or directives issued by the Commissioner of Health, and if determined to not be in compliance notwithstanding any law to the contrary the Commissioner may appoint a receiver to continue the operations on 24 hours' notice to the current operator, in order to preserve the life, health and safety of the people of the State of New York.

• The state assembly and state senate special elections, which are otherwise scheduled to be held on June 23, 2020 are hereby cancelled and such offices shall be filled at the general election. The special election to be held for the office of Queens Borough

President is hereby cancelled, and such office shall be filled at the general election.

• The special election to be held for the office of City Council in the 37th district is hereby cancelled, and such office shall be filled at the general election.

• The directive related to support persons for birthing patients contained in Executive Order 202.13 and 202.12 is hereby modified to require any article twenty-eight facility, shall, as a condition of licensure, allow any patient giving birth to have present with them: a support person, who does not have symptoms of COVID-19, for the labor, delivery and also the remaining duration of the patient's stay; and/or a doula, who does not have symptoms of COVID-19 for the labor, delivery, and the remaining duration of the patient's stay. The presence of a support person and/or doula will be subject to exceptions for medical necessity determined by the Commissioner.

• The directive contained in Executive Order 202.10 authorizing the Commissioner of Health to direct all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by canceling all elective surgeries and procedures, is hereby modified only to the extent necessary to authorize general hospitals to perform elective surgeries and procedures so long as the following criteria are met: within a county, the total available hospital inpatient capacity is over thirty percent and the total available hospital ICU capacity is over thirty percent and the total change, from April 17, 2020 to April 27, 2020, in the number of hospitalized patients who are positive for COVID-19 is fewer than ten; for each hospital within county that has met the eligibility criteria, the available hospital inpatient capacity is over thirty percent and the available hospital ICU capacity is over thirty percent and the change, from April 17, 2020 to April 27, 2020, in the number of hospitalized patients who are positive for COVID-19 is fewer than ten. The Commissioner of Health is authorized to issue guidance with respect to the implementation of these criteria. General hospitals that are authorized to perform elective surgeries and procedures must report, at a minimum, the number and types of surgeries and procedures performed to the Department of Health, in a manner prescribed by the Commissioner. General hospitals that do not meet the criteria to perform elective surgeries and procedures contained in this directive may seek a waiver from the prohibition, by submitting a plan that includes, at a minimum, their facility capacity, physical configuration, infectious disease protocols, and staffing capacity, including any applicable employment hardship information that includes any reductions in workforce, including furloughs, that have occurred due to the inability of such facility to perform elective surgeries or procedures, or any reductions in workforce, including furloughs, that may imminently occur due to the inability of such facility to perform elective surgeries or procedures, to the Department of Health, in a manner prescribed by the Commissioner. General hospitals shall not perform any elective surgery or procedure for patients until each such patient has tested negative for COVID-19 through an approved diagnostic test, and the hospital and patient have complied with the pre-operative and pre-procedure guidelines in a manner prescribed by the Commissioner.

• Any district or special district, including, but not limited to fire, library, sewer, or water, that conducts an election and/or budget vote shall be rescheduled to September 15, 2020 and collection of signatures for nominating petitions is hereby suspended until further notice, subject to a process determined by a future Executive Order; provided however, a library district may conduct an election on June 9, 2020 pursuant to this Executive Order if such election is managed by a school district.

• Circulation, filing, and collection of any independent nominating petition pursuant to section 6-138 of the Election Law for any office that would otherwise be circulated or filed pursuant to the Election Law or for any special district election, as provided for in Executive Order 202.13, continue to be postponed until further notice and shall be subject to a future Executive Order.

• Any village or town election that was postponed in March of 2020, or scheduled to be held on June 16, 2020, or any time prior to September 15, 2020, is hereby rescheduled for September 15, 2020.

• Executive Order 202.23 is modified to clarify that any voter that is in active and/or inactive status and is eligible to vote in a primary or special election to be held on June 23, 2020 who requests an absentee ballot via telephone for the June 23 special election or primary election, shall be sent an absentee ballot with a postage paid return envelope; provided however each voter shall not be sent more than one ballot, and shall not be required to complete an application either prior to or simultaneously to receiving the ballot. Further, the board of elections receiving the telephone request shall maintain a record of such telephone request for an absentee ballot, and may complete the absentee ballot application as such record on behalf of the voter requesting the absentee ballot, provided that no ballot shall be deemed invalid for lack of a complete absentee ballot application for any reason.

• Any suspension or modification of any law heretofore suspended in Executive Order 202, or any amended or modified Executive Order issued thereafter, which allowed for the practice of a profession in the state of New York without a current New York State licensure, or registration, including but not limited to those individuals who are validly licensed in another state or Canada, is hereby extended for a period of thirty days to allow those professionals the ability to continue to provide services necessary for the State's COVID-19 response.

• The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to authorize abatement of interest and penalties for a period of up to 100 days for taxpayers who were required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.

• Any licensee or franchisee of a racetrack in the State is hereby permitted to operate such racetrack as of June 1, 2020, provided such racetrack does not permit any visitor or fan into the facility, and allows on site only essential personnel; and provided further that such licensee or franchisee of a racetrack, and all essential personnel adhere to any directive or guidance issued by the Department of Health and/or by the Gaming Commission.

Signed: Andrew M. Cuomo
Dated: June 21, 2020

Executive Order No. 202.45

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

SA-128

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby extend any directive contained in Executive Order 202.34 and 202.35, provided such directive has not been superseded by a subsequent directive, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 26, 2020 the following:

• Paragraph (e) of subdivision 1 of Section 581 of the Labor Law, to the extent necessary to authorize the Commissioner of Labor to issue a finding related to experience rating charges as permitted by the Families First Coronavirus Response Act and incurred beginning with the benefit week starting March 9, 2020;

• Subdivision 4 of section 1 of chapter 25 of the laws of 2020 is modified to the extent necessary to provide that in addition to any travel to a country for which the Centers for Disease Control and Prevention has a level two or three travel health notice, an employee shall not be eligible for paid sick leave benefits or any other paid benefits pursuant to this chapter if such employee voluntarily travels which commences after June 25, 2020 to a state with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling average, and which the commissioner of the department of health has designated as meeting these conditions as outlined in the advisory issued pursuant to Executive Order 205, and the travel was not taken as part of the employee's employment or at the direction of the employee's employer;

• Section 28-66 of the Charter of the City of Buffalo, to the extent necessary to allow the Mayor to waive the additions prescribed therein on unpaid 2019-2020 city taxes for the months of April, May and June of 2020, and to require payments of 2019-2020 city taxes that are made after June 30, 2020 to be made without additions for the months of April, May and June of 2020;

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Ossining, Westchester County; Village of Pomona, Rockland County;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through July 26, 2020:

• The directive contained in Executive Order 202.35, as extended and as amended by Executive Order 202.38 and Executive Order 202.42, which amended the directive in Executive Order 202.10 that limited all non-essential gatherings, is hereby further modified to allow gatherings of fifty (50) or fewer individuals for any lawful purpose or reason, so long as any such gatherings occurring indoors do not exceed 50% of the maximum occupancy for a particular indoor area, and provided that the location of the gathering is in a region that has reached Phase 4 of the State's reopening, and provided further that social distancing, face covering, and cleaning and disinfection protocols required by the Department of Health are adhered to.

• Executive Order 202.41, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, 202.31, 202.34, and 202.35 which each closed or otherwise restricted public or private businesses or places of public accommodation, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

o That effective on June 26, 2020, the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Four industries, as determined by the Department of Health, in eligible regions, including:

Higher Education;

Film and Music Production;

Low-risk indoor arts and entertainment;

Low-risk outdoor arts and entertainment; and

Professional Sports without fans.

o Businesses or entities in industries open in Phase Four must be operated in compliance with the guidance promulgated by the Department of Health

o As of June 26, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Four reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase Four industries, subject to the same terms and conditions.

o Any previous directive that restricted operation of any industry, business, or facility that is permitted to open in Phase One, Phase Two, Phase Three, or Phase Four is hereby superseded, only insofar as it is inconsistent with any Executive Order allowing businesses, industries, and facilities to reopen.

• The directive contained in Executive Order 202.44 regarding elective surgeries is hereby amended to provide that the directive contained in Executive Order 202.10 authorizing the Commissioner of Health to direct all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by canceling all elective surgeries and procedures, is hereby modified to authorize general hospitals to perform elective surgeries and procedures so long as the established criteria are met currently, whether or not such criteria were met on the dates set forth in such directive, and as modified by the June 14th Department of Health guidance.

• Executive Order 202.34, which extended the directive contained in Executive Orders 202.28, 202.18, 202.14 and 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide, is hereby continued to provide that all schools shall remain closed to in-person instruction except for the purpose of provision of special education services. School districts must ensure the availability of meals, and child care, with an emphasis on serving children of essential workers. Meals may be provided by an alternative entity, provided that the school district shall be responsible for ensuring that all children have access to free meals. Should the students not have access through an alternative entity, the school district must provide the meals.

Signed: Andrew M. Cuomo
Dated: June 26, 2020

Executive Order No. 202.46

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 30, 2020 the following:
• Sections 6-138, 6-142, 6-158, 6-210, 6-206, and 15-108 of the Election Law in relation to independent nominations are modified as follows: Independent nominating petitions for an office to be filled at the time of the general election or any village election shall be filed between July 27 and July 30, 2020.
o A certificate of acceptance or declination for an independent nomination for an office to be filled at the time of general election or at a village election shall be filed not later than August 3, 2020.
o A certificate to fill a vacancy caused by a declination of an independent body for an office to be filled at the time of the general election or at a village election shall be filed not later than August 6, 2020.
o A signature made earlier than July 1, 2020, or later than July 30, 2020, shall not be counted upon a petition for an independent nomination for an office appearing on the general election ballot or at a village election.
o For any election in 2020, the signature requirements on an independent nominating petition for an independent nomination for the general election for any office that is not determined by a statewide election shall be whichever is less: (i) three and three tenths percentum of the total number of votes cast for governor at the last gubernatorial election in such unit, excluding blank and void votes, or (ii) a number equal to seventy percentum of the statutory minimum number provided for by subdivision 2 of section 6-142 of the election law, or for a village election, seventy percentum of the statutory minimum provided for in subdivision 6 of section 15-108 or subdivision 4 of section 6-206 of the election law. For an office determined by a statewide election, the signature requirements on an independent nominating petition shall be at least 30,000 valid signatures with at least 330 valid signatures being from each of one-half of the congressional districts for the State.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives:
• The directive contained in Executive Order 202.13, as extended by Executive Order 202.26 and 202.44, is hereby rescinded insofar as independent nominating petitions may be circulated, and signatures collected beginning July 1, 2020, consistent with this Executive Order, and filed consistent therein.

Signed: Andrew M. Cuomo
Dated: June 30, 2020

Executive Order No. 202.47

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
WHEREAS, despite community transmission, the State of New York has gone from having the highest infection rate to one of the lowest in the country and is one of only a few states reported to be on track to contain COVID-19;
WHEREAS, the Governor has undertaken a cautious, incremental, and evidence-based approach to reopening the State of New York;
WHEREAS, it is incumbent upon individuals and localities to respect and enforce the health protocols that that have allowed New York to move Forward in a phased reopening;
WHEREAS, local governments need additional tools at their disposal to ensure they can deter damaging and detrimental behavior, such as not wearing a face covering, not maintaining social distance, or gathering in large groups, all behaviors that increase transmission of the deadly COVID-19 virus;
WHEREAS, in the preceding weeks, investigators from various agencies have been observing and reporting to the State Liquor Authority on violations of the Executive Orders, relevant guidance, and the Alcoholic Beverage Control Law at State Liquor Authority licensed establishments;
WHEREAS, such investigators should have at their disposal all available tools for investigation and enforcement at such licensed establishments;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in

coping with such disaster, I do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.37; and I hereby temporarily suspend or modify the following from the date of this Executive Order through August 2, 2020:

• Section 2.20 of the Criminal Procedure Law, to the extent that it restricts, limits, or otherwise impedes the ability of a peace officer, as defined in Section 2.10 of the Criminal Procedure Law, to enforce provisions of the Alcoholic Beverage Control Law and the Public Health Law, or judgments or orders obtained for violation thereof, or to enforce the provisions of Executive Order 202 and any amendment or addition to such order.

• Sections 105 and 106 of the Alcoholic Beverage Control law to the extent they restrict, limit or otherwise impede the ability of a peace officer, as defined in Section 2.10 of the Criminal Procedure Law, to enforce provisions of the Alcoholic Beverage Control Law, or judgments or orders obtained for violation thereof, or to enforce the provisions of Executive Order 202 and any amendment or addition to such order;

• Subdivision 4 of section 2022 of the education law and subdivision 3 of section 2007 of the education law to the extent necessary to provide that, in the event that the original budget proposed by a school district was not approved by the voters at an election held on June 9, 2020, pursuant to Executive Order 202.26, any revote on resubmission to the voters of the original or revised budget shall occur on July 28, 2020 and shall be conducted in accordance with guidelines issued by the Department of Health pursuant to the authority granted by this executive order, and provided further that a school district proposing such revote shall operate upon a contingency budget pursuant to subdivision 5 of section 2022 of the education law section from July 1 to July 28;

• Paragraph a of subdivision 3 of section 2007 of the education law to the extent necessary to provide that, in lieu of the requirement that a school district publish two notices of a budget revote, each district shall send postcard notice to all residents of the district which details the date and location of the budget revote, date of the budget hearing, the definition of qualified voter, and instructions for applying for an absentee ballot. Such postcard notice shall be mailed no later than 21 days preceding such vote. If a school district possesses a resident's valid email address, the postcard notice may be sent via email to that resident instead of by mail;

• Subdivision 2-a of section 2022 of the education law to the extent necessary to authorize a school district possessing a qualified voter's valid email address to send a school budget notice via email to that voter instead of by mail;

• Sections 1608 and 1716 of the Education Law to the extent necessary to allow property tax report cards to be submitted to the State Education Department no later than 14 days prior to the date of the school budget revote, and the department shall make its compilation available electronically at the latest on July 21, 2020, seven days prior to the revote date;

• Sections 2018-a and 2018-b of the Education Law to the extent necessary to provide that, due to the prevalence and community spread of COVID-19, the potential for contraction of the COVID-19 virus shall be deemed a temporary illness for the purpose of eligibility to vote as an absentee voter in a school budget revote held July 28, 2020;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through August 2, 2020:

• The use of fireworks or dangerous fireworks, during the state disaster emergency declared by Executive Order 202, shall also be punishable as a violation of section 12(b) 2 of the public health law, and the Commissioner of Health is directed and authorized to issue emergency regulations, if such use meets the facts and circumstances established in subdivision 2 of section 270 of the penal law. In addition, use of fireworks by a licensee of any state entity inconsistent with any applicable guidance issued by the Department of Health shall be a basis for suspension or revocation of such license.

• Notwithstanding any provision of law or a party's rules to the contrary, any party caucus, party meeting or party convention held pursuant to the Election Law in the year two thousand twenty may be held by telephonic or video conferencing means in whole or in part at the discretion of the chairperson calling such meeting; provided, however, that any required notice shall include instructions to participants as to how to access such video teleconference.

• Notwithstanding any provisions of law or a party's rules to the contrary, proxy voting at any party caucus, party meeting or party convention held pursuant to the Election Law held in the year two thousand twenty shall be permitted. Any person eligible to attend and vote at such a meeting may hold up to ten proxies. A proxy statement may be in the form prescribed by the party's rule or as accepted in the past by the party entity or may be substantially as follows: "I, a member or eligible voter of [state party caucus, party meeting or party convention, do hereby give my proxy authorization to [state name of proxy holder] who shall be authorized to vote in my stead at the meeting to be held on [date] and any adjourned date thereof." Any proxy granted hereunder shall be revocable in a writing provided to the secretary or chair of the party entity or by the attendance of the proxy grantor at the meeting stated.

IN ADDITION, I hereby extend the following suspensions and directives contained in Executive Order 202.36 through August 2, 2020:

• Section 6530 of the Education Law, or any section of the Public Health Law, to the extent necessary to allow a questionnaire administered through an asynchronous electronic interface or electronic mail that is approved by a physician licensed in the State of New York to be sufficient to establish a practitioner-patient relationship for purposes of ordering a clinical laboratory test.

• The directive contained in Executive Order 202.44 which authorized any party caucus to be held remotely for an office to be filled at a town or village election to be held on September 15, 2020 is modified insofar as to authorize a remote caucus or convention for a town or village office, which is required by law to be filled at the general election in November, and is not to be filled at the September 15, 2020 town or village election.

• The directive contained in Executive Order 202.7, as extended, requiring all barbershops, hair salons, tattoo or piercing parlors and related personal care services to be closed to members of the public is hereby modified to allow for the opening of barbershops and hair salons, and to require opening or operations in compliance Department of Health guidance, and is only permitted in such regions authorized for Phase Two industries reopening.

• The directive contained in Executive Order 202.32 allowing any licensee or franchisee of a racetrack to operate such racetrack is hereby modified and extended until August 2, 2020, to allow any operator of an auto racetrack to operate beginning June 3, 2020, and to require opening or operations in compliance Department of Health guidance, and provided further such auto racetrack allows only essential personnel or participants to be on site, and does not permit any visitor or spectator into the facility or on premise.

• Executive Order 202.35, which amended prior Executive Orders with respect to New York on Pause, is here by modified as follows:

SA-131

• Any region authorized for Phase One reopening may allow outdoor, low-risk recreational activities and businesses providing such activities as determined by the Empire State Development Corporation, are permitted to operate if operated in accordance with Department of Health guidance.

Signed: Andrew M. Cuomo
Dated: July 3, 2020

Executive Order No. 202.48

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, as continued and contained in Executive Order 202.27, 202.28, , and 202.38, for another thirty days through August 5, 2020, except the following:

• The suspension or modification of the following statutes and regulations, and the following directives, are not continued, and such statutes, codes, and regulations are in full force and effect as of July 7, 2020:

o The suspension of Education law section 3604(7), and any associated directives, which allowed for the Commissioner of Education to reduce instructional days, as such suspensions and directives have been superseded by statute, contained in Chapter 107 of the Laws of 2020;

o The suspension of Section 33.17 of the Mental Hygiene Law and associated regulations to the extent necessary to permit providers to utilize staff members transport individuals receiving services from the Office of Mental Health or a program or provider under the jurisdiction of the Office of Mental Health during the emergency;

o The suspensions of sections 2800(1)(a) and (2)(a); 2801(1) and (2); 2802(1) and (2); and 2824(2) of the Public Authorities Law, to the extent consistent and necessary to allow the director of the Authorities Budget Office to disregard such deadlines due to a failure by a state or local authority to meet the requirements proscribed within these sections during the period when a properly executed declaration of a state of emergency has been issued, are continued only insofar as they allow a state or local authority a sixty day extension from the original statutory due date for such reports;

o Section 390-b of the Social Services Law and regulations at sections 413.4 and 415.15 of Title 18 of the NYCRR;

o Subdivision 8 of section 8-407 of the Election Law;

o The suspension of Criminal Procedure Law to the extent it requires a personal appearance of the defendant, and there is consent, in any jurisdiction where the Court has been authorized to commence in-person appearances by the Chief Administrative Judge; provided further that the suspension or modification of the following provisions of law are continued:

Section 150.40 of the Criminal Procedure Law, is hereby modified to provide that the 20-day timeframe for the return date for a desk appearance ticket is extended to 90 days from receiving the appearance ticket;

Section 190.80 of the Criminal Procedure Law, is hereby modified to provide that the 45-day time limit to present a matter to the grand jury following a preliminary hearing or waiver continues to be suspended and is tolled for an additional 30 days;

Section 30.30 of the Criminal Procedure Law, is hereby modified to require that speedy trial time limitations remain suspended until such time as petit criminal juries are reconvened or thirty days, whichever is later;

Article 195 of the Criminal Procedure Law, is hereby suspended to the extent that it would prohibit the use of electronic appearances for certain pleas, provided that the court make a full and explicit inquiry into the waiver and voluntariness thereof;

Sections 190.45 and 190.50 of the Criminal Procedure Law, are hereby modified to the extent necessary to allow an incarcerated defendant to appear virtually with his or her counsel before the grand jury to waive immunity and testify in his or her own defense, provided the defendant elects to do so;

The suspension of Section 180.80 and 190.80 of the Criminal Procedure Law, as modified by Executive Order 202.28, is hereby continued for a period not to exceed thirty days in any jurisdiction where there is not a grand jury empaneled; and when a new grand jury is empaneled to hear criminal cases, then 180.80 and 190.80 of the criminal procedure law shall no longer be suspended beginning one week after such grand jury is empaneled;

The suspension of Sections 180.60 and 245.70 of the Criminal Procedure Law, as modified by Executive Order 202.28, which allowed protective orders to be utilized at preliminary hearings, is hereby continued for a period of thirty days; and

The suspension of Sections 182.20, in addition to the modification contained in Executive Order 202.28 of section 182.30 of the Criminal Procedure Law is hereby extended for a period of thirty days, to the extent that it would prohibit the use of electronic appearances for felony pleas, or electronic appearances for preliminary hearings or sentencing;

o Business Corporation law sections 602, 605, and 708, as such suspensions have been superseded by statute, as contained in Chapter 122 of the Laws of 2020;

o Banking Law Section 39 (2), as such suspension has been superseded by statute, as contained in Chapters 112 and 126 of the Laws of 2020, as well as the directives contained in Executive Order 202.9;

o Insurance Law and Banking Law provisions suspended by virtue of Executive Order 202.13, which coincide with the expiration of the Superintendent's emergency regulations;

o Subdivision (28) of Section 171 of the Tax Law, to the extent that the Commissioner has extended any filing deadline;

o Sections 3216(d)(1)(c) and 4306 (g) of the Insurance Law, and any associated regulatory authority provided by directive in Executive Order 202.14, as the associated emergency regulations are no longer in effect;
o The directive contained in Executive Order 202.28, as extended, that prohibited initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, is continued only insofar as it applies to a commercial tenant or commercial mortgagor, as it has been superseded by legislation for a residential tenant, and residential mortgagor, in Chapters 112, 126, and 127 of the Laws of 2020; and
o The directive contained in Executive Order 202.10 related to restrictions, as amended by Executive Order 202.11, related dispensing hydroxychloroquine or chloroquine, as recent findings and the U.S. Food & Drug Administration's revocation of the emergency use authorization has alleviated supply shortages for permitted FDA uses of these medications.
• The directives contained in Executive Order 202.3, that closed video lottery gaming or casino gaming, gym, fitness center or classes, and movie theaters, and the directives contained in Executive Order 202.5 that closed the indoor common portions of retail shopping malls, and all places of public amusement, whether indoors or outdoors, as amended, are hereby modified to provide that such directives remain in effect only until such time as a future Executive Order opening them is issued.
IN ADDITION, I hereby suspend or modify for thirty days through August 5, 2020:
• the provisions of Articles 11-A and 11-B of the State Finance Law, and any regulations authorized thereunder, to the extent necessary to respond to the direct and indirect economic, financial, and social effects of the COVID-19 pandemic.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through August 5, 2020:
• The directive contained in Executive Order 202.41, that discontinued the reductions and restrictions on in-person workforce at non-essential businesses or other entities in Phase Three industries or entities, as determined by the Department of Health, in eligible regions, is hereby modified only to the extent that indoor food services and dining continue to be prohibited in New York City.

Signed: Andrew M. Cuomo
Dated: July 6, 2020

Executive Order No. 202.49

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15 and each successor Executive Order up to and including Executive Order 202.21, and Executive Order 202.29, as continued and contained in Executive Order 202.39, for another thirty days through August 6, 2020, except the following:
• The suspension or modification of the following statutes and regulations are not continued, and such statutes, codes, and regulations are in full force and effect as of July 8, 2020:
o 10 NYCRR 5-6.12(a)(4);
o Religious Corporations Law §§ 43, 45, as such suspensions have been superseded by Chapter 122 of the Laws of 2020;
o Environmental Conservation Law Articles 3, 8, 9, 13, 15, 17, 19, 23, 24, 25, 27, 33, 34, 35, 37, and 75, and 6, and NYCRR Parts 552, 550, 601, and 609 to the extent they were suspended to allow the Department of Environmental Conservation to suspend hearings if public comments were accepted electronically or by mail;
o Real Property and Proceedings Law § 711, Real Property Law § 232-a, and Multiple Dwelling Law § 4(8) and (9);
o Not for Profit Corporation Law § 1517; 19 NYCRR 203.3, 203.6, 203.13; 10 NYCRR 77.7(a)(1);
o Not for Profit Corporation Law § 1517; 19 NYCRR 203.3, 203.6, 203.13; 10 NYCRR 77.7(a)(4); and
o Public Health Law §§ 4140; 4144; Not for Profit Corporation Law § 1502, 1517, 19 NYCRR 203.1, 203.4, 203.8, 203.13; 10 NYCRR 13.1.

Signed: Andrew M. Cuomo
Dated: July 7, 2020

Executive Order No. 202.50

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or

regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and further, I do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.30 and Executive Order 202.40, which amended the directives contained in Executive Order 202.30, for thirty days until August 8, 2020.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through August 8, 2020:

• The directive contained in Executive Order 202.5, that required closure to the public of all indoor common portions of retail shopping malls, as extended, and as continued and modified in Executive Order 202.48, is hereby amended to allow such malls to open in regions of the state that are in Phase Four of the state's reopening, so long as such malls adhere to Department of Health issued guidance, effective 12:01am on Friday, July 10, 2020.

Signed: Andrew M. Cuomo
Dated: July 9, 2020

Executive Order No. 202.51

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the directives, not superseded by a subsequent directive, made by Executive Order 202.31, and I do hereby continue the suspensions and directives contained in Executive Order 202.41, the directive contained in Executive Order 202.42, and the suspensions and directives contained in Executive Order 202.43, with the following exceptions, for another thirty days through August 12, 2020:

• Section 5-18.0(2) of the Nassau County Administrative Code is no longer suspended or modified; and

• Any extension of the period for paying property taxes without interest or penalties pursuant to Real Property Tax Law Section 925-a is no longer in effect.

IN ADDITION, I hereby temporarily suspend or modify for the period from the date of this Executive Order through August 12, 2020, the following:

• Subdivision 1 of section 259 of the Education Law to the extent necessary to reduce the required number of signatures on registered public or free association library funding petitions to three and three tenths percentum of the total number of votes cast for governor at the last gubernatorial election in such municipality, excluding blank and void votes. Such petitions shall be submitted no less than 30 days prior to the scheduled election.

• Any state law, rule or regulation governing the gathering of nominating petitions for any public library district or special library district election to the extent necessary to provide that the minimum threshold requirement of signatures on nominating petitions for library trustee elections to be held on September 15, 2020 or on a subsequent date after September 15 through December 31, 2020, shall be a number equal to seventy percentum of the minimum number provided for by Education Law or the governing statutory provisions of such library. Such petitions shall be submitted no less than 30 days prior to the scheduled election.

