# 25-2381

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

SELENA STALEY, VIVIAN HOLMES, OLIVE IVEY,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

v.

FOUR SEASONS HOTELS AND RESORTS, HOTEL 57, LLC, TY WARNER HOTELS AND RESORTS LLC, H. TY WARNER, FSR INTERNATIONAL HOTEL INC., D/B/A FOUR SEASONS HOTELS AND RESORTS, HOTEL 57 SERVICES, LLC,

*Defendants-Appellees*.

On appeal from the United States District Court
for the Southern District of New York, No. 22-cv-6781 (JSR)

## BRIEF OF PUBLIC JUSTICE AND PROFESSOR CHARLOTTE GARDEN AS AMICI CURIAE IN SUPPORT OF THE APPELLANTS

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) Amicus Curiae Public Justice is a non-profit organization, does not issue stock, and has no parent corporations. Amicus Curiae Professor Charlotte Garden is an individual and not a corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i
TABLE OF AUTHORITIES........................................................................... iii
STATEMENT OF INTEREST.............................................................................1
INTRODUCTION AND SUMMARY OF ARGUMENT.......................................2
I. WARN Act Violations Deprive Employees of the Opportunity to Make Informed Decisions About Their Jobs and Livelihoods. ................................4
  A. The WARN Act's notice requirement. ......................................................4
  B. The WARN Act's purpose is to remedy real-world information asymmetries between employers and employees. ....................................7
  C. Temporary layoffs do not insulate employers from WARN Act damages. 10
II. Appellants Have Article III Standing to Bring Their Claims that the Hotel Violated the WARN Act by Failing to Issue Subsequent WARN Act Notifications. ..........................................................................................12
  A. Appellants have an injury-in-fact because the injuries resulting from their WARN Act claims are analogous to common-law fraudulent misrepresentation. ..........................................................................12
  B. Appellants' injuries are redressable. ......................................................17
CONCLUSION..........................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Bohnak v. Marsh & McLennan Cos.*,
79 F.4th 276 (2d Cir. 2023) ....................................................13

*California v. Texas*,
593 U.S. 659 (2021)....................................................18

*Carpenters Dist. Council of New Orleans v. Dillard Dept. Store*,
15 F.3d 1275 (5th Cir. 1994) ....................................................11

*Chafin v. Chafin*,
568 U.S. 165 (2013)....................................................18

*Cruper-Weinmann v. Paris Baguette America, Inc.*,
653 F. App'x 81 (2d Cir. June 30, 2016)....................................................1

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) ....................................................14

*Graphic Communications Intern. Union, Local 31-N v. Quebecor Printing*,
252 F.3d 296 (4th Cir. 2001) ....................................................12

*Guthrie v. Rainbow Fencing, Inc.*,
113 F.4th 300 (2d Cir. 2024) ....................................................9

*Long v. Dunlop Sports Group Am., Inc.*,
506 F.3d 299 (4th Cir. 2007) .................................................... 6-7

*Moreira v. Société Générale, S.A.*,
125 F.4th 371 (2d Cir. 2025) ....................................................14, 17

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) ....................................................13

*Murray v. Xerox Corp.*,
811 F.2d 118 (2d Cir. 1987) .................................................... 14-15, 15

*Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Capital Mgmt., LLC*,
105 F.4th 46 (2d Cir. 2024) ....................................................19

*Saba Capital Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*,
88 F.4th 103 (2d Cir. 2023) ..........14

*Soule v. Conn. Assoc. of Schools, Inc.*,
90 F.4th 34 (2d Cir. 2023) ..........18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..........1

*Stewart v. Jackson & Nash*,
976 F.2d 86 (2d Cir. 1992) ..........15

*TeWinkle v. Capital One, N.A.*,
No. 20-2049 (2d Cir.) ..........1

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..........1, 13, 14, 17

*United Paperworkers Intern. Union v. Specialty Paperboard, Inc.*,
999 F.2d 51 (2d Cir. 1993) ..........11