Signed: Andrew M. Cuomo
Dated: July 13, 2020

Executive Order No. 202.52

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

WHEREAS, the State of New York has gone from having the highest infection rate to one of the lowest in the country and is one of only a few states reported to be on track to contain the spread of COVID-19;

WHEREAS, the Governor has undertaken a cautious, incremental and evidence-based approach to reopening the State of New York;

WHEREAS, other states that may have taken a less cautious approach are experiencing an increased prevalence of COVID-19; and

WHEREAS, it is incumbent upon business owners and local governments to enforce public health requirements to allow our safe reopening to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby temporarily suspend or modify, and direct, for the period from the date of this Executive Order through August 15, 2020 the following:

• Any provision of the Alcoholic Beverage Control Law to the extent necessary to require that all businesses that are licensed by the State Liquor Authority for on premises service of alcoholic beverages, and which are required as a license condition to make food available, shall serve alcoholic beverages for on premises consumption or for off premises consumption only if the service of such alcoholic beverage is accompanied by the purchase of a food item by each individual that is being served an alcoholic beverage, consistent with the food availability requirement of the license under the Alcoholic Beverage Control Law. The Chairman of the State Liquor Authority shall be authorized to promulgate any reasonable guidance to effectuate this provision.

Signed: Andrew M. Cuomo
Dated: July 16, 2020

Executive Order No. 202.53

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.22, through 202.26, and including 202.32, except for the provision authorizing the extension of payment of sales and use taxes without penalty by the Commissioner of Tax and Finance, 202.33, 202.34, and 202.35 as contained in Executive Order 202.44 and Executive Order 202.45 until August 20, 2020.
IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through August 20, 2020:
• The directive contained in Executive Order 202.45, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, 202.31, 202.34, 202.35 and 202.41 which each closed or otherwise restricted public or private businesses or places of public accommodation, and allowed regions to enter Phase Four of the State's reopening so long as the prescribed public health and safety metrics set by the Department of Health have been met, is hereby continued until and unless later amended or extended by a future Executive Order, provided that as of July 20, 2020 the New York City region is deemed to have met the prescribed public health and safety metrics required for Phase Four industries to reopen, further provided, however, that indoor common portions of retail shopping malls and places of low-risk indoor arts and entertainment continue to be closed in such region.
• In addition, the directive contained in Executive Order 202.50, that allowed indoor common portions of retail shopping malls to open in regions that have met the public health and safety metrics to enter Phase Four of the State's reopening, is hereby amended to provide that indoor common portions of shopping malls continue to be closed in the New York City region.

Signed: Andrew M. Cuomo
Dated: July 21, 2020

Executive Order No. 202.54

**Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency.**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and
WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;
NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions, modifications, and directives, not superseded by a subsequent directive, made by Executive Order 202.36 and 202.37, as extended, and Executive Orders 202.46 and 202.47, for another thirty days through August 29, 2020, except the following:
• The directive contained in Executive Order 202.47 that allowed any person eligible to attend and vote at any party caucus, party meeting, or party convention held pursuant to the Election Law in the year two thousand twenty to hold up to ten proxies, is hereby amended to provide that any party committee rule in place prior to the issuance of this order that authorized more than ten proxies shall continue in full force and effect.
• The suspensions of sections 2022, 2007, 1608, 1716, 2018-a, and 2018-b, which were necessary to allow school budget revotes to occur on July 28, are no longer suspended.
• Any extension of the period for paying property taxes without interest or penalties pursuant to Real Property Tax Law Section 925-a is no longer in effect.
IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law, I do hereby retroactively extend by twenty-one days the period for paying without interest or penalty the property taxes that were due by July 1, 2020, in the Village of Atlantic Beach, Nassau County.

SA-135

# EXHIBIT H

SA-136

FOUR SEASONS

SUBSCRIBE TO UPDATES AT
press.fourseasons.com

# Four Seasons Hotel New York and Four Seasons Resort The Biltmore Santa Barbara

**August 3, 2023,** *Toronto, Canada*

Ty Warner Hotels and Resorts and Four Seasons Hotels and Resorts have been working together to prepare for the highly anticipated reopening of both the Four Seasons Resort The Biltmore Santa Barbara and Four Seasons Hotel New York. Both iconic properties are expected to reopen in fall 2024. Renovations and enhancements are planned throughout and the owner and operator look forward to ushering in a new era for both celebrated properties. In preparation for reopening, recalling furloughed employees will be a priority.

Furthermore, during its temporary closure the Coral Casino Beach and Cabana Club in Santa Barbara underwent a transformation, the details of which we look forward to sharing closer to reopening, and is scheduled to reopen in September 2023.  The process of recalling furloughed employees will commence in the near future.

## PRESS CONTACTS



**Sarah Tuite**
**Senior Vice President, Corporate Communications and Public Relations**
1165 Leslie Street
Toronto, M3C 2K8
Canada
prsm@fourseasons.com

---

RELATED:



**May 30, 2024,** *Toronto, Canada*
Who Wants to Go to Four Seasons? Bring the Whole Family Along for an Unforgettable Vacation This Year

https://press.fourseasons.com/news-releases/2024/family-vacations



**May 21, 2024,** *Toronto, Canada*
Where Will You Go in 2026? Four Seasons Private Jet Experience Reveals Six More Regional and Around-the-World Itineraries

https://press.fourseasons.com/news-releases/2024/2026-private-jet-itineraries

CONNECT WITH THE PRESS ROOM:      @FourSeasonsPR



Four Seasons Hotels and Resorts, 1165 Leslie Street, Toronto, Ontario M3C 2K8, Canada

SA-137

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SELENA STALEY, VIVIAN HOLMES, and      :
OLIVE IVEY, on behalf of themselves and  :
all others similarly situated,          :     Case No. 22-cv-6781 (JSR)
                                        :
                    Plaintiffs,         :     **WARNER DEFENDANTS' LOCAL**
                                        :     **CIVIL RULE 56.1 STATEMENT**
v.                                      :     **OF UNDISPUTED FACTS**
                                        :
FSR INTERNATIONAL HOTEL INC. d/b/a FOUR  :
SEASONS HOTELS AND RESORTS, HOTEL 57    :
SERVICES, LLC, HOTEL 57, LLC, TY WARNER  :
HOTELS & RESORTS LLC, and H. TY WARNER,  :
                                        :
                    Defendants.         :
                                        :
------------------------------------------------------------------X

Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC,

and H. Ty Warner (collectively the "Warner Defendants") submit, pursuant to Rule 56.1 of the

Local Civil Rules of the United States District Court for the Southern District of New York, the

following undisputed material facts in support of their motion for summary judgment in the above-

captioned action.

**A.    The Parties**

1.    The Four Seasons Hotel New York (the "Hotel") is a landmark 52-story, I. M. Pei

designed, 5-star hotel located at 57 East 57th Street in New York City.  *See* Declaration of Marc

B. Zimmerman dated May 31, 2024 ("Zimmerman Decl.") at ¶ 4, **Exhibit A** (First Amended

Complaint) at ¶¶ 3 and 168; Declaration of Cathy Hwang dated My 30, 2024 ("Hwang Decl.") at

¶ 3.

2.    Hotel 57 Services, LLC is a Delaware limited liability company. *Id.* at ¶ 5.

1

3.     The sole member of Hotel 57 Services, LLC is Hotel 57 Holdings, LLC, a limited liability company organized under the laws of Delaware. *Id.* at ¶ 6.

4.     Hotel 57 Services, LLC is (and at all times relevant to the Amended Complaint, was) the employer of the majority of the non-union employees working at the Hotel, including Plaintiffs Selena Staley ("Plaintiff Staley"), Vivian Holmes ("Plaintiff Holmes") and Olive Ivey (f/k/a Olive Rodriguez ("Plaintiff Ivey")) (collectively, "Plaintiffs").    *See* Elizabeth Ortiz Declaration dated May 30, 2024 ("Ortiz Decl.") at ¶¶ 5, 6.

5.     Hotel 57 Services, LLC is a signatory to an employment contract with non-union employees (including Plaintiffs) who work at the Hotel, titled U.S. EmPact℠ Employee Handbook, revised February 1, 2018 (the "EmPact Agreement"). Zimmerman Decl. at ¶ 4, **Exhibit B** (Declaration of Evan Brustein dated December 5, 2022 ("Brustein Decl.") with accompanying Exhibit A (EmPact Agreement), Exhibit B (Declaration of Selena Staley dated December 4, 2022 ("Staley Decl.")), Exhibit C (Declaration of Vivian Holmes dated December 5, 2022 ("Holmes 12/5/22 Decl.")) and Exhibit D (Declaration of Olive Ivey dated December 5, 2022 ("Ivey Decl."))); Zimmerman Decl. at ¶ 5, **Exhibit C** (transcript of Olive Ivey deposition dated March 31, 2023 ("Ivey Tr.")) at 66:23-24; 68:2-15; Hwang Decl. at ¶¶ 7, 8.

6.     Hotel 57 Services, LLC also is (and at all times relevant to the Amended Complaint was) the employer of the majority of the union employees working at the Hotel.  Hwang Decl. at ¶ 11.

7.     The terms and conditions of the union employees working at the Hotel are governed by applicable union collective bargaining agreements -- not the EmPact Agreement.  Zimmerman Decl. at ¶ 6, **Exhibit D** (transcript of Elizabeth Ortiz deposition dated April 3, 2023 ("Ortiz Tr.")) at 95:13-15, 96:10-14; Hwang Decl. at ¶ 12.

8.     Hotel 57, LLC is a Delaware limited liability company.  Hwang Decl. at ¶ 16.

2

9.      The sole member of Hotel 57, LLC is Hotel 57 Holdings, LLC, a limited liability company organized under the laws of Delaware.  *Id.* at ¶ 17; Zimmerman Decl. at ¶ 7, **Exhibit E** (transcript of deposition of Cathy Hwang dated April 14, 2023 ("Hwang Tr.")) at 295:16-24;.

10.     Hotel 57, LLC is the owner of the Hotel building and property and a signatory to the hotel management agreement with the Hotel's operator, defendant FSR International Hotels. Inc. ("FSR"), which manages the Hotel. *Id*. at ¶¶ 18, 20.

11.     Hotel 57, LLC has no employees.  *Id.* at ¶ 19; Hwang Tr. at 39:13-20, 40:7-15.

12.     Ty Warner Hotels & Resorts, LLC ("TWHR") is a Delaware limited liability company.  Hwang Decl. at ¶ 21.

13.     TWHR does not now have (nor did it have at any time) any ownership interest in the Hotel. *Id.* at ¶ 22.

14.     TWHR does not now have (nor did it have at any time) any ownership interest in Hotel 57, LLC. *Id.* at ¶ 23.

15.     TWHR does not now have (nor did it have at any time) any ownership interest in Hotel 57 Services, LLC. *Id.* at ¶ 24.

16.     TWHR is not a signatory to any collective bargaining agreement applicable to union employees working at the Hotel. *Id.*

17.     TWHR is not a signatory to the hotel management agreement. *Id.*

18.     TWHR plays no role with respect to Plaintiffs' employment at the Hotel. Hwang Tr. at 85:17-21, 86:2-15.

19.     Neither Hotel 57, LLC or TWHR is a subsidiary of, or contractor to, Hotel 57, Services, LLC.  Hwang Decl. at ¶ 4.

20.     Hotel 57 Services, LLC, Hotel 57, LLC and TWHR are separate and distinct entities. Hwang Decl. at ¶ 4.

3

21.    Neither Hotel 57, LLC, TWHR or H. Ty Warner is a signatory to the EmPact Agreement.  Hwang Decl. at ¶ 9.

22.    H. Ty Warner ("Mr. Warner") is an individual who maintains only indirect interests in Hotel 57 Services, LLC and Hotel 57, LLC and serves as an officer of each such entity.  Hwang Tr. at 92:16-17, 18-19; 93:1, 19-22, 94:1.

23.    Mr. Warner is not a signatory to the EmPact Agreement. Hwang Decl. at ¶ 9; Zimmerman Decl. at ¶ 4, **Exhibit B** (Brustein Decl. with accompanying Exhibit A (EmPact Agreement)), *in passim*.

24.    Mr. Warner is not a signatory to any collective bargaining agreement applicable to union employees working at the Hotel. Hwang Decl. at ¶15.

25.    Mr. Warner does not himself oversee the employees at the Hotel, control the employees at the Hotel or hire or fire employees at the Hotel. Hwang Tr. at 86:16-23, 87:13-25, 88:1-3, 317:14-20.

26.    Antione Chahwan, President of Hotel Operations America for Four Seasons Hotels and Resorts and Secretary of defendant FSR (the entity that operates the Hotel), has not had any contact directly with Mr. Warner. *See* Zimmerman Decl. at ¶ 8, **Exhibit F** (relevant portions of the deposition transcript of Antione Chahwan dated April 10, 2023 ("Chahwan Tr.")) at 42:13-15.

27.    FSR, which does business as Four Seasons Hotel, operates and manages branded hotels.  Chahwan Tr. at 26:17-22.

28.    FSR is a signatory to the hotel management agreement and operates the Hotel pursuant to the terms thereto.  *Id.* at 17:1-16; 26:14-22.

29.    Plaintiffs Staley, Holmes and Ivey all are New York residents.  Ivey Tr. at 7:21-23; *see also* Zimmerman Decl. at ¶ 9, **Exhibit G** (transcript of Selena Staley deposition dated April

SA-141

11, 2023 ("Staley Tr.")) at 6:5-7; and ¶ 10, **Exhibit H** (transcript of Vivian Holmes deposition dated March 30, 2023 ("Holmes Tr.") at 21:15-18.

30.     Plaintiffs are non-union employees of Hotel 57 Services, LLC who work at the Hotel.  Staley Tr. at 300:15-25, 184:19-20; Holmes Tr. at 295:9-15; Ivey Tr. 115:13-17.

31.     Plaintiff Staley is employed by Hotel 57 Services, LLC as a Reservations Agent and was hired in 2007. Staley Tr. 24:6-10, 27:13-22.

32.     Plaintiff Holmes is employed by Hotel 57 Services, LLC as a Rooms Division Administrative Assistant and was hired in 1998.  Holmes Tr. at 147:4-15.

33.     Plaintiff Ivey is employed by Hotel 57 Services, LLC as a Housekeeping Manager and was hired in 1997. Ivey Tr. at 104:3-15.

**B.**     **The EmPact Agreement**

34.     Plaintiffs each are parties to the EmPact Agreement.  Staley Tr. 93:6-95:10; Ortiz Tr. at 205:23-25, 206:1-7; Zimmerman Decl. at ¶ 4, **Exhibit B** (Brustein Decl. with accompanying Exhibit B (Staley Decl.), Exhibit C (Holmes 12/5/22 Decl.) and Exhibit D (Ivey Decl.)).

35.     Plaintiffs' claims in the Amended Complaint for No-Fault Separation Pay are based on purported obligations to them pursuant to the terms of the EmPact Agreement.  Holmes Tr. at 152:12-17; Ivey Tr. at 198:23-25, 199:2-3; Staley Tr. at 111:11-15; First Amended Complaint, *in passim.*

36.     The EmPact Agreement provides for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC who worked at the Hotel if their employment with Hotel 57 Services, LLC terminated only under specified circumstances as set forth therein.  *Id.* at ¶ 6, **Exhibit B** (Brustein Decl. with accompanying Exhibit A (EmPact Agreement)) at pp. 56-58.

37.     The EmPact Agreement does not provide for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC (and such non-union employees of Hotel

5

SA-142

57 Services, LLC are not entitled to "No-Fault Separation Pay) if their employment with Hotel 57 Services, LLC terminated by a "permanent layoff result[ing] from…national emergencies…acts of God…disasters…and any other cause beyond the control of Four Seasons." *Id.* at pp. 56-58.

38. The EmPact Agreement does not provide for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC (and such non-union employees of Hotel 57 Services, LLC are not entitled to "No-Fault Separation Pay) if their employment with Hotel 57 Services, LLC was subject to a temporary furlough. *Id.* at p. 56.

39. The EmPact Agreements sets forth, in relevant part "If I receive a permanent layoff with no right of recall or I am terminated for no fault, my termination will be considered "no-fault"…[h]owever, in the event of a permanent layoff or "no-fault termination", I will be eligible for separation pay in accordance with the "No-Fault Separation Pay Schedule" in effect at the time of my separation unless I have opted out by signing the "Opt-Out Verification" attached to my EmPact™" *Id*.

40. The EmPact Agreement also provides that an employee of Hotel 57 Services, LLC "[m]ay be eligible to apply for positions (which may or may not be Comparable Employment) at another Four Seasons Hotel or Resort…[i]f I am transferred to another Four Seasons Hotel or Resort, I will not be entitled to No-Fault Separation Pay." *Id*. at 57.

41. Further, the EmPact Agreements permits employees of Hotel 57 Services, LLC to have outside employment and activities. *Id*. at 27.

42. Specifically, under the Section titled "Moonlighting and Outside Employment" the EmPact Agreement provides, in relevant part "I am free to have outside employment and activities, provided it does not affect my attendance, performance or the Four Seasons Hotel New York reputation in the community." *Id*.

43.     The EmPact Agreement also contains a dispute resolution process called the Complaint, Arbitration & Review for Employees ("C.A.R.E."), which sets forth "a procedure to assure that problems and complaints are resolved in this fashion." *Id.* at p. 54.

44.     The C.A.R.E. procedure sets forth a multi-step dispute resolution procedure that each of Plaintiffs expressly agreed to use *first* "for all complaints even if I have exercised my right to opt out of the mediation/arbitration provision of C.A.R.E." Zimmerman Decl. at ¶ 4, Exhibit B at Exhibit A (EmPact Agreement) at p. 60 and  Exhibits B, C, and D.

45.      Specifically, the C.A.R.E procedure set forth in the EmPact Agreement provides, in relevant part as follows:

| STEP 1: | I will discuss the matter informally with my immediate supervisor. |
|---|---|
| STEP 2: | If STEP 1 does not solve the problem, I will file a written complaint with the Human Resources Office within **14 days** after the event or problem occurred. At my request the Director of Human Resources may assist me in preparing my complaint. |
| STEP 3: | The Director of Human Resources will conduct an investigation concerning my written complaint, including a meeting with me, within **7 days** after filing. |
| STEP 4: | The Director of Human Resources will issue a written decision to me within **7 days** after the close of the investigation. |
| STEP 5: | If I am dissatisfied with the written decision in STEP 4, I will appeal to the General Manager within **14 days** after STEP 4. The General Manager will meet with me and give me a written decision on my appeal within **14 days** after our meeting. |
| STEP 6: | **MEDIATION/ARBITRATION**. If I am not satisfied with the General Manager's written decision in STEP 5, and the complaint is based on one of the following types of claims as defined by law:<br>  **a**. employment discrimination;<br>  **b**. harassment as it relates to my employment;<br>  **c**. a wage or hour violation;<br>  **d**. or termination of my employment from the Hotel (including "constructive discharge", but not a permanent layoff);<br>then I must submit my complaint to be heard by an independent mediator/arbitrator unless I have chosen to opt out of the mediation/arbitration provisions by following the opt-out procedure provided on page 61. |

Zimmerman Decl. at ¶ 4, Exhibit B at Exhibit A (EmPact Agreement) at pg. 54.

46.     At no time prior to commencing this lawsuit did Staley, Ivey or Homes comply with steps 1-5 of the C.A.R.E. procedure set forth in the EmPact Agreement. Staley Tr. 336:24-339:21;  Ivey Tr. 245:11-248:11; Holmes 375:21-25; 376:2-25; 377:2-25; 378:3-8.

SA-144

**C.     COVID-19 Rapidly Grows From a Low-Risk Issue to a Global Pandemic Affecting All U.S. Businesses**

*December 19, 2019: No Article About COVID-19 is Covered By the New York Times*

47.     The New York Times did not publish any article about COVID-19 on December 19, 2019.  *See* Marc B. Zimmerman Declaration in support of Motion for Judicial Notice dated May 31, 2024 ("MBZ Decl.") at ¶¶ 3, 4, **Exhibit A**.

*January 2020: The anticipated risk level in the U.S. is very low*

48.     On January 19, 2020, the New York Times did not publish any article about COVID-19.  *Id.* at ¶¶ 5, 6, **Exhibit B**.

49.     Indeed, in January 2020, the soon-to-be COVID-19 pandemic was perceived in the United States as a very low risk that was doubtful even to spread within the United States.  MBZ Decl. at ¶¶ 7, 8, **Exhibits C, D**.

50.     In January 2020, the anticipated level of response to COVID-19 was relatively minor, including that "all that most Americans need to do [in response to COVID-19] is wash their hands and proceed with their usual weekend plans." *Id.* at ¶ 8, **Exhibit D**.

*March 7, 2020: New York State declares a disaster emergency for COVID-19*

51.     On March 7, 2020, New York State Governor Andrew Cuomo issued Executive Order 202.1, "Declaring a Disaster Emergency in the State of New York[.] MBZ Decl.  at ¶ 11, **Exhibit G** (Executive Order 202.1).

52.     Governor Cuomo's Executive Order 202.1 provided: "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and

8

more are expected to continue"; and "New York State is addressing the threat that COVID-19 poses to the health of its residents and visitors." *Id.*

53.     On March 7, 2020, as a consequence of the serious threat posed by COVID-19, Governor Cuomo "declare[ed] a state of disaster emergency for the entire state of New York." *Id.*

54.     As consequences of the serious threat posed by COVID-19, Governor Cuomo authorized "all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety." *Id.*

55.     As consequences of the serious threat posed by COVID-19, numerous federal and state (including New York State) laws, ordinances, rules and regulations were enacted and modified on expedited timetables to address the COVID-19 outbreak. *Id.*

> ***March 11, 2020: COVID-19 is designated as a pandemic;***
> ***March 13, 2020: COVID-19 is declared a national emergency;***
> ***<u>Further limitations and restrictions come in rapid succession</u>***

56.     On March 11, 2020, the World Health Organization ("WHO") designated COVID-19 as a pandemic. *Id.* at ¶ 9, **Exhibit E**.

57.     On March 12, 2020, Governor Cuomo ordered the cancellation of any large events or gatherings anticipated to be in excess of 500 people and restricted places of public accommodation and events or gatherings with less than 500 people to 50% of their occupancy or seating capacity. *Id.* at ¶ 11, **Exhibit G** (EO 202.1).

58.     On March 13, 2020, COVID-19 was declared a national emergency (which ceased by proclamation on May 11, 2023). *Id.* at ¶10, **Exhibit F**.

9

59.     On March 16, 2020, Governor Cuomo modified the restrictions on large events or gatherings requiring cancellation of those of more than 50 people. *Id.* at ¶ 11, **Exhibit G** (EO 202.3)

60.     On March 16, 2020, Governor Cuomo ordered restaurants and bars in New York State closed for on-site service. *Id.*

61.     On March 16, 2020, Governor Cuomo ordered gyms and fitness centers in New York State closed. *Id.*

62.     On March 16, 2020, Governor Cuomo ordered schools in New York State closed. *Id.*

### *March 18, 2020: New York State workplace restrictions ordered*

63.     On March 18, 2020, Governor Cuomo ordered shopping malls and indoor and outdoor places of public amusement in New York State closed. *Id.* (EO 202.5).

64.     On March 18, 2020, Governor Cuomo ordered that, effective on March 20, 2020, other than for entities providing "essential" services, "All business and not-for-profit entities shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize", and employers in New York State were ordered to reduce their in-person workforce at any location by 50%. *Id.* (EO 202.6).

65.     On March 19, 2020, Governor Cuomo modified the March 18, 2020 in-person workforce reduction for employers in New York State, effective on March 2020, from 50% to 75%. *Id.*

### *March 20, 2020: the Hotel temporarily suspended its hospitality operations due to the unprecedented risks and restrictions caused by COVID-19*

66.     On March 20, 2020, the Hotel temporarily suspended its operations with respect to outside guests due to the collective impact of the New York State Executive Orders, the

10

unprecedented health and safety issues, risks and restrictions presented by the COVID-19 global pandemic and national emergency, including the total decline of recreation and business travel and hotel accommodations. *See* Ortiz Tr. at 43:9-14; Staley Tr. at 204:21-23; and Hwang Tr. at 88:24, 89:1-3.

67.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, the plan was to re-open the Hotel and resume its operations on April 15, 2020. Chahwan Tr. at 175:2-9.

68.     Despite that the Hotel temporarily suspended its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, it nonetheless continued to operate as a business, albeit with reduced staffing requirements. Ortiz Tr. at 46:2-8, 68:18-21.

69.     As a result of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, most (but not all) Hotel employees either: (a) were placed on temporary furlough; or (b) had their working hours significantly reduced, beginning on that date and continuing over next few months. Ortiz Tr. at 46:19-24.

70.     As a result of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, Plaintiffs Staley and Ivey were placed on temporary furlough from their employment at the Hotel on March 20, 2020. Staley Tr. 204:10-14; Ivey 151:7-11, 153:12-16.

71.     Notwithstanding the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, Plaintiff Holmes continued to work at the Hotel (up to as many as 17 hours weekly) through July 2020. Zimmerman Decl. at ¶ 11, **Exhibit I** (Declaration of Vivian Holmes, dated February 6, 2023 ("Holmes 2/6/23 Decl.")) at ¶2; Holmes Tr. at 161:4-12; and Ortiz Tr. at 138:4-5.

11

72.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, some employees who worked at the Hotel were transferred to other Four Seasons locations. Ivey Tr. at 48:16-23.

73.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, there was nearly complete uncertainty about the continuing and future impact COVID-19 would have on the global population -- much less the length of time the global pandemic would impact the Hotel's operations and when the Hotel could resume its operations with respect to outside guests. Ortiz Tr. at 141:4-16.

74.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, ongoing construction projects at the Hotel continued. Hwang Tr. at 164:20-24; Chahwan Tr. at 132:22-25, 133:1-4.

***April 2, 2020: the Hotel reopens solely to house COVID-19 first responders***

75.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, the Hotel reopened on April 2, 2020 for the sole purpose of housing (free of charge) COVID-19 first responders (*i.e.*, doctors, nurses and other health care professionals) who bravely were battling the COVID-19 pandemic in New York City. Ortiz Tr. at 51:7-13.

76.     Upon the reopening of the Hotel on April 2, 2020 to house COVID-19 first responders, some Hotel 57 Services, LLC employees returned to in-person work at the Hotel. Ortiz Tr. at 51:7-13.

77.     Upon the reopening of the Hotel on April 2, 2020 to house COVID-19 first responders, some Hotel 57 Services, LLC employees, including Plaintiff Holmes, continued to work remotely, albeit on a reduced schedule. Ortiz Tr. at 138:21-25, 139:1-2.

12

78.     The COVID-19 pandemic was unpredictable and created a lot of uncertainty for the Hotel and the employees who worked there.  Holmes Tr. at 228:10-18.

79.     The uncertainty concerning the scope and duration of the COVID-19 pandemic in New York continued over the months following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Tr. at 64:9-11; and Chahwan Tr. at 48:1-15.

80.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Plaintiff Staley believed that the Hotel would reopen by April 15, 2020.  Staley Tr. at 208:3-12.

81.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Plaintiff Holmes was hopeful that the COVID-19 pandemic and the Hotel's closure would end quickly.  Holmes Tr. at 165:22-25.