**Statutes**

29 U.S.C. § 2101 *et seq.*..........4

29 U.S.C. § 2101(a)(2)..........5

29 U.S.C. § 2101(a)(5)..........5

29 U.S.C. § 2101(a)(6)..........5

29 U.S.C. § 2102(a) ..........5

29 U.S.C. § 2102(b) ..........5

29 U.S.C. § 2104(a) ..........17

29 U.S.C. § 2104(a)(1)..........6

29 U.S.C. § 2104(b) ..........6

City of Minneapolis, Ordinance No. 2021-012 (Mar. 12, 2021)..........9

**Other Authorities**

20 C.F.R. § 639.7(d) ....................................................................................5, 6

20 C.F.R. § 639.10 ........................................................................................6

Fed. R. App. P. 29(a)(4)(E).............................................................................1

Restatement (First) of Torts § 525 ...............................................................14

S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987)..........................................11

US Gen. Accounting Office, *Plant Closings: Limited Advance Notice and Assistance Provided Dislocated Workers* (July 1987) ..................................7

## STATEMENT OF INTEREST[1]

Public Justice is a national public interest advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting to preserve access to justice for victims of corporate and governmental misconduct. The organization maintains an Access to Justice Project, which seeks to remove procedural barriers that unduly restrict the ability of workers, consumers, and other civil litigants from seeking redress in the civil court system. As part of that work, Public Justice has long worked to promote appropriate interpretations of federal Article III standing requirements by participating in dozens of cases concerning standing issues, both as counsel for the parties and as amicus, including in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) (amicus), and *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (amicus), in the U.S. Supreme Court and *TeWinkle v. Capital One, N.A.*, No. 20-2049 (counsel), and *Cruper-Weinmann v. Paris Baguette America, Inc.*, 653 F. App'x 81 (2d Cir. June 30, 2016) (amicus), in this Court.

---

[1] No party's counsel authored this brief in whole or in part, nor did a party, its counsel, or any other person contribute money to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). Appellants consent to the filing of this brief. Appellees do not consent to the filing of this brief.

Charlotte Garden is the Gray, Plant, Mooty, Mooty & Bennett Professor of Law at the University of Minnesota Law School.[2] She teaches and writes about employment law and policy, and is a co-author of a leading employment law casebook. As an academic, she is interested in the rational and consistent implementation of employment law, including the WARN Act.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The WARN Act was enacted to ease the substantial harms and significant disruptions to workers and their families that result from workers not having advance knowledge of lengthy or permanent mass layoffs and other significant disruptions. The failure of the Appellees (hereinafter "the hotel") to comply with WARN Act requirements to notify employees about the length and nature of their continued furlough resulted in the very harms the WARN Act was designed to prevent—highlighting both why the WARN Act covers additional, subsequent notice requirements and that Appellants have an Article III injury-in-fact.

**I.** The fundamental requirement of the WARN Act is that employers give employees at least 60 days' notice before most closures or mass layoffs expected to last more than six months. To ensure that employees have all the information they need to make decisions, the content of notices is tightly regulated and multiple

[2] This faculty affiliation is noted for identification purposes only; Professor Garden joins this brief in her individual capacity and does not speak for the University of Minnesota or its Law School.

notices can be required as circumstances change. Employers who violate the WARN Act's notice requirements are liable to employees for up to 60 days' pay.

The purpose of the WARN Act's notice requirement is to lessen information imbalances between employers and employees, and overcome employers' incentives to withhold from their workforces information about upcoming closures and layoffs. As the facts of this case illustrate, failing to give accurate information to employees prevents them from being able to make decisions in their own interest. Here, because of the hotel's WARN Act failures, workers made decisions based on the understanding that the hotel would re-open once the pandemic subsided and the industry recovered—and not on fact that the hotel would be closed substantially longer. The WARN was enacted precisely because employee access to accurate information about workplace closures and layoffs is critical.

And, as this case demonstrates, the purpose of the WARN Act—to give employees the information they need to make decisions—is no less important when the shutdown is temporary or evolving. Indeed, the statute contemplates that multiple WARN Act notices may be required.