82.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Hotel 57 Services, LLC (through the Hotel manager, FSR) anticipated the Hotel would reopen on April 15, 2020.  Chahwan Tr. at 47:8-10; Ortiz Decl. at ¶ 9.

83.     Despite that Hotel 57 Services, LLC (through the Hotel manager, FSR) initially anticipated the Hotel would reopen on April 15, 2020, that target reopening date changed, and changed again, as the COVID-19 pandemic continued past each target date.  Chahwan Tr. at 47:8-25, 48: 1-25;  Ortiz Decl. at ¶ 10.

***Employees of Hotel 57 Services, LLC were regularly apprised of the Hotel's status***

84.     Throughout the COVID-19 pandemic, employees of Hotel 57 Services, LLC were regularly apprised of the status of the Hotel, including its anticipated reopening. Ortiz Tr. at 144:5-9; Ortiz Decl. at ¶ 11.

85.    On April 9, 2020, Hotel 57 Services, LLC advised its employees that the Hotel was housing medical personnel working on the front lines, the changing COVID-19 restrictions and reported that the suspension of its regular operations would continue until April 30, 2020. *See* Ortiz Decl. at ¶ 12, **Exhibit A** (April 9, 2020 Correspondence); Holmes Tr. 166:18-167:25.

86.    On April 30, 2020, Hotel 57 Services, LLC advised its employees that the continuing COVID-19 restrictions required it to postpone the Hotel's anticipated reopening date from April 30, 2020 to June 15, 2020. *Id.* at ¶ 13, **Exhibit B** (April 30, 2020 Correspondence); Staley Tr. at 227:5-10.

87.    On May 22, 2020, Hotel 57 Services, LLC advised its employees that it was extending first responder housing at the Hotel through June 30, 2020, and extended the suspension of Hotel operations through July 15, 2020. *Id.* at ¶¶ 14, **Exhibit C** (May 22, 2020 Correspondence); Staley Tr. at 231:25-232:10.

88.    On June 22, 2020, Hotel 57 Services, LLC advised its employees the Hotel would discontinue housing COVID-19 first responders and, given the continued effect of the COVID-19 pandemic on the Hotel, it would be "transitioning to a temporary shutdown of the hotel.". *Id.* at ¶15 , **Exhibit D** (June 22, 2020 Correspondence)

89.    The Hotel's continuing closure following the temporary suspension of its operations with respect to outside guests on March 20, 2020 was due to the impact of COVID-19 on its operation and long-terms effects on the luxury hotel business.  Hwang Decl. at ¶ 27.

90.    Although the Hotel presently is closed following the temporary suspension of its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 on Hotel operations and its long-term impact on the luxury hotel business, it will re-open once its owner and operator determine a way to do so profitably and safely.  Hwang Tr. 88:24, 89:1-3, 208:6; Hwang Decl. at ¶ 28.

14

91.     Although the Hotel presently is closed following the temporary suspension of its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 and its long-term impact on the luxury hotel business, it is not permanently closed.  Hwang Tr. at 223:12.

**D.     WARN Act Notices were issued to Hotel 57 Services, LLC employees**

92.     In or about August, 2020, faced with the numerous Executive Orders that restricted a wide range of activities in New York beginning with the onset of the pandemic in March 2020 and continuing for months thereafter,[1] Hotel 57 Services, LLC determined that COVID-19 likely would prevent the Hotel from reopening for an extended, indeterminable, period of time which it reasonably determined could last more than six (6) months.  Ortiz Tr. 100:1-19, 189:3-12; Ortiz Decl. at ¶ 16.

93.     On August 5, 2020, Hotel 57 Services, LLC sent WARN Act Notices to its non-union employees (including Plaintiffs), notifying them that, due to unforeseen business circumstances, their temporary layoff from their employment at the Hotel would continue for an as yet determined period of time. *Id.* at ¶  17, , Exhibits E, F, G (August 5, 2020 WARN Act Notices to Plaintiffs Holmes, Staley and Ivey); Holmes Tr. 234:3-6; Staley Tr. at 242:22-243:15.

94.     Hotel 57 Services, LLC issued WARN Act Notices to its non-union employees (including Plaintiffs), notifying them that they would be temporarily laid off from their employment at the Hotel less than four (4) months after the temporary suspension of the Hotel's

---

[1] *See* MBZ  Decl. at ¶ 11, Exhibit G (EO 202.8; EO 202.9; EO 202.10; EO 202.11; EO 202.12; EO 202.13; EO 202.14; EO 202.15; EO 202.16; EO 202.17; EO 202.18; EO 202.19; EO 202.20; EO 202.21; EO 202.22; EO 202.23; EO 202.24; EO 202.25; EO 202.26; EO 202.27; EO 202.28; EO 202.29; EO 202.30; EO 202.31; EO 202.32; EO 202.33; EO 202.34; EO 202.35; EO 202.36; EO 202.37; EO 202.38; EO 202.39; EO 202.40; EO 202.41; EO 202.42; EO 202.43; EO 202.44; EO 202.45; EO 202.46; EO 202.47; EO 202.48; EO 202.49; EO 202.50; EO 202.51; EO 202.52; EO 202.53; EO 202.54).

operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 on the Hotel and the unforeseen business circumstances the pandemic created. *Id.*

95.    On August 5, 2020, Hotel 57 Services, LLC sent WARN Act Notices to its non-union employees (including Plaintiffs) by regular mail and by e-mail. Ortiz Tr. 186:18-23.

96.    Hotel 57 Services, LLC also sent WARN Act Notices to its union employees who worked at the Hotel. Ortiz Tr. at 95:13-25, 96:1.

97.    The WARN Act Notices issued to each Hotel 57 Services, LLC employee set forth the individual date of their temporary layoff based upon their last day worked (*e.g.*, Plaintiff Ivey's notice specified March 14, 2020; Plaintiff Staley's notice specified March 21, 2020. Ortiz Decl. at ¶¶ 17, , Exhibits E, F, G.

98.    The WARN Act Notices stated the layoff was "expected to be temporary" for an "as yet undetermined" period. *Id.*

99.    The WARN Act Notice issued to Staley identifies the date her temporary layoff began as 3/21/2020. *Id.* at ¶ 17, Exhibit E.

100.    The WARN Act Notice issued to Holmes identifies the date her temporary layoff began as 7/14/2020. *Id.* at ¶ 17, Exhibit F.

101.    The WARN Act Notice issued to Ivey identifies the date her temporary layoff began as 3/14/2020. *Id.* at ¶ 17, Exhibit G.

102.    The WARN Act Notices also identified Rudolf Tauscher, General Manager of the Hotel and number (212) 350-6604 to contact for further information. *Id.* at ¶¶ 17, Exhibits E, F, G.

103.    The WARN Act Notices also included additional information such as Plaintiffs' eligibility "to receive job re-training, re-employment services, or other assistance with obtaining new employment from the New York State Department of Labor or its workforce partners". *Id.*

16

104.    The WARN Act Notices sent to Plaintiffs contained the best information available to Hotel 57 Services, LLC at the time they were sent in August 2020. *Id*. at ¶ 18.

**E.    Hotel 57 Services, LLC's furloughed employees were not terminated or permanently laid off from their employment at the Hotel and each maintains their right to be recalled to their employment at the Hotel upon its reopening**

105.    No employee of Hotel 57 Services, LLC (including Plaintiffs) who was temporarily furloughed following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 was terminated from their employment at the Hotel from the period March 2020 to the present.  Ortiz Tr. at 169:9-19; Chahwan Tr. at 191:5-10, 195:22-25.

106.    No employee of Hotel 57 Services, LLC (including Plaintiffs) who was temporarily furloughed following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 was permanently laid off with no right of recall to their employment at the Hotel from the period March 2020 to the present.  Ortiz Tr. at 169:9-19; Chahwan Tr. at 191:5-10, 195:22-25; Ortiz Decl. at ¶ 19.

107.    Hotel 57 Services, LLC's non-union employees were (and are) specifically permitted to maintain outside employment during their temporary furlough from their employment at the Hotel, without compromising their employment with Hotel 57 Services, LLC at the Hotel. Ortiz Tr. at 269:15-19, 270:9-13; EmPact Agreement at pp. 27; Hwang Tr. at 225:16-22; 226:21-23.

108.    Hotel 57 Services, LLC employees who have not previously: (a) resigned their employment with Hotel 57 Services, LLC; or (b) transferred to another FSR-operated property, all maintain their right to recall to their employment at the Hotel upon the reopening of the Hotel. EmPact Agreement at p. 57.

109.    Since it temporarily furloughed its employees following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of

17

COVID-19 on the Hotel, Hotel 57 Services, LLC steadfastly intended (and intends) to recall its employees once it is safe and profitable to reopen the Hotel.  Ortiz Tr. At 71:12-16, 73:4, 73:7-25; 74:1-3; 145:7-10; Ortiz Decl. at ¶ 21.

110.    Plaintiffs Staley, Holmes and Ivey all were, and remain, Hotel 57 Services, LLC employees from the date of their temporary furlough to date.  Ortiz Decl. at ¶ 22.

111.    In 2022, Plaintiff Ivey was told by Elizabeth Ortiz she was still an employee of Hotel 57 Services, LLC.   Ivey Tr. at 35:13-37:18.

112.    Plaintiff Ivey never received a notice of termination of her employment by Hotel 57 Service, LLC.  Ivey Tr. at 214:10-215:22.

113.    Plaintiffs Staley, Holmes and Ivey all maintain their right to recall to their employment with Hotel 57 Services, LLC at the Hotel upon the reopening of the Hotel.  Ortiz Decl. at ¶ 21.

114.    Plaintiff Holmes acknowledges she believes she has a right to be recalled to her employment at the Hotel upon the reopening of the Hotel.  Holmes Tr. at 363:17-20.

115.    Hotel 57 Services, LLC's non-exempt employees, including Plaintiffs Staley and Holmes, were paid by Hotel 57 Services, LLC during the period of their temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21: Ortiz Decl. at ¶¶ 36, 37, 38, 39, Exhibits H, I, J, K.

116.    Hotel 57 Services, LLC's non-exempt employees, including Plaintiffs Staley and Holmes, were paid (at their election their accrued but unused vacation time by Hotel 57 Services, LLC in 2021 and 2022 -- during the period of their temporary furlough.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21; Ortiz Decl. at ¶¶ 26, 37, 38, 39, 40, Exhibits I, J, K.

18

117.    Pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), Hotel 57 Services, LLC paid to its non-exempt "covered hotel service employee[s]", including Plaintiffs Staley and Holmes, weekly payments of five hundred dollars, commencing on October 11, 2021 and continuing for a maximum of 30 weeks (through its repeal on June 1, 2022), "for each week … that such employee *remains* laid off," as a result of closures or mass lay-offs caused by the COVID-19 pandemic.   Int. No. 2397-A §2(a). certain payments to "covered hotel service employee[s]".  Ortiz Decl. at ¶ 28.

118.    Pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), Hotel 57 Services, LLC, no payment was required thereunder to "managerial, supervisory or confidential employee[s]" of Hotel 57 Services, LLC, including Plaintiff Ivey.  *Id.*  at ¶ 28; Int. No. 2397-A §1(iii).

119.    Only a few non-union employees of Hotel 57 Services, LLC did not receive payments of five hundred dollars a week pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), because they were "managerial, supervisory or confidential employee[s]".  Ortiz Decl. at ¶ 29; Ortiz Tr. at 201:2-9.

120.    Hotel 57 Services, LLC continued making non-required payments of five hundred dollars weekly to a majority of its non-union employees who remained on temporary furlough, including Plaintiff Staley, following the 30-week period of payments required by New York City Local Law No. 405 Int. No. 2397-A (2021), through the present day, while they were (and are) on furlough.  Ortiz Tr. at 197:16-25, 198:1-2; 198:14-25, 199:1-25; Ortiz Decl. at ¶¶ 31, 32, Exhibit H

121.    From October 21, 2021  through the present day, Plaintiff Staley has received sixty five thousand dollars ($65,000), less applicable tax withholdings, from Hotel 57 Services, LLC. Ortiz Decl. at ¶¶ 33, 34, 39, 40, 41, 42, Exhibits K, L, M and N.

19

122.    Plaintiff Staley's last five hundred ($500) dollar payment from Hotel 57 Services, Inc. was May 30, 2024. *Id*. at ¶ 42, Exhibit N.

123.    During the period beginning on October 11, 2021 and continuing through the present day, Hotel 57 Services, LLC paid to its non-union employees who were on temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, the total sum of $1,436,051.00. Ortiz Decl. at ¶ 35.

124.    Following the conclusion of the mandatory payments under New York City Local Law, during the period beginning on June 1, 2022 and continuing through the present day, Hotel 57 Services, LLC paid to its non-union employees who were on temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, the total sum of $1,013,524.75. Ortiz Decl. at ¶ 36.

125.    Hotel 57 Services, LLC's non-union employees, including Plaintiffs Staley and Holmes, each were provided W-2 forms from Hotel 57 Services, LLC reflecting payments made to them by Hotel 57 Services, LLC during the period of their temporary furlough.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21; Ortiz Decl. at ¶ 37, 39, 41, Exhibits I, K and M.

126.    Hotel 57 Services, LLC made payments to its union employees who work at the Hotel during their period of temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Tr. 197:9-11.

127.    Plaintiffs were, and are, provided periodic communications concerning the Hotel's reopening status during their period of temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Decl. at ¶ 11.

128.    Plaintiffs maintained, and continue to maintain, their employment seniority for purposes of employment and employment benefits at the Hotel during their period of temporary

furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 and continuing to date. *Id.* at ¶ 25.

129.   Plaintiff Staley maintains her accrued vacation time bank with Hotel 57 Services, LLC (which presently includes 91 hours of vacation time) for use upon her return to work. *Id.* at ¶ 26.

130.   Plaintiff Ivey maintains her accrued vacation time bank with Hotel 57 Services, LLC (which presently includes 6 hours of vacation time) for use upon her return to work. *Id.*

**F.     The Hotel plans to reopen in Fall 2024**

131.   On August 3, 2023, Hotel 57 Services, LLC, in collaboration with its operator (FSR) announced the Hotel would be reopening by September 2024, upon completion of renovations and improvements to the Hotel and Hotel 57 Services, LLC and FSR are working hard to prepare and plan for the Hotel's reopening. MBZ Decl. at ¶¶ 12, 13, **Exhibit H** (Press Release).

132.   Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to COVID-19 (when it would be less disruptive to guests), significant renovations and improvements were made to the Hotel.  Hwang Decl. at ¶ 28.

133.   Renovations and improvements to the Hotel made following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 were and are intended to make the Hotel an even more desirable destination and enhance the ability to reopen the Hotel safely and profitably. *Id.*

134.   COVID-19 remained a factor in the Hotel's continued closure following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 and its long-term effect on the luxury hotel business.  *Id.* at ¶ 28.

135.   Upon the Hotel's reopening, Hotel 57, Services, LLC's employees, who have not either transferred or resigned, including Plaintiffs, remain on furlough with the right to recall to

21

SA-158

their employment when the Hotel reopens. Chahwan Tr. at 191:5-10, 195:22-25; Ortiz Decl. at ¶ 21.

Dated:  New York, New York
       May 31, 2024

 

/s/ Marc B. Zimmerman
Marc B. Zimmerman
James J. Boland
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, NY 10019
(212) 907-9700

Kathryn T. Lundy
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner*

22

SA-159

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

SELENA STALEY, VIVIAN HOLMES, and OLIVE
IVEY, on behalf of themselves and all others similarly
situated,

                                Plaintiffs,

               v.

FSR INTERNATIONAL HOTEL INC. d/b/a FOUR
SEASONS HOTELS AND RESORTS, HOTEL 57
SERVICES, LLC, HOTEL 57, LLC, TY WARNER
HOTELS & RESORTS, LLC, and H. TY WARNER,

                         Defendants.

------------------------------------------------------------------ X

Case No.: 22-CV-6781 (JSR)

**(ORAL ARGUMENT
REQUESTED)**

## MEMORANDUM OF LAW IN SUPPORT OF
## HOTEL 57 SERVICES, LLC, HOTEL 57, LLC, TY WARNER HOTELS & RESORTS,
## LLC AND H. TY WARNER'S MOTION FOR SUMMARY JUDGMENT

Marc B. Zimmerman
James J. Boland
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, NY 10019
(212) 907-9700

Kathryn T. Lundy
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Defendants Hotel 57 Services,
LLC, Hotel 57, LLC, Ty Warner Hotels &
Resorts, LLC and H. Ty Warner*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

PROCEDURAL HISTORY....................................................................................................... 2

FACTS ......................................................................................................................................... 3

    A.    Parties................................................................................................................... 3

    B.    A brief history of restrictions caused by the COVID-19 pandemic....................... 5

    C.    Hotel 57 Services, LLC issued WARN Act notices to its employees, including Plaintiffs............................................................................................... 9

    D.    Plaintiffs' continued employment by Hotel 57 Services, LLC............................. 10

    E.    Plaintiffs maintain their right of recall to employment with Hotel 57 Services, LLC at the Hotel upon its reopening....................................................... 11

    F.    The Hotel plans to reopen in Fall 2024................................................................. 11

ARGUMENT............................................................................................................................. 12

POINT I ..................................................................................................................................... 13

SUMMARY JUDGMENT SHOULD BE GRANTED ON THE WARN ACT CLAIMS ......... 13

    A.    Plaintiffs cannot establish liability for alleged federal and New York WARN Act violations against Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC ........................................................................................................ 14

    B.    Proper notice was issued to Plaintiffs pursuant to federal and New York WARN Acts ....................................................................................................... 16

        1.    WARN Act notices were sent to Plaintiffs on August 5, 2020................ 16

        2.    The unforeseen business exception to federal and New York WARN Acts apply ................................................................................... 17

POINT II .................................................................................................................................... 20

SUMMARY JUDGMENT SHOULD BE GRANTED ON THE BREACH OF CONTRACT CLAIM ................................................................................................................ 20

    A.    Plaintiffs have not complied with a contractual condition precedent................. 20

    B.    Plaintiffs are not eligible for No-Fault Separation Pay...................................... 21

        1.    Plaintiffs' employment was not terminated........................................... 21

2.     Plaintiffs did not receive permanent layoffs with no right to recall ........ 22

3.     COVID-19 was a "national emergency," precluding No-Fault
       Separation Pay ...................................................................................... 22

CONCLUSION............................................................................................................. 24

SA-162

TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................12

*Arculeo v. On-Site Sales & Mktg., LLC*,
    425 F.3d 193 (2d Cir. 2005).....................................................................................14

*Bickerstaff v. Vassar Coll.*,
    196 F. 3d 435 (2d Cir. 1999)....................................................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................12

*Coleman v. Optum, Inc.*,
    22 CV 5664 (ALC) 2023, WL 6390665 (S.D.N.Y. Oct. 1, 2023)..........................15

*Cook v. Arrowsmith Shelburne, Inc.*,
    69 F.3d 1235 (2d Cir. 1995).....................................................................................15

*Excelled Sheepskin & Leather Corp. v. Oregon Brewing Co.*,
    897 F.3d 413 (2d Cir. 2018).....................................................................................12

*Farid v. Smith*,
    850 F.2d 917 (2d Cir. 1988).....................................................................................12

*FDIC v. Great Am. Ins. Co.*,
    607 F.3d 288 (2d Cir. 2010).....................................................................................13

*Gross v. NBC*,
    232 F. Supp. 2d 58 (S.D.N.Y. 2002)........................................................................13

*Guippone v. BHS& B Holdings LLC*,
    747 F.3d 221 (2d Cir. 2013).....................................................................................15

*Halkias v. Gen. Dynamics Corp.*,
    137 F.3d 333 (5th Cir. 1998) ...................................................................................18

*Holcomb v. Iona Coll.*,
    521 F.3d 130 (2d Cir. 2008).....................................................................................12

*ISS Facility Services, Inc. v. Fedcap Rehabilitation Services, Inc.*,
    20 CV 6591 (RA), 2021 WL 2784550 (S.D.N.Y. July 2, 2021) .............................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................................13

*Presser v. Key Food Stores Co-Op.*,
  01 CV 8059, 2006 WL 2086346 (E.D.N.Y. July 25, 2006) ...................................16

*R.G. Group, Inc. v. Horn & Hardart Co.*,
  751 F. 2d 69 (2d Cir. 1984).................................................................................12

*Shaw v. Hornblower Cruises & Events LCC*,
  21 CV 10408 (VM), 2022 WL 16748584 (S.D.N.Y. Nov. 7, 2022) ......................14

*Sourceone Healthcare Techs., Inc. v. Bensonhurst Imaging Assocs. Mgmt. LLC*,
  08 CV 2568 (BMC), 2008 WL 2697324 (E.D.N.Y. July 2, 2008).........................14

*Trans Sport v. Starter Sportswear*,
  964 F. 2d 186 (2d Cir. 1992)................................................................................13

*In re Transcare Corp.*,
  614 B.R. 187 (Bankr. S.D.N.Y. 2020)..................................................................19

*Watson v. Mich. Indus. Holdings, Inc.*,
  311 F.3d 760 (6th Cir. 2002) ...............................................................................18

**OTHER AUTHORITIES**

29 U.S.C. §2102(b)(2)(A)..........................................................................................17

Fed. R. Civ. P. 56(a) .................................................................................................12

Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern
Districts of New York................................................................................................3

New York City Local Law No. 405 Int. No. 2397-A (2021)........................................10

New York WARN Act...................................................1, 2, 3, 9, 10, 13, 14, 15, 16, 18

20 C.F.R. §639.3(a)(2)..............................................................................................15

20 C.F.R §639.7........................................................................................................16

20 C.F.R. §639.9(b)(2)..............................................................................................17

22 C.F.R. §639.10.....................................................................................................16

85 Fed. Reg. 15337...............................................................................................6, 23

12 N.Y.C.R.R. §921-2.1 ............................................................................................16

12 N.Y.C.R.R. §921-6.3 ............................................................................................17

SA-164

12 NYCRR §921-1.1(e)..............................................................................15

12 NYCRR §921-6.3(b)..............................................................................18

**New York Executive Orders**

202.1...........................................................................................5, 6

202.8...............................................................................................9

202.9...............................................................................................9

202.10.............................................................................................9

202.11.............................................................................................9

202.12.............................................................................................9

202.13.............................................................................................9

202.14.............................................................................................9

202.15.............................................................................................9

202.16.............................................................................................9

202.17.............................................................................................9

202.18.............................................................................................9

202.19.............................................................................................9

202.20.............................................................................................9

202.21.............................................................................................9

202.22.............................................................................................9

202.23.............................................................................................9

202.24.............................................................................................9

202.25.............................................................................................9

202.26.............................................................................................9

202.27.............................................................................................9

202.28.............................................................................................9

202.29...................................................................................................................9

202.30...................................................................................................................9

202.31...................................................................................................................9

202.32...................................................................................................................9

202.33...................................................................................................................9

202.34...................................................................................................................9

202.35...................................................................................................................9

202.36...................................................................................................................9

202.37...................................................................................................................9

202.38...................................................................................................................9

202.39...................................................................................................................9

202.40...................................................................................................................9

202.41...................................................................................................................9

202.42...................................................................................................................9

202.43...................................................................................................................9

202.44...................................................................................................................9

202.45...................................................................................................................9

202.46...................................................................................................................9

202.47...................................................................................................................9

202.48...................................................................................................................9

202.49...................................................................................................................9

202.50...................................................................................................................9

202.51...................................................................................................................9

202.52...................................................................................................................9

202.53...................................................................................................................9

SA-166

202.54......................................................................................................................................9

Hotel's website (https://www.fourseasons.com/newyork/) ..........................................................11

## PRELIMINARY STATEMENT

Plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey (collectively, "Plaintiffs"), each a long-time employee of Hotel 57 Services, LLC at the Four Seasons Hotel New York, were placed on temporary furlough when the Four Seasons Hotel New York (the "Hotel") was forced to temporarily suspend operations and shut down to the public in March 2020 as a result of the COVID-19 pandemic. Unhappy that the Hotel had not yet reopened for an extended period, Plaintiffs filed this lawsuit, apparently believing that someone should compensate them for these unforeseen business circumstances.

Following the Court's April 19, 2024 Order dismissing three of Plaintiffs' causes of action and all claims against H. Ty Warner, the only claims left in this lawsuit are based on a: (1) purported failure to provide notice under the federal and New York WARN Acts; and (2) a contractual severance payment pursuant to Plaintiffs employment contract with Hotel 57 Services, LLC. Summary judgment should be granted in favor of the Warner Defendants on all these remaining claims in Plaintiffs' First Amended Complaint.

Plaintiffs' federal and New York WARN Act claims fail because Plaintiffs were sent proper WARN Act notices. Plaintiffs take issue that such WARN notices were slightly, but lawfully, delayed due to unprecedented and unforeseen business circumstances arising from the COVID-19 pandemic, and contend the Warner Defendants should have provided advance notice of Plaintiffs' furloughs before the Hotel was forced to close in compliance with state and city emergency mandate and before it reasonably believed the Hotel could not promptly reopen in light of the continuing effect of the COVID-19 pandemic. Despite Plaintiffs' belief, the federal and New York WARN Acts do not require the Warner Defendants to have clairvoyant powers to foresee the unforeseeable COVID-19 pandemic and its scope and effect on travel and business in New York City (including the Hotel's ability to operate in a safe and profitable manner) in

requiring the issuance of WARN Act notices.  To the contrary, the WARN Acts specifically excuse advance notice to employees when the closure or employment loss results from unforeseen business circumstances, as was the case here.  Plaintiffs' allegations that multiple or successive WARN Act notices are required are legally baseless.  The WARN Acts do not place such additional obligations on employers.

Plaintiffs' last remaining claim is that they were contractually entitled to a severance payment ("No-Fault Separation Pay") pursuant to their employment agreement with Hotel 57 Services, LLC. But No-Fault Separation Pay was due under the agreement only if Plaintiffs' employment with Hotel 57 Services, LLC *irrevocably ended* through (a) a permanent lay off with no right of recall or (b) termination without cause.  As the record establishes, neither of those triggering events has happened to Plaintiffs.  Plaintiffs were not provided any termination notice by Hotel 57 Services, LLC; they maintain and continue to accrue seniority; they maintain accrued vacation time; and, significantly, they have continued to be paid by Hotel 57 Services, LLC even during the Hotel's closure.  Indeed, Staley and most other furloughed non-exempt, non-union employees are being paid $500 each week to this very day.  Because, as these facts establish, as current employees on furlough, Plaintiffs all remain Hotel 57 Services, LLC employees, who are not entitled to Non-Fault Separation Pay.

**PROCEDURAL HISTORY**

Plaintiffs' First Amended Complaint dated December 19, 2022 contained six claims for relief (Dkt. No. 47) ("Amended Complaint" or "Amd. Compl.").  Following the Court's Order and Decision dated April 19, 2024 (Dkt. No. 78) on the Warner Defendants' Motion to Dismiss, only three claims remain: (1) the federal WARN Act claim against the Warner Defendants, except H. Ty Warner (Amd. Compl., First Cause of Action); (2) the New York WARN Act claim against the Warner Defendants, except H. Ty Warner (Amd. Compl., Second Cause of Action); and (3) breach

2

of contract against Defendant Hotel 57 Services, LLC (Amd. Compl., Third Cause of Action). Every claim in the Amended Complaint has been dismissed against H. Ty Warner.