**II.** Appellants have Article III standing to bring their WARN Act claims against the hotel. First, in addition to the reasons articulated in the Opening Brief, Appellants have an Article III injury-in-fact because their WARN Act claims are closely related to traditional common-law fraudulent misrepresentation claims.

Rather than providing the accurate information required by the WARN Act, the hotel appears to have intentionally mislead its employees about why and when the hotel would re-open. Hotel employees reasonably relied on the hotel's representations to their detriment: They were unable to make informed decisions about whether to seek other employment—the precise harm the WARN Act sought to prevent.

Appellants' claims are also redressable. The hotel's arguments to the contrary below conflate standing with the merits. Further, any requirement that the remedy a plaintiff seeks be sufficiently connected to their injury is met where, as here, a plaintiff has been injured by a violation of a statute and seeks the remedies the statute provides.

The district court's decision should be reversed.

## ARGUMENT

### I. WARN Act Violations Deprive Employees of the Opportunity to Make Informed Decisions About Their Jobs and Livelihoods.

#### A. The WARN Act's notice requirement.

The WARN Act, 29 U.S.C. § 2101 *et seq.*, was enacted in 1988 response to a wave of employer closures and relocations that proved tremendously disruptive to workers, their families, and communities. The statute's basic premise is that workers, unions, and local governments all benefit from advance notice of significant layoffs or plant closings. Put simply, knowledge is power.

Accordingly, the WARN Act requires most employers with 100 or more employees to provide 60 days' advance notice of foreseeable plant closings or mass layoffs to "affected employees," unions, and local government. 29 U.S.C. § 2102(a); *see also id.* § 2102(b) (listing exceptions to notice requirement when plant closings or layoffs due to unforeseeable circumstances).[3] "Affected employees" are those "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." *Id.* § 2101(a)(5). The statutory term "employment loss" includes long layoffs and significant hours reductions, in addition to permanent job loss. *Id.* § 2101(a)(6) (defining employment loss as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period").

The content of WARN notices is also tightly regulated. Among other information, notices must state "whether the [closing or layoff] is expected to be permanent or temporary," when the planned layoffs or closures will begin, and when the recipient employee will be separated from their job. 20 C.F.R. § 639.7(d). For

[3] A "plant closing" refers to "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees." 29 U.S.C. § 2101(a)(2).

anticipated temporary layoffs, the notice must inform recipients of "the estimated duration, if known." *Id.* Moreover, employers whose plans change after they issue initial WARN Act notices may be required to issue additional notices. 20 C.F.R. § 639.10 (requiring employers to issue additional notices if they postpone a closing or layoff, with postponements of 60 or more days requiring an additional notice that is "treated as new notice," and subject to the same requirements).[4]

Employers who fail to deliver required WARN notices can be liable for up to sixty days' backpay and fringe benefits for each "aggrieved employee who suffers an employment loss as a result of" a closing or layoff that was conducted without proper notice. 29 U.S.C. § 2104(a)(1). No other remedies are available, and the statute specifically forbids courts from "enjoin[ing] a plant closing or mass layoff." *Id.* § 2104(b). This means employers can avoid WARN Act liability by paying up to 60 days' pay and benefits in lieu of notice to employees who are furloughed or fired in a qualifying layoff or closing. *See Long v. Dunlop Sports Group Am., Inc.*, 506

[4] Although this regulation's focus is delayed plant closings, the district court correctly concluded in its March 31, 2025, opinion that employers must also issue new WARN Act notices "when the basis for the temporary closure or layoff changes." SPA-66. That a plant will remain open for longer than initially anticipated will be welcome news to many employees, though the additional notice may serve to temper employees' hopes that the planned closure or layoff has been cancelled altogether. But where, as here, the employer significantly changes its plans such that an earlier notice becomes substantially misleading, employees may face a much different calculus. For example, those who had hoped to rely on savings until they could resume their jobs may need to begin to formulate other plans.