### FACTS[1]

#### A.    Parties

This lawsuit involves the Four Seasons Hotel New York (the "Hotel"), a landmark 52-story, I.M. Pei designed 5-star hotel located at 57 East 57th Street, New York, New York (R.56: 1).  Given Plaintiffs' "kitchen sink" approach to their WARN Act claims against the Warner Defendants, it is necessary to distinguish these parties and their relationship (or lack thereof) to Plaintiffs.

Hotel 57 Services, LLC is a Delaware limited liability company (R.56: 2).  Hotel 57 Services, LLC was (and is) the employer of the majority of the workers at the Hotel, including Plaintiffs (R.56: 4).  Hotel 57 Services, LLC is *the* signatory to an employment contract with non-union employees (including Plaintiffs) who work at the Hotel (the U.S. EmPact[sm] Employee Handbook agreement revised February 1, 2018 (the "EmPact Agreement"), which was promulgated by the Hotel's operator, FSR International Hotels Inc. d/b/a Four Seasons Hotel ("FSR") (R.56: 5).[2]

Hotel 57, LLC is a Delaware limited liability company (R.56: 8). Hotel 57, LLC is the owner of the Hotel building and property and a signatory to the hotel management agreement with the Hotel's operator, FSR, which manages the Hotel (R.56: 10).  Hotel 57, LLC is not a signatory

---

[1] References to the Warner Defendants' Local Rule 56.1 Statement of Undisputed Facts are denoted as "R.56: __".

[2] Hotel 57 Services, LLC also was (and is) the employer of union employees working at the Hotel (R.56: 6). The terms and condition of such union employees are governed by an applicable union collective bargaining agreement; not the EmPact Agreement (R.56: 7).  Because Plaintiffs are not union employees, that collective bargaining agreement is not implicated by the present motion.

to the EmPact Agreement and has no employment relationship with any of the workers at the Hotel, including Plaintiffs (R.56: 11, 21).  It has no employees (R.56: 11).  It is a separate and distinct entity from Hotel 57 Services, LLC (R.56: 20).

Ty Warner Hotels & Resorts, LLC is a Delaware limited liability company (R.56: 12).  Ty Warner Hotels & Resorts, LLC does not have (and never had) any ownership interest in the Hotel, Hotel 57, LLC or Hotel 57 Services, LLC (R.56: 13, 14, 15).  Ty Warner Hotels & Resorts, LLC is not a party to the EmPact Agreement or the hotel management agreement, and it has no employment relationship with any of the workers at the Hotel, including Plaintiffs (R.56: 16, 17, 18, 21 ).  It is a separate and distinct entity from Hotel 57 Services, LLC (R.56: 20).

FSR International Hotels Inc. d/b/a Four Seasons Hotel ("FSR") operates branded hotels worldwide (R.56: 27).  FSR is a signatory to the hotel management agreement with Hotel 57 Services, LLC and operates the Hotel pursuant to the terms thereto (R.56: 28).

Plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey (f/k/a Olive Rodriguez), all are New York residents (R.56: 29).  Each is a non-union employee of Hotel 57 Services, LLC who works at the Hotel (R.56: 30). Staley is a Reservations Agent hired in 2007 (R.56: 31); Holmes is a Rooms Administrative Assistant hired in 1998 (R.56: 32); and Ivey is a Housekeeping Manager hired in 1997 (R.56: 33).  Plaintiffs are all parties to the EmPact Agreement and signed acknowledgements to that effect (R.56: 34).  Plaintiffs' claim for No-Fault Separation Pay is based on purported obligations pursuant to the terms of the EmPact Agreement.[3]

---

[3] The EmPact Agreement provides for a severance payment called "No-Fault Separation Pay" to employees of Hotel 57 Services, LLC *only* if their employment terminates by: (a) termination of employment without cause; or (b) permanent layoff with no right of recall, provided such permanent layoff did not "result[] from … national emergencies … acts of God … disasters … and any other cause beyond the control of Four Seasons" (R.56: 36, 37).

4

SA-171

**B.    A brief history of restrictions caused by the COVID-19 pandemic**

*December 2019: COVID-19 Is Not A Concern In the United States*

In December 2019, COVID-19 was not a concern in the United States, let alone a foreseeable risk to force the Hotel to close and furlough employees for more than six (6) months. Indeed, not even a single article concerning the novel coronavirus COVID-19 appeared in the New York Times' December 19, 2020 newspaper issue -- the newspaper issue published 90 days prior to the Hotel's closure because of the pandemic (R.56: 47).

*January 2020: the anticipated risk level in the U.S. is very low*

Likewise, in January 2020, the soon-to-be global COVID-19 pandemic was perceived in the United States as a very low risk and it was doubtful the virus would even spread within the United States (R.56: 50). The lack of perceived danger was reflected in the recommended response as the country was informed "all that most Americans need to do [in response to COVID-19] is wash their hands and proceed with their usual weekend plans." (R.56: 49). No article concerning the novel coronavirus COVID-19 appeared in the New York Times' January 19, 2020 newspaper issue -- the newspaper issue published 60 days prior to the Hotel's closure because of the pandemic (R.56: 48).

*March 7, 2020: New York State declares a disaster emergency from COVID-19*

Despite these early assurances, the COVID-19 outbreak developed rapidly and in unexpected ways through early 2020. Faced with dramatically changing circumstances, on March 7, 2020, New York State Governor Andrew Cuomo issued Executive Order 202.1, "Declaring a Disaster Emergency in the State of New York[.]" (R.56: 51). EO 202.1 reported that "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue" and that "New York State is addressing the threat that COVID-19 poses to the health of its residents and visitors." *Id.* As a result, Governor Cuomo

5

"declare[ed] a state of disaster emergency for the entire state of New York." *Id.* Numerous laws, ordinances, rules and regulations were modified, and Governor Cuomo authorized "all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety." *Id.*

### *March 11, 2020: COVID-19 is designated as a pandemic*

On March 11, 2020, the World Health Organization ("WHO") designated COVID-19 as a pandemic (R.56: 56). On March 12, 2020, Governor Cuomo ordered the cancellation of any large events or gatherings anticipated to be in excess of 500 people and restricted places of public accommodation and events or gatherings with less than 500 people to 50% of their occupancy or seating capacity (R.56: 57).

### *March 13, 2020: COVID-19 is declared a National Emergency*

On March 13, 2020, COVID-19 was declared a "National Emergency" by the President of the United States, a designation that continued through May 11, 2023. (R.56: 58); 85 Fed. Reg. 15337 (POTUS Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak).

### *New York State limitations on gatherings and workplace restrictions are ordered in rapid succession as COVID-19 rages on*

On March 16, 2020, Governor Cuomo modified the restrictions on large events or gatherings in New York State, requiring cancellation of those of more than 50 people (R.56: 59). New York's restaurants and bars were ordered closed immediately for on-site service, the city's gyms and fitness centers were closed, and its schools were shut down (R.56: 60). On March 18,

6

2020, New York's shopping malls and indoor and outdoor places of public amusement were ordered closed (R.56: 63).

Also on March 18, 2020, all New York businesses (with the exception of those entities providing "essential" services) were required -- effective March 20, 2020 -- to reduce their in-person workforces by 50% and to "utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize" (R.56: 64). On March 19, 2020, Governor Cuomo increased the required percentage of in-person workforce reduction from 50% to 75% (R.56: 65).

### *March 20, 2020: hospitality operations at the Hotel are temporarily suspended due to the risks and restrictions caused by COVID-19*

The Hotel temporarily closed to outside guests effective March 20, 2020, as a result of the collective impact of the national emergency caused by COVID-19, the New York State Executive Orders, the unprecedented health and safety issues, and the risks and restrictions presented by the global pandemic, which included the wholesale shutdown of any travel and demand for hotel accommodations (R.56: 66). At the time of this initial temporary suspension of hotel operations, the initial plan was to resume operations on April 15, 2020 (R.56: 67). However, there was unprecedented uncertainty about the continuing and future impact COVID-19 would have on New York City and the world as well as the length or extent of restrictions that would be imposed during the coming months on businesses in New York City (R.56: 73). Consequently, it could not be determined for how long the global pandemic would impact the Hotel's hospitality operations or when it could safely (and economically) reopen to guests (R.56: 83).

Despite the March 20, 2020 suspension of hospitality services, the Hotel remained open and continued to operate as a business -- albeit with reduced staffing requirements (R.56: 75, 76, 77). As a result of this unanticipated change, most (but not all) Hotel 57 Services employees

7

working at the Hotel were either placed on temporary furlough or had their working hours significantly reduced (R.56: 76, 77). For their part, Staley and Ivey were placed on temporary furlough from their employment at the Hotel in March 2020 (R.56: 70) while Holmes continued to work (as many as 17 hours per week) through July 2020 (R.56: 71).

### *April 2, 2020: the Hotel reopens to house COVID-19 first responders*

On April 2, 2020, the Hotel re-opened to house (free of charge) frontline COVID-19 first responders (*i.e.*, doctors, nurses and other health care professionals) battling the pandemic in New York City (R.56: 75). Accordingly, some Hotel 57 Services, LLC employees returned to work on-site (R.56: 76). Others, including Holmes, continued to work remotely, albeit on a reduced schedule (R.56: 77).

### *Employees of Hotel 57 Services, LLC were regularly apprised of the Hotel's status*

The COVID-19 pandemic was an unprecedented and unpredictable time in New York and throughout the world, creating uncertainty for the Hotel and the employees who worked there (R.56: 78, 79). When Hotel operations were suspended on March 20, 2020, reopening was anticipated to take place on April 15, 2020 (R.56: 83). That date, however, changed again and again, as the COVID-19 pandemic continued and evolved (R.56: 83).

The evolving scope and duration of the COVID-19 pandemic in New York was reflected in the similarly evolving restrictions put in place in Executive Orders issued by Governor Cuomo (R.56: 51-65). During this period of uncertainty, employees of Hotel 57 Services, LLC were regularly kept apprised of the status of the Hotel and its operations (R.56: 84). For example:

- on April 9, 2020, it advised employees of its plans to house first responder medical personnel at the Hotel, informed them of the present state of the evolving pandemic restrictions, and noted that the suspension of regular operations at the Hotel would continue until April 30, 2020 (R.56: 85);

8

- on April 30, 2020, it advised employees that, due to continuing COVID-19 restrictions, the suspension of regular operations at the Hotel would continue and the anticipated reopening date was pushed out to June 15, 2020 (R.56: 86); and

- on May 22, 2020, it advised employees that it was extending the commitment to house first responders through June 30, 2020, that the suspension of regular operations at the Hotel would continue, and that the anticipated reopening date was pushed out to July 15, 2020 (R.56: 87).

On June 30, 2020, the Hotel ceased housing first responders (R.56: 88).  Given the continuing effect of the COVID-19 pandemic -- including the restrictions on travel, business and everyday life in New York[4] -- Hotel 57 Services, LLC determined, and advised employees, that it would be "transitioning to a temporary shutdown of the hotel." (R.56: 88).

C.    **Hotel 57 Services, LLC issued WARN Act notices to its employees, including Plaintiffs**

Hotel 57 Services, LLC's decision to transition the Hotel during a span of just four months from: (a) operational, to (b) semi-operational, to (c) operational only to house first responders, to (d) temporary shutdown status reflected the uncertainty of the effect and duration of the COVID-19 crisis (R.56: 85-89, 92).

Only in August 2020 did Hotel 57 Services, LLC conclude that it could not continue to operate the Hotel in any capacity due to the pandemic and likely would not be able to do so safely

---

[4] *See* EO 202.8; EO 202.9; EO 202.10; EO 202.11; EO 202.12; EO 202.13; EO 202.14; EO 202.15; EO 202.16; EO 202.17; EO 202.18; EO 202.19; EO 202.20; EO 202.21; EO 202.22; EO 202.23; EO 202.24; EO 202.25; EO 202.26; EO 202.27; EO 202.28; EO 202.29; EO 202.30; EO 202.31; EO 202.32; EO 202.33; EO 202.34; EO 202.35; EO 202.36; EO 202.37; EO 202.38; EO 202.39; EO 202.40; EO 202.41; EO 202.42; EO 202.43; EO 202.44; EO 202.45; EO 202.46; EO 202.47; EO 202.48; EO 202.49; EO 202.50; EO 202.51; EO 202.52; EO 202.53; EO 202.54.

and profitably for an extended, indeterminable period of time expected to last more than six months (R.56: 92). Accordingly, on August 5, 2020, Hotel 57 Services, LLC issued WARN Act notices to Plaintiffs (and all its non-union employees) (R.56: 93), effective on, and specifying, their furlough date (Ivey's was March 14, 2020; Staley's was March 21, 2020 (R.56: 93); and Holmes' was July 14, 2020 (R.56: 93)).

### D.    Plaintiffs' continued employment by Hotel 57 Services, LLC

Although temporarily furloughed, the evidence in the record conclusively establishes that Plaintiffs (like other non-union employees who did not previously resign their employment with Hotel 57 Services, LLC or transfer to another FSR-operated property) remain Hotel 57 Services, LLC employees (R.56: 105, 106, 108, 112, 115, 116, 120, 121, 127-130). Staley, Holmes and Ivey have not been terminated (for any reason), nor have they been permanently laid off without right to recall when the Hotel reopens (R.56: 105, 106, 110). Ivey never received a notice of termination (R.56: 112). Plaintiffs also continue to accrue seniority (R.56: 128) and maintain their accrued vacation time banks for their return to work (R.56: 129, 130). Staley and Holmes (along with other non-union, non-exempt employees) were paid their accrued but unused vacation time in 2021 and 2022 (R.56: 116).

Additionally, Staley and Holmes (along with many other Hotel 57 Services, LLC non-union, non-exempt employees) were paid by Hotel 57 Services, LLC during their furlough, pursuant to (R.56: 117) which required payments to certain hotel service employees who were temporarily laid off as a result of closures or mass layoffs caused by the COVID-19 pandemic[5]

---

[5] Hotel 57 Services, LLC was required to pay each "covered hotel service employee" five hundred dollars "for each week … that such employee remains laid off," up to a maximum of 30 weeks; New York City Local Law No. 405 Int. No. 2397-A (2021) at §2(a).

10

(R.56: 117).  Holmes and Staley each began receiving $500 weekly payments from Hotel 57 Services, LLC in October 2021 (R.56: 117).

Moreover, after the 30-week period of required payments under New York City law expired, Hotel 57 Services, LLC voluntarily continued to pay many of its non-exempt employees, including Staley, $500 weekly -- *payments that continue to the present day* (R.56: 120).  Staley's most recent $500 payment from Hotel 57 Services, Inc. occurred on May 30, 2024 (R.56: 122). During the period beginning on October 11, 2021 and continuing through the present day, Hotel 57 Services, LLC paid to its non-union employees who were on temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, the total sum of $1,436,051.00. (R.56: 123). From October 21, 2021 through the present day, Staley has received sixty five thousand dollars ($65,000), for which W-2 employee tax forms reflecting these payments have been issued by Hotel 57 Services, LLC (R.56: 122, 125).

> **E.  Plaintiffs maintain their right of recall to employment with Hotel 57 Services, LLC at the Hotel upon its reopening**

Because Plaintiffs (like other non-union employees of Hotel 57 Services, LLC) have neither been permanently laid off with no right of recall nor terminated (for any reason), they retain their right to be recalled when the Hotel reopens. (R.56: 135).  It is (and has always been) Hotel 57 Services, LLC's intention to reopen the Hotel and to recall Plaintiffs and its other furloughed non-union employees (R.56: 109).  Those employees will return with their accrued seniority and other associated benefits under the EmPact Agreement. (R.56: 128).

> **F.  The Hotel plans to reopen in Fall 2024**

On August 3, 2023, Hotel 57 Services, LLC, in collaboration with FSR, announced the Hotel would be reopening in Fall 2024, upon completion of renovations and improvements (R.56: 131).  Following that press release, the Hotel's website (https://www.fourseasons.com/newyork/)

contains information documenting a Fall 2024 reopening (R.56: 131). Upon the Hotel's reopening, Hotel 57 Services, LLC's employees, including Plaintiffs, will be recalled to their employment with the Hotel (R.56: 135).

## ARGUMENT

Summary judgment is warranted where the record establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (summary judgment is integral "to secure the judge, speedy and inexpensive determination of every action"). A fact is only "material" if it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact'" (*Excelled Sheepskin & Leather Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018) (*quoting Celotex Corp.*, 447 U.S. at 323)) and can meet this burden in two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim; or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988) (*citing Celotex,* 477 U.S. at 331).

Once that burden is met, "[t]he non[]moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (*quoting Celotex*, 477 U.S. at 324). To meet that burden, the nonmoving party must provide "concrete particulars" rather than merely assert "a conclusion without supplying supporting arguments or facts." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F. 2d 69, 77 (2d Cir. 1984).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

12

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). To defeat summary judgment, a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving party may not defeat summary judgment by asserting mere "conclusory statements, conjecture or speculation". *Gross v. NBC*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); *see also FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation); *Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 451 (2d Cir. 1999) (a plaintiff's feelings and perceptions cannot serve as evidence to support a claim); *Trans Sport v. Starter Sportswear*, 964 F. 2d 186, 188 (2d Cir. 1992) (party cannot defeat summary judgment merely on the basis of conjecture or surmise).

The Amended Complaint is a confusing hodgepodge of disparate allegations, many of them contradictory and the vast majority conclusory and/or made "on information and belief." (R.56: 1). As set forth below, Plaintiffs failed to meet their burden to establish any of the remaining claims in the Amended Complaint based on: (1) federal WARN Act (Amd. Compl., First Cause of Action); (2) New York WARN Act (*Id.*, Second Cause of Action); or (3) breach of contract (*Id.*, Third Cause of Action). As such, the Warner Defendants are entitled to summary judgment.

**POINT I**

**SUMMARY JUDGMENT SHOULD BE GRANTED ON THE WARN ACT CLAIMS**

Despite Plaintiffs' knowing that *only* Hotel 57 Services, LLC was their employer (which employed and paid them *for years* prior to filing the instant lawsuit), and *only* Hotel 57 Services, LLC was a party to their employment contract, Plaintiffs assert claims against the other Warner Defendants without any purported factual basis, even though they maintain no legal or contractual relationship with Plaintiffs.

13

The Amended Complaint contains 42 purported "factual" allegations concerning Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC (Amd. Compl. ¶¶93-133), yet 38 of the 42 allegations (more than 90%) are pled solely "upon information and belief" (*Id*).  Tellingly, Plaintiffs do not allege even a single fact upon which any supposed "information" or "belief" is based.  This pleading tactic is not only improper (*see Sourceone Healthcare Techs., Inc. v. Bensonhurst Imaging Assocs. Mgmt. LLC*, 08 CV 2568 (BMC), 2008 WL 2697324, *2 (E.D.N.Y. July 2, 2008) ("[m]aking the allegation 'upon information and belief' does not dilute the Rule 11 obligation[s] in any way")) but faced with the record evidence to the contrary, highlights that Plaintiffs' unsupported "beliefs" are false and irrelevant.  Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC are entitled to summary judgment on the remaining claims in the Amended Complaint.

**A.      Plaintiffs cannot establish liability for alleged federal and New York WARN Act violations against Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC**

To establish liability under federal and New York WARN Acts, a plaintiff must demonstrate the defendant is a "covered employer." *Coleman v. Optum, Inc.,* 22 CV 05664 (ALC), 2023 WL 6390665, *8 (S.D.N.Y. Oct. 1, 2023), citing to, *Shaw v. Hornblower Cruises & Events LCC*, 21 CV 10408 (VM), 2022 WL 16748584 (S.D.N.Y. Nov. 7, 2022).  Here, Plaintiffs admit they were not employed by either Hotel 57, LLC or Ty Warner Hotels & Resorts, LLC (R.56: 31, 32, 33); and admit their employer is Hotel 57 Services, LLC (R.56: 30, 31, 32, 33).

These undisputed facts demonstrate Hotel 57, LLC and Ty Warner Hotel & Resorts, LLC: (1) are not individual employers for purposes of coverage under the federal or New York WARN Acts and; (2) are separate and distinct entities from Hotel 57 Services, LLC that cannot be considered a "single employer" with Hotel 57 Services, LLC (Plaintiffs' actual employer) for WARN Act purposes.

Only in limited circumstances (not present here) does the "single employer doctrine" permit distinct entities to constitute a single employer for the WARN Act. *See Arculeo v. On-Site Sales & Mktg., LLC,* 425 F.3d 193, 198 (2d Cir. 2005). "Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. §639.3(a)(2); *see also* 12 NYCRR §921-1.1(e). In the Second Circuit, a plaintiff alleging a single employer relationship must establish five factors: (i) common ownership; (ii) common directors/officers; (iii) de facto exercise of control; (iv) unity of personnel policies emanating from a common source; and (v) dependency of operations. *Guippone v. BHS& B Holdings LLC,* 747 F.3d 221, 226 (2d Cir. 2013). The determinative factor is the existence of control of labor relations. *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir. 1995). However, the Second Circuit has declined to extend the single employer doctrine (and consideration of the foregoing five factors) beyond a corporate subsidiary or a subcontractor of plaintiff's employment for claims relating to Federal and New York WARN Act violations. *See Coleman v. Optum, Inc.,* 2023 WL 6390665, *9, *citing*, *Gulino v. New York State Educ. Dep't.,* 460 F.3d 361 (2d Cir. 2006).

Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC were not contractually responsible for, and played no role whatsoever with respect to, Plaintiff's employment with Hotel 57 Services, LLC (R.56: 10, 11, 18). Hotel 57, LLC owns the real estate and improvements (*i.e.*, the building itself) that houses the Hotel (R.56: 10). For its part, Ty Warner Hotels & Resorts, LLC has no interest in the Hotel or its business (R.56: 13-18). Neither Hotel 57, LLC or Ty Warner Hotels & Resorts, LLC is a subsidiary of, or subcontractor to, Hotel 57 Services, LLC but separate and distinct entities (R.56: 19, 20). Accordingly, the undisputed facts demonstrate that neither entity

15

SA-182

has any control over Plaintiffs' employment necessary to establish WARN Act liability against either entity.

**B.      Proper notice was issued to Plaintiffs pursuant to federal and New York WARN Acts**

Summary judgment is also warranted on Plaintiffs' WARN Act claims (Amd. Compl., First and Second Causes of Action) as proper WARN Act notices were sent to Plaintiffs pursuant to the federal and New York WARN Acts.

**1.      WARN Act notices were sent to Plaintiffs on August 5, 2020**

WARN Act notices were sent to Plaintiffs (and Hotel 57 Services, LLC's other non-union employees) on August 5, 2020 (R.56: 93) (the "August 5, 2020 WARN Act Notices").  It is undisputed that each of Staley, Holmes and Ivey were sent and received such a notice (R.56: 93). And it is undisputed that each of the August 5, 2020 WARN Act Notices contains the information required by the federal and New York WARN Acts and their regulations. (R.56: 97-104).[6]

Further, Plaintiffs' theory that the Warner Defendants violated the WARN Acts by not issuing successive WARN Act notices every six (6) months is baseless (Amd. Compl. at ¶ 172). The WARN Acts do not require employers to provide affected employees with multiple notices, except in the limited circumstance (not present in this case) where the date or scheduled dates of a plant closing or mass layoff is extended before the layoff occurs.  *See* 22 C.F.R. §639.10; *Presser v. Key Food Stores Co-Op.*, 01 CV 8059, 2006 WL 2086346 (E.D.N.Y. July 25, 2006) (holding, in part, that additional notice was sufficient as it confirmed a postponement of the layoff was required and identifying the new date on which the layoff was anticipated).  No additional WARN

---

[6] The August 5, 2020 WARN Act notices duly contain: (1) a statement as to whether the planned action is expected to be permanent or temporary (R.56: 98); (2) the expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated. (R.56: 97); and (3) The name and telephone number of a company official to contact for further information. (R.56: 102). See 20 C.F.R §639.7; 12 N.Y.C.R.R. §921-2.1.

16

Act notice was required to Plaintiffs beyond the August 5, 2020 WARN Act Notices, which related to Plaintiffs original (and only) temporary furlough and was timely sent upon Hotel 57 Services, LLC's reasonable expectation after the onset of the unforeseen business circumstances caused by COVID-19 that Plaintiffs' temporary furlough would last longer than six months.

### 2. The unforeseen business exception to federal and New York WARN Acts apply

Plaintiffs purportedly challenge the timeliness of the August 5, 2020 WARN Act Notices. The federal and New York WARN Acts generally require advance notice (60 or 90 days, respectively) to workers of plant closings and mass layoffs, to provide transition time to adjust to employment loss. However, neither requires employers to have prophetic abilities to anticipate the unforeseeable. Indeed, exceptions apply to the advance notice requirement in circumstances present here.

Accordingly, both federal and New York WARN Acts specifically relieve employers from the advance 60-day or 90-day notice requirements when a covered "employment loss" is caused by circumstances or events not reasonably foreseeable at the time notice would otherwise have been required. *See* 29 U.S.C. §2102(b)(2)(A) (exception to federal WARN Act 60-day notice requirement if "the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required"); 12 N.Y.C.R.R. §921-6.3 (exception to New York WARN Act 90-day notice requirement "where a plant closing, mass layoff, relocation or covered reduction in work hours was caused by business circumstances that were not reasonably foreseeable when the 90-day notice would have been required").

Determining whether business circumstances causing a closing or mass layoff were reasonably foreseeable "focuses on the employer's business judgment." 20 C.F.R. §639.9(b)(2) ("[t]he employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market"); 12 N.Y.C.R.R.

17

§921-6.3 ("[t]he employer shall exercise commercially reasonable business judgment"). An employer is not required -- or even encouraged -- to provide "WARN notice and close its doors when there is a *possibility* that [layoffs may occur] at some undetermined time in the future." *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002) (emphasis in original). "Such a reading of the Act would force many employers to lay off their employees prematurely, harming precisely those individuals WARN attempts to protect." *Id*. at 765. Instead, "it is the *probability* of occurrence that makes a business circumstance 'reasonably foreseeable'" such that notice is required under the WARN Act. *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333 (5th Cir. 1998) (emphasis added).[7]

Here, there is no evidence that Hotel 57 Services, LLC (or FSR, as operator of the Hotel charged with managing Hotel 57 Services, LLC's employees), had any advance knowledge that COVID-19 would impact New York, or that New York State's Governor would shut down hotel operations before the executive orders mandated these restrictions. To the contrary, newspapers published on December 19, 2020 (90 days before the Hotel's closure) and January 20, 2020 (60 days before the Hotel's closure) did not even cover the novel coronavirus (COVID-19) (R. 56: 47, 48). In January 2020, COVID-19 was perceived in the United States as a risk that was exceedingly low with doubtfulness as to whether it would even spread within the United States (R.56: 49). It was not until March 11, 2020, mere days before the Hotel's forced temporary closure, that COVID-19 was designated as a pandemic by the WHO and not until March 13, 2020 that it was declared a National Emergency by the President of the United States (R.56: 56).