F.3d 299, 303 (4th Cir. 2007) (employer did not violate WARN Act when it closed plant without notice, but continued paying workers for 60 additional days).

### B. The WARN Act's purpose is to remedy real-world information asymmetries between employers and employees.

Congress enacted the WARN Act amidst a decline in the US manufacturing sector, which led to widespread layoffs. A 1987 GAO report put the problem starkly: "Major business and labor organizations agree that to be effective reemployment assistance should be in place before dislocation occurs. However, few employers provide advance notice[.]" US Gen. Accounting Office, *Plant Closings: Limited Advance Notice and Assistance Provided Dislocated Workers* at 3 (July 1987). The report found that even though plant closures were often foreseeable, the median length of notice to affected workers was only seven days, and one-third of workers received no notice. *Id.*

This disconnect is easy to understand: Employers often fear that they will be disadvantaged by workers' rational reactions to receiving notice of plant closings or layoffs. Workers may become disengaged as they focus on a new job search, or they may quit altogether, making an orderly shut-down more difficult. Whether because of wishful thinking or strategic positioning, employers might present themselves as "going concerns," allowing employees to look forward to long-term employment, raises, and promotions—right until the employer closes their doors for the last time.

Employers' incentives to soft-pedal, withhold, or misrepresent information about layoffs or closings explain the WARN Act's careful attention to the content of required notices. Missing or incomplete notices leave workers without information they need to make decisions in their own interests. Misleading notices are even worse, because they prompt workers to make decisions based on premises that the employer understands to be false.

This case illustrates the problem. The employer's August 5, 2020, notice informed workers that they would be temporarily laid off due to the COVID-19 pandemic—and then presumably rehired once the pandemic subsided. A-948. Instead, the hotel knew it would remain closed for at least another year, ostensibly for renovations, although the Appellants suggest that this decision was at least in part aimed at avoiding severance pay. Opening Br. 14.

At least one Appellant-employee reported that she would have acted differently if she had received accurate and timely information from her employer, as the WARN Act requires. A-889-90. Other record evidence suggests that employees were understandably anxious for information about when the defendant-hotel planned to reopen. A-605-13. This makes sense: a hotel worker laid off during the pandemic would have been unlikely to find a comparable job, and switching jobs

could have meant the loss of seniority-based benefits or severance pay.[5] She could reasonably have decided that her best option was to wait for the pandemic to subside, assuming her workplace would then re-open. But a worker who knew she would be out of work long after her counterparts at other hotels were back to work might have sought another job as soon as possible, or at least applied to competitor hotels once they began to re-open.

This reality illustrates one reason that *Guthrie v. Rainbow Fencing, Inc.*, 113 F.4th 300 (2d Cir. 2024), is inapposite. That case involved a New York law requiring employers to provide employees with information about how their pay is calculated; the Court concluded that the plaintiff did not have standing to assert a bare violation of this requirement without alleging "some causal connection between the lack of accurate notices and the downstream harm." *Id.* at 308. But a pay-calculation disclosure, which will often contain information to which the employee already has access, is much different than a WARN Act notice. The former could be helpful to the subset of employees who are both interested in discerning whether they have been underpaid and willing to advocate for themselves. But even then, the pay-calculation disclosure will change things for only a small number of employees. For

---

[5] Underscoring the importance of employment stability this industry, some jurisdictions acted during the pandemic to adopt "right to recall" ordinances for hotel workers. *See, e.g.*, City of Minneapolis, Ordinance No. 2021-012 (Mar. 12, 2021) (requiring that most hotels and event centers offer reinstatement to laid-off employees before offering employment to new workers).

some, it will provide reassurance that they were paid correctly; others will find it no easier to interpret than other information already in their possession. Undoubtedly, some employees will alter their course of action because of the disclosure—but this group is likely a small one.

In contrast, the WARN Act was enacted precisely because of the critical importance of information about impending layoffs and closures—information about which employers are likely to be the sole source of credible information. Only the most blasé (or perhaps in-denial) employee would fail to act on notice of an impending closure or layoff; were it otherwise, employers would not have proven so reticent to provide adequate notice of these events to their workforces.