---

7 The regulations implementing the New York WARN Act expressly identify a "a public health emergency, including but not limited to a pandemic" as an unforeseen business circumstance that will excuse advanced notice. *See* 12 NYCRR §921-6.3(b)

SA-185

The evidence establishes that uncertainty over the continued necessity and/or duration of that closure progressed rapidly -- all in a matter of a few months following Hotel 57 Services, LLC's decision to close the Hotel to outside guests on March 20, 2020 (R.56: 56-66, 73, 78-83).

The record evidence establishes that Hotel 57 Services, LLC, using its reasonable commercial business judgment, did not determine that the probability of an extended closure (based upon a determination that it could not operate the Hotel safely and profitably in any capacity) required WARN Notices (*i.e.*, that the temporary layoff would last more than six months) until it issued those notices on August 5, 2020 (R.56: 92).  As the August 5, 2020 WARN Act Notices expressly confirm, the probable extended closure and layoffs were "due to *unforeseen business circumstances* and the continued major economic downturn stemming from the COVID-19 virus pandemic and consequent travel and tourism disruptions outside the employer's control" (R.56: 92) (emphasis added).

"In reviewing the employer's business judgment, the court 'must be careful to avoid analysis by hindsight.'" *In re Transcare Corp.*, 614 B.R. 187, 209 (Bankr. S.D.N.Y. 2020) (quoting *Watson* 311 F.3d at 765).  The only evidence in the record about Hotel 57 Services, LLC's business judgment is that Hotel 57 Services, LLC provided Plaintiffs proper notice of their "employment loss", as defined under the federal and New York WARN Acts, as soon as practicable following: (a) the Hotel's suspension of hospitality operations on March 20, 2020; (b) the Hotel ending its April 9, 2020 through June 30, 2020 period of housing first responders; and (c) its resulting decision that it could no longer continue any operations amidst the raging COVID-19 crisis. Plaintiffs have adduced no evidence in the record, from either a fact or expert witness, to the contrary.  Accordingly, Hotel 57 Services, LLC (and the other Warner Defendants) are entitled to summary judgment on Plaintiffs' First and Second Causes of Action.

19

SA-186

## POINT II

### SUMMARY JUDGMENT SHOULD BE GRANTED ON THE BREACH OF CONTRACT CLAIM

In their Third Cause of Action, Plaintiffs contend Hotel 57 Services, LLC breached the EmPact Agreement by not paying them contractual severance pay ("No-Fault Separation Pay") based on their contradictory allegations that Plaintiffs were both: (1) permanently laid off by Hotel 57 Services, LLC without a right of recall (Amd. Compl. at ¶¶15, 16, 350); and (2) terminated from their employment for no fault (*Id.*, at ¶¶ 255, 259, 350).

### A.    Plaintiffs have not complied with a contractual condition precedent

As an initial matter, summary judgment should be granted on Plaintiffs' breach of contract claim because Plaintiffs have not, nor can they, submit any evidence to establish they have complied with the dispute resolution process set forth in Steps 1-5 of the C.A.R.E. procedure in the EmPact Agreement[8] -- a condition precedent to bringing a claim against Hotel 57 Services, LLC (R.56: 43-46).  In fact, Plaintiffs flatly concede they did not comply with their contractual requirements to follow any of the required steps 1-5 of C.A.R.E (R.56: 46**)**. *See ISS Facility Services, Inc. v. Fedcap Rehabilitation Services, Inc*., 20 CV 6591 (RA), 2021 WL 2784550 (S.D.N.Y. July 2, 2021) (dismissing breach of contract claim for failure to comply with a contractual condition precedent where plaintiff did not plausibly allege that the parties complied with all the contract's dispute resolution provisions).

---

[8] The C.A.R.E. dispute resolution procedure requires, in order: informal discussion with an immediate supervisor (Step 1); a written complaint with the Human Resources Office (Step 2), an investigation concerning the complaint by the Director of Human Resources (Step 3), a written decision following the close of investigation by the Director of Human Resources (Step 4), and an appeal to the General Manager, and written decision thereafter (Step 5) (R.56: 45).

SA-187

**B.    Plaintiffs are not eligible for No-Fault Separation Pay**

Assuming, arguendo, that they had engaged in the required internal dispute resolution procedure under C.A.R.E. (they did not), the undisputed facts demonstrate Plaintiffs still are not eligible for No-Fault Separation Pay under their contract with Hotel 57 Services, LLC.  The EmPact Agreement provides: "[i]f I receive a permanent layoff with no right of recall or I am terminated for no fault, my termination will be considered "no-fault."  …. [I]n the event of a permanent layoff or "no-fault" termination, I will be eligible for separation pay in accordance with the "No-Fault Separation Pay Schedule" in effect at the time of my separation…." (R. 56: 37; EmPact at pp. 56-57). The contractual framework of the EmPact Agreement is straightforward. There are only two events that could trigger Plaintiffs' eligibility for No-Fault Separation Pay: (1) termination of Plaintiffs' employment for no fault; or (2) Plaintiffs' permanent layoff with no right of recall, provided that such permanent layoff was not the result of causes beyond the control of Four Seasons, specifically including national emergencies.

Plaintiffs rely on the extended nature of their furlough and contend the lengthy time period necessarily connotes a termination of their employment or permanent layoff without a right of recall.  But argument and subjective belief are not evidence, nor are they sufficient to create an issue of fact to avoid summary judgment.  The irrefutable evidence demonstrates neither event happened, and Plaintiffs are not entitled to contractual No-Fault Separation Pay.

**1.    Plaintiffs' employment was not terminated**

No Plaintiff was terminated from her employment with Hotel 57 Services, LLC.  It is undisputed that Hotel 57 Services, LLC did not provide notice of termination of employment (R.56: 112).  That is because not only was Plaintiffs' employment not terminated, but *they remain employed by Hotel 57 Services, LLC to this very day*.

21

Specifically, Plaintiffs: (1) receive periodic communications from Hotel 57 Services, LLC concerning the Hotel's reopening status (R.56: 84); (2) maintain and continue to accrue seniority (R.56: 128); and (3) maintain their accrued vacation time banks for use upon their return to work (R.56: 129, 130) (if they did not themselves elect to be paid out that accrued time during their furlough (R.56: 125).

Perhaps most importantly, Hotel 57 Services, LLC paid its non-exempt, non-union furloughed employees (including Staley) $500 each week from October 2021 (the beginning date of 30 weeks of required payments to those furloughed employees pursuant to New York City law) and continuing to the present day -- even though the required payments to those furloughed employees ended in May 2022 (R.56: 120). In all, Hotel 57 Services, LLC paid to these furloughed employees a total of $1,436,051.00 while they were on furlough (R.56: 123).

**2.    Plaintiffs did not receive permanent layoffs with no right to recall**

The same record evidence demonstrates that Hotel 57 Services, LLC did not permanently lay off Plaintiffs from their employment at the Hotel without a right of recall -- and Plaintiffs have adduced no evidence to the contrary. In fact, again notwithstanding Plaintiffs' subjective beliefs, it is undisputed that Plaintiffs Staley, Holmes and Ivey all maintain their right to recall to their employment at the Hotel upon its reopening, which is currently expected to be in Fall 2024 (R.56: 131). In fact, Plaintiff Holmes even acknowledged she believes she has such right to be recalled (R.56: 114). Accordingly, because they maintain a right to recall to employment at the Hotel, Hotel 57 Services, LLC did not breach the EmPact Agreement as Plaintiffs are not eligible for No-Fault Separation Pay, regardless of whether or not their furlough is deemed a permanent layoff.

**3.    COVID-19 was a "national emergency," precluding No-Fault Separation Pay**

Even assuming, *arguendo* Plaintiffs were able to establish that they experienced a permanent layoff and lost their recall rights (they cannot), they still would be unable to establish a

22

breach of contract claim under the EmPact Agreement.  This is because the EmPact Agreement specifically provides Hotel 57 Services, LLC employees are ineligible for No-Fault Separation Pay where a layoff results from, in relevant part, "national emergencies" (R.56: 37) -- whether or not their layoff was permanent and whether or not the employee had a right of recall to their employment at the Hotel.

Regardless of whether Plaintiffs experienced a permanent layoff with no right of recall, they still are not entitled to No-Fault Separation Pay because it is indisputable such action was caused by the COVID-19 pandemic -- which was designated a National Emergency on March 13, 2020  (R.56: 58); 85 Fed. Reg. 15337 (POTUS Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak).  As the record establishes Plaintiffs were subject to layoffs beginning in March 2020 stemming from the COVID-19 virus pandemic (R.56: 69, 90, 91), Plaintiffs cannot establish an actual breach of the EmPact Agreement resulting from a failure to pay them such No-Fault Separation Pay because they are simply not entitled to this payment pursuant to that contract.

**CONCLUSION**

For all of the foregoing reasons, there is no genuine issue as to any material fact and the

Warner Defendants are entitled to judgment as a matter of law on all claims asserted by Plaintiffs

in the First Amended Complaint.


Dated:  New York, New York
        May 31, 2024

                                    /s/ Marc B. Zimmerman
                                    Marc B. Zimmerman
                                    James J. Boland
                                    SMITH, GAMBRELL & RUSSELL, LLP
                                    1301 Avenue of the Americas, 21st Floor
                                    New York, NY 10019
                                    (212) 907-9700

                                    Kathryn T. Lundy
                                    VENABLE LLP
                                    151 West 42nd Street, 49th Floor
                                    New York, NY 10036
                                    (212) 307-5500

                                    *Attorneys for Defendants Hotel 57 Services,*
                                    *LLC, Hotel 57, LLC, Ty Warner Hotels &*
                                    *Resorts, LLC and H. Ty Warner*

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

SELENA STALEY, VIVIAN HOLMES, and OLIVE
IVEY, on behalf of themselves and all others
similarly situated,

                                Plaintiffs,

          v.

FSR INTERNATIONAL HOTEL INC. d/b/a FOUR
SEASONS HOTELS AND RESORTS, HOTEL 57
SERVICES, LLC, HOTEL 57, LLC, TY WARNER
HOTELS & RESORTS, LLC, and H. TY WARNER

                              Defendants.

------------------------------------------------------------------- X

Case No.: 22-CV-6781 (JSR)

**(ORAL ARGUMENT
REQUESTED)**

### DEFENDANTS' JOINT OPPOSITION TO
### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Paul Wagner
STOKES WAGNER ALCA
903 Henshaw Road
Ithaca, NY 14850
(607) 677-6801

John R. Hunt
STOKES WAGNER ALCA
1201 W. Peachtree Street, NW, St. 2615
Atlanta, GA 30309
(404) 766-0076

*Attorneys for Defendant FSR International
Hotel, Inc.*

Marc B. Zimmerman
James J. Boland
SMITH GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, NY 10019
(212) 907-9700

Kathryn T. Lundy
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Defendants Hotel 57 Services,
LLC, Hotel 57, LLC, Ty Warner Hotels &
Resorts, LLC and H. Ty Warner*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    A.    The COVID-19 Pandemic and Suspension of Hotel Operations........................... 2

    B.    Hotel 57 Services, LLC's WARN Act Notices ....................................................... 3

    C.    Plaintiffs' Furloughs, WARN Act Notices, and Continued Employment by Hotel 57 Services, LLC................................................................................................ 6

    D.    Plaintiffs' Remaining Claims and Proposed Classes ........................................... 12

ARGUMENT .......................................................................................................... 15

I.    PLAINTIFFS' MOTION SHOULD BE DENIED FOR DISPOSITIVE THRESHOLD REASONS.................................................................................. 16

    A.    Plaintiffs Waived Their Rights to Pursue Their Claims As a Class Action......... 16

    B.    Plaintiffs Improperly Seek to Certify Fail-Safe Classes ...................................... 18

    C.    Plaintiffs Have Not Established Standing Of Their Purported Class Members, and Their Proposed Classes are Not Ascertainable ............................ 19

II.    PLAINTIFFS HAVE NOT SATISFIED RULE 23(a) .................................... 20

    A.    Plaintiffs Have Not Proven Numerosity ............................................... 21

    B.    Plaintiffs Have Not Established Common Questions of Law or Fact ................. 22

    C.    Plaintiffs' Claims Are Not Typical ....................................................................... 23

    D.    Plaintiffs Are Not Adequate Class Representatives............................................. 27

        1.    Plaintiffs Are Not Adequate Class Representatives............................... 27

        2.    Proposed Counsel is Not Adequate.......................................................... 32

III.    PLAINTIFFS' CLASSES CANNOT BE CERTIFIED UNDER RULE 23(b)(3) .......... 35

    A.    Individual Issues Predominate .............................................................................. 35

    B.    A Class Action is Neither Manageable Nor Superior ......................................... 39

CONCLUSION....................................................................................................... 40

5965933v1/33457-0004

SGR/56201433.15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 291 (1997)......................................................................................................35

*Ansari v New York University*,
    179 F.R.D. 112 (S.D.N.Y. 1998) .................................................................................15

*Bombin v. Southwest Airlines Co.*,
    No. 5:20-cv-01883-JMG, 2023 WL 5832166 (E.D. Pa. Sept. 7, 2023) ....................17

*Bowling v. Johnson & Johnson*,
    No. 17 Civ. 3982 (AJN), 2019 WL 1760162.......................................................22, 26

*Coleman v. Optum Inc.*,
    No. 1:22-cv-05664 (ALC), 2023 WL 6390665 (S.D.N.Y. Oct. 1, 2023)..................16

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................................15, 16, 35

*DeCastro v. City of New York*,
    No. 16-CV-3850 (RA), 2019 WL 4509027 (S.D.N.Y. Sept. 19. 2019) ...................19

*Denny v. Deutsch Bank AG*,
    443 F.3d. 253 (2d Cir. 2006).................................................................................19, 29

*Eisen v. Carlisle & Jacquelin*,
    391 F.2d 555 (2d Cir. 1968)........................................................................................32

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022)....................................................................................................20

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)..............................................................................15, 23, 24, 35

*Haymount Urgent Care PC v. Go Fund Advance, LLC*,
    635 F. Supp. 3d 238 (S.D.N.Y. 2022).......................................................................17

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).........................................................................................15

*Johnson v. Nextel Communications*,
    780 F.3d 128 (2d Cir. 2015).......................................................................................22

5965933v1/33457-0004

SGR/56201433.15

*Korea Week, Inc. v. Got Capital, LLC¸*
No. 15-6351, 2016 WL 3049490 (E.D. Pa. May 27, 2016)......................................................17

*In re LIBOR-Based Financial Instruments Antitrust Litig.,*
299 F. Supp. 3d 430 (S.D.N.Y. 2018)..........................................................................25, 26, 27

*Lujan v. Defenders of Wildlife¸*
504 U.S. 555, 560-61 (1992) .........................................................................................19

*Marin v. Apple-Metro, Inc.,*
Nos. 12 CV 5274 (ENV) (CLP) and 13 CV 1417 (DNV (CLP), 2017 WL
4950009, at *37 (E.D.N.Y. Oct. 4, 2017) ................................................................18

*Nayal v. HIP Network Services IPA, Inc.,*
620 F. Supp. 2d 566 (S.D.N.Y. 2009)....................................................................17

*Palmer v. Convergys Corp.,*
No. 7:10-cv-145 (HL), 2012 WL 425256 (M.D. Ga. Feb. 9, 2012) ...........................17

*In re Petrobas Securities,*
862 F.3d at 269 ....................................................................................................19, 21

*Schonton v. MPA Granada Highlands,*
No. 16-cv-12151-DJC, 2019 WL 1455197 (D. Mass. April 2, 2019) ...............23, 24, 27

*Scott v. New York City Dist. Council of Carpenters Pension Plan¸*
224 F.R.D. 353 (S.D.N.Y. 2004) ..............................................................27, 28, 29

*Spokeo, Inc. v. Robbins,*
578 U.S. 330 (2016)...............................................................................................19

*TransUnion LLC v. Ramirez,*
--- U.S. ---, 141 S. Ct. 2190 (2021)........................................................................19

*Tyson Foods, Inc. v. Bouaphakeo,*
136 S. Ct. 1036 (2016)...........................................................................................35

*Wal-Mart Stores, Inc. v. Dukes¸*
564 U.S. 388 (2011)..........................................................................................16, 22

*Wexler v. AT&T Corp.,*
No. 15-cv-686 (FB)(PK), 2019 WL 5694028 (E.D.N.Y. Aug. 5, 2019)............27, 32

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ...............................................................................40

**Statutes**

29 U.S.C. § 2102(b)(2)(A)....................................................................................36

5965933v1/33457-0004

SGR/56201433.15

SA-195

**Other Authorities**

20 C.F.R. § 639.1(a)........................................................................................36

20 C.F.R. § 639.3 ............................................................................................36

12 N.Y.C.R.R. § 921-1.1 .................................................................................36

12 N.Y.C.R.R. § 921-2.1 .................................................................................36

12 N.Y.C.R.R. § 921-6.3 .................................................................................36

Fed. R. Civ. P. 12(a)(1).....................................................................................22

Fed. R. Civ. P. 23(a) and 23(b)(3) ...................................................................40

Fed. R. Civ. P 23(b)(3)(A) ...............................................................................40

Fed. R. Civ. P. 23(g) ........................................................................................32

Fed. R. Civ. P. 23(g)(1)(A(i)............................................................................33

Fed. R. Evid. 602 .............................................................................................21

Fed. R. Evid. 702 .............................................................................................21

Fed. R. Civ. P. 23.................................................................................1, 15, 35

5965933v1/33457-0004

SGR/56201433.15

SA-196

## INTRODUCTION

Ignoring that the United States Supreme Court has expressly held that a party seeking class certification must affirmatively establish – with "evidentiary proof" – that each and every requirement of Rule 23 of the Federal Rules of Civil Procedure is satisfied, Plaintiffs have filed a motion to certify two classes in this lawsuit without even attempting to meet their burden.

Although there are myriad reasons why this case cannot and should not be certified as a class action – including that Plaintiffs' claims involve numerous issues of individual fact about which even the three named Plaintiffs do not agree – the most glaring, and insurmountable, defect is the inadequacy of Plaintiffs and their chosen counsel to properly represent the interests of absent class members. Plaintiffs, who waived their right to bring a class action in the first instance and admittedly have not complied with their contractual pre-suit obligations, all admit that they cannot testify about critical facts in support or their own claims, let alone the claims of absent class members. And their counsel, who presented Plaintiffs' motion without regard for Plaintiffs' burden of proof and without competent admissible evidence, neglected to secure and identify an expert to calculate the damages for Plaintiffs or any purported classes – leaving the named Plaintiffs and purported class members with no admissible evidence of damages in this case should a class be certified.

Absent and unsuspecting class members deserve better. No classes can – or should – be certified in this case. Plaintiffs' motion for class certification should be denied.

## BACKGROUND

This case involves the Four Seasons Hotel New York, a landmark 52-story, I.M. Pei designed 5-star hotel located at 57 East 57th Street, New York, New York ("Hotel"). Hwang Decl. ¶ 3. That Hotel is owned by defendant Hotel 57 LLC, and managed by defendant FSR International Hotel, Inc. ("FSR") pursuant to a hotel management agreement with Hotel 57 LLC.

SA-197

*Id*. at ¶ 15.  Hotel 57 Services, LLC employs Plaintiffs and others working at the Hotel.  *Id*. at ¶ 5.  Although named as a defendant, Ty Warner Hotels & Resorts LLC has no relationship to Hotel management or Plaintiffs.  *Id.* at ¶¶ 16-20; Hwang Dep. 85:17-21, 86:2-15.  No claims remain against H. Ty Warner.[1]

### A.    The COVID-19 Pandemic and Suspension of Hotel Operations

On March 7, 2020, Governor Cuomo issued Executive Order 202.1, "Declaring a Disaster Emergency in the State of New York[.]"  EOH 202.1.[2]  The executive order reported that "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue" and that "New York State is addressing the threat that COVID-19 poses to the health of its residents and visitors." *Id.* As a result, Governor Cuomo "declare[ed] a state of disaster emergency for the entire state of New York." *Id.*  Numerous laws, ordinances, rules and regulations were modified, and the governor authorized "all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety." *Id.*

---

[1] Plaintiffs' motion fails to candidly address the different defendants that they have sued, the evidence relating to their respective individual involvement (or, for most, lack of involvement) in the Hotel, its operations, Plaintiff's employment, or the claims Plaintiffs have asserted – or not asserted – against each.  It is unclear whether that is deliberate or whether Plaintiffs simply do not understand these factual and legal realities.

[2] "EO ___" refers to Executive Orders issues by Governor Cuomo, attached to the declaration in support of the Warner Defendants' motion for judicial notice and publicly available at www.op.nysed.gov/about/covid-19/expired-executive-orders.

SGR/56201433.15

SA-198

More executive orders followed in rapid succession.[3]  Workplace restrictions were also quickly put in place.  On March 18, 2020, Governor Cuomo ordered that with the exception of entities providing "essential" services, "[a]all business and not-for-profit entities shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize" effective March 20, 2020 at 8:00 p.m.  EOH 202.6.  Employers were ordered to reduce their in-person workforce at any location by 50% by the same day and time.  *Id.*  The next day, Governor Cuomo increased the in-person reduction to 75%.  EO 202.7.

Given the collective impact of the orders relating to COVID-19, the health and safety issues presented, and the lack of any travel or demand for accommodations, the Hotel closed to outside guests were temporarily suspended on March 20, 2020.  Ortiz Dep. 46:19-24.

Although the Hotel closed to outside guests, it qualified as an "essential services" and continued to operate as a business with reduced staffing.  *Id* at 46:2-8, 68:18-21.   As a result, starting in March 2020 and continuing over the course of the next few months, most, but not all, employees, were either placed on temporary furlough or had their working hours reduced. *Id*  at 46:19-24.

**B.      Hotel 57 Services, LLC's WARN Act Notices**

Although Plaintiffs' lawsuit centers around an alleged failure to provide WARN Act notices in connection with the events set forth above (under federal and New York law), in truth, WARN Act notices were promptly sent – a fact of which all three Plaintiffs and their counsel were aware when Plaintiffs commenced this lawsuit but never disclosed in any complaint.

---

[3] *See* EO 202.1 (March 12, 2020, cancelling gathering excess of 500 people and restricting places of public accommodation to 50% of capacity); EO 202.3 (March 16, 2020, closing restaurants, bars, gyms and fitness centers and cancelling gatherings of more than 50 people);  EO 202.4 (March 16, 2020.closing schools); EO 202.5 (March 18, 2020, closing shopping malls and indoor and outdoor places of public amusement, save parks).

- 3 -

In March 2020, hotel employees fell into two categories, union and non-union. Ortiz Decl. at ¶ 4. For union employees, the suspension of Hotel operations required immediate action. Union employees are governed by a collective bargaining agreement. *Id* at ¶ 5. That agreement called for advance notice of a temporary reduction in work for a business reason. *Id* at ¶ 8. Although there was uncertainty over the nature and extent of COVID-19 and its effect on operations, WARN Act notices were sent to union employees on March 26, 2020 to satisfy the contract requirement. *Id*.

Non-union employees, which included supervisory and management-level staff, were in a different position. No collective bargaining agreement required any immediate action or notice, and at the time the Hotel stopped taking guests, there was uncertainty about the impact COVID-19 would have and the length of time that it would impact Hotel operations. *Id* at ¶ 9-10; Ortiz Dep. 64:9-11. For example, on April 2, 2020, the Hotel was opened to house doctors, nurses and other health care professionals battling the pandemic free of charge, at Hotel 57, LLC's expense. Ortiz Dep. 51:7-13. As result, many employees, including non-union employees who had just been furloughed in March, were back working on-site. *Id* at 51:7-13; Ortiz Decl. ¶ 13.

Uncertainty about the scope and duration of the pandemic continued over the following months, as reflected in the multiple New York executive orders issued from and after March 2020 that evolved over time, both as to the level of restrictions and their duration.[4]

---

[4] The very first March 7, 2020 executive order declaring the state of emergency, but not ordering closures or other personal or business restrictions, expired six months later, on September 7, 2020, and the suspension and modification of laws and regulations in that order only extended through April 6, 2020. EO 202. These and other dates in executive orders were changed and extended over time in subsequent orders as the pandemic developed. *See, e.g.*, EO 202.8; EO 202.9; EO 202.10; EO 202.11; EO 202.12; EO 202.13; EO 202.14; EO 202.15; EO 202.16; EO 202.17; EO 202.18; EO 202.19; EO 202.20; EO 202.21; EO 202.22; EO 202.23; EO 202.24; EO 202.25; EO 202.26; EO 202.27; EO 202.28; EO 202.29; EO 202.30; EO 202.31; EO 202.32; EO 202.33; EO 202.34; EO 202.35; EO 202.36; EO 202.37; EO 202.38; EO 202.39; EO 202.40; EO 202.41; EO 202.42;

- 4 -

SGR/56201433.15

The same uncertainty existed at the Hotel. Initially, when the Hotel closed to outside guests on March 20, 2020, the targeted "return date" for full operations was April 15, 2020. Ortiz Decl. ¶ 11. As the pandemic evolved, the targeted date to resume regular operations changed. *Id.* at ¶¶ 15-17, Ex. A (April 30, 2020 (reported on April 9); Ex. B (June 15, 2020 (reported on April 30)); Ex. C (July 15, 2020, with first responders staying on until June 15, 2002 (reported on May 22)).

On June 22, 2020, employees were informed that the housing of health care professionals would end on June 30, 2020. *Id.* at ¶ 18, Ex. D. Employees were also told that the Hotel would "temporarily be suspending most . . . operations," but would "continue to operate with reduced staffing" with a targeted re-opening in "late summer." *Id.* With the COVID-19 pandemic still raging in August 2020 and although uncertainty remained as to its duration, WARN Act notices were sent to all remaining Hotel 57 Services, LLC non-union employees on August 5, 2020. *Id.* at ¶¶ 19-20; Ortiz Dep. 100:1-19, 189:3-12.

Non-union Hotel 57 Services, LLC employees who are not actively working remain on furlough pending the Hotel's reopening, which has been publicly announced to take place in Fall 2024. Ortiz Decl. ¶ 23. No furloughed employee has been terminated. *Id.* at ¶ 21. Nor has any furloughed employee been permanently laid off with no right of recall. *Id.* at ¶ 22. Each retains their accrued seniority, and also retains their accrued vacation (to the extent the employee did not elect to be paid for that vacation during furlough, which many did). *Id.* at ¶¶ 27-28.

In addition, under New York City Local Law No. 405 Int. No. 2397-A (2021), hotels were required to provide certain payments to "covered hotel service employee[s]" temporarily laid off

---

EO 202.43; EO 202.44; EO 202.45; EO 202.46; EO 202.47; EO 202.48; EO 202.49; EO 202.50; EO 202.51; EO 202.52; EO 202.53; EO 202.54.