### C. Temporary layoffs do not insulate employers from WARN Act damages.

The district court erred by holding that Appellants did not have standing to pursue a potential WARN Act violation that occurred during an ongoing temporary shutdown. The district court distinguished this situation from "ordinary" WARN Act cases, writing that "the Act mandates that employers must continue to employ their regular employees for at least 60 days after" the WARN Act notice, meaning that employees "can sue the employer for up to the 60 days of back pay, that they would have received if the employer had complied with the Act's mandated timing." SPA-89. That is, the district court viewed the employees as having no claim to back pay because they were already out of work when the subsequent WARN Act violation

occurred. But this distinction misses the point: reading the record in the light most favorable to Appellants, the employer's WARN Act obligation was to provide notice of its new planned temporary closure for renovations while either reopening for the 60-day notice period, or providing payment in lieu of notice. In other words, the WARN Act violation attributable to the hotel's decision to renovate deprived plaintiffs of the opportunity to earn during a 60-day notice period; the analysis is no different than it would be for any other WARN Act violation.

Courts often conceive of WARN Act damages as "the wages the employee would have received" if the employer had remained operational during a notice period beginning on the date of a covered employment loss. *See Carpenters Dist. Council of New Orleans v. Dillard Dept. Store*, 15 F.3d 1275, 1283 (5th Cir. 1994). This approach is consistent with the WARN Act's legislative history: the Senate Labor Committee wrote that WARN Act damages "are to be measured by the wages . . . the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period[.]" S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987). This Court has recognized that this remedy is not back-pay in the most literal sense because "it does not compensate for past services." *United Paperworkers Intern. Union v. Specialty Paperboard, Inc.*, 999 F.2d 51, 55 (2d Cir. 1993). Instead, the WARN Act calls on courts to ask what would have happened if the employer had operated as the statute requires.

Here, the employer's initial choice to attribute its temporary shutdown to the pandemic could only have been understood by employees as expressing an intention to reopen once the pandemic abated. But that time came and went, and still the employer did not re-open. Instead, it embarked on a new temporary shutdown, for a new reason. This new shutdown required a new notice, and, assuming the employer was not covered by a statutory exception, a new notice period. *See Graphic Communications Intern. Union, Local 31-N v. Quebecor Printing*, 252 F.3d 296 (4th Cir. 2001) (explaining that WARN Act contemplates that a worker can be subject to multiple employment losses). Under the WARN Act's logic, back-pay is appropriate because the employees would have been paid if the employer had re-opened on the schedule implied by its initial notice, and then remained operational for the duration of a second notice period.

## II. Appellants Have Article III Standing to Bring Their Claims that the Hotel Violated the WARN Act by Failing to Issue Subsequent WARN Act Notifications.

### A. Appellants have an injury-in-fact because the injuries resulting from their WARN Act claims are analogous to common-law fraudulent misrepresentation.

As Appellants' brief explains, Appellants suffered an injury-in-fact because the hotel's failure to send a second WARN notice caused economic loss and a lost opportunity to take action in response to the hotel's temporary shutdown. Opening Br. 37-50. As explained above, the WARN Act was intended to prevent exactly these

numerous, concrete harms to workers and their families. Article III standing to bring WARN Act claims under these circumstances—particularly where the employer is alleged to have strung furloughed employees along at least in part to avoid formally terminating their employment and paying severance—should not be a close case.

Appellants have standing for another reason as well: Their WARN Act claims caused them harms analogous to those giving rise to fraudulent misrepresentation tort claims at common law. The hotel intentionally failed to provide truthful information about the length of the furlough—as required by the WARN Act—including by implying that the hotel would reopen when the danger posed by COVID-19 had abated. Appellants reasonably and detrimentally relied on the hotel's misstatements. Under the Supreme Court's and this Court's precedent, that's sufficient to show an Article III injury.