SGR/56201433.15

as a result of the COVID-19 pandemic.[5]  Under that law, Hotel 57 Services, LLC was required to pay covered employees $500 "for each week … that such employee ***remains*** laid off," up to a maximum of 30 weeks.  Int. No. 2397-A § 2(a) (emphasis added).  Under that provision, covered furloughed employees were paid $500 per week for the required period beginning in October 2021 and continuing through February 2022.  Ortiz Decl. ¶¶ 29-32. In addition, beginning in July 2022, Hotel 57 Services, LLC elected to continue paying, and is still paying, $500 per week to most furloughed non-union, non-exempt employees, including Selena Staley.[6]  *Id.* at ¶ 33.

**C.      Plaintiffs' Furloughs, WARN Act Notices, and Continued Employment by Hotel 57 Services, LLC**

Plaintiffs' motion is conspicuously silent on the facts relating to each of the three named Plaintiffs.  Despite proclaiming each to be typical, adequate representatives whose circumstances mirror those of every purported absent class member, Plaintiffs do not candidly reveal the evidence and facts about themselves.  That is not accidental.  The evidence refutes Plaintiffs' proclamations.

***Selena Staley***:  Staley has been a Hotel 57 Services, LLC employee at the Hotel since 2007, and is a Reservations Agent.[7]  Staley was furloughed on March 20, 2020, when the Hotel stopped taking outside guests as a result of COVID-19.  Staley Dep. 204:10-23, 207:22-208:2.  Staley was

---

[5] A "covered hotel service employee" is one who: "(i) was employed by such hotel on March 1, 2020; (ii) as of March 1, 2020, had been employed by such hotel for a period of not less than one year to perform hotel service; (iii) was not a managerial, supervisory or confidential employee and did not otherwise exercise control over the management of such hotel; and (iv) was laid off after March 1, 2020 due to a closure or a mass layoff."  Int. No. 2397-A § 1.

[6] As of the date of this opposition, payments to these furloughed employees, including Staley, total $1,013,524,75, which are reflected in IRS Form W-2s issued (for prior years, and to be issued for current year) to each.  Ortiz Decl. ¶ 38.

[7] Staley maintains a profile on LinkedIn, an April 10, 2023 printout of which she identified at her deposition.  Staley Dep. 24:6-10; Boland Decl. ¶ 8, Ex. 72.  That printout disclosed her ***current*** (April 10, 2023) employment as "Reservations Agent at Four Seasons Hotel," Ex. 72, which she has not changed since.  *See* https://www.linkedin.com/in/selena-staley-818a8612/ (accessed May 29, 2024).

- 6 -

aware that the Hotel reopened shortly thereafter to house doctors and nurses, but was not working on-site during the time. *Id*. at 210:9-211:14, 213:7-10. Staley does not know who was working at the Hotel during this time, how many people were working or whether they were union employees, non-union employees, or both. *Id*. at 213:11-214:14. Staley was sent a WARN Act notice dated August 4, 2022, which she produced from her files. *Id.* at 278:5-279:20; Boland Decl. ¶ 7, Ex. 78.

Staley testified that her employment was "terminated," although she is "confused" about the date. *Compare* Staley Dep. 242:16-20 (unequivocally testifying she was terminated was March 20, 2020) *with id*. at 274:5-20 (changing the date to June 25, 2021). Whatever the date, Staley continued to be paid vacation pay and holiday pay by Hotel 57 Services, LLC through the end of 2021. *Id.* at 290:20-291:24, 293:13-18; Boland Decl. ¶ 7, Ex. 83. Staley was also paid $500 per week (under the New York City law for current employees who remained on furlough) by Hotel 57 Services, LLC from October 2021 through at least her deposition in April 2023. Staley Dep. 292:10-24, 293:19-294:23, 299:4-23. Indeed, although Staley continues to claim she was "terminated" back in June 2021, *she continues to be paid the $500 per week as a current employee to this day*. Oritz Decl. ¶¶ 33-35, Ex. H.

Although she seeks to serve as a class representative, Staley does not know if she will even testify at trial. Staley Dep. 145:6-146:6. That is because Staley has limited, if any, ability to testify in support of her own claims. *See id*., *passim* (answering "I don't remember" or "I don't understand [the/your/that] question" 227 times and 111 times, respectively). Staley does not know anything about the defendants she sued. *Id*. at 315:24-327:11. She does not know what, if anything, any of them allegedly did wrong. *Id.* Other than wanting to be "treated fairly" and to be "heard," Staley does not know what recovery she seeks. *Id*. at 88:24-90:7. Staley does not know how much money she wants, cannot calculate her alleged damages, and does not know if she wants anything in addition to money (and does not know who would know), and does not

- 7 -

know who will testify at trial about what Staley wants. *Id*. at 320:17-321:11; *see also id*. at 195:25-199:2.

Staley also cannot testify about the merits of her claims. Although suing defendants for allegedly violating the federal or New York WARN Acts, Staley admits that she was sent (and received) the August 5, 2020 WARN Act notice. *Id*. at 278:5-279:20. Staley testified that her only complaint under the WARN Act is that the Hotel has not yet reopened, which is not a violation of the federal or New York WARN Acts. *Id*. at 280:15-25. And with respect to her claim for payment of No-Fault Separation Pay under the EmPact Agreement, Staley admits that she can only receive that payment if she was either (i) permanently laid off with no right of recall, or (ii) terminated for no-fault. *Id*. at 334:3-7. Staley admits that she cannot testify that either happened to her, *id*. at 334:8-336:17, nor can she testify as to what happened to any other purported class member, *id*. at 336:18-20.[8] Staley also cannot testify that she followed the necessary steps in the EmPact Agreement (C.A.R.E. steps 1-5) required to pursue a claim in the first place. *Id*. at 336:24-339:21.

***Vivian Holmes***:  Holmes, a Rooms Division Administrative Assistant, has been a Hotel 57 Services, LLC employee at the Hotel since 1998.[9] Holmes Dep. 156:9-164:14. After the Hotel stopped taking outside guests on March 20, 2020, Holmes was designated an "essential worker"

---

[8] Staley also refused to answer basic questions outright, and dodged many others. Staley was repeatedly asked who, if anyone, told her that she was terminated. She refused to and did not identify a single person. Staley Dep. 240:2-241:14, 274:21-275:16. Ultimately, Staley was forced to admit that it was just a conclusion she drew in June 2021, not something that actually happened. *Id*. at 275:17-276:11.

[9] Holmes maintains a profile on LinkedIn, a March 28, 2023 printout of which she identified at her deposition. Holmes Dep. 24:6-10; Boland Decl. ¶ **8**, Ex. 4. That printout disclosed her ***current*** (March 28, 2023) employment as "Administrative Assistant Four Seasons Hotels and Resorts," Ex. 4, which she has not changed since. *See* https://www.linkedin.com/in/vivian-holmes-079005a1/ (accessed May 6, 2024).

SGR/56201433.15

who was allowed to travel to and from work and continued working, doing payroll from home. *Id*. at 155:6-156:8; 161:4-12. Holmes admitted that there were other workers designated as "essential" working onsite and remotely after March 20, 2020, but does not know the number or the names. *Id*. at 156:9-164:14. Holmes continued to do payroll after the Hotel opened to house medical personnel and knows that workers changed over time, but does not know how many people were working or their names. *Id*. at 170:172:17.

Ultimately, Holmes was placed on temporary layoff/furlough on July 14, 2020. Ortiz Decl. ¶ 20, Ex. F. A WARN Act notice was sent to Holmes on August 5, 2020. *Id*. Despite Plaintiffs (collectively) producing two copies of the August 5, 2020 WARN Act notice addressed to Holmes, Boland Decl. ¶ 7, Exs. 39, 40, Holmes testified that she did not receive that notice in August 2020.[10] Holmes Dep. 234:24-235:4. Instead, Holmes testified that she received the letter in 2021 as an attachment to an (alleged) email from Elizabeth Ortiz.[11] *Id*. at 235:5-8, 236:4-8.

Whether she did or did not receive the WARN Act notice sent to her in August 2020 (or simply does not remember), Holmes continued to be paid accrued vacation and holiday pay by Hotel 57 Services, LLC through the end of 2021 and into 2022. *Id*. at 299:301:11. Holmes was also paid $500 per week (under the New York City law for current furloughed employees) from October 2021 into 2022, for a total of $15,000.00. Ortiz Decl. ¶ 34, Ex. H.

Like Staley, Holmes seeks to serve as a class representative. Holmes Dep. 37:14-18. Unlike Staley, Holmes understands that she will testify at trial. Holmes Dep. 311:22-25. Yet

---

[10] Plaintiffs' counsel produced documents, purportedly from the three Plaintiffs, as an undifferentiated group, all with the same Bates prefix. *See* Boland Decl. ¶ 8, Ex. 20. With limited exceptions, no Plaintiff can even identify, much less authenticate, documents that she may have produced. *See* Staley Dep, *passim*; Holmes Dep. *passim*; Ivey Dep. *passim*.

[11] Holmes admits that she does not know whether any other employee received or did not receive the August 5, 2020 WARN Act notice when it was sent. Holmes Dep. 237:19-238:7.

- 9 -

Holmes, like Staley, lacks memory and is unable to testify to a host of facts and alleged events/issues relevant to her claims in this case. *See id*., *passim* (answering "I don't know" or "I [don't/can't] remember" 118 times and 181 times, respectively). Holmes does not know who/what any of the Defendants she sued are (she testified that H. Ty Warner is "[a]n entity," *id*. at 329:17-20), cannot testify about her allegations against them or what any of them specifically did wrong (other than "violation of the WARN Act and no-fault separation pay"). *Id*. at 311:22-334:2.

Like Staley, Holmes claims that she is entitled to be paid No-Fault Separation Pay under the EmPact Agreement. *Id*. at 361:7-10. But like Staley, Holmes did not follow the required C.A.R.E. steps (1-5) in the EmPact Agreement required to pursue a claim. Holmes concedes that No-Fault Separation Pay is only paid if she receives a permanent layoff with no right of recall or is terminated for no-fault. *Id*. at 361:11-362:19. Unlike Staley, Holmes did ***not*** testify that she was terminated. Instead, Holmes testified that she was "permanently laid off." *Id*. at 362:21-24, 363:8-9, 364:24, 366:24-25, 371:21-372:6. Holmes, however, will not and cannot testify that she has been permanently laid off ***with no right of recall***.[12] *Id.* at 363:4-13, 372:7-18. Holmes testified that she should be recalled when the Hotel reopens and very much wants that to happen. *Id*. at 141:5-19, 363:17-20, 369:13-370:3.

Holmes testified that she has suffered a host of monetary damages as a result of both the alleged WARN Act violations and failure to pay No-Fault Separation Pay for which she wants to be compensated, which extend ***far*** beyond the statutory WARN Act penalty and amount of No-Fault Separation Pay sought on her behalf. *Id*. at 343:345:4, 386:20-390:10. Holmes admitted that she cannot testify to the amount of any damages. *See Id.* at 340:21-25.

---

[12] Like Staley, Holmes cannot testify that anyone ever told her that she was permanently laid off. Holmes Dep. 365:6-366:25. At her deposition, Holmes testified that she was still "furloughed." *Id*. at 28:24-29:4.

- 10 -

SGR/56201433.15

*Olive Ivey*:  Ivey is a Senior Housekeeping Manger at the Hotel and has been employed since 1997.  Ivey Dep. 102:6-104:15.  Ivey was furloughed in March 2020, when the Hotel stopped taking outside guests as a result of COVID-19.  *Id*. at 151:7-11, 153:12-16.  Ivey was aware that the Hotel reopened shortly thereafter to house COVID-19 first responders, but did not work there during that time, although others did.  *Id*. at 168:25-170:7.  Ivey was asked to return to work at that time but declined for family health reasons.  *Id*. at 170:8-19.  Ivey does not know if others were similarly asked to work during that time but declined.  *Id*. at 170:20-24.

Ivey was sent a WARN Act notice on August 5, 2020.  Ortiz Decl. ¶ 20; Boland Decl. ¶ 8, Ex. 69.  Ivey admits that she "might have seen that notice," but does not recall.  Ivey Dep. 192:11-25.

Although Ivey declined to return to work at the Hotel in 2020, she did return to work after being placed on furlough.  *Id*. at 108:17-109:21  In "either 2021 or 2022," Ivey worked at a Four Seasons hotel in downtown New York as a Housekeeping Manager (an option for current employees) until she had an accident and could no longer work due to her injury.  *Id*. at 12:6-13:6.  Prior to that (Ivey has not worked since her injury, *id*. at 13:23-24), but still in 2021 or 2022, Ivey worked as part of a task force at a Four Seasons hotel in Philadelphia.  *Id*. at 108:17-109:21.  In addition to working for these other Four Seasons hotels, Ivey continued to be paid by Hotel 57 Services, LLC for accrued vacation and other pay in 2021 and 2022.  Boland Decl. ¶¶ 7-8, Exs. 64, 54.

Like Staley and Holmes, Ivey has limited ability to testify in support of her own claims.  Like Staley and Holmes, Ivey did not and cannot testify about the amount of any damages she seeks.  Ivey Dep. 236:17-24, 238:8-17.  And just as Staley's and Holmes' stories differ on key facts, so does Ivey's story.  As for the WARN Acts, Ivey contends that they were violated because she was temporarily sent home initially, later concluded that it was permanent, and claims that she

- 11 -

should have been informed – ignoring the August 5, 2020 WARN Act notice that Plaintiffs produced (which Ivey does not recall but does not deny receiving). *Id.* at 195:12-25.

As for No-Fault Separation Pay under the EmPact Agreement, Ivey admits that she never received a notice of termination from Hotel 57 Services, LLC. *Id.* at 212:10-14, 215:14-22. And just like Staley and Holmes, Ivey admits that not a single person from Hotel 57 Services, LLC ever told her that her employment was terminated – which, according to Ivey, happened in June 2021 before she was allowed to work at the downtown New York and Philadelphia Four Seasons locations. *Id.* at 211:25-212:13. In addition, like Staley and Holmes, Ivey did not follow the C.A.R.E. steps (1-5) required before she filed suit. *Id.* at 245:11-248:11.

### D.    Plaintiffs' Remaining Claims and Proposed Classes

Without ever disclosing that: (i) they were sent WARN Act notices on August 5, 2020, (ii) no one from Hotel 57 Services, LLC or anyone associated with the Four Seasons Hotel New York ever told them they were permanently laid off with no right of recall or terminated for no-fault, (iii) they each continued to be paid by Hotel 57 Services, LLC into at least 2022 (and to this day for Staley), or (iv) they had not followed the required pre-suit C.A.R.E. steps in the EmPact Agreement, Plaintiffs commenced this lawsuit on August 9, 2022. Dkt. 1. Plaintiffs alleged, contrary to fact, that no WARN Act notices were ever provided to them, they had been terminated from their employment, and they had satisfied all of their obligations under the EmPact Agreement and were entitled to No-Fault Separation Pay.

After the Warner Defendants[13] moved to dismiss Plaintiffs' complaint (FSR, which was misnamed, filed an answer), Plaintiffs filed a First Amended Complaint on December 19, 2022. Dkt. 48. The First Amended Complaint corrected the misnomer and made the same allegations,

---

[13] "Warner Defendants" refers to Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner.

- 12 -

SGR/56201433.15

SA-208

asserting claims for : (1) violation of the Federal WARN Act (First Cause of Action); (2) violation of the New York WARN Act (Second Cause of Action): (3) breach of contract (Third Cause of Action); (4) breach of the implied covenant of good faith and fair dealing (Fourth Cause of Action); (5) "alter ego" (Fifth Cause of Action); and (6) promissory estoppel (Sixth Cause of Action). *Id.* Five claims were asserted against all Defendants. *Id.* One – the self-styled "alter ego" claim – was asserted only against Mr. Warner. *Id.*

The First Amended Complaint sought certification of two classes (termed "Class" and "Sub-Class"):

> [A]ll former employees of Defendants who worked for Defendants at the Hotel, and whose employment was furloughed on the Furlough Date,[14] and whose employment at the Hotel was furloughed for more than six months, commencing on or about the Furlough Date, and/or laid off as a result of a mass layoff or plant closing carried out by Defendants on or about or after March 20, 2020 ["Class"].

> [A]ll members of the Class who remained on furlough through June 25, 2021 and were not paid their No-Fault Separation Pay. ["Sub-Class"].

*Id.* at ¶¶ 286, 298. Plaintiffs purported to assert their first, second and fifth causes of action on behalf of themselves and the Class, and their third, fourth and fifth causes of action on behalf of themselves and the Sub-Class. *Id.* at ¶¶ 285, 297.

The Warner Defendants filed a motion to dismiss the First Amended Complaint on November 9, 2022.[15] Dkt. 28, 41. On April 19, 2024, the Court granted that motion in part and denied it in part. Dkt. 78. The Court dismissed Plaintiffs' federal and New York state WARN Act claims (first and second causes of action) against H. Ty Warner, and dismissed Plaintiffs' breach of contract claim (third cause of action) against all Warner Defendants except Hotel 57 Services,

---

[14] The First Amended Complaint defines the "Furlough Date" as March 20, 2020. 1st Am. Compl. ¶ 3.

[15] FSR filed an answer to the First Amended Complaint on December 5, 2022, asserting 16 defenses to Plaintiffs' claims. Dkt. 42.

- 13 -

LLC. *Id.* The Court also dismissed Plaintiffs' claims for breach of the duty of good faith and fair dealing (fourth cause of action), alter ego (fifth cause of action) and promissory estoppel (sixth cause of action), which Plaintiffs conceded they would not pursue. *Id.* On May 3, 2024, the Warner Defendants filed an answer to the First Amended Complaint, asserting ten separate defenses to Plaintiffs' claims. Dkt. 80.

As a result of the Court's April 19, 2024 Order, three claims remain in this case: (1) violation of the federal WARN Act against FSR, Hotel 57 Services, LLC, Hotel 57 LLC and Ty Warner Hotels & Resorts, LLC; (2) violation of the New York WARN Act against FSR, Hotel 57 Services, LLC, Hotel 57 LLC and Ty Warner Hotels & Resorts, LLC; and (3) breach of contract against FSR and Hotel 57 Services, LLC. No claims remain against H. Ty Warner.

In their motion for class certification, Plaintiffs have switched things up. Plaintiffs now seek certification of the following two classes:

> [A]ll former non-union employees of Defendants who worked for Defendants at the Hotel, and whose employment was furloughed on or after March 14, 2020, and whose employment at the Hotel was furloughed for more than six months, commencing on or after March 14, 2020, and/or laid off as a result of a mass layoff and/or plant closing carried out by Defendants on or about or after March 14, 2020. [WARN Class]

> [A]ll former non-union employees of Defendants who worked for Defendants at the Hotel, and remained on layoff through June 25, 2021 and were not paid their No-Fault Severance Pay. [EmPact Class]

Pls.' Mem. at 1-2. Plaintiffs have changed their definitions in two material respects. First, Plaintiffs have replaced the "Furlough Date" in their first definition with "on or after March 14, 2020." This change recognizes that, contrary to their representations, the facts of employee furloughs, dates, timing, etc., vary among purported class members – just as they vary as among

- 14 -

Staley, Holmes and Ivey (*e.g.*, all three have different dates, only one of which (Staley) is on or about the prior "Furlough Date").[16]

Second, Plaintiffs have restricted their proposed classes to only non-union employees. Plaintiffs do not explain this change, nor do they provide any rationale for it.

### ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual names parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). To fall within the exception, Plaintiffs, as proponent of the class, must affirmatively **prove** that each of the requirements of Rule 23 is satisfied. *Id*.; *see also In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 39-42 (2d Cir. 2006). Plaintiffs must "'prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation as required by Rule 23(a)." *Comcast Corp.* 569 U.S. at 33, quoting *Wal-Mart Stores, Inc. v. Dukes*¸ 564 U.S. 388 (2011) (emphasis in original). Plaintiffs must also "satisfy, through evidentiary proof, at least one of the provisions of Rule 23(b)." *Id*. A failure to establish any one of Rule 23's requirements precludes certification. *Ansari v New York University*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998) ("[F]ailure to prove any element precludes [class] certification.").

A court must engage in a "rigorous analysis" of Rule 23's requirements. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *In re Initial Public Offering Sec. Litig.*, 471 F.3d at 33 ("the certification decision requires 'rigorous analysis'") (citing *Gen. Tel. Co.*). Because "that

---

[16] In their brief, Plaintiffs suggest that this change was the result of reviewing "7,400 pages of documents" and, specifically, certain spreadsheets. Pls.' Mem. at 24. This excuse does not hold water. Plaintiffs knew before the first complaint was filed that different non-union employees continued to work for different periods of time after COVID-19 hit, including when the Hotel reopened for first responders. Plaintiffs also knew that even Staley, Holmes and Ivey had different post-March 2020 work experiences and different furlough dates.

SGR/56201433.15

'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351, a court must probe behind the pleadings and make whatever factual and legal inquiries are necessary to resolve class certification. *Comcast*, 569 U.S. at 33 ("[r]epeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question").

## I.     PLAINTIFFS' MOTION SHOULD BE DENIED FOR DISPOSITIVE THRESHOLD REASONS

### A.     Plaintiffs Waived Their Rights to Pursue Their Claims As a Class Action

As an initial dispositive matter, Plaintiffs' motion should be denied because Plaintiffs are barred from pursuing claims in this case on a class-wide basis.  Under the plain terms of the EmPact Agreement, Staley, Holmes and Ivey all clearly and unequivocally waived their right to have claims submitted as part of a class action:

> Waiver of Right to Submit Claim as Part of Class or Collective Action.  To the extent permitted by law, I understand that if I do not opt out of the mediation/arbitration provision of CARE, ***I waive my right to have my claims submitted as part of a class or collective action in court (whether I initiate a claim or I am invited to join a class or collective action),*** and I waive my right to have my claims submitted as part of a class arbitration.  This waiver shall not affect or diminish the substantive remedies that I may be awarded by an arbitrator.

Boland Decl. ¶ 8, Ex. 58 at 56 (emphasis added).  The express purpose of this provision was to bar employees from asserting *any* claims as part of a class or collective action, whether they are subject to arbitration or litigated in court.  Brown Decl. ¶ 5.  It applies not only to Plaintiffs' claim for breach of the EmPact Agreement itself (first cause of action), but also to Plaintiffs' claims under the WARN Acts (second and third causes of action).  *See e.g.*, *Coleman v. Optum Inc.*, No. 1:22-cv-05664 (ALC), 2023 WL 6390665, at *7-8 (S.D.N.Y. Oct. 1, 2023) (class action waiver applies to claims under federal and New York state WARN Acts).

SGR/56201433.15

Plaintiffs concede that the EmPact Agreement is a valid and enforceable contract; indeed, it provides the basis for Plaintiffs' breach of contract claim. Contractual class action waivers are valid and enforceable under New York law. *Nayal v. HIP Network Services IPA, Inc.*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009) (courts applying New York law uniformly hold that class action waivers are not unconscionable); *see also Haymount Urgent Care PC v. Go Fund Advance, LLC*, 635 F. Supp. 238, 245-46 (S.D.N.Y. 2022) (class action waiver not unconscionable under New York law) (*citing Nayal*). And they are valid and enforceable whether the claims are asserted in arbitration or in court, as the EmPact Agreement expressly provides. *See, e.g., Haymount*, 635 F. Supp. 3d at 246; *see also Palmer v. Convergys Corp.*, No. 7:10-cv-145 (HL), 2012 WL 425256, at *3 (M.D. Ga. Feb. 9, 2012) ([a]s a litigation device, class action waivers are proper tools to be used by parties in contracting and bargaining . . . these waivers are not limited to the context of arbitration").

Because Staley, Holmes and Ivey are contractually barred from pursuing any of their remaining claims as part of a "class or collective action in court, their motion for class certification should be denied. *See e.g., Bombin v. Southwest Airlines Co.*, No. 5:20-cv-01883-JMG, 2023 WL 5832166, at *15 (E.D. Pa. Sept. 7, 2023) (plaintiffs subject to contractual class action waiver are inadequate class representatives precluding certification); *Korea Week, Inc. v. Got Capital, LLC*, No. 15-6351, 2016 WL 3049490, at*11 (E.D. Pa. May 27, 2016) (same; "[t]he Plaintiffs agreed to pursue claims on their own behalf and cannot now change their minds and transform into fiduciaries for others").[17]

---

[17] In their brief, Plaintiffs seek to avoid their waiver by arguing that the Court already definitively held that the waiver only applies to claims subject to arbitration. Pls.' Mem. at 7. Not only is that false, Dkt. 73 at 15, but it also ignores that the Court's prior ruling applied the standard for a motion to strike. *Id*. at 8-9. The standard of proof for class certification is fundamentally different, as is the evidence. *See* Brown Decl. ¶¶ 1-6.

- 17 -

### B.    Plaintiffs Improperly Seek to Certify Fail-Safe Classes

Plaintiffs' motion should also be denied because it seeks to have the Court certify improper fail-safe classes. "'A fail-safe class is one whose definition shields the putative class members from receiving an adverse judgment . . .' In other words, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment.'" *Marin v. Apple-Metro, Inc.*¸ Nos. 12 CV 5274 (ENV) (CLP) and 13 CV 1417 (DNV (CLP), 2017 WL 4950009, at *37 (E.D.N.Y. Oct. 4, 2017), quoting *Spread Enters., Inc. v. First Data Merchant Servs. Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014).  Proposed fail-safe classes may not be certified because "they are unfair to defendants, prevent[] an adverse judgment being entered against plaintiffs, and are unmanageable because the members of the class could only be known after a determination of liability." *Id.* (citations omitted).

Plaintiffs' proposed classes are fail-safe.  Both are comprised of "all former non-union employees of Defendants who worked for Defendants at the Hotel . . ." Pls.' Mem. at 1-2.  In doing so, Plaintiffs confine the classes to employees who were, in fact, "terminated" or "permanently laid off" and thus no longer employees.  But whether Plaintiffs – or any other purported class members – were, in fact, terminated or permanently laid off and are thus "former non-union employees" of Hotel 57 Services, LLC is the central issue in dispute for Plaintiffs' breach of contract claim.  It is ***only*** if Plaintiffs prevail on that claim that Plaintiffs and any other purported class members will be "former employees."  If Plaintiffs lose, they will not be former employees but will remain the current employees that they are today.  Plaintiffs' proposed classes are both fail-safe and cannot be certified.[18]

---

[18] Plaintiffs' "WARN Class" is a fail-safe class for the further reason that membership is triggered, in part, by a purported "former employee" being "laid off as a result of a mass layoff and/or plant closing carried out by Defendants on or about or after March 14, 2020" – an element that Plaintiffs must prove to recover on their WARN Act claims.  Pls.' Mem. at 2.

- 18 -

SGR/56201433.15

**C.    Plaintiffs Have Not Established Standing Of Their Purported Class Members, and Their Proposed Classes are Not Ascertainable**

"To succeed on their motion for class certification, Plaintiffs must first surpass the threshold requirements of Article III standing and ascertainability." *DeCastro v. City of New York*, No. 16-CV-3850 (RA), 2019 WL 4509027, at *4 (S.D.N.Y. Sept. 19. 2019) *citing In re Petrobas Securities*, 862 F.3d at 269.  Plaintiffs' motion should be denied because Plaintiffs have not established either.