A plaintiff bringing a statutory claim has alleged an Article III injury-in-fact when their "asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 433. It need not be "an exact duplicate," *id.*, and "it matters not whether" the applicable state law recognizes the relevant tort, *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 286 (2d Cir. 2023). *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) ("The fit between a new statute and a pedigreed common-law cause of action need not be perfect, but we are called to consider at a minimum

whether the harms match up between the two."). A "'close relationship' in kind"—"not degree"—is sufficient. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020)[6]; *see also Moreira v. Société Générale, S.A.*, 125 F.4th 371, 386 (2d Cir. 2025) (finding that the wrongful use of confiscated property for gain was sufficiently analogous to unjust enrichment to be an injury-in-fact even though the defendants were not enriched at the plaintiffs' expense); *Saba Capital Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 115-17 (2d Cir. 2023) (finding that the harm of losing equal shareholder voting rights was analogous to the harm of losing property rights and therefore an injury-in-fact).

Under the common law, an actor is liable for harm caused by a fraudulent misrepresentation when they "fraudulently make[ ] a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon." Restatement (First) of Torts § 525. As New York law puts it, to prevail on a fraudulent misrepresentation claim, a plaintiff must prove that the defendant (1) "made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for the purpose of inducing [the plaintiff] to rely on it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." *Murray v. Xerox Corp.*, 811 F.2d 118, 121

[6] *TransUnion* cited favorably to the analysis in *Gadelhak*, indicating that it was an example of a case containing a modern harm sufficiently analogous to a traditionally recognized harm. 594 U.S. at 425.

(2d Cir. 1987). If a promise about the future "was actually made with a preconceived and undisclosed intention of not performing it," that promise "constitutes a misrepresentation of material existing fact" for purposes of fraud. *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (cleaned up).

This Court has repeatedly considered fraud claims in the context of an employer's misrepresentations to its employees. For example, in *Stewart*, the plaintiff's fraud claims survived a motion to dismiss where she alleged that a law firm lied to her about the firm's existing and planned environmental practice to induce her to join the firm and to continue working there. 976 F.2d at 88-90. The harm resulting from the misrepresentation, this Court explained, was "damage to her career development" because she was unable to "work in her chosen specialty" while at the defendant law firm. *Id.* at 88. *See also Murray*, 811 F.2d at 123 (where statements about future promotions were intended to induce an employee to take a position in another location, but were premised on conditions that did not occur, there was no fraudulent misrepresentation).

Though an alleged harm need not align exactly with the traditional common-law claim, Appellants' WARN Act allegations here bear a "close relationship" to traditional fraudulent misrepresentation claims. Appellants presented evidence that the hotel knew as early as August 2020 that the hotel would be closed for renovations until at least September 2021—information the hotel was required to share with its

employees under the WARN Act. Opening Br. 12 n.50 (collecting record citations). Instead of providing truthful, legally mandated notices, in August 2020, the hotel communicated to furloughed employees that it remained closed because of COVID and that its re-opening date would be October 15, 2020. A-996. In September 2020, a communication cited COVID as the reason for pushing back the re-opening date to "year-end 2020." A-999. In December 2020, the hotel, again citing COVID, told employees the re-opening would be "late April 2021," A-1002, and a February missive said re-opening was not possible in April because of ongoing COVID impacts, A-1003. Only in June 2021 did the hotel share that the hotel was closed for renovations—and would continue to be closed for a substantial length of time. A-1005. Appellants contend that the hotel continued to cite COVID as the reason for the closure and continued to tell Appellants the hotel would re-open soon to avoid the furlough being considered a loss of employment under the WARN Act or the workers' employment agreements because such an employment loss would require the hotel to pay out severance or backpay. *See, e.g.*, A-227. Without accurate WARN Act notices, employees like Appellants reasonably relied on the continued statements that the hotel would open soon, once the impacts of COVID had passed, and either declined to seek other employment or quit without demanding severance—harm at least on par with the damage to the plaintiff's career in *Stewart*. In short, the hotel knowingly misled its workers about the reason for and length of

its closure to avoid them realizing they were entitled to severance or backpay even if they quit and sought other employment. The employees reasonably relied on the hotel's communications to their detriment. That's more than a sufficiently close relationship to the traditional common-law tort of fraudulent misrepresentation to satisfy the injury-in-fact requirement. *See Moreira*, 125 F.4th at 386 (finding a sufficiently close relationship even though the claims lacked one of the traditional tort's elements).