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016), *citing Lujan v. Defenders of Wildlife¸* 504 U.S. 555, 560-61 (1992).  As the Supreme Court has held, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, --- U.S. ---, 141 S. Ct. 2190, 2208 (2021).  "'The filing of suit as a class action does not relax this jurisdictional requirement.'" *DeCastro*, 2019 WL 4509027, at *4, quoting *Denny v. Deutsch Bank AG*, 443 F.3d. 253, 263 (2d Cir. 2006).  "[N]o class may be certified that contains members lacking Article III standing." *Id*.

Plaintiffs have not even attempted to prove that each of them has, or continues to have, Article III standing for each claim they present and form of relief – damages – they seek, much less that all purported class members have standing.  That is because Plaintiffs fail to deal with any facts established by evidence.  For example, Staley and Holmes each were paid substantial amounts by Hotel 57 Services, LLC as current employees on furlough long ***after*** they now claim they were "terminated" or "permanently laid off" in June 2021.  Indeed, to date, Staley has been paid $65,000.00 since October 2021 as a current employee.  Ortiz Decl. ¶ 36.

- 19 -

Article III standing must exist not only at the time a lawsuit is filed, but at all times thereafter. *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 718 (2022) ("Although most disputes over standing concern whether a plaintiff has satisfied the requirement when filing suit, Article III demands that an actual controversy persist throughout all stages of litigation.") (internal quotations omitted).     Plaintiffs offer no evidence to prove that Staley continues to have Article III standing after accounting for her post-alleged termination payments. Nor do they offer evidence to prove that any other Plaintiff or purported class member has Article III standing, including the numerous non-union employees who, like Staley, have been paid $500 per week for years.  Ortiz Decl. ¶ 34, Ex. H.

Plaintiffs' proposed classes also have serious ascertainability problems that relate to Article III standing.  Their class definitions do not square with the people they apparently think are class members.  As explained above, those classes only include "former non-union employees" who worked at the Hotel.  But the only "former non-union employees" who worked at the Hotel are those who either (i) transferred, or (ii) resigned. *Id*. at ¶¶ 21-24.   Plaintiffs have not established standing for these purported class members, either.  Employees who transferred or voluntarily resigned would not be entitled to No-Fault Separation Pay under the EmPact Agreement, and whether Hotel 57 Services, LLC violated the WARN Acts with respect to any of them – such that they have Article III standing to assert claims for any violations – is not addressed in Plaintiffs' motion.  Because Plaintiffs have not established Article III standing for any purported class members and their classes are not ascertainable, their motion should be denied.

## II.     PLAINTIFFS HAVE NOT SATISFIED RULE 23(a)

Under Rule 23(a), Plaintiffs are required to prove four things: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

- 20 -

SGR/56201433.15

of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). As with all requirements for certification, Plaintiffs must prove that each Rule 23(a) requirement is satisfied by a preponderance of the evidence. *In re Petrobras Securities*, 862 F.3d at 260.

As explained below, Plaintiffs fail to do so. To the contrary, Plaintiffs ignore – or simply do not comprehend – the requirement to provide actual "evidentiary proof" that each requirement of Rule 23(a) is satisfied. Instead, Plaintiffs astoundingly submit a declaration from one of their lawyers, Evan Brustein, "testifying" to various purported facts and creating and testifying about documents in support. Brustein Decl. ¶¶ 3-34, Exs. A-D. And, just as astoundingly, Plaintiffs purport to rely on their lawyer's declaration and the documents that he created. Pls.' Mem. at 3 & n.7, 5-6, 9 & n.37, 18-19 & n.76, 22-23.

It should go without saying that counsel's declaration, its contents, and documents he created and attempts to testify about substantively (rather than simply identify as true copies of documents produced) are inadmissible and wholly insufficient to satisfy Plaintiffs' burden of proof. Counsel is neither a witness with personal knowledge of any relevant facts as required by Fed. R. Evid. 602, nor is he an expert providing testimony under Fed. R. Evid. 702.[19] Nothing in his declaration (including documents he created) other than his recitation of his background and experience is admissible – *i.e.*, it is not "evidentiary proof – nor may it be considered. Plaintiffs have failed to meet their evidentiary burden of proof under Rule 23(a).

A.    **Plaintiffs Have Not Proven Numerosity**

Plaintiffs' failure to meet their burden of proof begins with the very first requirement for certification: that their proposed classes are "so numerous that joinder of all members is

---

[19] Nor could counsel serve as a witness for Plaintiffs in this WARN Act/breach of contract class action in any event. *See* N.Y. Rules of Prof. Conduct 3.7 (lawyer as witness).

- 21 -

impracticable." Fed. R. Civ. P. 12(a)(1). Plaintiffs provide no competent evidentiary proof –
witness testimony, authenticated documents – to establish this element. They rely solely on the
inadmissible testimony of their lawyer, which they cannot do. Pls.' Mem. 5-6, 9 & n.37.

In any event, Plaintiffs ignore that their class definitions refute their lawyer's numerosity
contentions. As noted above, both of Plaintiffs' proposed classes are defined to include only
"former non-union employees." Pls.' Mem. at 1-2. But as explained above, as of now the only
"former" non-union employees of Hotel 57 Services, LLC are those who (i) transferred to another
Four Seasons location, or (ii) resigned. Ortiz Decl. ¶¶ 21-24. Not only have Plaintiffs failed to
establish that these purported class members have standing to assert any of the remaining claims
in this lawsuit, but there is no evidence that they are so numerous that joinder is impracticable.

### B.    Plaintiffs Have Not Established Common Questions of Law or Fact

As the Supreme Court has noted, "[a]ny competently crafted class complaint literally raises
common questions." *Wal-Mart*, 564 U.S. at 349 (*quoting* Richard A. Nagareda, *Class
Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009)); *Johnson v. Nextel
Communications,* 780 F.3d 128, 138 (2d Cir. 2015). As the Court held, however, "[r]eciting these
questions is not sufficient to obtain class certification." *Id*. Instead,

> What matters to class certification . . . is not the raising of common 'questions'—
> even in droves—but, rather, the capacity of a classwide proceeding to generate
> common *answers* apt to drive the resolution of the litigation. Dissimilarities within
> the proposed class are what have the potential to impede the generation of common
> answers.

*Id*. at 350 (quoting Nagareda) (emphasis in original). Thus, the focus of the commonality
requirement is not merely on identifying purportedly common questions ("even in droves"), but
on demonstrating that the proceeding can generate answers to those questions that are the same for
each and every class member. And, like all requirements for class certification, Plaintiffs must
establish this requirement "with evidentiary proof." *Johnson*, 780 F.3d at 138.

- 22 -

Plaintiffs have wholly failed to meet their burden. Rather than identify questions common to the claims of the three Plaintiffs and all purported class members in this lawsuit, Plaintiffs instead list questions found to be common in a ***different lawsuit*** with different facts, different plaintiffs, and a different record.[20] Pls.' Mem. at 10-11. Plaintiffs never explain, or demonstrate with evidentiary proof, how any of the three remaining claims ***in this lawsuit based on the facts and the record developed*** can be resolved with class-wide proof applicable to each and every class member.

Nor could they. Not even the claims of Staley, Holmes and Ivey can be established with proof applicable to all three. They each have different furlough dates, different post-March 2020 work experiences and different testimony about what the contend happened to them (*i.e.*, termination or permanent layoff – neither of which Plaintiffs testified were for "no fault" or with "no right of recall"). They also tell different stories about how they came to believe they were no longer employed in June 2021 despite continuing to be paid long after. Every other purported class member will likewise have his or her own story to tell. Commonality is not satisfied.

### C.    Plaintiffs' Claims Are Not Typical

The Supreme Court has held that the commonality and typicality requirements "tend to merge," and serve as "guideposts" as to whether the plaintiff's claims are "so interrelated" with those of absent class members. *Gen. Tel. Co.*, 457 U.S. at 157 n.13. "The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class." *Schonton v. MPA Granada Highlands,* No. 16-cv-12151-DJC, 2019 WL 1455197, at *7 (D. Mass. April 2,

---

[20] The only allegedly "common" questions Plaintiffs have fashioned for this case are relate to (i) whether Plaintiffs' alleged "terminations" "violate" the EmPact Agreement (which does ***not*** prohibit employee terminations), and (ii) the alleged requirement to provide "multiple" WARN Act notices (which are ***not*** required under the statutes). Pls.' Mem. at 11.

- 23 -

2019). Put another way, a proposed class representative is "typical" only if in presenting her case she will be presenting the claims of all absent class members as well. *Id.* ("In evaluating typicality, the Court seeks to ensure that the named plaintiff[s], in presenting [their] case, will necessarily present the claims of the absent plaintiffs.") (citations omitted).

As a threshold matter, Plaintiffs cannot satisfy the typicality requirement because they are not even members of the proposed classes they seek to certify. To satisfy typicality, "a class representative must be part of the class" that he or she purports to represent. *Gen. Tel. Co.*, 457 U.S. at 156. As explained above, the proposed classes are defined to only include "former non-union employees," and Staley, Holmes and Ivey are current Hotel 57 Services, LLC employees.

But just as importantly, Plaintiffs have not proven, and cannot prove, that their individual claims and the purported bases for them are "typical" of each and every class member. Indeed, Plaintiffs are not even typical of one another. Each has a different history with respect to their employment after the Hotel closed to outside guests in March 2020. Holmes continued to work for a period of months, while Staley and Ivey did not. Holmes Dep. 155:6-156:8; Staley Dep. 204:10-13, 207:22-208:2; Ivey Dep. 168:25-170:7. Ivey was given the opportunity to continue to work, but declined for personal reasons. Ivey Dep. 170-8-19. Staley and Holmes qualified for continued payments to furloughed (*i.e.*, ***not*** permanently laid off or terminated) employees under the New York City statute and received those payments from October 2021 forward (after they say they were terminated or laid off), while Ivey did not. Ortiz Decl. ¶¶ 30-32. Staley continues to receive those payments to this day, while Holmes does not. *Id.* at ¶¶ 33, 35. Ivey worked at other Four Seasons properties in 2021 or 2022 as allowed by the EmPact Agreement (again, after her claimed "termination"), Ivey Dep. 12:6-13:6, 108:17-109:21, while Staley and Holmes did not.

These differences multiply exponentially over the purported classes. As Plaintiffs admit, the Hotel reopened shortly after initially closing to house medical personnel fighting the COVID-

- 24 -

SGR/56201433.15

19 pandemic and there were employees working there during that period.  Plaintiffs do not know who those individuals were, nor do they know how many employees, like Ivey, may have been given the opportunity to work at the Hotel during that period but declined – all of which is relevant to **whether and when, if at all,** any particular employee may have been subject to a required notice under the federal and New York WARN Acts.

Plaintiffs' motion does not even acknowledge these facts, much less address them. Plaintiffs also ignore that Staley, Holmes and Ivey do not even agree on what allegedly happened to them that would allow them to claim No-Fault Separation Pay in the first instance.  Staley testified that she was "terminated," but does **not** claim that she was terminated **for no-fault**, which is required for No-Fault Separation Pay.  In contrast, Holmes testified that she was permanently laid off, but does **not** claim that she was permanently laid off **with no right of recall** – again, which is required for No-Fault Separation Pay.

Moreover, Plaintiffs all admit that no person associated with the Hotel 57 Services, LLC or the Hotel ever told them that they were terminated or permanently laid off (because these things never happened).  But even if a party's subjective beliefs could form the basis for a breach of contact claim – and they clearly cannot – Plaintiffs have not proven, and cannot prove, that any other purported class member had the same experiences or beliefs.  Typicality is not satisfied.

In addition, typicality is not satisfied because Plaintiffs are each subject to significant individual defenses.  *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 460 (S.D.N.Y. 2018) ("typicality is not satisfied where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation") (citations omitted).  FSR asserted sixteen defenses to Plaintiffs' claims, Dkt. 42¸ and the Warner Defendants

SGR/56201433.15

have asserted ten. Dkt. 80. Plaintiffs' motion does not acknowledge a single one, let alone address any of them.[21]

And with good reason. There are serious defenses asserted against each of the three Plaintiffs' claims that will consume this lawsuit. *See e.g.* Dkt. 80 at 43-53. For example, all three Plaintiffs failed to follow the contractual condition precedent prior to filing suit in the first instance, the C.A.R.E. steps. Whether that bars their respective breach of contract claims outright (sixth defense), is a major issue for their claims in this case. *See* Brown Decl. ¶ 4. In addition, Holmes and Staley each were paid $500 per week as current employees on furlough from October 2021 forward – long after they now claim in this lawsuit to have been "terminated" (Staley, Ivey) or "permanently laid off" (Holmes) in June 2021. Yet, they pocketed that money without complaint, and Staley continues to pocket that money to this day. Whether their conduct estops Staley and Holmes from now claiming they were no longer employees after June 2021 (first defense), worked a fraud on Hotel 57 Services, LLC, which paid them in good faith (second defense), or operates as a waiver of their claims (fourth defense), are issues that will consume these Plaintiffs' case going forward. So, too, are issues relating to the effect of these payments on any damages that Holmes and Ivey may seek under the EmPact Agreement (third defense).

"The defendant need not show at the certification stage that a unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d at 460-61; *see also Bowling v. Johnson & Johnson¸* No. 17 Civ. 3982 (AJN), 2019 WL 1760162, at *4 S.D.N.Y. April 22, 2019) ("relevant inquiry" for class certification "is whether any unique

---

[21] Plaintiffs argue in their introduction (and not in their discussion of typicality) that "the defenses being raised for each class member are the same." Pls.' Mem. at 4. But Plaintiffs cite only fact witness testimony, *see id.*, not any defense that either FSR or the Warner Defendants asserted.

- 26 -

defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members"). That is the case here, and typicality is not satisfied.

### D.     Plaintiffs Are Not Adequate Class Representatives

"The adequacy of the class representative is widely considered the most important of the Rule 23(a) factors because it directly implicates the due process rights of absent class members who will be bound by the judgment." *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d at 567 (citations omitted); *Wexler v. AT&T Corp.*, No. 15-cv-686 (FB)(PK), 2019 WL 5694028, at *3 (E.D.N.Y. Aug. 5, 2019) ("It is widely agreed that adequacy is the most important factor to be considered when addressing requests for class certification.") (citations omitted). "Because class members do not, by nature, participate except through the class representative, the Court's obligation to examine a proposed representative's adequacy is even more significant in light of the constitutional defect that attaches to the choice of an inadequate class representative." *Wexler*, 2019 WL 5694028, at *3 (citations omitted). To satisfy this requirement, Plaintiffs are required to prove (i) their adequacy as representatives, including that there are no conflicts between them and absent class members and that they will vigorously prosecute the case, and (ii) the experience and adequacy of proposed class counsel. *Schonton*, 2019 WL 1455197, at *8. Plaintiffs have not done so.

#### 1.     Plaintiffs Are Not Adequate Class Representatives

Although all are much-valued employees whom Hotel 57 Services, LLC intends to recall and hopes will return when the Hotel reopens, Staley, Holmes and Ivey are not adequate representatives to assert claims on behalf of their proposed classes.

"An essential element of adequacy of representation is that the class representative be sufficiently familiar with the case as to exercise independent control over the attorney." *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004).

- 27 -

A class representative must therefore not only "possess a minimal degree of knowledge regarding the action," by must also "have a general understanding of the nature of class-action litigation." *Id.* "Knowledge of issues central to the case and of the role of class representatives is crucial since not even the presence of competent class counsel can make up for an utter lack of familiarity with the action on the part of named plaintiffs." *Id.* at 356.

As their depositions confirm, Plaintiffs lack an understanding of the nature of this lawsuit, the claims made on their behalf, the bases for them, or the defendants they have filed claims against or the bases for suing those parties. Indeed, there is significant doubt that any of these three Plaintiffs can competently testify about even the facts of their own claims. Each admits that she lacks memory of the key facts, events and documents that are set forth in and form the basis of their allegations in the First Amended Complaint. Indeed, with respect to documents, not only do these Plaintiffs lack memory of the key documents in their complaint, but they cannot even identify or authenticate many of the documents that purportedly came from their own files.

Plaintiffs are also largely unaware of the proceedings that have taken place in the case. At their depositions, Plaintiffs were shown and questioned about the significant filings that had been made in the case, including the complaints, material filings such as motions to dismiss the case in its entirety or to compel arbitration, and discovery responses, including their own verifications (deposition exhibits 5-28). Staley Dep. 30:15-194:25; Holmes Dep. 30:14-137:13; Ivey Dep. 38:5-97:20, 236:25-238:18. Over and over again Plaintiffs testified that they did not recall even seeing significant filings and pleadings that have been made or having any understanding of what they are or their significance. *See id.*

Staley's testimony about the Warner Defendants' motion to dismiss is typical. After admitting she cannot even recall that significant filing or event, Staley Dep. 123:4-22, Staley tellingly testified as follows:

- 28 -

SGR/56201433.15

SA-224

Q.  Do you think that whether the defendants have filed a motion to ask the judge to throw your case out right away is an important thing for you, as a plaintiff, to know?

ATTORNEY BRUSTEIN:· Objection.

A.  I don't remember.

Q.  You don't remember whether it's an important thing for you to know?

A.  I don't remember.

Q.· I am trying to understand what you mean by you don't remember, ma'am. Because I'm asking you a different question.  I'm not asking you if you remember something.  I'm asking whether you, sitting here today as a plaintiff in this lawsuit think that knowing whether the defendants have filed a motion to throw your entire lawsuit out is an important thing for you to know?

ATTORNEY BRUSTEIN:  Objection.

A.  I don't understand the question.

Q.  Can you help me out and tell me what you don't understand?

A.  I don't know.

*Id.* at 124:4-25.  Holmes' testimony about this lawsuit was similar.  *See e.g.*, Holmes Dep. 66:5-21 (Holmes only keeps herself informed about filings "sometimes").

In addition, no Plaintiff made any tangible effort to learn what her obligations as a class representative might be.  Holmes Dep. 11-41:22; Ivey Dep. 49:18-50:4; Staley Dep. 49:50:4.  Nor is there any evidence that any Plaintiff supervises, monitors or directs the work of proposed class counsel – indeed, proposed class counsel refused to allow the first Plaintiff to answer questions on that topic.  *See* Holmes Dep. 53:5-25 (counsel directing Holmes not to answer).  Plaintiffs are not adequate class representatives for these reasons alone.  *See Scott*, 224 F.R.D. at 356-57 (and cases cited).

More significantly, there are serious conflicts between Plaintiffs and absent class members. *Denny v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (class representatives "must have

- 29 -

SGR/56201433.15

no interests antagonistic to the interests of other class members). Chief among these is the very finding and sole relief that Plaintiffs seek for themselves for their breach of contract claim under the EmPact Agreement – a payment of No-Fault Separation Pay.

As Plaintiffs admit (but their brief conspicuously ignores), to receive No-Fault Separation Pay an employee must either be permanently laid off with no right of recall or terminated for no-fault. Boland Decl. ¶ 8. Ex. 58 at 57. Although the three Plaintiffs testified that they were subject to different actions (permanent layoff versus termination) and although no Plaintiff can or will confirm under oath that she was, in fact, subject to either of the actions that would result in No-Fault Separation Pay, they can only prevail on their third cause of action if the jury finds that they were permanently laid off with no right of recall or terminated for no-fault. The consequence of that finding is significant; it would formally end Plaintiffs' employment as of a specific date. It would also eliminate any right that Plaintiffs now have to be recalled to their current jobs – with the seniority and associated benefits such as pay level, vacation days and personal days – when the Hotel reopens.

No-Fault Separation Pay is not some financial benefit paid to current employees under the EmPact Agreement; it is *severance*. It is *only* paid to an employee who is *terminated for no-fault* or *permanently laid off with no right of recall*. If Plaintiffs prevail on their third cause of action to recover No-Fault Separation Pay, the jury must find that one of those two things happened to them, and as a result, their employment at the Four Seasons Hotel New York is finished.[22]

---

[22] As each Plaintiff admitted, no one from Hotel 57 Services, LLC or the Four Seasons Hotel New York ever formally permanently laid them off with no right of recall or terminated their employment for no-fault. This is simply the subjective beliefs that these three people harbor, which their third cause of action seeks to have a jury find as a matter of fact in order for them to recover No-Fault Separation Pay. 1st Am. Compl. ¶¶ 348-349.

SGR/56201433.15

SA-226

It is one thing for Staley, Holmes and Ivey to seek to have their own employment permanently ended in this lawsuit with no right of recall in exchange for a damages award of No-Fault Separation Pay (to the extent they have not already been paid post-alleged termination). It is quite another for these three Plaintiffs to make that same trade-off for every other employee who would be a member of their purported class, many of whom currently are and long have been reaching out to Hotel 57 Services, LLC to be recalled when the Hotel reopens. Ortiz Decl. ¶ 25.

Plaintiffs' motion ignores this fundamental conflict entirely. But as Plaintiffs themselves admit, the conflict is very real. *See e.g.*, Ivey Dep. 240:4-25 (admitting that she does not know whether anyone else would be willing to give up the right to be recalled to recover No-Fault Separation Pay and that there are other employees who would like to be recalled when the Hotel reopens). The conflict is evident among the three Plaintiffs. Staley, for example, is not sure that she wants to return to work at the Hotel and testified that she is willing to forego her right to be recalled in exchange for the Court finding that she has, in fact, been terminated and entitled to No-Fault Separation Pay:

> Q. . . . One of the things that you are seeking in this case is no-fault separation pay, correct?
>
> A. Yes.
>
> Q. And that requires under the EmPact agreement for you to either have been permanently laid off with no right of recall or to have been terminated without fault right?
>
> A. Yes.
>
> Q. And you are willing to have a court declare that to be the case so that you can get that no-fault separation pay, true?
>
> ATTORNEY BRUSTEIN: Objection.
>
> A. Yes.

- 31 -

Staley Dep. 45:2-14. The same is true for Ivey. Like Staley, Ivey is willing to forego the right to recall in order to recover No-Fault Separation Pay. Ivey Dep. 241:2-12.

In contrast, Holmes testified that she very much wants to be recalled when the Hotel reopens and believes that she should be recalled, Holmes Dep. 141:5-19, 363:17-20, 372:7-18, for which maintaining her right of recall (allowing her to work with the seniority, pay, and benefits that she has accrued and continues to accrue) is critical. That right of recall will be eliminated if she is found to have been terminated for no-fault or permanently laid off with no right of recall and thus entitled to the No-Fault Separation Pay she seeks in this lawsuit.

"Courts in the Second Circuit are concerned not only with actual conflicts of interest but also with the *appearance* of impropriety and *potential* conflicts of interest." *Wexler*, 2019 WL 5694028, at *4 (citing cases) (emphasis in original). Giving up the right to be recalled with the Hotel reopens in order to recover No-Fault Separation Pay presents a real, irreconcilable conflict between and among Plaintiffs and other purported class members (even Ivey admits that she is not authorized to make that choice for everyone else, Ivey Dep. 241:13-14).

### 2.      Proposed Counsel is Not Adequate

"[A]n essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968). Plaintiffs fail to prove that their proposed class counsel is adequate. The only "evidence" Plaintiffs offer on this requirement are the declarations of their three lawyers attesting to their own experience– only one of whom, a lawyer added long after this class action was filed, claims to have class action experience. That is insufficient.

Indeed, for as many years of experience that proposed counsel collectively possess, their performance as counsel for Plaintiffs in this lawsuit belies any suggestion that they are qualified and adequate to protect the interests of absent class members. *See* Fed. R. Civ. P. 23(g). That

- 32 -

SGR/56201433.15

begins with counsel's failure to investigate and understand the various entities and individual named in the complaints before filing suit. The First Amended Complaint, for example, has 109 allegations made "upon information and belief." Of these, 65 allegations relate to the named defendants, including *every* allegation about Ty Warner Hotels & Resorts, LLC and H. Ty Warner. 1st Am. Compl. ¶¶ 42-43, 47-49, 51, 67-76, 78-85, 93-94, 96, 99-105, 108-133, 135-139. Sue first, investigate later, was apparently counsel's approach.

Counsel also failed to reconcile the allegations in the complaints with the facts known to Staley, Holmes and Ivey at the time suit was filed. The WARN Act notices are a prime example. The complaints allege that no WARN Act notices were provided even though each Plaintiff knew prior to filing suit that a WARN Act notice had been sent to her (even if Holmes did not recall receiving it at the time it was sent). Fed. R. Civ. P. 23(g)(1)(A(i). The complaints also alleged – and Plaintiffs' brief continues to proclaim – that Staley, Holmes and Ivey were also "told" by someone that if they obtained another job they would not be eligible for No-Fault Separation Pay.[23] A simple review of the EmPact Agreement reveals that Hotel 57 Services, LLC employees were always allowed to secure additional outside employment. Boland Decl. ¶ 8, Ex. 58 at 27. Evidently, counsel either never sufficiently reviewed the contract or discovered this provision or, if they did, failed to inform the Plaintiffs. Either way, it is a failure that demonstrates they are not adequate counsel for absent class members.[24]

_____

[23] For this contention, Plaintiffs cite the deposition "[t]ranscript" of Elizabeth Ortiz at pages 249:22 - 250:12. Pls.' Mem. at 3, n.6. Plaintiffs fail to tell the Court that what they cite from the "transcript" is actually the transcription of an illegal recording that Plaintiffs' counsel played for Ms. Ortiz at her deposition, for which Plaintiffs have failed to either authenticate or provide any testimony establishing its admissibility. And Plaintiffs further fail to tell the Court that Ms. Ortiz did *not* testify that Plaintiffs or other employees would forfeit No-Fault Separation Pay if they obtained other employment on furlough, which they were *always* allowed to do, but only that they would not qualify for that pay if they resigned. Ortiz Dep. at 270:14-271:8.

[24] Counsel's failure was a huge disservice to Plaintiffs, who believed at the time of their 2023 depositions that they could not secure outside employment (although Staley admitted that she does

- 33 -

But more importantly, counsel's performance since the complaints were filed – including the current motion – prove that they cannot be found adequate. Despite having the obligation to establish that common questions exist, predominate over individual questions, etc. with admissible class-wide "evidentiary proof," Plaintiffs submit virtually no evidence whatsoever. Plaintiffs make a lot of bald accusations about "Defendants" as if they are some undifferentiated group. But the only defendant that employed Plaintiffs and is a party to the EmPact Agreement is Hotel 57 Services, LLC. Plaintiffs offer nothing to show that they can prove any of their remaining claims against each defendant individually with class-wide proof.[25]

Moreover, Plaintiffs have completely failed to develop admissible calculation of damages in discovery. As noted above, no Plaintiff can even calculate to testify as to the amount of her claimed damages, much less the amount of damages for other class members. Simply put, the calculation of damages in this case, either for the three Plaintiffs individually or for class members on a class-wide basis (amounts, interest, etc.), requires expert testimony.