**B. Appellants' injuries are redressable.**

If a plaintiff has an injury-in-fact that is caused by the defendant, and a court can provide a remedy that redresses the injury, such a plaintiff has Article III standing to sue. *TransUnion*, 594 U.S. at 423. Here, as discussed above, Appellants have demonstrated an injury-in-fact sufficient to bring their claims that the hotel violated the WARN Act by not providing a compliant notice that accurately reflected the nature and length of the employees' furlough. If they prevail on their WARN Act claims, Appellants will be entitled to the remedy provided by the WARN Act for violations: 60 days' backpay and benefits. *See* 29 U.S.C. § 2104(a). That is, a court can provide a remedy redressing the injury underlying Appellants' WARN Act claims: the remedy provided by the WARN Act for WARN Act violations.

Below, the hotel argued that Appellants also lacked standing because their claims were not redressable under the WARN Act. A-2786. That argument appears

to rest on the hotel's view that Appellants did not make out a claim under the WARN Act. *Id.* But that's just an argument that Appellants lose on the merits, not they don't have standing—Appellants do not need to demonstrate that they will prevail on their claims to have Article III standing. *See Soule v. Conn. Assoc. of Schools, Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (en banc) ("Standing is about who may access the courthouse, not about the merits of the claims to be heard once inside. . . . The standing issue must therefore be resolved irrespective of the merits of the substantive claims." (cleaned up)); *see also Chafin v. Chafin*, 568 U.S. 165, 174 (2013) (explaining that "the legal availability of a certain kind of relief" goes to the merits, not standing).

It is true enough, as the hotel points out, that the remedy sought must have some connection to the injuries alleged to satisfy the redressability prong. A-2786. Here, the hotel's WARN Act violation caused Appellants' injuries and the remedies they seek are the remedies provided by the WARN Act for violations—that more than satisfies the connection requirement. Where courts have found an insufficient connection, the relief sought would not remedy the injury alleged, for example, where plaintiffs sought injunctive relief regarding statutory provisions the plaintiffs did not challenge, *California v. Texas*, 593 U.S. 659, 671 (2021), or injunctive relief that primarily impacted others and would not impact the particularized injury they suffered, *Soule*, 90 F.4th at 50. On the other hand, amicus is not aware of any court

that has suggested that statutorily provided remedies are insufficiently connected to injuries caused by a violation of that statute. In fact, this Court has held that a plaintiff had Article III standing to sue for a statutory remedy when they brought a statutory claim and alleged an injury that had a sufficiently close relationship a traditional common-law claim—without any closer examination of the relationship between the statutory remedy and the injury-in-fact. *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Capital Mgmt., LLC*, 105 F.4th 46, 54, 56 (2d Cir. 2024) (holding that where the statutory violation was analogous to a traditional claim for breach of fiduciary duty, plaintiff had standing to seek statutory remedies, disgorgement of profits for a six-month period). So too here.

## CONCLUSION

For the foregoing reasons, and those in the Opening Brief, this Court should reverse the district court's dismissal of Appellants' action.

Respectfully submitted,

January 27, 2026

*/s/ Leah M. Nicholls*
Leah M. Nicholls
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

*Counsel for Amici Curiae Public Justice and Professor Charlotte Garden*

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 4,604 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f), as calculated by Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

January 27, 2026

*/s/ Leah M. Nicholls*
Leah M. Nicholls

## CERTIFICATE OF SERVICE

I certify that on January 27, 2026, I electronically filed this brief with the Clerk of the U.S. Court of Appeals for the Second Circuit via ACMS. I further certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

*/s/ Leah M. Nicholls*
Leah M. Nicholls