Under the Court's scheduling order, Plaintiffs were required to identify experts by March 10, 2023. Dkt. 32. Plaintiffs never did so, and discovery is over. As a result, neither Staley, Holmes or Ivey have any admissible calculation of damages for either their WARN Act or breach of contract claims in this lawsuit, and there is no admissible calculation of class-wide damages for the proposed classes (or admissible evidence that those damages can be calculated on a class-wide basis). This, too, disqualifies counsel from serving as counsel for any proposed classes.

---

not know what anyone else believed, Staley Dep. 289:14-290:16). Tellingly, Ivey's LinkedIn profile suggests that after being shown the provisions at her March 31, 2023 deposition, Ivey promptly secured other employment the following month (as she was always able to do). https://www.linkedin.com/in/olive-ivey-40b58741/ (accessed 5/28/2024).

[25] Ty Warner Hotels & Resorts, LLC, Hotel 57, LLC and H. Ty Warner are prime examples. Plaintiffs offer no evidentiary proof to demonstrate that they can establish liability for these parties (two Delaware limited liability companies and one officer) under governing Delaware law.

- 34 -

### III. PLAINTIFFS' CLASSES CANNOT BE CERTIFIED UNDER RULE 23(b)(3)

Certification under Rule 23(b)(3) is permissible only if, in addition to finding that the requirements of Rule 23(a) are satisfied, "the court finds that the questions of law common to class members predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As with all Rule 23 requirements, Plaintiffs bear the burden of proving that common questions, in fact, predominate over individual questions and that a class action is a superior method of adjudicating the controversy. *Comcast*, 569 U.S. at 33. Plaintiffs have not met their burden.

#### A. Individual Issues Predominate

Contrary to Plaintiffs' conclusory assertions, *see* Pls.' Mem. at 17-19, the claims they have asserted in this case are inherently individual. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50, at 196–97 (5th ed. 2012)). Accordingly, a Court must "probe behind the pleadings" to understand the parties' claims and defenses and determine whether they are subject to proof by common evidence. *See Gen. Tel. Co.*, 457 U.S. at 160; *see also Castano*, 84 F.3d at 744. If liability questions are not subject to class-wide proof but, rather, would require both individual and fact intensive determinations, common issues do not predominate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 291, 625 (1997). As probing behind the pleadings reveals, that is the case here.

Plaintiffs have three remaining causes of action, two for violations of the federal and New York State WARN Acts and one for breach of contract. As for the WARN Acts, these are "notice"

- 35 -

SGR/56201433.15

statutes. They require certain "employers" to provide notice in advance (60 or 90 days) of a plant closure or mass layoff to "affected employees". 20 C.F.R. § 639.1(a); 12 N.Y.C.R.R. § 921-2.1. Affected employees are those who, at the time, are expected to suffer an "employment loss," meaning a termination or layoff/significant reduction in hours for a period of more than 6 months as a result of the closure or layoff. 20 C.F.R. § 639.3; 12 N.Y.C.R.R. § 921-1.1. Although 60- or 90-days' notice is required, there are exceptions. Both the federal and New York WARN Acts recognize that advance notice is excused when the anticipated employment loss for an affected employee results from events outside of the employer's control, such as national emergencies and unforeseeable business circumstances. 29 U.S.C. § 2102(b)(2)(A); 12 N.Y.C.R.R. § 921-6.3.

This is *not* a case where WARN Act notices were never provided to affected employees. Hotel 57 Services, LLC sent WARN Act notices to union employees on March 26, 2020, when their contracts dictated notice be provided at least two weeks in advance of a schedule change. Despite initially defining their classes to include both union and non-union employees, Plaintiffs have now dropped union employees from their class and do purport to complain about WARN Act notices those employees were sent– including, for example, that those notices were not accompanied by some "payment" or that they were not provided 60 and 90 days before COVID-19 forced the Hotel's closure.

Non-union employees, including Staley, Holmes and Ivey, were also sent WARN Act notices. These were sent on August 5, 2020, when it was reasonably foreseeable that the furloughs that began in March, but were not completed for months because employees continued to work, would last longer than 6 months. Although Plaintiffs seem to believe that WARN Act notices must be accompanied by some payment, that is simply false. The payment Plaintiffs focus on is a civil penalty for failing to provide notice; it is not a payment that must accompany notice. If WARN Act notices are timely, of if the advance notice requirement is excused for statutory reasons, no

- 36 -

SGR/56201433.15

payment (*i.e.* civil penalty) would be imposed.  Thus, the issue for Staley's, Holmes' and Ivey's WARN Act claims is whether their notices were timely given the circumstances surrounding COVID-19 at the time and when it was reasonably foreseeable that each of them would suffer an "employment loss" as a result.

As the record demonstrates, that is an inherently individual question.  Ivey and Staley were furloughed in March 2020 around the time the Hotel stopped taking outside guests, while Holmes continued to work from home on a reduced basis.  At the time, however, the Hotel was targeted to resume normal operations in less than four weeks, on April 15, 2020.  While that re-opening did not happen because COVID-19 was still evolving, the Hotel did re-open shortly after to house medical personnel.  Holmes continued to work from home and other employees were called back to work at the property.  Ivey was given the chance to return to work but declined.  The Hotel finally closed to all guests after medical staff departed at the end of June 2020, but certain staff continued to work after that closure.

As the above demonstrates, this case does not involve a simple fact pattern where a plant or business shut down permanently one day, leaving all employees terminated and out of work in the same position.  That facts here are far more individualized and nuanced.  All of the above facts and circumstances will have to be presented and considered for each of the three Plaintiffs to determine whether and when each became an "affected employee" – *i.e.*, one whose furlough was expected to exceed 6 months or work significantly reduced for that period – and whether, given the circumstances, their individual August 5, 2020 WARN Act notices were timely.

A similar collection of individual facts and circumstances would have to be presented and considered for each and every other purported class member.  And Hotel 57 Services, LLC and the other defendants have a due process right to put each Plaintiff to his or her proof and defend

- 37 -

SGR/56201433.15

against their timeliness claims.[26]  These individual issues predominate for Plaintiffs' federal and New York WARN Act claims.

Individual issues also predominate for Plaintiffs' breach of contract claim based on the EmPact Agreement.  Again, this case does not present a typical fact pattern.  Plaintiffs' breach of contract claim is not based on Hotel 57 Services, LLC formally terminating Staley, Holmes or Ivey for no fault or permanently laying them off with no right of recall and then refusing to pay them no-Fault Separation Pay.  That never happened, and Staley, Holmes and Ivey remain Hotel 57 Services, LLC employees to this day.  Instead, Staley, Holmes and Ivey seek to be **declared** "terminated" from their employments given the length of their furloughs and their subjected beliefs about what that period of time means and what things allegedly said to each of them mean. Ivey Dep. 240:4-10 (admitting that lawsuit is asking court to "determine that you were terminated from your employment").

Putting aside the bizarre nature of Plaintiffs' breach of contract claim, it presents an overwhelming and inherently individual issue: whether every other non-union employee and purported class member has the same beliefs and contentions about his or her employment and whether all of those employees want the same "termination" declaration and payment.  As explained below, this is not only an individual issue of fact that precludes certification, but the importance of this issue is so significant to each purported EmPact Class member that a class action is not superior to allowing employees to litigate their own breach of contract claim, if ending their employment at the Hotel in exchange for No-Fault Separation Pay, is indeed what they want.

---

[26] For example, Ivey declined to resume work shortly after furlough for personal reasons.  She cannot now use her own self-imposed "layoff" during that period to complain, for example, about the timeliness of her WARN Act notice.  Similar facts will be present for numerous other members of the proposed WARN Class.

SGR/56201433.15

Other individual issues exist for Plaintiffs' claim.  Not only must each Plaintiff and class member choose to pursue the claim in the first instance given the consequences for their individual employment status, but each Plaintiff and class member will have to prove that, in fact, they were terminated for no-fault or permanently laid off with no right of recall.  Staley will have to testify and prove that happened to her, as will Holmes and Ivey – and they tell different stories.  Each class member would have to do the same, and Hotel 57 Services, LLC will have the right to defend against each of these Plaintiff's and class member's claim.

As detailed above, there is already evidence relating to Staley, Ivey and Holmes that contradicts their claims of having been "terminated" – including substantial payments made to each of them as current employees long after their alleged terminations and other facts (LinkedIn profiles, continued receipt of employee communications, etc.) – that undermine their claims.  In addition, neither Staley, Holmes nor Ivey satisfied their obligations to follow the pre-suit C.A.R.E. process in the EmPact Agreement, which may bar their breach of contract claim outright.

Just as Hotel 57 Services, LLC is entitled to present this evidence to defend Staley's, Holmes and Ivey's individual claims, it is entitled – indeed, has a due process right – to present evidence to defend the individual claims of each and every class member.  These individual issues predominate and make class certification inappropriate.

**B.    A Class Action is Neither Manageable Nor Superior**

Finally, a class action for the claims Plaintiffs assert is not "superior to other available methods for fairly and efficiently adjudicating the controversy," if any, between Hotel 57 Services, LLC (or any other defendant) and purported class members. Fed. R. Civ. P. 23(b)(3).  For one, a class action is simply not manageable.  Plaintiffs have submitted no trial plan, and as demonstrated above, there are a host of individual issues of fact involved in Plaintiffs' two WARN Act claims and their uniquely fashioned breach of contract claim under the EmPact Agreement, including

- 39 -

individual issues relating to the defenses against those claims. These issues of fact render a class action unmanageable and not superior. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.').

A class action is not superior to other methods of resolving any purported class member's claims for other reasons as well. For one, Plaintiffs have no expert calculation of damages for any purported classes and have no admissible evidence of damages to present at trial. While Staley, Holmes and Ivey must live with the consequences of this failure, absent class members should not be forced to do so. A class action is not superior to other methods for these class members to assert their claims, if any, for this reason alone.

But just as importantly, absent class members have obvious and serious "interests in individually controlling the prosecution" of any action asserting their individual claims. Fed. R. Civ. P 23(b)(3)(A). This case does not involve some alleged consumer fraud or other misconduct affecting hundreds or thousands (or more) individuals, each of whom may suffered a modest, but real, economic damage for which a class action may be the only viable option to recover. This case, under Plaintiffs' theory, involves serious claims that have equally serious consequences for absent class members – the final termination of their employment at the Hotel just as it is on the cusp of reopening and recalling employees. Ortiz Decl. ¶ 26. No class action can, or should, override each class member's interest in so fundamentally controlling his or her own destiny.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs have failed to prove by a preponderance of the evidence that the requirements for class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied. Plaintiffs' motion for class certification and appointment of class counsel should be denied.

- 40 -

Dated: New York, NY                  Respectfully submitted,
      May 31, 2024


/s/ Paul Wagner                      /s/ James J. Boland
Paul Wagner                          Marc B. Zimmerman
STOKES WAGNER ALC                    James J. Boland
903 Henshaw Road                     SMITH, GAMBRELL & RUSSELL, LLP
Ithaca, NY 14850                     1301 Avenue of the Americas, 21st Floor
(607) 677-6801                       New York, NY 10019
                                     (212) 907-9700
John R. Hunt
STOKES WAGNER ALC                    Kathryn T. Lundy
1201 W. Peachtree Street, NW, St.    VENABLE LLP
2615                                 151 West 42nd Street, 49th Floor
Atlanta, GA 30309                    New York, NY 10036
(404) 766-0076                       (212) 307-5500

*Attorneys for Defendant FSR*        *Attorneys for Defendants Hotel 57 Services,*
*International Hotel, Inc.*           *LLC, Hotel 57, LLC, Ty Warner Hotels &*
                                     *Resorts, LLC and H. Ty Warner*

- 41 -

SGR/56201433.15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

SELENA STALEY, VIVIAN HOLMES, and OLIVE
IVEY, on behalf of themselves and all others similarly
situated,

                                     Plaintiffs,

                  v.

FSR INTERNATIONAL HOTEL INC. d/b/a FOUR
SEASONS HOTELS AND RESORTS, HOTEL 57
SERVICES, LLC, HOTEL 57, LLC, TY WARNER
HOTELS & RESORTS, LLC, and H. TY WARNER

                                  Defendants.

------------------------------------------------------------------ X

Case No.: 22-CV-6781 (JSR)

**DECLARATION OF
ELIZABETH ORTIZ**

I, Elizabeth Ortiz, pursuant to 28 U.S.C. § 1746, state and declare as follows:

1.     I am the Director of People & Culture for defendant Hotel 57 Services, LLC.  I have personal knowledge of the matters set forth in this Declaration.

1.     I submit this declaration in connection with Defendants' Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner's opposition to Plaintiffs' Motion for Class Certification dated May 10, 2024.

2.     I am employed by Hotel 57 Services, LLC as Director of People & Culture and have been employed in that position for approximately four (4) years.  I have personal knowledge of Hotel 57 Services, LLC's business operations at the Four Seasons Hotel New York, located at 57 East 57th Street in New York City (the "Hotel") from March 2020 through the present day.  I am a custodian of Hotel 57 Services, LLC's employment business records for operations at the Hotel.

SA-238

3.      I have personal knowledge of how Hotel 57 Services, LLC's business operations at the Hotel were affected by the COVID-19 pandemic and how Hotel 57 Services, LLC responded to these conditions with respect to its employees.

4.      Hotel 57 Services, LLC employs two categories of employees at the Hotel: union and non-union.

5.      Hotel 57 Services, LLC has union contracts (collective bargaining agreements) that contain the terms and conditions of employment of its union employees who work at the Hotel.

6.      Hotel 57 Services, LLC has an employment contract with its non-union workers at the Hotel that contains the terms and conditions of employment of its non-union employees who work at the Hotel.  This employment contact is called the "EmPact Agreement" (the precise name of the employment contract is the U.S. EmPact℠ Employee Handbook, revised February 1, 2018).

7.      As a result of the COVID-19 pandemic, the Hotel temporarily closed to outside guests beginning on March 20, 2020.

8.      The union contract required that Hotel 57 Services, LLC give notice to its union employees of a temporary reduction of work for a business reason.  Hotel 57 Services, LLC sent WARN Act notices to its union employees on March 26, 2020 to satisfy that union contract requirement.

9.      There was no contract that required Hotel 57 Services, LLC to give notice to its non-union employees of the Hotel's temporary closure on March 20, 2020.

10.      As of March 20, 2020, it was uncertain how COVID-19 would continue to impact Hotel 57 Services, LLC's business operations at the Hotel, and for how long.

2

11.    As of March 20, 2020, Hotel 57 Services, LLC targeted April 15, 2020 as the Hotel's reopening date (and the date it could resume regular operations at the Hotel).

12.    The target date for the Hotel's reopening to outside guests changed because COVID-19 and the various government and agency responses to the pandemic continued to disrupt life and restrict business operations in New York City.

13.    On April 2, 2020, the Hotel re-opened to house (free of charge -- at Hotel 57, LLC's expense) doctors, nurses and other health care professionals.  Many of Hotel 57 Services, LLC's employees, including non-union employees who were furloughed when the Hotel closed two weeks earlier (on March 20, 2020), were brought back to work on-site at the Hotel.

14.    Because the pandemic was unpredictable and created uncertainty as to when the Hotel would be able to resume regular business operations, I worked with my team to prepare and send various correspondence to Hotel 57 Services, LLC employees in an effort to keep them engaged and informed as to the status of the Hotel.

15.    On April 9, 2020, I sent a letter to Hotel 57 Services, LLC employees who worked at the Hotel telling them that Hotel 57 Services, LLC's planned to provide complimentary housing for medical personnel at the Hotel, the changing COVID-19 restrictions, that the Hotel's regular operations would continue to be suspended until April 30, 2020 and that Hotel 57 Services, LLC would let employees know if the Hotel's reopening date would be extended further.  A true, correct and complete copy of my April 9, 2020 letter is attached hereto as **Exhibit A**.

16.    On April 30, 2020, I sent a letter to Hotel 57 Services, LLC employees who worked at the Hotel telling them that Hotel 57 Services, LLC planned to continue to provide complimentary housing for the medical community at the Hotel until May 31, 2020, that because of the continuing COVID-19 restrictions, the Hotel's regular operations would continue to be

3

suspended until June 15, 2020 and that Hotel 57 Services, LLC would let employees know if the Hotel's reopening date would be extended further. A true, correct and complete copy of my April 30, 2020 correspondence is attached hereto as **Exhibit B**.

17.     On May 22, 2020, my team advised employees that Hotel 57 Services, LLC planned to continue to provide complimentary housing for the medical community at the Hotel until June 30, 2020 and the Hotel's regular operations would continue to be suspended until July 5, 2020. A true, correct and complete copy of Hotel 57 Services, LLC's May 22, 2020 correspondence is attached hereto as **Exhibit C**.

18.     On June 22, 2020, my team advised employees that Hotel 57 Services, LLC would end complimentary housing for health care professionals at the Hotel on June 30, 2020 and, because of the continued effect of the COVID-19 pandemic, it would be temporarily suspending most of the Hotel's operations and anticipated a late summer 2020 reopening date. A true, correct and complete copy of the June 22, 2020 correspondence is attached hereto as **Exhibit D**.

19.     In August 2020 the COVID-19 pandemic and the restrictions it caused continued to constrain the ability to resume the Hotel's operations. At that time, Hotel 57 Services, LLC determined that COVID-19 would likely prevent the Hotel's reopening for an extended, indeterminable period of time which it reasonably believed could last more than six (6) months beyond the Hotel's closure to outside guests on March 20, 2020.

20.     On August 5, 2020, Hotel 57 Services, LLC sent WARN Act notices to all of its non-union employees (including Selena Staley, Vivian Holmes and Olive Ivey), letting them know that because of unforeseen business circumstances outside of Hotel 57 Services, LLC's control caused by COVID-19, employees would continue on a temporary furlough from their work at the Hotel for an undetermined time. A true, correct and complete copy of the August 5, 2020 WARN

4

SA-241

Act notice sent to Selena Staley is attached hereto as **Exhibit E**.  A true, correct and complete copy of the August 5, 2020 WARN Act notice sent to Vivian Holmes is attached hereto as **Exhibit F**. A true, correct and complete copy of the August 5, 2020 WARN Act Notice sent to Plaintiff Ivey is attached hereto as **Exhibit G**.

21.    Hotel 57 Services, LLC has not terminated the employment of any of its furloughed non-union employees who work at the Hotel (including Selena Staley, Vivian Holmes and Olive Ivey) since the Hotel's temporary closure on March 20, 2020.

22.    Hotel 57 Services, LLC has not permanently laid off with no right of recall any of its furloughed non-union employees who work at the Hotel (including Selena Staley, Vivian Holmes and Olive Ivey) since the Hotel's temporary closure on March 20, 2020.

23.    All of Hotel 57 Services LLC's non-union employees who work at the Hotel (including Selena Staley, Vivian Holmes and Olive Ivey), who have not either transferred or resigned, remain on furlough with a right to recall to their employment when the Hotel reopens.

24.    All of Hotel 57 Services, LLC's non-union employees who work at the Hotel (including Selena Staley, Vivian Holmes and Olive Ivey), who have not either transferred or resigned were, and are, Hotel 57 Services, LLC employees from the date of their temporary furlough to the present day.

25.    Since March 2020 through the present day I have received numerous phone calls from Hotel 57 Services, LLC employees inquiring about the Hotel's re-opening and expressing interest to be re-called to work when the Hotel re-opens.

26.    In connection with the Hotel's announcement of its re-opening, I am in the process of preparing re-call notices to Hotel 57 Services, LLC employees who currently remain on temporary furlough.

5

27.     Although they are on temporary furlough, all of Hotel 57 Services, LLC's non-union employees (including Selena Staley, Vivian Holmes and Olive Ivey) continue to accrue work seniority through today for purposes of their employment and employment benefits.

28.     All of Hotel 57 Services, LLC's non-union employees who did not elect to have their accrued vacation time paid out during their temporary furlough (many did) continue to maintain their accrued vacation time bank with Hotel 57 Services, LLC for use upon their return to work at the Hotel.  Selena Staley has 91 accrued and banked vacation hours and Olive Ivey has 6 accrued and banked vacation hours.

29.     Although they are on temporary furlough, Hotel 57 Services, LLC has continued to pay most of its non-union, non-exempt employees during their furlough.

30.     As required by New York City law (New York City Local Law No. 405 Int. No. 2397-A (2021)), Hotel 57 Services, LLC paid Selena Staley, Vivian Holmes and its other non-union, non-exempt hotel service employees five hundred dollars each week for the period October 11, 2021 through June 1, 2022, while they were on furlough.

31.     The New York City law (New York City Local Law No. 405 Int. No. 2397-A (2021)) did not also require Hotel 57 Services, LLC to make a five hundred dollar weekly payment to its managerial, supervisory or confidential non-union employees (including Olive Ivey), and it did not do so.

32.     Hotel 57 Services, LLC paid the majority of its non-union employees (**29 people**) five hundred dollar weekly payments for the period October 21, 2021 through May 19, 2022, while they were on furlough.

33.     After the five hundred dollar weekly payments required by New York City law (New York City Local Law No. 405 Int. No. 2397-A (2021)) ended on May 19, 2022, Hotel 57

6

Services, LLC continued (and continues) to make weekly five hundred dollar payments to Selena Staley and most of its non-union, non-exempt employees (**21 people**), through the present day, while they were (and are) on furlough.

34.     A true and correct copy of the payment worksheet to non-union, non-exempt employees from October 21, 2021 through February 2, 2023 (when the worksheet was produced in discovery in this matter) is attached hereto as **Exhibit H**.

35.     The most recent five hundred dollar weekly payment from Hotel 57 Services, LLC to employees, including Selena Staley, was made on May 30, 2024.

36.      From October 21, 2021 through today, Hotel 57 Services, LLC paid Selena Staley sixty-five thousand dollars ($65,000), less tax withholdings.

37.     During the period from October 11, 2021 through today, Hotel 57 Services, LLC paid its non-union, non-exempt employees (**29 people**) who are on temporary furlough the total sum of **$1,436,051.00**.

38.     During the period July 2022 through today, Hotel 57 Services, LLC paid its non-union, non-exempt employees (**21 people**) who are on temporary furlough the total sum of **$1,013,524.75**.

39.     A true and correct copy of the 2021 W-2 form issued by Hotel 57 Services, LLC (in redacted format) to Vivian Holmes is attached hereto as **Exhibit I**.

40.     A true and correct copy of the Earning Statement issued by Hotel 57 Services, LLC to Vivian Holmes (in redacted format) dated June 30, 2022 is attached hereto as **Exhibit J**.

41.     A true and correct copy of the 2021 W-2 form issued by Hotel 57 Services, LLC to Selena Staley (in redacted format) is attached hereto as **Exhibit K**.

7

SA-244

42.     A true and correct copy of the Earning Statement issued by Hotel 57 Services, LLC to Selena Staley (in redacted format) dated April 21, 2022 is attached hereto as **Exhibit L.**

43.     A true and correct copy of the 2023 W-2 form issued by Hotel 57 Services, LLC to Selena Staley (in redacted format) is attached hereto as **Exhibit M**.

44.     A true and correct copy of the Earning Statement issued by Hotel 57 Services, LLC to Selena Staley (in redacted format) reflecting her last payment on May 30, 2024 is attached hereto as **Exhibit N**.

45.     I declare and certify that all records attached to this Declaration were made at or near the time by, or from information transmitted by, a person with knowledge of those matters and were kept in the course of a regularly conducted business activity of Hotel 57 Services, LLC and were prepared as a regular practice of that activity.

46.     I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  May 30, 2024

_____
Elizabeth Ortiz

8

SA-245

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

SELENA STALEY, VIVIAN HOLMES, and OLIVE :
IVEY, on behalf of themselves and all others similarly :
situated, :
             :  Case No.: 22-CV-6781 (JSR)
        Plaintiffs, :
     v. :  **DECLARATION OF**
             :  **CATHY HWANG**
FSR INTERNATIONAL HOTEL INC. d/b/a FOUR :
SEASONS HOTELS AND RESORTS, HOTEL 57 :
SERVICES, LLC, HOTEL 57, LLC, TY WARNER :
HOTELS & RESORTS, LLC, and H. TY WARNER :
             :
       Defendants. :

-------------------------------------------------------------------- X

   I, Cathy Hwang, pursuant to 28 U.S.C. § 1746, state and declare as follows:

   1.  I am the Vice President, Treasurer and Secretary of defendants Hotel 57 Services, LLC and Hotel 57, LLC and I am the Chief Financial Officer for Ty Warner Hotels & Resorts, LLC. I have held this position since 2020. I have personal knowledge of the facts set forth in this Declaration.

   2.  I submit this declaration on behalf of Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner's opposition to Plaintiffs' motion for class certification dated May 10, 2024.

   3.  The Four Seasons Hotel New York is a landmark 52-story, I.M. Pei designed, 5-star hotel located at 57 East 57th Street in New York City (the "Hotel").

   4.  Hotel 57 Services, LLC, Hotel 57, LLC and Ty Warner Hotels & Resorts, LLC are separate and distinct companies.

   5.  Hotel 57 Services, LLC is (and has been since January 2020) the employer of Selena Staley, Vivian Holmes, Olive Ivey and the other non-union workers at the Hotel.

6.      Hotel 57 Services, LLC has an employment contract with its non-union workers at the Hotel (including Selena Staley, Vivian Holmes and Olive Ivey) that set out the required terms and conditions of employment of its non-union employees who work at the Hotel. This employment contact is titled U.S. EmPact<sup>SM</sup> Employee Handbook, revised February 1, 2018, and is referred to as the "EmPact Agreement".

7.      Hotel 57 Services, LLC is the employer signatory to the EmPact Agreement.

8.      Hotel 57 Services, LLC is (and has been since January 2020) the employer of a majority of the union workers at the Hotel.

9.      Hotel 57 Services, LLC has union contracts (collective bargaining agreements) that set out the required terms and conditions of employment of its union employees who work at the Hotel.

10.      Hotel 57 Services, LLC's union employees are not covered by the terms of the EmPact Agreement.

11.      Hotel 57 Services, LLC's non-union employees are not covered by the terms of any union contract.

12.      Hotel 57, LLC is a Delaware limited liability company.

13.      Hotel 57, LLC is the owner of the Hotel building and property.

14.      Hotel 57, LLC does not employ any employees.

15.      Hotel 57, LLC is a signatory to a hotel management agreement with the Hotel's operator, FSR International Hotels, Inc., which manages the Hotel.

16.      Ty Warner Hotels & Resorts, LLC is a Delaware limited liability company.

17.      Ty Warner Hotels & Resorts, LLC does not have (and never had) an ownership interest in the Hotel.

2

SA-247

18.    Ty Warner Hotels & Resorts, LLC does not have (and never had) an ownership interest in Hotel 57, LLC.

19.    Ty Warner Hotels & Resorts, LLC does not have (and never had) an ownership interest in Hotel 57 Services, LLC.

20.    Ty Warner Hotels & Resorts, LLC is not a signatory to a hotel management agreement with respect to the Hotel, the EmPact Agreement or any union contract covering Hotel 57 Services, LLC's union employees working at the Hotel.

21.    I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  May 30, 2024

Cathy Hwang

Cathy Hwang

3